66

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - X
                                   :
3       ZHENKAI SUN, et al.,       :   16-CV-04840(RPK)
                                   :
4            Plaintiffs,           :
                                   :
5                                  :   United States Courthouse
      -against-                    :   Brooklyn, New York
6                                  :
                                   :
7                                  :   November 16, 2021
        SUSHI FUSION EXPRESS,      :   9:30 a.m.
8       INC., et al.,              :
                                   :
9            Defendants.           :
                                   :
10   - - - - - - - - - - - - - - - X

11            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE RACHEL P. KOVNER
12               UNITED STATES DISTRICT JUDGE

13
                      A P P E A R A N C E S:
14
     For the Plaintiff:        TROY LAW, PLLC
15                             41-25 Kissena Boulevard, Suite 103
                               Flushing, New York 11355
16
                               BY:  AARON SCHWEITZER, ESQ.
17

18   For the Defendants:       SAMUEL & STEIN
                               1441 Broadway, Suite 6085
19                             New York, New York 10018

20                             BY:  MICHAEL SAMUEL, ESQ.
                                    ANDREW BERESIN, ESQ.
21

22   Court Reporter:           DENISE PARISI, RPR, CRR
                               Official Court Reporter
23                             Telephone: (718) 613-2605
                               E-mail:  DeniseParisi72@gmail.com
24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.

1           THE COURTROOM DEPUTY:  All Rise.

2           (Jury enters the courtroom.)

3           (Whereupon, the witness resumes the stand.)

4           THE COURT:  Thank you everyone for being on time.

5           Mr. Chan, can you swear in the interpreter?

6           THE COURTROOM DEPUTY:  Please stand and raise your

7    right hand.

8           (Interpreter sworn.)

9           THE INTERPRETER:  Yes.

10          THE COURTROOM DEPUTY:  Thank you.

11   **WEI GAO**,

12          called as a witness, having been previously

13          sworn/affirmed, was examined and testified as

14          follows:

15   REDIRECT EXAMINATION

16   BY MR. SCHWEITZER:

17   Q    Mr. Gao, yesterday you were asked questions regarding

18   your deposition from 2018.

19          Do you recall that?

20   A    Yes.

21   Q    Do you recall at your deposition being asked the

22   following question and giving the following answer, page 13,

23   line 21.

24          MR. SAMUEL:  Objection, your Honor.  I don't know

25   the foundation for this.  I think he can only use the

1  deposition to impeach.

2          THE COURT:  Sidebar.

3          (Continued on the next page.)

*Sidebar*                                                                69

1           (Sidebar conference.)

2           MR. SCHWEITZER:  You can use a deposition to

3    impeach or rehabilitation.  The deposition testimony from

4    yesterday was cherrypicked to impeach.  He gave other

5    testimony at other points in the depositions --

6           THE COURT:  Is this a rule of completeness argument?

7           MR. SCHWEITZER:  Yes.

8           THE COURT:  Can I see the deposition?

9           MR. SCHWEITZER:  About the interview, line 21.

10          We got to the restaurant.  Who did you meet with.

11          MR. SAMUEL:  I think that was prior to the testimony

12   that we had admitted.

13          MR. SCHWEITZER:  This is page 13.  You admitted page

14   12 for the proposition that he was interviewed by Yang Yang

15   Gao.

16          THE COURT:  Let me see.

17          MR. SAMUEL:  What line?

18          MR. SCHWEITZER:  Line 21 through 23.

19          THE COURT:  What is the relevance?  You admitted

20   testimony saying he was interviewed by Yang Yang Gao.

21          MR. SCHWEITZER:  The deposition testimony from page

22   12 said he was interviewed by Yang Yang Gao.  This is saying

23   he was interviewed by Michael.

24          THE COURT:  Can I see the defense exhibits?  Do you

25   have a copy of page 12?

*Sidebar*                                                            70

1          MR. SCHWEITZER:  I do.  Line three through seven is

2    what was admitted before.

3          THE COURT:  Okay.  I mean I'll allow --

4          MR. SAMUEL:  If that's the only one, we don't have

5    an objection.  But I guess if there are other parts --

6          THE COURT:  Let's talk about it now.

7          MR. SCHWEITZER:  Okay.  Sixteen through 22 admitted

8    yesterday, page 16, lines 16 through 22, were admitted

9    yesterday.

10         MR. SAMUEL:  Where you said Yang Yang Gao was in a

11   higher position?

12         MR. SCHWEITZER:  Yes.  I would like to admit 17,

13   four through nine:  Do you know if Yang Yang Gao ever hired

14   anybody or had a say --

15         THE COURT:  It doesn't seem like it's completely

16   associated.

17         MR. SAMUEL:  It would be hearsay.

18         MR. SCHWEITZER:  It's highly relevant.

19         THE COURT:  Certainly relevant.  You can elicit the

20   testimony as to whether Yang Yang Gao had any responsibilities

21   you want.  The question is whether it's necessary to make

22   complete a statement that he admitted, as I understand your

23   hearsay theory.  I don't see how it's necessary to make that.

24   He admitted that Yang Yang Gao had a higher position.  You're

25   explaining things that Yang Yang Gao did or didn't do.  It's

1   not necessary to make it complete.  Anything else?

2            MR. SCHWEITZER:  Page 31 through 25 through nine,

3   page 31, 25 through 32, four -- actually.

4            THE COURT:  What is that?

5            MR. SCHWEITZER:  This is 14, not four.

6            MR. SAMUEL:  I'm confused now.  This is to --

7            THE COURT:  This is a different issue.  What issue?

8            MR. SAMUEL:  To rehabilitate impeached issue?

9            MR. SCHWEITZER:  These two are about rehabilitation.

10  This is about --

11           MR. SAMUEL:  You have to ask him --

12           THE COURT:  This is --

13           MR. SCHWEITZER:  This is the personal knowledge,

14  apparently he witnessed Levi hiring someone.

15           THE COURT:  You can ask him if he witnessed him

16  hiring somebody.  I don't understand why you would be reading

17  his deposition.

18           MR. SCHWEITZER:  I may need to refresh his

19  recollection.

20           THE COURT:  You can refresh his recollection.

21           MR. SAMUEL:  You can use a deposition to refresh

22  recollection?

23           THE COURT:  Sure.  You can use anything to refresh

24  recollection.

25           MR. SAMUEL:  But it wouldn't --

*Sidebar*                                                                72

1          THE COURT:  Does this refresh your recollection as

2    to whether --

3          MR. SAMUEL:  That couldn't come into evidence.

4          THE COURT:  Right.

5          MR. SAMUEL:  Okay.  Also, I guess we need to know

6    what is that based on.  Did he --

7          MR. SCHWEITZER:  You asked him if he witnessed

8    something.

9          THE COURT:  You're right.  Looking at the next two

10   sentences he is going to say, how do you know that.  He will

11   say Michael and Yang Yang Gao said so.  What is the basis for

12   admitting that?

13         MR. SCHWEITZER:  That's not it.  It starts over

14   here:  Did you ever witness Levi hire somebody.  Then he

15   witnessed him hiring his friend.

16         THE COURT:  So to lay a foundation, if you ask him:

17   Did he ever witness anybody hiring somebody to work as Sushi

18   Fussion Express; if he says:  I don't recall.  Then you can

19   show him the deposition to refresh his recollection.

20         MR. SCHWEITZER:  All right.

21         THE COURT:  Anything else?

22         MR. SCHWEITZER:  Page 34, four through 25 is about

23   witnessing Levi supervising anybody.  He talks about being

24   taught by Levi to make --

25         THE COURT:  This is to refresh your recollection.

*Sidebar*                                                                  73

1   If he's saying something he doesn't recall it.  You want to

2   show him the deposition to refresh his recollection that's

3   okay.

4              MR. SCHWEITZER:  That's fine, your Honor.

5              (End of sidebar conference.)

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court.)

2    BY MR. SCHWEITZER:

3    Q    Do you recall being presented yesterday on cross with a

4    transcript of your deposition saying that Yang Yang Gao

5    interviewed you?

6    A    I'm sorry, I didn't understand your question.

7    Q    Do you recall yesterday being asked by defense counsel a

8    question about a deposition that you gave where you said that

9    Yang Yang Gao interviewed you?

10   A    Yes.  The person was with my boss, Michael.

11   Q    What did you mean when you said Yang Yang Gao interviewed

12   you?

13   A    I forgot what I said at that moment.

14   Q    To your recollection, did Yang Yang Gao ask you any

15   questions other than those that were interpreted from what

16   Michael, the other guy, was saying?

17              THE INTERPRETER:  Can you repeat the question?

18   Q    To your recollection, did Yang Yang Gao say anything to

19   you other than something that was interpreted from what

20   Michael Yagudaev was saying?

21              THE INTERPRETER:  One more time?

22   Q    Did Yang Yang Gao ask you anything himself other than

23   what he was interpreting from Michael Yagudaev?

24   A    No.

25   Q    Do you recall during your deposition shortly after --

1   withdrawn.

2          Do you recall at your deposition being asked the

3   following question and giving the following answer.

4          Question:  When you got to the restaurant, who did

5   you meet --

6          THE COURT:  Can I see counsel?

7          (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar* 76

1          (Sidebar conference.)

2          THE COURT:  He just said that Yang Yang Gao was

3  present and translated.  Everything Yang Yang Gao said was a

4  translation of a question.

5          MR. SCHWEITZER:  Yes.  But that is impeached by the

6  deposition testimony.  I need to rehabilitate with the

7  deposition testimony that he also gave which left the jury

8  give the impression that he only testified about one thing at

9  the deposition and only one thing at the trial.  The jury

10  needs to know that the deposition testimony --

11          THE COURT:  You're going to ask him:  Do you recall

12  being asked who was present; effectively, Yang Yang Gao and

13  Michael?

14          MR. SCHWEITZER:  No.  I'm going to ask him:  Do you

15  recall being asked the question who was present.  And do you

16  recall giving the answer Michael and Yang Yang Gao.

17          (End of sidebar conference.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

Case 1:16-cv-04840-RPK-LB  Document 183  Filed 05/24/22  Page 12 of 178 PageID #: 1756

1            (In open court.)

2    BY MR. SCHWEITZER:

3    Q    Do you recall being asked on page 13, line 21 of your

4    deposition.

5            Question:  And when you got to the restaurant, who

6    did you meet with?

7            Answer:  Michael and Gao Yang Yang Gao.

8    A    Yes.

9            MR. SCHWEITZER:  I ask that page 13 be marked.

10           THE COURT:  Any objection?

11           MR. SAMUEL:  One moment, your Honor.  Okay, your

12   Honor.

13           THE COURT:  You want to give it a number?

14           MR. SCHWEITZER:  Yes, we'll make it exhibit 16.

15           THE COURT:  Exhibit 16 is admitted.

16           (Plaintiff Exhibit 16, was received in evidence.)

17   BY MR. SCHWEITZER:

18   Q    Do you recall being asked on cross-examination yesterday

19   about any differences in responsibilities between yourself and

20   Gao Yang Yang?

21   A    I forgot.

22   Q    Do you recall being presented with deposition testimony

23   yesterday saying that Gao Yang Yang was responsible for

24   ordering supplies?

25   A    No, I didn't see it yesterday.

1            MR. SCHWEITZER:  May I see a copy of defense Exhibit

2   B, please?

3            May I approach?

4            THE COURT:  Yes.

5   BY MR. SCHWEITZER:

6   Q    On page 16, line 23, the question reads:  And how were

7   his responsibilities -- referring to Yang Yang Gao --

8   different than your responsibilities?  Your answer, which runs

9   over to page 17 says:  He is more responsible for the sushi

10  bar, for example he orders the supplies.

11           Do you recall that?

12  A    It seems like that.

13  Q    And do you recall being shown this document yesterday?

14           THE COURT:  What is the document?

15           MR. SCHWEITZER:  Exhibit B.

16  A    This side?  I didn't see it.

17  Q    What did you mean by ordering supplies?

18  A    I mean that he needed to sell whatever material that a

19  sushi bar needs to the boss.

20  Q    In the course of ordering supplies, did Yang Yang Gao

21  speak to vendors?

22           MR. SAMUEL:  Objection, your Honor.

23           THE COURT:  Sustained.

24  Q    Did you ever observe Yang Yang Gao speaking to vendors?

25           MR. SAMUEL:  Objection.

1          THE COURT:  Overruled.

2    A    Are you referring to sending messages to the boss?

3    Q    I'm referring to speaking directly to the sellers of

4    supplies?

5    A    No, I haven't seen it.

6    Q    In the course of so-called ordering supplies, did Yang

7    Yang Gao tell you to do anything?

8    A    No.

9    Q    How often did Yang Yang Gao give the boss a list of what

10   needed to be ordered?

11         MR. SAMUEL:  Objection.

12         THE COURT:  Sustained.

13   Q    How often did you observe Yang Yang Gao giving a list of

14   supplies to the boss that needed to be ordered?

15         MR. SAMUEL:  Same objection.

16         THE COURT:  Overruled.

17   A    It seems like two to three times in a week.

18   Q    And each time you observed Yang Yang Gao giving the boss

19   a list of supplies to order, how much time did he spend doing

20   that?

21         MR. SAMUEL:  Objection, your Honor.  Relevance.

22         THE COURT:  Overruled.  If you're talking about

23   instances where you observed --

24         MR. SAMUEL:  It was more of a relevance objection

25   than --

1          THE COURT:  Overruled.

2          THE INTERPRETER:  Can you repeat the question?

3          MR. SCHWEITZER:  Read it back.

4          (Whereupon, the record was read.)

5   A    I don't know.  I didn't pay attention to that.

6   Q    Did you observe Yang Yang Gao ever hire anybody himself?

7          THE INTERPRETER:  Did you observe Yang Yang Gao

8   hiring anybody?

9          MR. SCHWEITZER:  Hiring, yes.

10  A    No, I didn't see.

11  Q    Did you ever witness Mr. Katanov hire anybody?

12  A    No, I didn't.

13  Q    Do you recall at your deposition being asked the

14  following question --

15         MR. SAMUEL:  Objection.

16  Q    -- and giving the following answers?

17         THE COURT:  Sustained.

18         MR. SCHWEITZER:  Just to refresh recollection.

19         THE COURT:  You haven't laid a proper foundation for

20  that question.

21  BY MR. SCHWEITZER:

22  Q    Do you recall at your deposition --

23         Did you ever witness Mr. Katanov hiring anybody from

24  Sushi Fussion Express to work at a different restaurant?

25         MR. SAMUEL:  Objection.

1          THE COURT:  Sustained.

2          MR. SCHWEITZER:  Sidebar, your Honor.

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference.)

2          MR. SCHWEITZER:  This is laying the foundation for

3     page 31, which we discussed, to refresh the recollection of

4     the witness.

5          THE COURT:  Two problems.  You can refresh if he

6     says he didn't remember something.  You just asked him if he

7     had ever seen Levi Katanov hiring anybody.  If he said

8     something different in the past, that is not saying he didn't

9     remember.  You can't use the deposition to refresh.

10         The second set of questions he said he didn't

11    witness Levi Katanov hire anybody, right, so then you can't

12    say did you ever witness him hire somebody for X restaurant.

13         MR. SCHWEITZER:  The deposition took place four

14    years ago.  I don't think he remembers what he said.

15         THE COURT:  If he says the facts are X, you cannot

16    refresh him with something he hasn't said.

17              (End of sidebar conference.)

18              (Continued on the next page.)

19

20

21

22

23

24

25

1              (In open court.)

2    Q    Do you remember one way or the other whether Mr. Katanov

3    transferred anybody from Sushi Fussion Express to any other

4    restaurant?

5              MR. SAMUEL:  Objection.

6              THE COURT:  Overruled.

7    A    You're asking whether I know or not, right?

8    Q    Whether you remember or not.

9    A    Yes.

10   Q    What do you remember?

11   A    I remember my friend who I work with before, Gi Fu Wang

12   (ph), had gone there before.

13   Q    Is that Jeff?

14   A    Wang.

15   Q    Jeff Wang?

16   A    Gi Fu Wang.

17             MR. SCHWEITZER:  Can I confer with the interpreter

18   for a minute?

19             THE COURT:  Yes.

20             Why don't you ask for a spelling instead of telling

21   that to the interpreter.

22             MR. SCHWEITZER:  Because we had the spelling on the

23   record from yesterday.  The interpreter wasn't here for it.

24             THE COURT:  Could you ask the interpreter to spell

25   it out so we're all on the same page and talking about the

1    same person?

2    BY MR. SCHWEITZER:

3    Q    Mr. Gao, can you please spell Jeff's name?

4    A    J-E-F-F.

5    Q    Thank you.  What do you remember happening between

6    Mr. Katanov and Jeff?

7    A    He asked Jeff to go to his --

8             MR. SAMUEL:  Objection.

9    A    -- to work one day a week.

10            THE COURT:  Overruled.

11            This is something he witnessed?

12            MR. SCHWEITZER:  Yes.

13   Q    How did Jeff respond?

14            MR. SAMUEL:  Your Honor, can we have a sidebar?

15            (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference.)

2          MR. SAMUEL:  Yesterday we did talk about a

3  statement by a party opponent.  I have the discovery request

4  that I sent to them, and I have the responses where they said

5  there were no statements by a party opponent, which I think

6  is he trying to do now.

7          MR. SCHWEITZER:  The statement was elicited in

8  discovery.  He testified to it in deposition.

9          MR. SAMUEL:  In your discovery responses you said

10  there were none.

11          MR. SCHWEITZER:  It doesn't matter where the party

12  opponent statement comes from.

13          (End of sidebar conference.)

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1            (In open court.)

2    BY MR. SCHWEITZER:

3    Q    You said a moment ago that Mr. Katanov offered Jeff a

4    part-time position at one of his restaurants.  How did Jeff

5    respond?

6            MR. SAMUEL:  Objection.

7            THE COURT:  The relevance is not obvious to me.

8    I'll allow one question.  You can answer.

9    A    He went there.

10   Q    Do you recall if Mr. Katanov gave you instructions on how

11   to improve your work?

12           MR. SAMUEL:  Objection to what we sidebarred about.

13           THE COURT:  Overruled.

14   A    I don't remember it clearly.

15           MR. SCHWEITZER:  May I use the witness's deposition

16   to refresh his recollection?

17           THE COURT:  Sure.

18   BY MR. SCHWEITZER:

19   Q    On page four, line four ending line 25 --

20           THE COURT:  You shouldn't read it into the record.

21   You should show the witness and ask if it refreshes his

22   recollection.

23           MR. SCHWEITZER:  The witness doesn't read English.

24           THE COURT:  Have the translator translate it.

25           MR. SCHWEITZER:  Please read verbatim line four

1    through line 25 of page 34.

2              (Interpreter translating for the witness.)

3    Q    Did that refresh your recollection as to whether or not

4    Mr. Katanov gave you instructions on to how to improve your

5    work?

6    A    I forgot.

7    Q    Do you recall giving the answers in that document in

8    response to the questions in that document?

9    A    It's been a long time.  I don't remember very clearly.

10   Q    Did Mr. Katanov instruct you on how to prepare a certain

11   dish?

12   A    I don't remember.

13   Q    Do you recall saying at your deposition, line 23 --

14             THE COURT:  Sustained.

15   Q    Did Mr. Katanov judge that you had not prepared a dish

16   well and asked you to redo it?

17             MR. SAMUEL:  Objection.

18             THE COURT:  Sustained.

19             MR. SCHWEITZER:  Sidebar, your Honor.

20             THE COURT:  I don't think we need a sidebar.  We

21   have to keep going.

22   BY MR. SCHWEITZER:

23   Q    Yesterday do you recall testifying about Mr. Katanov

24   asking you to make a special roll?

25   A    Yes.  He asked me to do two rolls that he asked me.

1   Q    Was he satisfied with them the first time you did them?

2           MR. SAMUEL:  Objection.

3           THE COURT:  Overruled.

4   A    He didn't mention whether he was satisfied or not.  He

5   took the rolls and left.

6   Q    Did you observe Mr. Katanov telling anyone else to redo a

7   task that was not done well the first time?

8           MR. SAMUEL:  Objection.

9           THE COURT:  Overruled.

10  A    It's been a long time.  I don't remember clearly.

11  Q    I'm showing you page 34, again please read lines 14 and

12  15.  See if that refreshes your recollection.

13           (Interpreter translating for witness.)

14  Q    These are your words.  Does that refresh your

15  recollection?

16  A    It should have happened.

17  Q    What should have happened?

18  A    That he had told the people to redo things that was not

19  done well.

20  Q    Such as?

21  A    Like when a roll was not done well, he would ask people

22  to redo the roll.  Or when the cleaning work was not done

23  well, he would tell people to clean it up.

24  Q    What people did he tell?

25           MR. SAMUEL:  Objection, your Honor.

1          THE COURT:  Overruled.

2    A    What I witnessed I think it was the sushi chef.

3    Q    What sort of cleaning are you referring to?

4    A    The sushi bar and the cutting board.

5          MR. SCHWEITZER:  Nothing further.

6          THE COURT:  Any recross?

7    RECROSS-EXAMINATION

8    BY MR. BERESIN:

9    Q    Good morning, Mr. Gao.  You can please clarify for the

10   jury, you yourself only worked at one location, Sushi Fussion

11   Express at 7132 Main Street, correct?

12         MR. SCHWEITZER:  Beyond the scope of redirect.

13         THE COURT:  Overruled.

14   A    Yes.

15   Q    Thank you.  And did my client, Mr. Katanov, did you ever

16   witness him hiring or firing anyone from the restaurant that

17   you worked at?

18   A    No.

19   Q    Thank you.  Your friend Jeff, the only knowledge that you

20   had that he worked somewhere else is from him telling you?

21         MR. SCHWEITZER:  Objection.

22         THE COURT:  Overruled.

23   A    Yes.

24   Q    Thank you.  Regarding Mr. Yang Yang Gao, he was in charge

25   of the sushi bar at the restaurant you worked at, correct?

1   A    When you say in charge, what do you mean by that?

2   Q    I mean, he had a greater authority, greater

3   responsibility than the other sushi chefs there.

4              MR. SCHWEITZER:  Objection.

5              THE COURT:  Overruled.

6              MR. SCHWEITZER:  Sidebar, your Honor.

7              THE COURT:  We have got to cut down on the number of

8   sidebars.

9              MR. SCHWEITZER:  Authority and responsibilities are

10  two different things one --

11             THE COURT:  He's clarified what he meant by the

12  question.  He can ask the clarified question.

13             MR. SCHWEITZER:  The clarified question is itself

14  unclear and compound.

15             THE COURT:  Overruled.

16  A    No.  He only did one more thing than us, which is to send

17  what was needed to the boss.  The rest of his work is the same

18  as us.

19  Q    Thank you.  Would Yang Yang Gao tell you which orders to

20  prepare?

21  A    Isn't this what the manager told us about, the order, and

22  told us to do?

23  Q    Yes.  Which manager do you mean when you say manager?

24  A    The one who ever answered the phone or took the order

25  told me.

1  Q    Who told you in what order to prepare particular orders

2  of rolls, et cetera, other sushi dishes?  Who would tell you

3  that?

4  A    Myself.  He would give me the order and then I prepared

5  the order myself.

6  Q    Who would give you the order?

7  A    The one who answered the phone.

8  Q    Mr. Gao, do you remember being asked yesterday about your

9  deposition testimony?

10 A    Yes, you showed me a piece of paper.

11 Q    Yes.  This is your deposition testimony marked

12 Defendants' Exhibit B, page 16, from your deposition where you

13 were asked the question:  What was the name of the person that

14 was more in charge?  Your answer was:  Yang Yang Gao.

15           MR. SCHWEITZER:  For completeness I ask that the

16 excerpt which ended on line 22 on page 16 also be read to

17 include lines 23 on page 16 through line three on page 17 for

18 completeness.

19           THE COURT:  You admitted your exhibit.

20           MR. SCHWEITZER:  Yes, but the --

21           THE COURT:  The objection is overruled.  Let him ask

22 his question.

23           MR. SCHWEITZER:  It's also on Exhibit B, 16 and 17.

24           THE COURT:  What is the question?

25 BY MR. BERESIN:

1  Q    Mr. Gao are you changing your testimony today compared to

2  what you said at your deposition --

3            MR. SCHWEITZER:  Objection.

4  Q    -- about Yang Yang Gao being more in charge of the sushi

5  bar?

6            THE COURT:  Overruled.

7  A    I don't really understand what you mean.

8  Q    Mr. Gao, at your deposition you testified that Mr. Yang

9  Yang Gao was more in charge of the sushi bar where you worked.

10           MR. SCHWEITZER:  Objection.  At his deposition he

11  testified, he clarified what that meant.  That has not been

12  read.

13           THE COURT:  Sidebar.

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

 1              (Sidebar conference.)

 2         THE COURT:  This is how I'd like to do objections.

 3    You say objection and one word.  If I don't understand what

 4    your objection is, I'll ask you tell me more about it.  If I

 5    don't understand what the question is offered for I will ask

 6    that.

 7              We can't have a lot of argument on objections in

 8    front of the jury.  And we can't have a lot of sidebars.

 9    Okay?

10         MR. SCHWEITZER:  Yes.  But the question being asked

11    is overly confrontational and argumentative and misrepresents

12    the deposition testimony.

13              On Exhibit B itself it says:  How were his

14    responsibilities different from your responsibilities and who

15    was responsible for the sushi bar.

16              That's what he said.  That has not been put in the

17    record.

18         THE COURT:  So what is the basis for saying the

19    change of testimony?

20         MR. BERESIN:  I believe he just said on the stand

21    that no one was in charge.  He just said something to that

22    effect.

23         THE COURT:  I'm not seeing anything on those lines,

24    just conversation of who takes the orders and is giving the

25    order to him.  He said Yang Yang Gao ordered supplies.

1          MR. BERESIN:  I think I just asked him, did he have

2     more responsibility and authority than --

3          THE COURT:  He said he didn't understand your

4     question.  Let's move on.

5          (End of sidebar conference.)

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                                    95

1          (In open court.)

2          MR. BERESIN:  Nothing further, your Honor.  Thank

3     you.

4          THE COURT:  Anything else?

5          MR. SCHWEITZER:  No, your Honor.

6          THE COURT:  Thank you.  You're excused.

7          (Whereupon, the witness was excused.)

8          THE COURT:  You can call your next witness.

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2              (In open court.)

3              MR. SCHWEITZER:  Zhenkai Sun.

4              (Witness takes the stand.)

5              THE COURTROOM DEPUTY:  Can you tell him to stand and

6    raise his right hand?

7              (Witness sworn.)

8              THE WITNESS:  Yes.

9              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

10   **ZHENKAI SUN**,

11             called as a witness, having been first duly

12             sworn/affirmed, was examined and testified as

13             follows:

14   DIRECT EXAMINATION

15   BY MR. SCHWEITZER:

16   Q    Please state your full name for the record.

17   A    Zhenkai Sun.

18   Q    Mr. Sun, are you familiar with a restaurant Sushi Fussion

19   Express?

20   A    Yes.

21   Q    How are you familiar with it?

22   A    I work there.

23   Q    How did you learn about the job available there?

24             THE INTERPRETER:  Did you say how did you know that

25   the job was available there?

1   BY MR. SCHWEITZER:

2   Q    How did you learn about the job availability?

3   A    I saw it on the internet.

4   Q    Was the ad that you saw in English, Chinese, or some

5   other language?

6   A    English.

7   Q    And on what website did you see it?

8   A    Craigslist.

9   Q    To your recollection, what did the ad say?

10  A    It only says that the sushi restaurant is hiring sushi

11  chef.

12  Q    Did the ad provide any contact information?

13  A    It was a phone number, and I called that phone number.

14  Q    Who answered the phone?

15  A    Michael.

16  Q    And what, if anything, did you speak with Michael about

17  over the phone?

18  A    I asked him whether they were hiring any sushi chef, and

19  I also ask him for the exact address.

20  Q    And what did he say?

21  A    He said yes, and then he gave me the address and told me

22  to go there to do, like, a trial work.

23  Q    Did you and Michael discuss what salary you could expect

24  if you were hired in the course of the telephone conversation?

25  A    No, but it was mentioned when I went there.

1  Q    And during the course of the telephone conversation, did

2  you and Michael discuss what schedule you would be working if

3  you were hired?

4  A    No.  That was discussed when I went there.

5  Q    When you did go to the restaurant, what happened?

6  A    I went in and then I was waiting for Michael to come and

7  interview me.

8  Q    How long did you wait?

9  A    About half an hour.

10 Q    What did you do during that time?

11 A    I was sitting there playing on my cell phone.

12 Q    Who was working the sushi bar that day?

13 A    The day when I went there, I didn't know the person's

14 name, and when I went there to work, I found out the persons

15 name is Alan.

16 Q    Does Alan have any other names?

17 A    I don't know his Chinese name.  I only know him by his

18 English name.

19 Q    Is Alan in the courtroom today?

20 A    No.

21 Q    Was Alan the only person working the sushi bar on the day

22 you came?

23 A    Yes.

24 Q    Who interviewed you?

25 A    Michael.

1   Q    What did he say and what did you say during the

2   interview?

3   A    He asked me to go to sushi bar and make some sushi to

4   show him, and then he told me that I could work there, and

5   then he told me how much I would be getting per week and told

6   me about my work schedule.

7   Q    Did Michael have you sign any paperwork?

8   A    No.

9   Q    Did Michael confer with Alan or anybody else before

10  hiring you?

11          MR. SAMUEL:  Objection.

12          THE COURT:  Overruled.

13          If you know.

14  BY MR. SCHWEITZER:

15  Q    If you know.

16          THE INTERPRETER:  This is the interpreter.  Could

17  you repeat the question?

18  BY MR. SCHWEITZER:

19  Q    To your knowledge, did Michael confer with Alan or

20  anybody else before making the decision to hire you?

21  A    No.  He made his own decision.

22  Q    Did Alan continue working after you were hired?

23  A    Yes.  I worked with him.

24  Q    For how long did you work with him?

25  A    About one year.

1  Q    Was that throughout your employment, or only a part of
2  your employment?
3  A    What do you mean?
4  Q    Did you work with Alan throughout your employment, or did
5  Alan leave before you left?
6  A    Alan left before I left.
7  Q    When you were interviewing with Michael, did you speak
8  with Michael in English?
9  A    Yes.
10 Q    Did anyone need to interpret between you and Michael?
11 A    No, because I was able to understand and speak simple
12 conversation.
13 Q    Did Alan have any role in your interview?
14 A    No.  I was just making rolls, and Alan was doing his own
15 work.
16 Q    Was Yang Yang Gao in the restaurant that day when you
17 went in to interview?
18 A    No.
19 Q    Did you know Yang Yang Gao from before you started to
20 work at Sushi Fussion Express?
21 A    No.  I met him after I started working there.
22 Q    Did you start working the same day as your interview, or
23 some other day?
24 A    The next day after the interview.
25 Q    And is that when you first met Yang Yang Gao?

1   A    Correct.

2   Q    How do you know what rolls you would make at the sushi

3   station?

4   A    When the order came in, I would just do according to the

5   order.

6   Q    How would you know that an order had come in?

7   A    The person who answered the phone or the person who took

8   the order would give it to me.

9   Q    Was the person who answered the phone somebody who worked

10  at the sushi bar, or somebody who worked somewhere else?

11  A    That person didn't know how to do sushi.  That person

12  just answered the phone, typed up order, and serviced the

13  customers.

14  Q    I'm sorry, I should have been clearer.

15        Where in the restaurant was that person's

16  workstation?

17  A    The person does everything else besides sushi.

18  Q    But where do they work?  At the front counter?  In the

19  dining room?  In the kitchen?  Where?

20  A    Next to the sushi bar where there is a computer.

21  Q    How many sushi chefs were there on duty at any one time?

22        THE INTERPRETER:  This is interpreter.  How many

23  sushi chefs were on duty when what?

24        MR. SCHWEITZER:  At any one time.

25        THE INTERPRETER:  All right.

1  A    When there is a chef that has his day off, there will be

2  two chefs.  When nobody has their day off, there are three

3  sushi chefs.

4  Q    What are the days when somebody has a day off?

5  A    Monday to Wednesday.

6  Q    And what are the days when all three sushi chefs would be

7  working?

8  A    From Thursday to Sunday, there are three sushi chefs.

9  Q    Between Mondays, Tuesdays, and Wednesdays, there would be

10  one day when you and Alan would work, one day when Yang Yang

11  Gao would work, and one day when Alan and Yang Yang Gao would

12  work?

13  A    Yes.

14  Q    Was there any difference between the days when you would

15  work with Alan and the days that you would work with Yang Yang

16  Gao in terms of what happened at the sushi bar?

17  A    No difference.  Just making the orders.

18  Q    How did the sushi chefs determine which of them would

19  take which tasks?

20  A    I don't really understand the question.  Could you repeat

21  that?

22  Q    How would you know whether you would be doing a

23  particular order or whether Alan or whether Yang Yang Gao

24  would be doing a particular order?

25  A    I would be just doing whatever order that I was given.

1  Q    Was there anybody who assigned particular orders to

2  particular sushi chefs?

3  A    Sometimes whoever answer the phone would distribute the

4  orders, and I would do whatever order that I was given.

5  Q    Did Yang Yang Gao have any authority to tell you to do

6  particular orders?

7           MR. SAMUEL:  Objection.

8           THE COURT:  Sustained.

9  BY MR. SCHWEITZER:

10 Q    Did Yang Yang Gao tell you to do particular orders?

11          MR. SAMUEL:  Objection.  Calls for hearsay.

12          THE COURT:  Overruled.

13 A    Now, for big orders, we would be making the orders

14 together; and for smaller orders, we will be just working on

15 our own.

16 Q    Who were the owners of Sushi Fussion Express, to your

17 knowledge?

18 A    Which location are you referring to?  The one on Main

19 Street or together?

20 Q    The one where you worked.

21 A    Michael.

22 Q    Are you familiar with Leva Katanov?

23          THE INTERPRETER:  This is the interpreter.  Can you

24 repeat the name?

25          MR. SCHWEITZER:  Leva, L-E-V-A, Katanov,

1  K-A-T-A-N-O-V?

2  A    I know him.

3  Q    How do you know him?

4  A    I met him in the restaurant.  He often came.

5  Q    How often?

6  A    I don't remember.  It's been a long time.

7  Q    On the order of once per week?  On the order of once per

8  month?  On the order of once per year?

9  A    Sometimes it's once a week, sometimes it's once in two

10 weeks.  It's not on a fixed basis.

11 Q    What would he do when he came to the restaurant?

12 A    He would walk around.  Sometimes he would say that a

13 sushi bar is dirty and told us to clean up.  Sometimes he took

14 something and then left.

15 Q    What sort of things would he take?

16 A    Like salmon, tuna, avocado, cucumber, things for

17 preparing sushi.  Sometimes he would take the party tray and

18 left.

19 Q    When you say that sometimes he would take things for

20 preparing sushi, had those things that he took been used to

21 prepare sushi, or were they still raw and needed to be

22 prepared?

23 A    I didn't understand the question.  Could you repeat that?

24 Q    For instance, would he take salmon rolls, or would he

25 take salmon filets that could be cut up and be used for rolls?

1  A    Raw.  The whole thing.

2  Q    The whole thing meaning uncut up filet?

3  A    Correct.

4  Q    Was the same true of the tuna?

5  A    Yes.  Things for preparing sushi.

6  Q    And how about the cucumber and avocado?

7  A    He took them.

8  Q    You said the -- excuse me.  You said there was a station

9  for the receptionist next to the sushi bar.  Was that where

10 the cash register was located?

11 A    Yes.  The person answered the phone, gave us the order.

12 He is the manager for the restaurant.

13 Q    Does that person also work the cashier?

14 A    Yes.  Besides sushi, he does everything else.

15 Q    Is the cashier located next to the sushi bar off to the

16 side?

17 A    Correct.

18 Q    Did you ever observe Mr. Katanov giving the cashier

19 money?

20 A    When you say Katanov, you Levi?

21 Q    Yes.

22 A    Then no.  No, I have not.

23 Q    Did Michael, Mr. Yagudaev, ever speak to you about

24 Mr. Katanov?

25 A    Yes.

1   Q    What did he say to you?

2              MR. SAMUEL:  Objection.

3              THE COURT:  Is there a hearsay exception rule?

4              MR. SCHWEITZER:  Excuse me.  This is a statement

5   made to the witness by a party.

6              THE COURT:  I thought the question was as to Mr. --

7   I'm sorry, could you read back the question?

8              MR. SCHWEITZER:  The question was, what did Michael

9   say about Mr. Katanov.

10             MR. SAMUEL:  That's double hearsay.

11             THE COURT:  So that's a statement of Michael's,

12  not --

13             MR. SCHWEITZER:  Yes.

14             THE COURT:  Sustained.  Sustained.

15  BY MR. SCHWEITZER:

16  Q    After you were hired at Sushi Fussion Express, did you

17  observe anyone else being interviewed?

18  A    Yes.  I've seen many.

19  Q    Where did the people being interviewed at Sushi Fussion

20  Express go on to work?

21  A    They were interviewed at the location that I worked on

22  Main Street.  If they passed interview, they would be working

23  somewhere else.

24  Q    Where would they work?

25             MR. SAMUEL:  Objection, Your Honor.

```
 1              THE COURT:  What's the basis for knowledge?  Do you
 2   want to rephrase the question?
 3   BY MR. SCHWEITZER:
 4   Q    How do you know that they went to work somewhere else?
 5   A    Because I've seen the text messages between Yang Yang Gao
 6   and Levi.
 7              MR. SAMUEL:  Objection.  It's hearsay, Your Honor.
 8              THE INTERPRETER:  He's pointing at the name that I
 9   wrote down on my -- on my sheet that says Katanov.
10              THE COURT:  Why wouldn't the statements of
11   Mr. Katanov be admissible?
12              MR. SAMUEL:  I thought we covered this.  We asked
13   for --
14              THE COURT:  This is your discovery-related
15   objection.  I'm going to overrule it for now.
16              THE INTERPRETER:  This is the interpreter.  Could
17   you repeat the question?
18              MR. SCHWEITZER:  Please read it back.
19              (Record read.)
20   A    Because I've seen the text messages between Yang Yang Gao
21   and this person.  Yang Yang Gao had asked me whether someone
22   was interested in coming here to work.
23   Q    Are you familiar with an individual named Summer?
24              THE INTERPRETER:  This is the interpreter.  Did you
25   say Summer?
```

1        MR. SCHWEITZER:  Like the season.

2    A    Yes.

3    Q    Who was that person?

4    A    He's my cousin.

5    Q    Did Summer interview at Sushi Fussion Express?

6    A    He was interviewed at the Main Street location and went

7    to work somewhere else.

8    Q    Where did he go to work?

9        MR. SAMUEL:  Objection.

10       THE COURT:  Can you rephrase the question so that it

11   doesn't call for hearsay?

12   BY MR. SCHWEITZER:

13   Q    How do you know he went to work somewhere else?

14   A    He mentioned it to me.

15       MR. SAMUEL:  Objection.

16       THE COURT:  Sustained.

17   BY MR. SCHWEITZER:

18   Q    Did you observe him going to work somewhere else?

19       MR. SAMUEL:  Objection.

20       THE COURT:  Overruled.

21   A    When you say "did you observe," I don't know what you

22   mean.

23   Q    Did you see where he was working?

24   A    He worked at the Main Street location for a few days, and

25   then he was no longer there, and then he mentioned that he --

1              MR. SAMUEL:  Objection.

2              THE COURT:  Sustained.

3              You have to stop there.  Anything that somebody else

4    told the witness, you shouldn't be eliciting.

5    BY MR. SCHWEITZER:

6    Q    Did you observe anyone tell Summer to stop working at the

7    Main Street location -- Sushi Fussion --

8              MR. SAMUEL:  Objection.

9              THE COURT:  Overruled.

10             MR. SAMUEL:  Objection.  This is a leading question.

11             THE COURT:  Overruled.

12             You can answer the question.

13   A    I forgot the question.  Could you repeat that?

14   Q    Did you observe anyone tell Summer to stop working at the

15   Sushi Fussion Express -- the Main Street location?

16   A    I don't remember the detail, but a few days later, he

17   told me that --

18             MR. SAMUEL:  Objection.

19             THE COURT:  Sustained.

20             You can't testify about what other people told you.

21             THE WITNESS:  Okay.

22   BY MR. SCHWEITZER:

23   Q    Are you familiar with any other Sushi Fussion locations?

24   A    Yes.

25   Q    What other Sushi Fussion locations are you familiar with?

1   A     The one that's on Main Street.  It's on the menu.  All

2   the locations are on the menu.

3   Q     What locations were on the Main Street menu?

4   A     Forest Hills, Great Neck.

5   Q     Any others?

6   A     And then there are some other locations that I don't

7   remember.

8   Q     Have you ever seen Sushi Fussion's website?

9   A     No.  No, I did not.  I only saw the menu.

10  Q     All right.

11        Did the menu have on it the address for 722 Kings

12  Highway in Brooklyn?

13  A     It's been a long time.  I don't remember.

14  Q     Was the Main Street location where you worked -- Sushi

15  Fussion Express -- a kosher restaurant?

16  A     Yes, I know.

17  Q     Who, if anyone, was in charge of making sure the

18  restaurant kept kosher?

19        MR. SAMUEL:  Objection.

20        THE COURT:  Can you rephrase it in a way that

21  indicates he's going to have a basis for knowledge or that

22  calls for him to answer on a basis for knowledge?

23  BY MR. SCHWEITZER:

24  Q     Did you receive any instructions from anyone at the

25  restaurant as to how to keep kosher?

1   A    Yes.  At the beginning they mentioned.

2   Q    Who gave you those instructions?

3   A    Michael and also the person who answered the phone.

4   Q    What was the person's name who answered the phone?

5   A    I forgot, because the person worked for a period of time

6   and then the person stopped working.

7   Q    Okay.

8        Did Yang Yang Gao give you any instructions as to

9   how to keep kosher?

10  A    No, because at the beginning, everything was told to me

11  by Michael.

12  Q    You mentioned that you had seen text messages between

13  Yang Yang Gao and Leva Katanov.  Were those text messages from

14  your time working at Sushi Fussion Express?

15  A    Yes, when I worked with Yang Yang Gao.

16  Q    Why did -- withdrawn.

17       Did Yang Yang Gao say why he was sharing those text

18  messages with you?

19            MR. SAMUEL:  Objection.

20            THE COURT:  Sustained.

21  BY MR. SCHWEITZER:

22  Q    The day Yang Yang Gao shared those text messages with

23  you, did you see them without his permission?

24            MR. SAMUEL:  Objection.

25            Also I think we have the best evidence issue.  If

1    he's going to talk about text messages --

2              THE COURT:  Let's take a sidebar.

3              (Sidebar.)

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Sidebar conference held on the record out of the

2   hearing of the jury.)

3        MR. SAMUEL:  Sorry, I'm trying to cut down on the

4   sidebars, but he's already been going for 45 minutes, and we

5   stipulated to many facts in order to avoid this.

6        THE COURT:  Yes.  It does seem like we are spending

7   a really long time eliciting a lot of stuff that's not

8   relevant; sitting there and waiting for the interview on his

9   cell phone; or we are asking the same question, like, three

10  different ways.  He gave you instructions about keeping

11  kosher, he gives you an answer, and then did so and so give

12  you instructions about keeping kosher -- a different person.

13  You have to speed this up.

14        What's the objection on the text messages?  He's got

15  Levi Katanov -- he's seen text messages from Levi Katanov,

16  your client.

17        MR. SAMUEL:  It's a best evidence rule and, again,

18  it goes to the discovery response.  I know you overruled our

19  objection, but I think it's critical in this case because they

20  needed to disclose it.  They can't bring it up at trial.

21        THE COURT:  I have my law clerk researching this

22  question, and I'm happy to hear more from the parties on it at

23  a break.  It seems to me like he's indicating it was disclosed

24  in the deposition, and then the question for me is, do I

25  preclude this testimony entirely when it was disclosed to me

1   in some form.

2          MR. SAMUEL:  Right.  But when we -- during the

3   deposition, that was a hearsay answer.  He said he saw someone

4   else's text message, but how does he know it was from Levi?

5   How does he know who it was from?

6          THE COURT:  So there are two objections you can

7   make.  One is, it wasn't disclosed to us.  It sounds like it

8   was disclosed to you through the deposition, so then you would

9   have to persuade me, but, nonetheless, it should be precluded

10  from trial, and that seems like a hard road to hoe, but my law

11  clerk is looking into it.  We can take it up at a break.

12         The second objection is more of an evidentiary.  It

13  shouldn't come in in any event.

14         MR. SAMUEL:  Best evidence, i mean --

15         MR. SCHWEITZER:  I'm not even asking about the

16  contents.  I'm asking about the context in which he saw it.

17         THE COURT:  I'm not really sure why we are getting

18  into, did he give you permission, or whatever.  So he's going

19  to say, I take it that Yang Yang Gao gave him permission to

20  look at the text messages.  What's the relevance for that?

21         MR. SCHWEITZER:  Foundation for why he was being

22  shown that.

23         THE COURT:  What are we going to get to?  What's

24  going to be the bottom line on this?

25         MR. SCHWEITZER:  This is about Yang Yang Gao finding

1  out his friends, people he knows, acquaintances, who might be

2  interested in working for --

3          MR. SAMUEL:  That doesn't get us anywhere.  We can't

4  go all day with this witness.

5          THE COURT:  I'm not sure I understand what the

6  testimony is going to be.  He's going to say what?  He's going

7  to say he saw the text messages with Levi Katanov and Yang

8  Yang Gao.  What's your next question?

9          MR. SCHWEITZER:  Why did Yang Yang Gao show you

10 these text messages.

11         THE COURT:  He's not going to have a basis to answer

12 why Yang Yang Gao did something.  What's your next question

13 going to be?

14         MR. SCHWEITZER:  Did you do anything in response to

15 Yang Yang Gao showing you these text messages?

16         THE COURT:  All right.  If you want to do, did Yang

17 Yang Gao show you text messages?  Yes.  What did you do in

18 response?  And if it's going to be something relevant to the

19 case, then I will allow it.

20         MR. SAMUEL:  I just don't see the relevance.

21         How much longer do you have on -- with this witness.

22         MR. SCHWEITZER:  Not much longer.

23         MR. SAMUEL:  Like five minutes or --

24         MR. SCHWEITZER:  I hesitate to speculate.  Not more

25 than ten questions.

1          THE COURT:  Okay.  Great.  So he can ask, did Yang

2    Yang Gao show you text messages, what did you do in response.

3              (Sidebar conference ends.)

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2   BY MR. SCHWEITZER:

3   Q    You mentioned text messages between Yang Yang Gao and

4   Leva Katanov.  Did Yang Yang Gao show you those text messages?

5   A    Yes.

6   Q    What did you do, if anything, in response to Yang Yang

7   Gao showing you those text messages?

8   A    Because he asked me whether --

9               MR. SAMUEL:  Objection.

10               THE COURT:  Sustained.

11   BY MR. SCHWEITZER:

12   Q    Listen to the question again.

13          What did you do in response to Yang Yang Gao showing

14   you those text messages?  For instance, did you say anything

15   to Yang Yang Gao?  Did you take any actions with respect to

16   third parties?  What did you do?

17   A    I still don't understand.  What do you mean by "third

18   party"?

19   Q    Did Yang Yang Gao showing you text messages prompt you to

20   take any action?  And, if so, what action did you take?

21   A    To see whether any of my friends will be interested in

22   working in -- with trying to find.

23   Q    Did you try to find people to work at Sushi Fussion?

24   A    That would be my cousin, Summer.

25   Q    Did you ask anyone else besides your cousin, Summer?

1    A    Yes, but the person was not interested.

2    Q    Where did you tell Summer there would be an open

3    position?

4              MR. SAMUEL:  Objection.  Objection as to his

5    knowledge of --

6              THE COURT:  Overruled.

7    A    To come for an interview at the place where I worked.

8    Q    Did you tell Summer where, if he was hired, where he

9    would be working?

10   A    No.

11   Q    Okay.  Did you know when you spoke to Summer where he

12   would be working if he was hired?

13             MR. SAMUEL:  Objection.

14             THE COURT:  Overruled.

15   A    On that day?

16   Q    When you spoke to Summer and told him about -- to come

17   for an interview, did you -- did you know where he was going

18   to be working if he was hired?

19   A    I didn't know on that day.

20   Q    Did you participate in Summer's interview?

21   A    I think I did.

22   Q    In what capacity?

23   A    Serve as an interpreter.

24   Q    Between who and who?

25   A    Him and Michael.

1   Q     Who else, if anyone, besides you, Michael, and Summer

2   participated in Summer's interview?

3   A     No.

4   Q     No one?

5   A     No.

6   Q     And who decided to -- that Summer would be hired?

7   A     Michael.

8   Q     Did you have any input into Michael's decision as to

9   whether Summer would be hired?

10  A     No.  I was -- just served as an interpreter.

11  Q     Did you observe Michael conferring with any other person

12  before deciding to hire Summer?

13  A     To confirm what?

14  Q     Confer, converse, speak.

15  A     No.  They made the decision between themselves.

16  Q     Who is "they"?

17          MR. SAMUEL:  Objection as to how he would possibly

18  know who made the decisions.

19          THE COURT:  Would you rephrase the question?

20          MR. SCHWEITZER:  Yes.

21  BY MR. SCHWEITZER:

22  Q     I would like to clarify.

23          What do you mean when you say they would make the

24  decision -- when you say "they would make a decision between

25  themselves," who are you referring to?  Michael and Summer?

1  Michael and somebody else?

2  A     Between Michael and Summer.

3  Q     Did you observe Michael hire Summer?

4  A     He came to work after few days.  He must have been hired.

5  Q     Did you observe Michael confer with Yang Yang Gao about

6  Summer?

7  A     No.

8             MR. SCHWEITZER:  Nothing further.

9             THE COURT:  This might be a good time to take a

10 break in case anybody wants to use the bathroom, or get water,

11 or take a stretch break, so let's take ten minutes before

12 cross.

13            If the parties would stick around for a second, that

14 would be great.

15            THE COURTROOM DEPUTY:  Jurors, follow me.

16            (Jury exits.)

17            THE COURT:  Just a couple thoughts.  I really would

18 appreciate it if you would think hard about streamlining some

19 of this.  It seems like we are getting into a lot of areas

20 where it's not obvious what the relevance is, and a lot of

21 areas where you are asking five questions and you can ask one

22 question, so I would really appreciate it if you'd think about

23 how to speed this up.

24            Let's talk now about whether there are any

25 evidentiary issues that you are expecting to come up on cross

 1   or that you are expecting to come up on your next witness so

 2   that we can resolve them without the jury being here.

 3          My, kind of, pending question is just about this --

 4   or question I welcome your thoughts on is about this issue of

 5   statements that Mr. Katanov -- it sounds like they were

 6   testified about in a deposition.  They weren't disclosed in

 7   response to an interrogatory; is that right?

 8          MR. SCHWEITZER:  They were not disclosed in response

 9   to either party's interrogatory.  We had asked for

10   communications between Mr. Katanov and the plaintiffs and got

11   nothing.

12          MR. SAMUEL:  We didn't have anything, but in the

13   deposition, I mean, I specifically asked him about those text

14   messages, but, I mean, I think that's just clear hearsay and

15   best evidence.  If they wanted to introduce it, I mean, the

16   person who had the text messages -- Yang Yang Gao -- he would

17   be the -- that would be the best evidence to --

18          THE COURT:  Let's set aside the best evidence.

19          MR. SCHWEITZER:  That goes to the contents.

20          THE COURT:  So set aside the best evidence.

21   Again -- I think a couple times we raised it, and it may come

22   up again, Mr. Katanov said something, it's a statement of a

23   party opponent, and I think your objection is, we made a

24   request in discovery for what?  You submitted an

25   interrogatory?

*Proceedings*                                                       122

1          MR. SAMUEL:  Yeah.

2          THE COURT:  And sought statements of your client.

3          MR. SAMUEL:  Statements and any text messages or

4     correspondence.

5          THE COURT:  Okay.  And --

6          MR. SAMUEL:  Produced nothing.

7          THE COURT:  Then these witness gave depositions, and

8     they identified these statements, or they described these

9     conversations in the depositions.

10          MR. SAMUEL:  They described it, but they never

11     produced it.  We haven't seen it.

12          THE COURT:  Okay.  But they are conversations, for

13     the most part.  I think we've been talking about it,

14     Mr. Katanov said X or Y.

15          MR. SCHWEITZER:  And these statements, because they

16     were from Mr. Katanov, would be in Mr. Katanov's possession.

17     We --

18          THE COURT:  What's the rule for the -- what do you

19     want me to look to as a basis for concluding that these

20     statements should not be admissible?

21          MR. SAMUEL:  They weren't disclosed, and it was

22     mentioned at a deposition, but if one of the defendants -- if

23     one of the plaintiffs was in possession -- I mean, we don't

24     know what the text message said.

25          THE COURT:  We are not doing the text messages.

1   He's not trying to offer the text messages.  He didn't try to

2   offer the text messages, so I'm just trying to get ahead of

3   any objections where we have witnesses saying Mr. Katanov said

4   X, and you are going to object that it wasn't produced in

5   discovery, so that means that there is a rule or something

6   that you point to where the statements were identified in the

7   deposition, testified about in a deposition, but you're saying

8   they weren't produced in response to the discovery response so

9   they should be precluded.  What should I look to for that?

10              MR. SAMUEL:  We will just talk about the text

11  message for one minute --

12              THE COURT:  Is anybody offering the text messages?

13              Are you going to offer the text messages through one

14  of these witness?

15              MR. SCHWEITZER:  No.  It was Yang Yang Gao who

16  testified about what he was told.

17              THE COURT:  Okay.  So anything we need to talk about

18  there?

19              MR. SAMUEL:  What he was told?  Wouldn't that be

20  hearsay?

21              THE COURT:  It's your client.  What he was told by

22  your client.  If you think there's a basis to object because

23  you didn't get these in response to -- a request that you

24  should have gotten into, I'm happy to hear more about it.  It

25  doesn't seem to me that when you got the accounting of the

1    statements in a deposition that the appropriate thing for me

2    to do is preclude those statements on the theory that you

3    didn't get them in response to some other request, but if you

4    think that's the right answer, I'm open to hearing more about

5    it.  I haven't heard of a rule or that there's something I

6    should be looking at.

7              Let's turn to anything else that you think is going

8    to come up on your evidentiary questions.  You should hash out

9    what's going to come up on your cross.

10             MR. SAMUEL:  I know on the joint pretrial order,

11   Mr. Schweitzer put in a website and menu.  I'm not sure if

12   he's intending to introduce it or not, but we haven't -- it

13   hasn't come up yet.

14             MR. SCHWEITZER:  I think that's the best witness to

15   bring those in on would be Mr. Katanov.

16             MR. SAMUEL:  I mean --

17             THE COURT:  So he's going to show you the website

18   and he's going to show you the menu, and he's going to ask

19   your client about them.  It sounds like he can do that.  If

20   your client says that's the website and that's the menu, then

21   I think they're going to come in.

22             MR. SAMUEL:  Okay.

23             THE COURT:  Nothing you are expecting to come up on

24   your cross that's going to require a sidebar, because I just

25   want to talk about it now.

*Proceedings*                                                                125

1          MR. SAMUEL:  I'm going to try to keep it short.

2          THE COURT:  Great.

3          MR. SAMUEL:  Just for scheduling purposes, do you

4    know how long you are going to need with Mr. Chipengule?

5          MR. SCHWEITZER:  Thirty minutes.

6          THE COURT:  Great.

7          MR. SAMUEL:  All right.  Thank you.

8          (A recess in the proceedings was taken.)

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  I think Mr. Sun can come back to the

2    witness box.

3    CROSS-EXAMINATION

4    BY MR. SAMUEL:

5    Q    Good morning, Mr. Sun.

6    A    Good morning.

7    Q    I just want to ask you a couple questions about the

8    testimony you gave earlier this morning.

9    A    Okay.

10   Q    You never saw Levi Katanov hire anybody from the Main

11   Street location; is that correct?

12           MR. SCHWEITZER:  Objection the scope of direct.

13           THE COURT:  Overruled.

14   A    Correct, but I have seen messages.

15   Q    But you never seen Levi hire anyone at the store?

16           MR. SCHWEITZER:  Asked and answered.

17           THE COURT:  Sustained.

18   Q    Did you ever see Levi Katanov fire anybody from the Main

19   Street location where you worked?

20           MR. SCHWEITZER:  Objection, outside the scope.

21           THE COURT:  Overruled.

22   A    No, I have not.

23   Q    When you were paid, the owner Michael paid you; right?

24   A    Yes.  I was paid by Michael but he mentioned to me that

25   he-

Sun - cross - Mr. Samuel                    127

1          MR. SCHWEITZER:  Objection.

2    Q    I am only asking who paid you.

3          THE COURT:  Listen to the question and answer the

4    question.  Your attorney has the opportunity to follow up

5    with additional questions if he wants.

6    A    Okay.  It was Michael.

7    Q    Levi never paid you; isn't that correct?

8    A    Correct.

9    Q    Now, earlier you testified that on occasion Levi would

10   come in and take some supplies in the store; is that correct?

11   A    Yes.

12   Q    And, sir, you don't have any personal knowledge as to

13   whether Levi paid for those supplies or not; isn't that

14   correct?

15         MR. SCHWEITZER:  Objection.

16         THE COURT:  Overruled.

17   A    Correct.  I don't know.

18   Q    Now, is it also correct that you don't know whether

19   Michael Yagudaev and Levi Katanov are business partners in

20   any way; isn't that true?

21         MR. SCHWEITZER:  Outside the scope.

22         THE COURT:  Overruled.

23   A    I know.

24   Q    Okay.  Sir, do you recall giving a deposition in this

25   case?

 1          Do you recall giving a deposition in this case?

 2  A    When?

 3  Q    July 5th, 2018.

 4  A    I don't remember.

 5          MR. SCHWEITZER:  May I have this marked as

 6  Defendants' Exhibit C.

 7          May I approach the witness?

 8          THE COURT:  Sure.

 9  Q    I want to direct your attention to page 25, sir, line 21

10  of this document.

11          Let me direct your attention to page 24.

12          Do you remember being asked that question, if you

13  can please read that question?

14          MR. SCHWEITZER:  Objection, line number.

15  Q        "Q.  Do you know if Michael Yagudaev and Levi

16  Katanov are partners in this whole Sushi Fussion chain of

17  restaurants?

18          "A.  I don't know?"

19  A    It's been a long time.  I don't remember.  I remember

20  Michael telling me --

21          MR. SCHWEITZER:  Objection.

22          THE COURT:  I think you answered the question.  I

23  ask you to pay attention to what the question is and just

24  answer that.

25  Q    So do you remember that answer that you don't know

1   whether they are partners?

2   A    I don't remember.

3   Q    Sir, do you have any personal knowledge as to whether

4   Levi Katanov and Michael Yagudaev share a common set of

5   accounting books?

6            MR. SCHWEITZER:  Beyond the scope.

7            THE COURT:  Overruled.

8            THE WITNESS:  I don't know.

9   Q    Do you know if they share a common bank account?

10  A    I don't know.  I only know that their store has the same

11  name.

12  Q    Okay.  So you don't know if the Sushi Fussion stores

13  that are run by Michael Yagudaev and the stores run by Levi

14  Katanov have any legal ownership?

15           MR. SCHWEITZER:  Assuming a legal conclusion.

16           THE COURT:  Overruled.

17           THE INTERPRETER:  Can repeat the question?

18  Q    Do you have any personal knowledge of stores owned

19  between Michael Yagudaev and the stores owned by Michael

20  Katanov?

21  A    I know they share the same name just like McDonald's.

22  There are so many McDonald's in America.

23  Q    Aside from sharing the same name, that is about all of

24  the personal knowledge you have; isn't that correct?

25  A    Right.  They have the same name.

1          MR. SAMUEL:  I have no further questions.

2          THE COURT:  Any redirect?

3          MR. SCHWEITZER:  Yes, your Honor.

4   REDIRECT EXAMINATION

5   BY MR. SCHWEITZER:

6   Q    Not only did the Sushi Fussion restaurants have the same

7   name, they also --

8          MR. SAMUEL:  Objection.

9          MR. SCHWEITZER:  Withdrawn.

10  Q    You testified on direct about Sushi Fussion Express's

11  menu.  What-

12         MR. SAMUEL:  Objection.

13  Q    What information, if any, was on the Sushi Fussion menu?

14         MR. SCHWEITZER:  Beyond the scope.

15         THE COURT:  Overruled.

16  A    All the locations of the restaurant.

17  Q    Would that include addresses?

18  A    Correct.

19  Q    Would it include phone numbers?

20  A    Yes.  Everything is on there.

21  Q    What was the full extent of the information on Sushi

22  Fussion Express's menu?

23         THE INTERPRETER:  Can you please repeat the

24  question?

25  Q    You said everything was on there.

1            What was the full extent of the information on

2   Sushi Fussion Express's menu about other Sushi Fussion

3   restaurants?

4   A    Their addresses, phone numbers, and the minimum for

5   delivery.

6   Q    What does that mean; a delivery radius?

7   A    Right.  The minimum a customer should pay in order to

8   get a delivery.

9   Q    I see.

10           You mentioned on direct that the cash register was

11  next to the sushi bar; right?

12           MR. SAMUEL:  Objection, beyond the scope.

13           THE COURT:  Where are you going with this?

14           MR. SCHWEITZER:  There was questions about his

15  personal knowledge about payments made by Mr. Katanov.

16           THE COURT:  Overruled.

17  A    Correct.

18  Q    Were you able to observe from your station at the sushi

19  bar whether anyone put money into or took money out of the

20  cash register?

21  A    Correct.

22  Q    Did you ever observe Mr. Katanov either putting money

23  into or taking money out of the cash register?

24  A    I don't remember.

25  Q    You don't remember whether you observed, or you don't

Sun - Redirect - Mr. Schweitzer          132

1    remember observing?

2    A     I didn't understand.

3              MR. SCHWEITZER:  Withdrawn.

4              Before I ask my next question, your Honor, there is

5    apparently an evidentiary issue.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                    133

1              (At the side bar.)

2              MR. SCHWEITZER:  I am going to ask him what it was

3    he was trying to say about what Michael told him -- what

4    Michael told him he testified to at deposition.

5              MR. SAMUEL:  Michael told him about what?

6              MR. SCHWEITZER:  Page 9, lines 19 through 24.

7              Who is the owner.

8              He already said Michael is the owner.  He says

9    Michael is the majority owner.

10             MR. SAMUEL:  No.  He testified on direct that

11   Michael is the owner and-

12             THE COURT:  This is Michael who allegedly made the

13   statements to him?

14             MR. SCHWEITZER:  Yes.

15             THE COURT:  Why are statements of Michael --

16             MR. SCHWEITZER:  They are opponents.

17             MR. SAMUEL:  He is not the opponent at this trial.

18             MR. SCHWEITZER:  Yes, in this case.

19             MR. SAMUEL:  No.

20             MR. SCHWEITZER:  Just because he hasn't shown up at

21   this trial does not mean his statements are admissible.  I

22   can look at that over a break.

23             THE COURT:  This is not a criminal trial.  It is

24   hearsay whether it is a target opponent against another

25   person at the trial.  I am familiar with the matter coming up
```

Sidebar                                                    134

1  in a criminal context.  Tell me what you want to say about

2  this.

3          MR. SAMUEL:  Like you said, it is not against our

4  party.  It is against a different party and that would be

5  inadmissible hearsay.

6          MR. SCHWEITZER:  The statement is from a part I

7  about.

8          THE COURT:  I got the issue.  I am going to need to

9  take a minute.  It is a statement of a different party

10  opponent.  It is not a statement against Mr. Katanov.

11          MR. SAMUEL:  Your Honor, also we can't forget one

12  of the first questions he answered on direct was that Michael

13  is the owner.  He said he doesn't know if they share a common

14  set of books.  He has no idea if they are partners in the

15  business.  So...

16          MR. SCHWEITZER:  What kind of employee is going to

17  know these things?  We're dealing with a sushi chef.

18          MR. SAMUEL:  That is clearly inadmissible hearsay.

19          THE COURT:  Give me a moment and I will look at

20  this issue.

21          MR. SCHWEITZER:  It probably does matter Michael

22  defaulted.  There is no way to question him about it.

23          MR. SAMUEL:  He could have been subpoenaed to the

24  trial.

25          THE COURT:  The argument you are making is it is a

Sidebar                                          135

1    statement of a party opponent and admissible on that basis.

2              Is there any exception to the hearsay?

3              MR. SCHWEITZER:  On that basis, I suppose it would

4    be best evidence because Mr. Yagudaev has disappeared off the

5    face of the earth.

6              THE COURT:  There is no best evidence exception to

7    hearsay.

8              MR. SCHWEITZER:  You can't serve a subpoena.

9              THE COURT:  Sit down and give me a second.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          136

1              (In open court; jury present.)

2              THE COURT:  My suggestion is it is 12:01.  I think

3    it is a reasonable lunch break.  I need to look at an issue

4    raised by the parties.

5              Why doesn't everyone come back at 1:00.

6              (Jury excused.)

7              MR. SAMUEL:  We did some research.  It looks like

8    the operative rule is 81(d), which talks about hearsay

9    admission by a party opponent and here are the exceptions for

10   admissions by a party opponent.  There are five categories.

11   It doesn't fit any of these five.  Number one, it has to be

12   his own statement.  Either in his individual or

13   representative capacity.  That doesn't fit.  None of the

14   other four fit.

15             MR. SCHWEITZER:  Your Honor, respectively,

16   801(2)(b) fits, when the party manifested or adopted or

17   believed it to be true.

18             THE COURT:  That I haven't heard anything about so

19   far.

20             MR. SCHWEITZER:  It hasn't been done so far in

21   light of what is in Exhibit 5.

22             THE COURT:  So tell me what the basis is.  Your

23   theory this is a statement that is offered against Mr.

24   Katanov and Mr. Katanov manifested that he adopted or

25   believed it to be true.  What is the statement and what is

Proceedings                137

1   the evidence that Mr. Katanov adopted or believed it to be

2   true.

3          MR. SCHWEITZER:  So the evidence that Mr. Katanov

4   adopted or believed to be true is on the website for Sushi

5   Fussion Express, known there as Sushi Restaurant Flushing.

6          THE COURT:  So I don't get lost, what is the

7   statement?  The statement is a statement of Mr. Yagudaev that

8   Levi is a partial owner; is that right?

9          MR. SCHWEITZER:  The statement is a statement by

10  Sushi Fussion, LLC.

11         THE COURT:  I am asking what is the hearsay

12  statement you are arguing over.

13         MR. SCHWEITZER:  The statement is owners, Levi and

14  Michael, have set out to create --

15         THE COURT:  I thought it was something from a

16  deposition he was going testify.

17         MR. SCHWEITZER:  He would testify that Michael made

18  a statement to him that Levi was an owner.

19         THE COURT:  So Levi adopted that to be true how?

20         MR. SCHWEITZER:  By putting it on the website that

21  Levi and Michael were owners of Sushi Fussion.

22         MR. SAMUEL:  It says they are owners but it

23  doesn't -- they are jointly owners in separate stores.

24         MR. SCHWEITZER:  It doesn't say that.

25         MR. SAMUEL:  A lot of McDonald's are owned by --

Proceedings                          138

1          MR. SCHWEITZER:  Sushi Cuisine on Kings Highway

2    doesn't mention --

3          THE COURT:  Since I have a little bit of time, I am

4    going to spend time looking at it.  The parties have to

5    manifested, adopted the statement to be true.  The question

6    is whether or not there is some extrinsic evidence from which

7    he can conclude he was an owner, but whether there is

8    something you can agree with his statement Mr. Yagudaev.  It

9    seems like it is circumstantial evidence that he was in fact

10   an owner.  It would be circumstantial evidence that he was in

11   fact an owner but also a statement by the person in control

12   of a website.

13          Do you know that Mr. Katanov controlled the

14   website?

15          MR. SCHWEITZER:  Yes.  It was copyrighted by Sushi

16   Fussion, LLC, and we stipulated that Mr. Katanov was an owner

17   of Sushi Fussion.

18          MR. SAMUEL:  The website is not in evidence at this

19   point.  Second of all, if it gets into evidence at some

20   point, we can definitely cross-examine Levi about it.

21          THE COURT:  The evidence that this website is a

22   statement of Mr. Katanov is that the website is copyrighted

23   by Sushi Fussion, LLC, and that Mr. Katanov is an owner of

24   Sushi Fussion, LLC?

25          MR. SCHWEITZER:  Yes.

Proceedings                      139

1          THE COURT:  Can I see the website?

2          MR. SCHWEITZER:  The statement is on page 5.  The

3    copyright is on page 6.

4          THE COURT:  This Sushi Fussion is the one in the

5    market?

6          MR. SCHWEITZER:  No, 7132 Main Street.  The

7    supermarket was also on Main Street but in a different

8    location.

9          THE COURT:  Are these witnesses testifying about

10   working at this one?

11         MR. SCHWEITZER:  Yes.

12         MR. SAMUEL:  The owners, Levi and Michael,

13   collectively each own separate restaurants.

14         THE COURT:  You all can put in the website and

15   argue.  Is this the location of the restaurant?

16         MR. BERESIN:  The basis for him to testify is not

17   that.  It is based on Michael telling him.

18         THE COURT:  As I understand the arguments, this is

19   effectively a hearsay statement.  He is going to testify is

20   effectively a statement of Mr. Katanov.  Mr. Katanov

21   effectively adopted this statement and other statements on

22   the website.  My first reaction is not how you normally adopt

23   a statement.  I am not sure these are attributable to Mr.

24   Katanov.

25         Let me take another look at the issue and see if I

1    can find some cases.

2              I am trying to limit the side bars.  If there are

3    other evidentiary issues that will come up, I would like to

4    cut them out during the lunch break.

5              (Luncheon recess.)

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2          (Time start: 1:00 p.m.)

3          THE COURT:  Let me just speak to the evidentiary

4    issue we were discussing earlier, which was that whether

5    statements that Mr. Yagudaev made about Mr. Katanov's alleged

6    ownership of the restaurant are admissible.  I don't think

7    those statements are admissible.  I did additional looking

8    around at the break.  I think where we landed was that the

9    basis being offered is they were statements adopted or

10   acquiesced by Mr. Katanov and that was the theory of their

11   admissibility.

12          Here is what McCormick on evidence says about that.

13   It says that knowledge of the contents of the statement is

14   ordinarily essential for a party like Mr. Katanov appears to

15   be adopting or acquiescing Mr. Yagudaev's statements.  It is

16   not inevitably so.  You can have a situation where so and so

17   or Mr. Katanov said, So and so, like Mr. Yagudaev, is a

18   reliable person and knows what he is talking about.  That may

19   be an adoption of those statements by Mr. Yagudaev without

20   knowledge of the contents of the statement.

21          Here, we don't have any kind of conduct that

22   manifests adoption or acquiescence.  We don't have any

23   evidence that Mr. Katanov knew about this statement.

24   Instead, what we have is some other evidence from which a

25   jury could conclude that Mr. Katanov was an owner of the

Proceedings                                                        142

1    restaurant, evidence on the website.

2              Give me one second, Mr. Chan, before the jury comes

3    in.

4              THE DEPUTY CLERK:  Yes, Judge.

5              THE COURT:  Other evidence on the website, a

6    consistent statement with what Mr. Yagudaev said.  I don't

7    think that is what the rule is talking about when it talks

8    about adopting or acquiescing.  That is where I am at on that

9    issue.

10             Any areas that you want to go into on redirect?

11             MR. SCHWEITZER:  No.  I wasn't planning to do

12   anything else on redirect for this witness.

13             THE COURT:  Is there any recross?

14             MR. SAMUEL:  No, no recross.

15             THE COURT:  I will have the witness take the stand

16   and then we'll excuse the witness.

17             Any further redirect of Mr. Sun?

18             MR. SCHWEITZER:  No, your Honor.

19             THE COURT:  Any recross?

20             MR. SAMUEL:  No, your Honor.

21             THE COURT:  Mr. Sun, you are excused.

22             THE INTERPRETER:  Are we excusing the witness?

23             THE COURT:  Yes.  We're excusing the witness.

24             (Witness excused.)

25             THE COURT:  Who is your next witness?

Chipengule - Direct - Schweitzer                    143

1            MR. SCHWEITZER:  Mr. Chipungule.

2            THE DEPUTY CLERK:  Mr. Chipungule, please stand and

3    raise your right hand.

4            **CHARLES CHIPENGULE**, called by Plaintiff, having

5    been first duly sworn, was examined and testified as follows:

6            THE DEPUTY CLERK:  Please be seated.

7    DIRECT EXAMINATION

8    BY MR. SCHWEITZER:

9    Q    State your full name for the record.

10   A    Charles Chipungule.

11   Q    Are you familiar with a restaurant called Sushi Fussion

12   Express?

13   A    Yes.

14   Q    How are you familiar with it?

15   A    I used to work with it.

16   Q    What was your position there?

17   A    Cook.

18   Q    How did you get your position there?

19   A    I was told about the job by a friend who used to work

20   there.

21   Q    What friend was this?

22   A    That is Denzel.

23   Q    What was Denzel's position?

24   A    He used to work the same position as I did, cook.

25   Q    When you say "cook," is that distinct from a sushi chef?

Chipengule - Direct - Schweitzer                144

1    A    Yes.  I prepared what goes into the sushi.  All that is

2    used to prepare the sushi.

3    Q    Where is your workstation?

4    A    In the kitchen behind the sushi.

5    Q    Do you handle cooking food as well as preparing sushi

6    ingredients?

7    A    Yes.

8    Q    Did you work with Denzel at Sushi Fussion Express?

9    A    For a while until he left.

10   Q    After Denzel told you about the job opening at Sushi

11   Fussion Express, what did you do?

12   A    I went to the place and I talked to Michael.

13   Q    What did you and Michael talk about?

14   A    About the position, the cook position.

15   Q    Your duties?

16   A    Excuse me?

17   Q    Did you talk about your duties?

18   A    Yes.  He did mention my duties.

19   Q    Did you talk about your salary?

20   A    Yes, he did.

21   Q    Did you talk your schedule?

22   A    Yes, we did.

23   Q    Was anyone else involved in this conversation?

24   A    No.  No.

25   Q    When did you learn you would be hired?

1   A    Same day I was told to come back whenever I was ready to

2   work, which was the next day.

3   Q    Michael told you that?

4   A    Yes.

5   Q    At the end of your interview?

6   A    Yes.

7   Q    Was anybody else involved in your interview?

8   A    No.

9   Q    Was Denzel involved in your interview?

10  A    No.

11  Q    Was Yang Yang Gao involved in your interview?

12  A    No.

13  Q    Did you know Yang Yang Gao before you started working at

14  Sushi Fussion Express?

15  A    No.

16  Q    Did you and he work alongside each other?

17  A    I am not sure about the question.

18  Q    Did you work at the same workstation?

19  A    No.

20  Q    How would you know what sushi ingredients to prepare or

21  what dishes to prepare?

22  A    When any chef was working out front, he would let me

23  know what they needed for the order -- the order they needed

24  at that current time.  If he needs something.  I need sweet

25  potatoes.  So I provide that.

1  Q    Lean into the mic.

2  A    For instance if he said, I need sweet potatoes, I would

3  prepare that for the sushi he was asking me.

4  Q    Who would tell you that?  Sushi chef?  Somebody else?

5  A    Sushi chef.

6  Q    Was there a particular sushi chef that gave you requests

7  to prepare food to go into sushi -- withdrawn.

8        Was there a particular sushi chef that gave you

9  requests to prepare items for sushi?

10 A    No.

11 Q    Did you receive such requests from Wei Yang Gao?

12 A    Yes.

13 Q    Did you receive such requests from Sun Zhenkai?

14 A    Yes.

15 Q    Did you receive similar questions from Yang Yang Gao?

16 A    Yes, I did.

17 Q    Did those requests differ in any substantial way?

18 A    Yes, they did.

19 Q    How did they differ?

20 A    According to the sushi roll we were making.  So the

21 ingredients mostly differed.

22 Q    It is just what ingredient you were asked to prepare?

23 A    Correct.

24 Q    Did the manner in making the requests differ from person

25 to person?

Chipengule - Direct - Schweitzer                147

1   A    No.

2   Q    How much time did you spend typically preparing sushi

3   ingredients versus preparing cooked dishes?

4   A    How much time did I spend making --

5   Q    As a proportion.  50/50?  60/40?  70/30?

6   A    I did most of the -- the biggest part was preparing the

7   sushi ingredients.  There were not a lot of cooked items in

8   the sushi.

9   Q    Are you familiar with Hibachi Express?

10  A    Yes, I am.

11  Q    How are you familiar with that?

12  A    I used to work there.

13  Q    How did you come to work there?

14  A    Michael introduced the job to me.  He told me he was

15  opening a new location.

16  Q    What was your job at Hibachi Express?

17  A    I was cooking.  Cook.

18  Q    What did that entail?

19  A    Entailed making, like, dishes for the customers.

20  Q    These are all cooked dishes?

21  A    Cooked dishes, correct.

22  Q    At some point did your employment at Hibachi Express

23  end?

24  A    Could you please repeat?

25  Q    At some point did you stop working at Hibachi Express?

Chipengule - Direct - Schweitzer                148

1   A     Yes, I did.

2   Q     What happened then?

3   A     It closed down.

4   Q     Where did you work next?

5   A     Sushi Fussion.

6   Q     Express?

7   A     Yes.

8   Q     How did you come to be transferred from Hibachi Express

9   to Sushi Fussion Express?

10  A     Michael transferred me.

11  Q     What was your job at Sushi Fussion Express the second

12  time you worked there?

13  A     I was prepping the hibachi items as well as the sushi

14  items like before.

15  Q     What was the difference about preparing hibachi items?

16  A     From the previous place?

17  Q     From your previous time working at Sushi Fussion

18  Express, correct.

19  A     There was no difference.  We were making the same except

20  it is a different location.

21  Q     Were you preparing hibachi items when you first worked

22  at Sushi Fussion Express?

23  A     No.

24  Q     You started preparing hibachi the second time you worked

25  at Sushi Fussion Express?

Chipengule - Direct - Schweitzer                    149

1    A    Correct.

2    Q    Why is that?

3    A    Because he closed that store and combined the sushi with

4    the hibachi.

5    Q    So around the time you started working the second time

6    at Sushi Fussion Express, Sushi Fussion Express started off

7    with hibachi items?

8    A    Yes.

9    Q    During your second term of employment at Sushi Fussion

10   Express, approximately what proportion of your time was spent

11   preparing sushi ingredients and what portion of your time was

12   spent preparing hibachi?

13   A    I would say 60 percent was more the sushi and about less

14   was the hibachi.

15   Q    Are you familiar with Leva Katanov?

16   A    Yes.

17   Q    How are you familiar with him?

18   A    Michael introduced him to me.

19   Q    Where did this introduction take place?

20   A    In the store in the kitchen.  I think in the kitchen.

21   Q    At which location?

22   A    In the kitchen in the Sushi Fussion location.

23   Q    Was that during your first period or second period of

24   employment at Sushi Fussion Express?

25   A    This was the first period.

1   Q    Did you see Mr. Katanov after that introduction?

2   A    I did see him a couple of times in the store.

3   Q    Where in the store did you see him?  From the front?  In

4   the dining room?  In the kitchen?

5   A    I would say he would come and observe everywhere.  In

6   the kitchen and go back out.

7   Q    Were members of the general public permitted in the

8   kitchen?

9   A    No.

10  Q    When Mr. Katanov came into the kitchen at Sushi Fussion

11  Express, what would he do?

12  A    He would normally observe and walk around and talk to

13  Michael.  Most of the times he spoke to Michael.

14  Q    When you say "observe," what do you mean?

15  A    Like, just walk into the place and look around.  Go to

16  the back and say hi to the guys in the kitchen.

17  Q    Did he give you any instructions?

18  A    He did not directly give me the instructions.

19  Q    Would he speak to you?

20  A    Yes.

21  Q    What would he speak to you about?

22  A    So he offer suggestions like how to keep the place clean

23  or how to cut sweet potatoes to help them cook faster.

24  Q    What suggestions would Mr. Katanov offer regarding

25  cleanliness?

1    A    Like to clean the front.  Like to keep the place clean.

2    Q    How so?

3    A    Because it was dirty, I guess.

4    Q    When you say "the front," what do you mean?

5    A    Well, where the customers come in.  Like, the front of

6    the house.

7    Q    The kitchen, did he offer any suggestions regarding

8    cleanliness in the kitchen?

9    A    In the kitchen it was more of the cooking I'd say.  Not

10   the cleaning.

11   Q    What suggestions did he offer regarding your cooking?

12   A    A suggestion like how to cut the potatoes and how to do

13   it faster.  So it comes out faster, the size, I would cut

14   them smaller or in a different way.

15   Q    Did you implement Mr. Katanov's suggestions?

16   A    Yes.

17   Q    Why?

18   A    Because they were valid.

19   Q    Why were they valid?

20   A    Well, because Mike told me he is the big boss so...

21        MR. SAMUEL:  Objection.

22        THE COURT:  Sustained.

23        MR. SAMUEL:  Move to strike.

24        MR. SCHWEITZER:  Objection.

25        THE COURT:  Struck.

1  Q    Would there be any consequences if you did not implement

2  Mr. Katanov's suggestions?

3             MR. SAMUEL:  Objection.

4             THE COURT:  You can ask him in a way that asks for

5  the basis of knowledge.

6  Q    What, if anything, did you think would happen if you did

7  not implement Mr. Katanov's suggestions?

8  A    I have no idea because I always did.

9             MR. SCHWEITZER:  Nothing further.

10            THE COURT:  Cross.

11 CROSS-EXAMINATION

12 BY MR. SAMUEL:

13 Q    Good afternoon, Mr. Chipungule.

14 A    Good afternoon.

15 Q    I should have a couple of questions for you.

16            Mike Yagudaev was the owner of the store that you

17 worked at; isn't that correct?

18            MR. SCHWEITZER:  Objection, basis for knowledge.

19            THE COURT:  Rephrase.

20 Q    Do you know who owned the store where you worked at?

21 A    No.

22 Q    Do you know if Michael owned the store?

23            MR. SCHWEITZER:  Objection, asked and answered.

24            THE COURT:  Sustained.

25 Q    Who is your boss?

Chipengule - Cross - Samuel                  153

1    A    Michael.

2    Q    Is that Michael Yagudaev?

3    A    Correct.

4    Q    And is it fair to say that you don't know anything about

5    the business relationship, if any, that existed between

6    Michael and Levi; isn't that correct?

7    A    That is fair.

8    Q    You never worked for Levi Katanov, have you?

9    A    No.

10   Q    Levi Katanov never paid you your salary?

11   A    No.

12   Q    He didn't hire you?

13   A    No.

14   Q    You don't know if Levi Katanov receives any share of the

15   profits from the Sushi Fussion that you worked at; isn't that

16   right?

17   A    No, I don't know.

18   Q    And you don't know if Levi Katanov had any ownership

19   interest in Hibachi Express; isn't that right?

20   A    Would that normally be, like, if I heard it from someone

21   else?

22   Q    No.  Only your personal knowledge.

23   A    Personal, no.

24   Q    You don't know whether Levi Katanov had any ownership

25   interest in either of the two locations you worked at; is

1    that right?

2    A    That is correct.

3    Q    The Sushi Fussion that you worked at was 7132 Main

4    Street?

5    A    Correct.

6    Q    That is called Sushi Fussion Express?

7    A    Express.

8              MR. SAMUEL:  I have nothing further.

9              THE COURT:  Any redirect?

10             MR. SCHWEITZER:  No.

11             THE COURT:  Thank you, Mr. Chipungule.

12             THE WITNESS:  Thank you.

13             (Witness excused.)

14             THE COURT:  Who is the next witness?

15             MR. SCHWEITZER:  Yang Yang Gao.

16             THE DEPUTY CLERK:  Mr. Gao, please stand and raise

17   your right hand.

18             (Continued on next page.)

19

20

21

22

23

24

25

1        **YANG YANG GAO**, called by Plaintiff, having been

2    first duly sworn, was examined and testified as follows:

3            THE DEPUTY CLERK:  Thank you, Mr. Gao.  Please be

4    seated.

5    DIRECT EXAMINATION

6    BY MR. SCHWEITZER:

7    Q    Good afternoon, Mr. Gao.

8            Please state your full name for the record.

9    A    My name is Yang Yang Gao.

10   Q    Are you known by any other names?

11   A    Yes.

12   Q    What other names?

13   A    Eddie Gao.

14   Q    Eddie being an English name?

15   A    Yes.

16   Q    Are you familiar with any restaurant Sushi Fussion in

17   Forest Hills?

18   A    Yes.

19   Q    How are you familiar with it?

20   A    I work there.

21   Q    When did you work there?

22   A    In 2011.

23   Q    From when to when in 2011 approximately?

24   A    From August to September.

25   Q    How did you come to work there?

1  A    I found the information on the internet and then I got

2  in contact with the boss Leo.

3  Q    Leo, does that refer to Levi Katanov?

4  A    Yes.

5  Q    Do you mind if I call him Leo going forward?

6        Would you know who I am talking about?

7  A    Yes.

8  Q    After you saw and ad online what, did you do?

9  A    He asked me to come over for interview.

10 Q    Did you call him on the phone?  Did you email him?  Did

11 you text him?

12 A    I called him.

13 Q    During that phone conversation, he told you to come for

14 an interview?

15 A    Correct.

16 Q    What else, if anything, was said by you or by him during

17 that phone conversation?

18 A    He asked me to go to the store for an interview.

19 Q    Did he tell you what store to go to?

20 A    Yes.

21 Q    What store did he tell you to go to?

22 A    Forest Hills.

23 Q    Did you go to Forest Hills for an interview?

24 A    Yes.

25 Q    When you went for an interview, did you observe other

Y. Gao - Direct - Schweitzer                157

1   sushi workers already working?

2   A    Yes.

3   Q    What was said during your interview?

4   A    He asked me how long have I worked.

5   Q    What did you say?

6   A    I said that I have worked for five years.

7   Q    As a sushi chef?

8   A    Correct.

9   Q    What else, if anything, did he say to you?

10  A    He asked me to go for the interview and then show him

11  how I make rolls.

12  Q    Did you demonstrate making rolls for Mr. Katanov?

13  A    Yes.

14  Q    Was anybody else involved in this interview besides

15  yourself and Mr. Katanov?

16  A    No.

17  Q    In 2011 were you able to speak and understand at least

18  some English?

19        THE INTERPRETER:  Can you repeat that?

20  Q    In 2011 were you able to speak and understand at least

21  some English?

22  A    Those basics, yes.

23  Q    Did your interview with Mr. Katanov take place in

24  English?

25  A    Yes.

1  Q    During your interview, did you and Mr. Katanov discuss

2  what schedule you would be working?

3  A    Yes.

4  Q    What was discussed?

5  A    After the interview, he asked me to go talk at the

6  entrance and we talked about salary and working schedule.

7  Q    What working schedule were you told on the day of your

8  interview?

9  A    From Sunday to Thursday from 10:30 a.m. to 10:00 p.m.

10         THE INTERPRETER:  Can the interpreter clarify

11  something with the witness?

12         MR. SCHWEITZER:  Please.

13  A    On Friday after the sunset, we should be off work

14  because of Jewish rules.

15  Q    On Friday if your work ended at sundown, when did it

16  begin?

17         THE INTERPRETER:  Can you repeat that?

18  Q    For Friday if your work ended at sundown, when did your

19  workday begin?

20  A    10:00.

21  Q    Did you work at any span of time on Saturday?

22  A    Yes.

23  Q    What span of time?

24  A    Starting from around 6:30 p.m. to 12:00 at night.

25  Q    You also said that you were informed of your salary on

1    the day of your interview.

2           What salary were you informed of?

3    A    750.

4    Q    Per unit of time?

5           THE INTERPRETER:  Can the interpreter verify

6    something with the witness?

7    Q    Let me see if I can ask the question in a clearer way.

8           Was that $750 per week?  Per day?  Per month?  Per

9    year?

10   A    750 per week.

11   Q    Was that salary expressed to you in terms of an hourly

12   rate?

13   A    No.

14   Q    Would you make the same -- withdrawn.

15          Sundown changed from week to week; right?

16   A    Right.

17   Q    Days were longer in the summer and shorter in the

18   winter?

19   A    That's right.

20   Q    Would you get paid the same $750 per week if you were

21   working in the summer as opposed to if you were working in

22   the winter?

23   A    Correct.

24   Q    Were you told what position you were being hired for?

25   A    Yes.

1   Q    What position were you told you were being hired for?

2   A    Sushi chef.

3   Q    Were you told you were being hired as a manager or

4   supervisor?

5   A    No.

6   Q    Were you told you were hired as the head sushi chef?

7   A    No.

8   Q    You mentioned that at the time you were hired there were

9   already sushi chefs employed at Sushi Fussion Forest Hills.

10            Who were they?

11  A    You said who are they?  Are you asking for their names?

12  Q    If you know.

13  A    Ray.  Another person's name who I forgot.

14  Q    There were two sushi chefs aside from you once you were

15  hired?

16  A    Correct.

17  Q    Forest Hills, were there days when there would be only

18  two sushi chefs on duty?

19  A    Correct.

20  Q    What days would those be?

21  A    From Monday to Wednesday.

22  Q    Each sushi chef would have one Monday, Tuesday, and

23  Wednesday off?

24  A    Correct.

25  Q    Do you recall which Monday or Tuesday or Wednesday was

1    your day off?

2    A    Wednesday.

3    Q    On Monday you would be working with either Ray or the

4    other sushi chef and on Tuesday you would working with either

5    Ray or the sushi chef?

6    A    Correct.

7    Q    Wednesdays Ray and the other sushi chef would be working

8    without you?

9    A    Correct.

10   Q    Were you given any onboarding paperwork when you were

11   hired at Forest Hills?

12   A    No.

13   Q    Were you given any piece of paper to take home with you

14   at the time you were hired at Forest Hills?

15   A    No.

16   Q    How did Mr. Katanov tell you what your salary would be?

17   Verbally?  In writing?  Or some other way?

18   A    Verbally.

19   Q    At the time you were hired, were you told you would be

20   exempt from receiving overtime pay?

21   A    No.

22   Q    At the Forest Hills location, did you see any posted

23   notices regarding federal or state wage and hour law?

24   A    No.

25              (Continued on next page.)

Y. Gao - Direct - Schweitzer                    162

1   DIRECT EXAMINATION

2   BY MR. SCHWEITZER:   (Continuing)

3   Q    At Forest Hills, how would you spend your working days?

4   What would you do?

5   A    I just made rolls for the whole day.

6   Q    Did you do anything at Forest Hills besides making rolls?

7   A    No.

8   Q    How were the tasks divided up between sushi chefs,

9   between Ray, yourself and the other individual?

10  A    Could you repeat the question?

11  Q    How was it decided who would do Task A or Task B or Task

12  C?

13  A    We did together.

14  Q    You decided among yourselves?

15  A    The person who answered the phone gave me the order and I

16  would do it.

17  Q    If the person who answered the phone gave you the order,

18  you would do the order; if the person who answered the phone

19  gave Ray the order, Ray would do the order; that sort of

20  thing?

21  A    Correct.

22  Q    Did Ray ever assign you orders or tasks to do?

23  A    No.

24  Q    And to your knowledge, did Ray have any role in hiring or

25  firing other employees at Forest Hills?

1  A    This is only decided by the boss.

2  Q    To your knowledge, did Ray spread word of vacancies at

3  the restaurant at Forest Hills?

4        THE INTERPRETER:  Did you say spread the word of

5  vacancy for the restaurant at Forest Hills?

6        MR. SCHWEITZER:  Vacancies, job openings.

7        THE INTERPRETER:  Okay.

8  A    Yes.

9  Q    To your knowledge, why would he do that?

10 A    The boss would ask him to ask his friends whether anyone

11 would be willing to come to work.

12 Q    To your knowledge, is that a common practice in the

13 restaurant industry?

14       MR. SAMUEL:  Objection.

15       THE COURT:  Overruled.

16 A    Yes.

17 Q    To your knowledge, did the other sushi chef, the one

18 whose name you don't know, have any role in hiring or firing

19 other employees?

20 A    No.

21 Q    To your knowledge, did the other sushi chef whose name

22 you don't know spread word of vacancies at the restaurant?

23 A    No.

24 Q    To your knowledge, did the other sushi chef whose name

25 you don't know give you instructions or tasks to do?

1    A    No.

2    Q    All right.  We've talked about what schedule you were

3    told at your interview for Forest Hills.  What schedule did

4    you end up working once you started to work at Forest Hills?

5    A    You're talking about working schedule, right?

6    Q    Yes.  When did you -- what days did you work and when did

7    each day start and end?

8    A    August 11, 2011.  You want me to also tell you when I

9    stopped working?

10   Q    Oh, I think there's been some confusion.  I'm not asking

11   about the span of time you worked; you said it was from

12   August to September.

13          I'm asking you what days of the week did you work,

14   Monday, Tuesday, Wednesday, Thursday, et cetera.  And of those

15   days, when did your working day begin, what time of day, and

16   what time of day did you working day end?

17   A    My off day is on Wednesday.

18   Q    And from what time to what time did you work Sundays

19   through Thursdays, Fridays and Saturdays?

20   A    From Sunday to Tuesday, I start at 10:30 a.m. and finish

21   at 10:00 p.m.

22   Q    All right.  How about Thursday?

23   A    The same thing.

24   Q    How about Friday?

25   A    From 10:00 a.m. to sundown.

Y. Gao - Direct - Schweitzer                165

1   Q    And on Saturday?

2   A    6:30 to 12:00.

3   Q    Was there a time recording system -- for instance, a time

4   clock with punch cards, a sign-in sheet, an electronic

5   scanner -- at Forest Hills?

6   A    No.

7   Q    Did you ever miss a workday you were scheduled to work at

8   Forest Hills?

9   A    No.

10  Q    Because sundown was different from Friday to Friday, did

11  the hours that you worked at Forest Hills change from week to

12  week?

13        THE INTERPRETER:  Interpreter requires repetition.

14  A    The schedule varied on Friday and on Saturday.

15  Q    And does that mean the hours that you worked changed at

16  least somewhat from week to week?

17  A    Yes, but only for Friday and Saturday.  The rest remained

18  the same.

19  Q    And we talked about the salary you were promised at your

20  interview.  At Forest Hills, what salary did you end up

21  getting paid?

22  A    750.

23  Q    And who was it who paid you?

24  A    Leo, the boss.

25  Q    I'm sorry, when you said 750 a moment ago, are you

Y. Gao - Direct - Schweitzer                    166

1   referring to $750 per week?

2   A    Correct.

3   Q    How often did you get paid?

4   A    Once a week.

5   Q    And how did Leo give you your pay, by cash, by check, by

6   direct deposit?

7   A    Cash.

8   Q    And at Forest Hills, did you receive any other piece of

9   paper along with your pay?

10              THE INTERPRETER:  Along with your pay?

11              MR. SCHWEITZER:  Along with your pay, yes.

12              THE INTERPRETER:  Okay.

13  A    No.

14  Q    At Forest Hills, did you keep track of the stock, see

15  what was running low or tell the boss?

16  A    No.

17  Q    Who did that?

18  A    Ray.

19  Q    Did Ray exercise any authority over you, give you any

20  instructions or tasks to do related to keep stock of the

21  ingredients?

22  A    No.

23  Q    In a typical week, about how much time would Ray spend

24  informing the boss what needed to be ordered?

25  A    I'm not sure.

1  Q    Did Ray have any other additional duties that you did not

2  have?

3  A    That he needs to inform the boss when the ingredients are

4  low on stock.

5  Q    Besides that?

6  A    No, the rest the same.

7  Q    All right.  He said you worked at Forest Hills between

8  August to September.  Why did you stop?

9  A    Because he opened up a supermarket there and he asked me

10 to go work there.

11 Q    Were you the first sushi chef that went over to work

12 there?

13 A    No.

14 Q    Who preceded you?

15 A    There was another chef whose name I don't know.

16 Q    Was it anybody who had worked at Forest Hills or -- yes,

17 was it anybody who worked at Forest Hills?

18          THE INTERPRETER:  Were there anybody who worked at

19 Forest Hills?

20          MR. SCHWEITZER:  I apologize.  I was stumbling over

21 my words and wasn't clear.

22 Q    Was the sushi chef at the supermarket, the one who

23 preceded you, someone who had also worked at Forest Hills?

24 A    Yes.

25 Q    To your knowledge, how long had the other sushi chef

1    worked at the supermarket before you were transferred over?

2    A    For about a week.

3    Q    Did Leo tell you why he wanted you for the supermarket

4    job specifically?

5    A    Because he was busy.  No, let me think.

6              Because he wanted me to go there to help the other

7    sushi chef and work together.

8    Q    Did he tell you he wanted you to manage the location?

9    A    No.

10   Q    Did Leo give you any indication that you and the other

11   sushi chef would have different ranks?

12   A    No.

13   Q    And during your time working at the supermarket location,

14   were there ever more than two sushi chefs working at any one

15   time?

16   A    No.

17   Q    Were there any other employees at all working at the

18   supermarket?

19   A    Yes.

20   Q    What other employees?

21   A    One of them is Leo, the boss's partner.  The other person

22   answered the phone.

23   Q    When you say Leo, the boss's partner, are you referring

24   to Mr. Katanov?

25   A    No, his partner whose name is Rob.  Leo's partner, whose

1   name is Robert.

2   Q    Okay.  And who was the other person you mentioned?

3   A    Albert.

4   Q    Albert?

5   A    Yes.

6   Q    And Albert was the person answering the phone?

7   A    Yes.

8   Q    All right.  So there were four individuals at the glatt

9   kosher supermarket location working?

10  A    Correct.

11  Q    Was Mr. Katanov's partner, Robert, at the location at all

12  times?

13  A    Yes.

14  Q    Could Robert tell you what to do?

15  A    Yes.

16  Q    Could Robert tell the other sushi chef what to do?

17  A    Yes.

18  Q    Could Robert tell Albert, the person handling the phone,

19  what to do?

20  A    Yes.

21  Q    Could you tell the other sushi chef what to do?

22  A    Yes.

23  Q    Could the other sushi chef tell you what to do?

24  A    Yes.

25  Q    Could the receptionist tell you what to do?

Y. Gao - Direct - Schweitzer                    170

1    A    Yes.

2    Q    Could the receptionist tell the other sushi chef what to

3    do?

4    A    Yes.

5    Q    Given what you've said, who, if anyone, was in charge at

6    the supermarket?

7         MR. SAMUEL:  Note my objection.

8    Q    Who, if anyone, was in charge at the supermarket

9    location?

10   A    Robert.

11   Q    What tasks did you do on a regular basis for the

12   supermarket location?

13   A    I make rolls, prepare the ingredients and work on the

14   fryers.

15   Q    Did you tell Robert or Leo what supplies needed to be

16   ordered?

17   A    Yes.

18   Q    Did the other sushi chef also say that?

19   A    No.

20   Q    About how often did you tell Robert that supplies needed

21   to be ordered?

22   A    Once a week.

23   Q    And approximately how much time did you spend doing that?

24   A    About 15 minutes.

25   Q    Did that include counting up the inventory or only

1  talking to Robert?

2  A    I send him messages.

3  Q    By sending him messages, you're referring to text

4  messages?

5  A    Yes.

6  Q    And it took you 15 minutes to send those text messages?

7  A    Because I need to count the inventory and then send him

8  messages, so it was about 15 minutes.

9  Q    Why would you send Robert text messages if he was present

10 at the restaurant -- at the supermarket, rather?

11 A    Because sometimes he was outside.  But even when he's

12 inside, I always contact him by text message.

13 Q    Why when it was inside would you contact him by text

14 message?

15 A    Because this way he will be able to remember.

16 Q    The supermarket was a kosher supermarket, right?

17 A    Correct.

18 Q    When you went to work at the supermarket, did you have

19 any knowledge about how to keep kosher?

20 A    The boss mentioned it to me.

21 Q    Did you give any other workers instructions about how to

22 make sure the restaurant was kosher -- I'm sorry, the

23 supermarket was kosher?

24 A    The boss would always tell me or those at the supermarket

25 how to keep things kosher, or I would tell them because they

1   don't speak English.

2   Q    When you say the boss, who are you referring to?

3   A    Robert.

4   Q    And you would interpret between Robert and the other

5   sushi chef and Albert?

6   A    Yes.

7   Q    Now, what schedule did you work at the supermarket

8   location?

9   A    From Sunday to Thursday, 9:30 a.m. to 9:00 p.m..  Friday,

10  to sundown.  And Saturday, my day off.

11  Q    When did you learn that your schedule was changing?

12  A    Leo, the boss, would tell me.

13  Q    Was there a timekeeping mechanism in place for the

14  Sushi Fussion in the supermarket?

15           THE INTERPRETER:  Could you repeat that?

16  Q    Was there a timekeeping system in place for the

17  supermarket location, a punch clock, a scanner, a sign-in

18  sheet?

19  A    No.

20  Q    And if you worked from 9:30 to 9:00 Sundays through

21  Thursdays and 9:30 through sundown on Fridays, how many hours

22  would you work?

23  A    I'm not sure whether it is 63 hours.

24  Q    Okay.  Over the course of a two-week period, you would

25  work more than 40 hours, correct?

Y. Gao - Direct - Schweitzer                    173

1   A    Correct.

2   Q    And in the course of a one-week period, you would work

3   more than 40 hours, correct?

4   A    Correct.

5   Q    And what was your salary at the supermarket location?

6   A    850.

7   Q    Per week?

8   A    Correct.

9   Q    Why did your salary increase?

10  A    I asked him for it.

11  Q    Who did you ask?

12  A    Leo, the boss.

13  Q    Why did you ask for a raise?

14  A    Because it was busier.

15  Q    Was it your idea that your salary be raised, not Leo's?

16  A    It's my own idea.

17  Q    How did you get paid at the supermarket location, by

18  cash, by check, some other way?

19  A    One week would be cash and another week will be cash plus

20  check.

21  Q    How much by check and how much by cash on the second

22  week?

23  A    Check would be 300 and cash would be 550.

24  Q    Did you receive any written notice that your pay rate

25  would be changed?

Y. Gao - Direct - Schweitzer                    174

1   A    No.

2   Q    Did you receive any pay stubs with your pay?

3   A    There was no pay stub.

4   Q    Were there ever pay periods when you were not given a

5   check?

6           Let me clarify.  Were there ever pay periods when

7   you were supposed to be given a check like you would have

8   ordinarily been given a check, but were not?

9   A    No.

10  Q    Do you know why your pay was split up the way it was, one

11  week all cash, one week some by check, some by cash?

12  A    That's what they requested.

13  Q    "They" being who?

14  A    Leo, the boss.

15  Q    Do you know why he did things that way?

16  A    I don't know.

17  Q    Why did you accept being paid that way?

18  A    Because they request this, so -- and then I accepted it.

19  Q    On a typical day, what would you do at the supermarket?

20  A    Make rolls and also prepare the ingredients, make fried

21  items.

22  Q    Would it be fair to say that all those things can be

23  characterized as cooking?

24          THE INTERPRETER:  Could you please repeat that?

25  Q    Is it fair to say that all those things can be

1  characterized as some form of cooking?

2  A    Yes.

3  Q    Who opened and closed the supermarket location?

4  A    The supermarket just open.  When we go in, we can just

5  start working.  There is no such a thing in terms of who opens

6  it, who closes it.

7  Q    And to your knowledge, why was it you who gave Robert the

8  list of ingredients to order?

9  A    Because I worked there longer.

10  Q    Worked where longer?

11  A    The supermarket.

12  Q    Did the person who preceded you at the supermarket leave

13  at some point?

14  A    When I started working there, the person worked with me

15  for two days and then stopped working there.

16  Q    I see.  And were they replaced?

17  A    He stopped working.

18  Q    Was he replaced?  Did somebody else come and replace him?

19  A    Me.

20  Q    So wait a minute, was there a second sushi chef that came

21  in and replaced the sushi chef that left?

22  A    He left, I worked there, and then another person came.

23  Q    When did the other person come?

24  A    After he left.

25  Q    How soon after he left?

1   A    The next day.

2   Q    And who was the person who came and replaced the sushi

3   chef that had preceded you?

4   A    Chen Wei, sushi chef.

5   Q    Can you spell that?

6   A    Last name is Chen, C-h-e-n.  First name is Wei, W-e-i.

7   Q    And did Chen Wei continue working at the supermarket

8   location throughout the remainder of your employment there?

9           THE INTERPRETER:  The very last part?

10          MR. SCHWEITZER:  "The remainder of your employment

11  there."

12  A    Yes.

13  Q    Were you involved in Chen Wei's hiring at all?

14  A    Yes.

15  Q    How so?

16  A    Leo, the boss, asked me to find somebody for him.

17  Q    And how did you go about doing that?

18  A    I asked my friends.

19  Q    Chen Wei was one of your friends?

20  A    He's my friend's friend.

21  Q    And once Chen Wei expressed some interest in working at

22  the supermarket, what happened?

23  A    They came for an interview.

24  Q    Who did he interview with?

25  A    Leo, the boss.

1    Q    And where did that interview take place?

2    A    Inside the supermarket.

3    Q    Did Chen Wei speak English?

4    A    No.

5    Q    Did you participate in the interview?

6    A    Yes.

7    Q    In what capacity?

8    A    Interpreting.

9    Q    Did you say anything to Chen Wei during the interview

10   that was not an interpretation of something Leo had said?

11   A    No.

12   Q    And did the interview consist of just talking or was

13   there also a demonstration component?

14   A    Yes, there was demonstration of making sushi.

15   Q    And who did Wei Chen demonstrate making sushi to?

16   A    Leo, the boss.

17   Q    Who made the decision to hire Chen Wei?

18   A    Leo, the boss.

19   Q    When was that decision made, during the interview or

20   sometime after?

21   A    Interview.

22   Q    Did Leo ask you for your opinion as to Chen Wei, how Chen

23   Wei was working?

24   A    Yes.

25   Q    What did you say?

Y. Gao - Direct - Schweitzer                178

1   A    He asked me whether he was good.  I said, "Okay."

2   Q    When you said it was a strong recommendation?

3            MR. SAMUEL:  Objection.

4            THE COURT:  Sustained.

5   Q    Okay.

6            Was Wei Chen the only other person hired to work at

7   the supermarket after you were hired?

8   A    There were many others.

9   Q    In what position?

10  A    Sushi chefs.

11  Q    Were there ever more than two sushi chefs working at any

12  one time?

13  A    No.

14  Q    Did Chen Wei leave during your employment?

15  A    Yes.

16  Q    Who followed Chen Wei?  Who replaced Chen Wei?

17  A    Kimy Lin, my friend.

18  Q    How did Kimy Lin come to be hired?

19  A    Leo, the boss, asked me if any of my friends was

20  interested in a job.

21  Q    And Kimy Lin expressed interest?

22  A    He came for an interview.

23  Q    And what happened during that interview?

24  A    He demonstrated making rolls to the boss.

25  Q    And what happened after that?

1   A     After the demonstration, the boss told him to come work

2   the next day.

3               (Continued on the next page.)

1  DIRECT EXAMINATION

2  BY MR. SCHWEITZER: (Continuing)

3  Q    Did Kimy Lin leave the position during your employment?

4  A    Yes.

5  Q    Who replaced Kimy Lin?

6  A    Rico, R-I-C-O.

7  Q    How did Rico come to be employed?

8  A    Leo, the boss's partner, Robert, asked me to find

9  somebody who would be interested to come and work here.

10  Q    And how did you find Rico?

11  A    Through friend.

12  Q    Rico's a friend of a friend?

13  A    He is a person from my native place in China.

14  Q    Did you know him personally before he started to work at

15  Sushi Fussion?

16  A    Yes.

17  Q    And what happened after Rico expressed interest in

18  joining Sushi Fussion?

19  A    The next day he came to work.

20  Q    Was there an interview process before he came to work?

21  A    Yes.

22  Q    How did that interview process go?

23  A    He demonstrated making rolls to -- to Robert.

24  Q    Who was involved in that interview?

25  A    I was there.

1    Q    Did you speak?

2         THE INTERPRETER:  This is the interpreter.  Did you

3    say "Did you speak?"

4    Q    Did you speak during the interview?

5    A    I interpreted for him.

6    Q    "Him," being Robert?

7    A    Yes.

8    Q    When was the decision made to hire Rico?

9    A    After the interview.

10   Q    How long after the interview?

11   A    Right away.

12   Q    And who made that decision?

13   A    Robert.

14   Q    Based on what?

15   A    The rolls he made was okay.

16   Q    And did Rico continue to work through your employment?

17   A    Yes.

18   Q    Did you and Wei Chen work the same schedule?

19   A    Yes.

20   Q    Did you and Kimy Lin work the same schedule?

21   A    Yes.

22   Q    Did you and Rico work the same schedule?

23   A    Yes.

24   Q    To your knowledge, what was way Chen's rate of pay?

25   A    750.

1  Q    To your knowledge, did Wei Chen ever ask for a raise?

2  A    No.

3  Q    To your knowledge, was Wei Chen ever given a raise?

4  A    No.

5  Q    What was Kimy Lin's starting salary?

6  A    750.

7  Q    To your knowledge, did Kimy Lin ever ask for a raise?

8  A    No.

9  Q    To your knowledge, was Kimy Lin ever given a raise?

10 A    No.

11 Q    What was Rico's starting salary?

12 A    750.

13 Q    To your knowledge, did Rico ever ask for a raise?

14 A    No.

15 Q    And to your knowledge, was Rico ever given a raise?

16 A    No.

17 Q    Did Albert continue working throughout your employment?

18 A    Yes.

19 Q    At the supermarket, did you see any notices posted

20 regarding federal or state wage and hour law?

21 A    No.

22 Q    How did your employment at the supermarket come to an

23 end?

24 A    They transferred the store to a new location.

25 Q    Who is "they"?

1   A    Leo, the boss.

2   Q    And what location was that?

3   A    Sushi Fussion Express.

4   Q    When you say transfer the location, what do you mean?

5   A    That everything inside the store was moved over.

6   Q    Did that include employees?

7   A    Yes.

8   Q    Did Rico continue to work at Sushi Fussion Express?

9   A    Yes.

10  Q    Did Albert continue to work at Sushi Fussion Express?

11  A    Yes.

12  Q    As a sushi chef and as a receptionist respectively?

13          THE INTERPRETER:  This is the interpreter.  Could

14  you please repeat?

15  BY MR. SCHWEITZER:

16  Q    Rico continued to work at Sushi Fussion Express as a

17  sushi chef, and Albert continued to work at Sushi Fussion

18  Express as a receptionist?

19  A    Yes.

20  Q    Initially, at Sushi Fussion Express, who were the sushi

21  chefs?

22  A    I and Rico.  And then after week, Lee was added in.

23  Q    Who is Lee?

24  A    The chef.

25  Q    How long did Lee continue to work?

1  A    About one to two months.

2  Q    How did Lee come to work for Sushi Fussion Express?

3  A    He was transferred from the Manhattan location of Sushi

4  Fussion.

5  Q    Who is Chen?

6          THE INTERPRETER:  Interpreter.  Could you repeat

7  that?

8  BY MR. SCHWEITZER:

9  Q    You said Lee was Chen's friend from the Sushi Fussion

10 Manhattan --

11          THE INTERPRETER:  This is the interpreter.  I said

12 Lee was transferred from --

13          MR. SCHWEITZER:  Oh, transferred.

14          THE INTERPRETER:  -- the Manhattan location of Sushi

15 Fussion.

16 BY MR. SCHWEITZER:

17 Q    For how long did Lee continue to work?

18 A    One to two months.

19 Q    Did you have any role in onboarding Lee?

20 A    No.

21 Q    After Lee left, who replaced him?

22 A    I don't remember.  Ten years ago.  Such a long time ago.

23 Q    Okay.

24          Did you have any role in hiring employees to work at

25 Sushi Fussion Express?

1   A    The boss asked me to find him people.

2   Q    "The boss" being?

3   A    Michael.

4   Q    During your time at Sushi Fussion Express, did Leo ask

5   you to find people to work at any other location?

6   A    Yes.

7   Q    Do you recall any sushi chefs at Sushi Fussion Express

8   besides Lee who were -- who were hired without your

9   involvement?

10  A    Yes.

11  Q    Who else besides Lee was hired at Sushi Fussion Express

12  without your involvement?

13  A    Kevin Zhenkai Sun.

14  Q    Anyone else?

15          MR. SCHWEITZER:  Z-H-E-N-K-A-I.

16  A    And then after that, I don't remember.

17  Q    So let me just clear something up.

18          You said Lee, Kevin, and Zhenkai Sun.  Are those

19  three different people or two people?

20  A    Kevin is Zhenkai Sun.

21  Q    What other locations did Mr. Katanov ask you to find

22  sushi for?

23  A    Every location.

24  Q    Can you list them?

25  A    Great Neck, Forest Hills, and Kings Highway.

1    Q    That last one is in Brooklyn?

2    A    Yes.

3    Q    How would you know that Mr. Katanov wanted you to help

4    him look for new workers?

5    A    He sent me messages.

6    Q    What sort of messages?

7    A    Phone messages.

8    Q    Answering machine?  Voicemail?  Text?

9    A    Text messages.

10   Q    What did those text messages say?

11              MR. SAMUEL:  Objection as to best evidence.

12              THE COURT:  Sidebar.

13              (Sidebar.)

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                187

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3                THE COURT:  What about that?

4                MR. SCHWEITZER:  Is it from years ago?  He's changed

5    phones.

6                THE COURT:  You don't have the text messages?

7                MR. SAMUEL:  There's no foundation for that and

8    still best evidence.

9                THE COURT:  Okay.  Give me a second.

10               (Sidebar conference ends.)

11               (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2           THE COURT:  Did you want to lay a foundation for

3    your response to that objection?

4    BY MR. SCHWEITZER:

5    Q    Are you still in possession of any of these text

6    messages?

7    A    No.  This matter had been eight years -- over eight years

8    ago.  I've switched many phones.

9    Q    What did the text messages say?

10   A    Can you find me chef?

11   Q    And what would you do in response to those text messages?

12   A    I would put up an ad on the internet or ask my friends.

13   Q    And what would the ad say?

14   A    Just hiring chef.

15   Q    Would there be any information about salary or schedule?

16   A    No.

17   Q    Would the ad be in English, Chinese, or some other

18   language?

19   A    Chinese.

20   Q    Would there be contact information in the ad?

21   A    Yes.

22   Q    What contact information would go in the ad?

23   A    Phone number.

24   Q    What location would that phone number reach?

25   A    It's not fixed.  It depends on what location he told me

1   to look for people.

2   Q    Did any of the people who responded to your ads get

3   interviewed at the Sushi Fussion Express location?

4   A    Yes.

5   Q    Which persons responded to your ad got interviewed at the

6   Sushi Fussion Express location?

7   A    Summer.

8   Q    Who asked you -- withdrawn.

9           How did you know to put the word out to which

10  Summer, in particular, responded?

11  A    I didn't understand the question.  Could you repeat?

12  Q    Who was it who told you to put the word out to which

13  Summer responded?  Was it Leo?  Was it Michael?  Was it

14  Robert?  Was it somebody else?

15  A    There was a chef who asked Summer to come in.

16           MR. SAMUEL:  Objection.

17           THE COURT:  Give me a sec.

18           MR. SAMUEL:  Hearsay.

19           THE COURT:  Sustained.

20  BY MR. SCHWEITZER:

21  Q    Which location did Summer interview to join?

22  A    Great Neck.

23  Q    To your knowledge, was Summer responding to an ad you had

24  posted regarding Great Neck, or to word of mouth regarding

25  Great Neck that you had started?

1           THE INTERPRETER:  This is the interpreter.  Could
2  you repeat the question?
3  BY MR. SCHWEITZER:
4  Q    To your knowledge, was Summer responding to an ad
5  regarding Great Neck that you had posted, or to word of mouth
6  regarding Great Neck that you had started?
7           MR. SAMUEL:  Just objection, Your Honor.  I don't
8  know if there's a proper foundation if this witness knows the
9  answer to that or what his basis of that knowledge would be.
10          THE COURT:  Give me a second.
11          (Pause.)
12          THE COURT:  Was this witness present for the
13  interview?
14  BY MR. SCHWEITZER:
15  Q    Were you present for Summer's interview?
16  A    No.
17          THE COURT:  Is the basis going to be something that
18  Summer told the witness, or something else?
19          MR. SCHWEITZER:  I can ask this in a different way.
20  BY MR. SCHWEITZER:
21  Q    Just prior to Summer's interview, did you post an ad
22  looking for new hires at Great Neck?
23  A    Yes.
24  Q    Did that ad give Great Neck's contact information?
25  A    It was my phone number.

1   Q     Didn't catch that.  Please repeat.

2          THE INTERPRETER:  Sure.  Interpreter will repeat.

3   A     It was my phone number.

4   BY MR. SCHWEITZER:

5   Q     Why did you put your phone number in the ad?

6   A     Because if they call, I can speak Chinese, and a lot of

7   Chinese people, they don't speak English.

8   Q     After Summer interviewed at Sushi Fussion Express, where

9   did Summer end up working?

10          MR. SAMUEL:  Objection.  I think that calls for

11   hearsay.

12          THE COURT:  Is there going to be a non-hearsay basis

13   for this?

14          MR. SCHWEITZER:  Summer was responding to an ad for

15   Great Neck --

16          THE COURT:  Sustained.

17   BY MR. SCHWEITZER:

18   Q     Did you see Summer work at Sushi Fussion Express?

19   A     Yes.

20   Q     For how long?

21   A     One to two days.

22   Q     And then what happened?

23   A     Then he got transferred --

24          MR. SAMUEL:  Objection.

25          THE COURT:  Could we approach, please?

1          (Sidebar.)

2          (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                   193

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          THE COURT:  It seems like you are asking a lot of

4     questions where the only basis for the witness's knowledge is

5     going to be hearsay, but you are asking it in a vague way.

6          MR. SAMUEL:  He's trying to back door it.

7          THE COURT:  Do you have a non-hearsay basis for this

8     question, or are you going to ask a bunch of additional

9     questions for which the basis of knowledge is things that

10    Summer said or things that another person said to the witness?

11         MR. SCHWEITZER:  I will ask a different question.

12         THE COURT:  Okay.  Please, are there other questions

13    in this line of inquiry where the basis of knowledge is going

14    to be something that another person told the witness?

15    Because, if so, I would like to talk now about whether there's

16    some hearsay exception.

17         MR. SAMUEL:  I let a lot of them go until now.

18         THE COURT:  We resolved it.

19         (Sidebar conference ends.)

20         (Continued on following page.)

21

22

23

24

25

 1                    (In open court.)

 2    BY MR. SCHWEITZER:

 3    Q    Did you observe anyone tell Summer to stop working at

 4    Sushi Fussion Express and start working at Great Neck?

 5                    MR. SAMUEL:  Objection.

 6                    THE COURT:  Is it going to be a person who is -- who

 7    was -- let's talk --

 8                    MR. SCHWEITZER:  I will rephrase.

 9    BY MR. SCHWEITZER:

10    Q    Did you observe Michael tell Summer to stop working at

11    Sushi Fussion Express and start working at Great Neck?

12                    MR. SAMUEL:  Just objection to that.

13                    THE COURT:  Sustained.

14    BY MR. SCHWEITZER:

15    Q    Did you work at Great Neck at any point?

16    A    Yes.

17    Q    When?

18    A    When I was in the supermarket.

19    Q    Why did you do that?

20    A    Leo, the boss, told me to go there.

21    Q    For what purpose?

22    A    It was very busy over there.  It needed help.

23    Q    Who, if anyone, was in charge of the Great Neck location?

24                    THE INTERPRETER:  This is the interpreter.  Could

25    you repeat the first two words?

1   BY MR. SCHWEITZER:

2   Q    Who, if anyone, was in charge of the Great Neck location

3   sushi bar?

4   A    Leo, the boss.

5   Q    What did you do at the Great Neck location?

6   A    Making rolls.

7   Q    Did you do anything else at the Great Neck location?

8   A    No.

9   Q    Do you have any role in inventory at the Great Neck

10  location?

11  A    No.

12  Q    Did you have any role in making inventory at Sushi

13  Fussion Express?

14           THE INTERPRETER:  Interpreter requests repetition.

15  BY MR. SCHWEITZER:

16  Q    Did you have any role in ordering inventory at Sushi

17  Fussion Express?

18  A    I was only telling Michael what we needed, and then he

19  would place the order.

20  Q    At the supermarket location, did you speak directly to

21  any vendors for supplies?

22  A    No.

23  Q    At the supermarket location, did you give the vendors any

24  money?

25  A    No.

1    Q    At the Sushi Fussion Express location, did you speak with

2    any vendors to order supplies?

3    A    No.

4    Q    At the Sushi Fussion Express, did you pay any vendors

5    money for supplies?

6    A    No.

7    Q    What was your starting rate of pay at Sushi Fussion

8    Express?

9    A    850.

10   Q    For how long was it 850?

11   A    One week.

12   Q    What happened then?

13   A    I asked for a raise.

14   Q    Who did you ask?

15   A    I asked Michael.

16   Q    Why did you ask for a raise?

17   A    Because it was very busy.

18   Q    And what sort of raise did you request?

19   A    To 900.

20   Q    And was that request granted?

21   A    Yes.

22   Q    When your wage rate was changed, did you receive a

23   written notice of that change?

24   A    No.

25   Q    Did you observe any other workers at -- any other sushi

1    chefs, rather, at Sushi Fussion Express that asked Michael for

2    a raise?

3    A    Yes.

4    Q    Who did you observe and what did they ask for?

5    A    Rico.  Rico, who asked for 775.

6    Q    And how did Michael respond?

7              MR. SAMUEL:  Objection.

8              THE COURT:  Sustained.

9    BY MR. SCHWEITZER:

10   Q    Did you observe Rico getting paid?

11             THE INTERPRETER:  This is the interpreter.  Could

12   you repeat that?

13   BY MR. SCHWEITZER:

14   Q    Did you observe Rico getting paid?

15   A    Yes.

16   Q    How much was he paid?

17             MR. SAMUEL:  Objection.

18             THE COURT:  Overruled.

19   A    I saw him, but I was not able to see how much he was

20   holding in his hand.

21   Q    Okay.

22             Did you observe when Rico asked for a raise?  Did

23   you see that conversation?

24   A    I interpreted for him.

25   Q    So you were involved in that conversation?

1   A    Yes.

2   Q    Did you recommend to Michael that his wage rate be

3   raised?

4   A    No.

5   Q    Was his wage rate raised?

6   A    Yes.

7   Q    To the 775 that he asked for?

8   A    Correct.

9   Q    Did your wage rate remain at $900 a week throughout the

10  remainder of your employment?

11  A    There was some add-ons later on.  It was added to 925.

12  Q    When was that?

13  A    In 2015.

14  Q    When in 2015?

15  A    In April, Passover, the Jewish holiday.

16  Q    You said your wage rate was raised to what?

17  A    925.

18  Q    Why?

19       THE INTERPRETER:  This is the interpreter.  Did you

20  say "why?"

21  BY MR. SCHWEITZER:

22  Q    Why was it raised?  What prompted it to be raised?

23  A    Because -- because it was Passover, it was a Jewish

24  holiday, the store was closed.  We were not getting paid for

25  that day.

1   Q    Was that a temporary raise to 925 to cover the time off,

2   or was that a permanent raise going forward?

3   A    It was permanent.

4   Q    How were you paid at Sushi Fussion Express?  By cash, by

5   check, or some other way?

6   A    The same thing.  The first week will be cash.  The second

7   week will be cash plus check.

8   Q    And how much did you receive by check when you received

9   checks?

10  A    280 for the check?

11  Q    Did you receive any pay stubs with your pay from Sushi

12  Fussion Express?

13  A    No.

14  Q    Who was it -- who was it who gave you pay at Sushi

15  Fussion Express?

16  A    Michael, the boss.

17  Q    Did you see any notices regarding the federal or state

18  wage and hour laws posted in the Sushi Fussion Express

19  location?

20  A    No.

21          MR. SCHWEITZER:  I would like to show the witness an

22  exhibit.

23          Would it be possible to do it electronically?

24          THE COURT:  Sure.

25          Is it in evidence or do you want to show it just to

1    the witness?

2              MR. SCHWEITZER:  Just to the witness to lay some

3    foundation.

4              THE COURT:  What exhibit are we talking about?

5              MR. SCHWEITZER:  Exhibit 1.

6              THE COURT:  For me it's showing like an ELMO --

7              MR. SCHWEITZER:  That's probably because that's on.

8              THE COURT:  There we go.  We've got it.

9    BY MR. SCHWEITZER:

10   Q    Mr. Gao, I'm showing you what's been marked for

11   identification as Plaintiffs' Exhibit 1.

12             Do you recognize this document?

13   A    Yes.

14   Q    What do you recognize it to be?

15   A    It's about overtime.

16   Q    Is this an employee handbook?

17   A    Right.

18   Q    From when do you recognize this document?

19             THE INTERPRETER:  This is the interpreter.  From

20   when --

21   BY MR. SCHWEITZER:

22   Q    From when do you recognize this?  When did you first see

23   it?

24   A    In 2016, Michael showed it to me.

25   Q    To your knowledge, how was this document created?

1          MR. SAMUEL:  Objection to that question.

2          THE COURT:  Unlikely the witness is going to have a

3    basis; right?  Do you have a basis of knowledge?

4          MR. SCHWEITZER:  The question is to your knowledge.

5    If he doesn't know, he can say "I don't know."

6          THE COURT:  Okay.  Go ahead.

7    A    Michael, at that time, was being sued.

8    Q    By whom?

9    A    Wei Gao and Kevin Zhenkai Sun.  He was sued.  That's why

10   he made this handbook.

11   Q    And he showed you a copy of this handbook?

12   A    Correct.

13   Q    Do you know why he did that?

14   A    He showed it to me.  He wanted me to sign.

15   Q    I'm showing you the last page.  Is this a signature page?

16   A    Right.

17   Q    Does your signature appear on this page?

18          THE INTERPRETER:  This is the interpreter.  Whose

19   signature?

20   BY MR. SCHWEITZER:

21   Q    Does your signature appear on this page?

22   A    I didn't sign on it.

23   Q    Why not?

24   A    Because I knew what this was about.

25   Q    What do you mean by that?

1   A    It's about overtime.  It's employee's handbook.

2            MR. SCHWEITZER:  I ask that Exhibit 1 be admitted

3   into evidence.

4            THE COURT:  Any objection?

5            MR. SAMUEL:  No objection.

6            THE COURT:  Admitted.

7            (Plaintiffs' Exhibit 1 received in evidence.)

8            MR. SCHWEITZER:  I would like to just stop sharing

9   screen for a second and page over to another exhibit.

10           All right.  I show the witness Exhibit 2.

11  BY MR. SCHWEITZER:

12  Q    Is there a document on your screen?

13           MR. SCHWEITZER:  I just want to know if he can see

14  it because I don't want to move on to questioning about a

15  blank screen.

16  A    Yes.

17  Q    Do you recognize this document?

18  A    Yes.

19  Q    What do you recognize it to be?

20  A    This is a menu.

21  Q    For what restaurant?

22  A    Forest Hills.

23  Q    Is that a location where you worked?

24  A    This is my first location.

25  Q    And there appears to be a phone number on the first page

1   of this document.  Is that the phone number for Forest Hills?

2   A    Correct.

3           MR. SCHWEITZER:  I ask that Exhibit 2 be admitted.

4           THE COURT:  Any objection?

5           MR. SAMUEL:  No objection.

6           THE COURT:  Admitted.

7           (Plaintiffs' Exhibit 2 received in evidence.)

8           MR. SCHWEITZER:  Remove screen sharing briefly,

9   please.

10          All right.  I'm showing the witness Exhibit 3.

11  Please share the screen.

12  BY MR. SCHWEITZER:

13  Q    Can you see the exhibit?

14  A    Yes.

15  Q    Do you recognize this document?

16  A    Menu.

17  Q    For what location?

18  A    Sushi Fussion Express.

19  Q    There appears to be a phone number on this document.

20          Do you know what location that phone number

21  corresponds to?

22  A    It reaches the Express.

23          MR. SCHWEITZER:  I ask that Exhibit 3 be admitted.

24          THE COURT:  Any objection?

25          MR. SAMUEL:  No objection.

1          THE COURT:  Admitted.

2          (Plaintiffs' Exhibit 3 received in evidence.)

3          MR. SCHWEITZER:  I ask for a publication.

4          THE COURT:  Tsz, you can publish it to the jury.

5          THE COURTROOM DEPUTY:  Public?  Okay.

6          (The above-referred to exhibit was published.)

7    BY MR. SCHWEITZER:

8    Q    This menu appears to be for a location called Sushi

9    Fussion Kew Gardens Hill.  How do you know that corresponds to

10   Sushi Fussion Express?

11   A    It was changed to Express later on.

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (Continuing)

2    BY MR. SCHWEITZER:

3    Q    Was it known at Kew Gardens Hills at any time when you

4    worked at it?

5    A    It was just called Sushi Fussion.  Kew Gardens Hills is

6    just the location.  The name was still Sushi Fussion.

7    Q    When was it changed to Sushi Fussion Express?

8    A    I don't remember.

9    Q    Some time in 2017?

10   A    I don't know.  2017 I was not working there yet.

11   Q    Not working there yet, or not working there anymore?

12   A    I stopped working there.

13   Q    Okay.

14        MR. SCHWEITZER:  I move for publication and screen

15   sharing.

16        Please, start up screen sharing again.

17   Q    I am showing you a document marked for identification as

18   Exhibit 4.

19        Do you recognize this document?

20   A    Yes.

21   Q    What do you recognize it to be?

22   A    It's a menu.

23   Q    For what location?

24   A    Kings Highway.

25   Q    That's the one in Brooklyn?

1    A    Correct.

2              MR. SCHWEITZER:  Ask that Exhibit 4 be admitted.

3              THE COURT:  Any objection?

4              MR. SCHWEITZER:  No objection.

5              THE COURT:  Admitted.

6              (Plaintiffs' Exhibit 4 was received in evidence as

7    of this date.)

8              MR. SCHWEITZER:  Screen sharing again, please.

9    Q    I am showing you what has been marked for identification

10   as Plaintiffs' Exhibit 5.

11             Do you recognize this document?

12   A    Yes.

13   Q    What do you recognize it to be?

14   A    It's a menu.

15   Q    For what location or locations does this document

16   contain information?

17   A    Not sure which one you are trying to show me.

18   Q    I was showing you the whole thing, but I can go page by

19   page.

20             I am showing you page Bates No. 124.  That's the

21   second page of the exhibit after the cover page.

22             What location does this correspond to?

23   A    Brooklyn.

24   Q    What information does it contain?

25   A    Address, phone number, business hours.

1   Q    I am showing you page 126.

2          What does this location correspond to?

3   A    Forest Hills.

4   Q    What information does it contain?

5   A    Address, phone number, information regarding making a

6   reservation.

7   Q    I am showing you page 128.

8          What location does this correspond to?

9   A    Could you repeat?

10  Q    What location does the information on page 128

11  correspond to?

12  A    Sushi Fussion, Flushing.

13  Q    Is that Sushi Fussion Express?

14  A    Correct.

15  Q    What information does it contain?

16  A    Address, phone number, business hours.

17          MR. SCHWEITZER:  I ask that Exhibit 5 be admitted.

18          THE COURT:  Any objection?

19          MR. SAMUEL:  I am not sure if there is a proper

20  foundation.  I really don't know what it is being admitted

21  for.

22          THE COURT:  Give me a second.

23          Do you want to lay a foundation?  Can the witness

24  tell you where this document comes from?

25  Q    What is this document?

1   A     Which one?

2   Q     The whole thing.

3   A     Menu.

4   Q     Have you ever seen Sushi Fussion's website?

5   A     Yes.

6         MR. SAMUEL:  Objection.

7   Q     Did you see this information on Sushi Fussion's website?

8         MR. SAMUEL:  Objection, leading.

9         THE COURT:  Overruled.

10  A     Yes.

11  Q     Is this exhibit taken from Sushi Fussion's website?

12        MR. SAMUEL:  Objection.

13        THE COURT:  Overruled.

14  A     Correct.

15        MR. SCHWEITZER:  I ask that Exhibit 5 be admitted.

16        MR. SAMUEL:  Admitted.

17        (Plaintiffs' Exhibit 5 was received in evidence as

18  of this date.)

19        MR. SCHWEITZER:  Allow screen sharing, please.

20        THE COURT:  How much longer do you have with this

21  witness?

22        MR. SCHWEITZER:  Not much longer.

23        THE COURT:  Less than ten minutes?

24        MR. SCHWEITZER:  Probably not.

25        THE COURT:  We're coming up on 3:30 so why don't we

Y. Gao - Direct - Schweitzer                209

1   give the jurors an opportunity for a bathroom break.

2            Come back in ten minutes.

3            (Recess.)

4   Q    Mr. Yang, I am showing you a copy of what has been

5   marked as Plaintiffs' Exhibit 11.

6            THE DEPUTY CLERK:  Is it in the system?

7            MR. SCHWEITZER:  Is the screen share on?

8            THE DEPUTY CLERK:  Okay.

9   BY MR. SCHWEITZER:

10  Q    Are you familiar with Sushi Fussion, LLC?

11  A    Yes.

12  Q    What does that refer to?

13  A    I don't understand your question.

14  Q    I will withdraw it.

15           On the document I would like to direct your

16  attention to the fourth column to the left headed "total

17  pay."

18           What do you see below that heading?

19  A    Under total pay?

20  Q    Yes.

21  A    300.

22  Q    That's $300?

23  A    Yes.

24  Q    Refresh our memory.  You were paid $300 per week every

25  two weeks by check at the supermarket; correct?

Y. Gao - Direct - Schweitzer                210

1    A    Correct.

2    Q    Is this a record of those payments by check?

3    A    Correct.

4             MR. SCHWEITZER:  I ask that Exhibit 11 be admitted.

5             THE COURT:  Any objection?

6             MR. SAMUEL:  No.

7             THE COURT:  Admitted.

8             (Plaintiffs' Exhibit 11 was received in evidence as

9    of this date.)

10   Q    You said you were familiar with Leve Katanov from Forest

11   Hills in the supermarket.

12            What, if any, involvement did you have at the --

13            THE INTERPRETER:  Can you repeat the question and

14   slow down for me a little bit.

15   Q    You said you were familiar with Leva Katanov from your

16   time at Forest Hills and at the supermarket.

17            What involvement did he have with Sushi Fussion

18   Express?

19   A    Like, Michael partnership with him.

20            MR. SAMUEL:  Objection, your Honor.  I think the

21   witness should be instructed to answer the questions that he

22   has personal knowledge of.

23            THE COURT:  Sustained.

24            I am going to strike the answer.

25   Q    Did Katanov come to Sushi Fussion Express?

Y. Gao - Direct - Schweitzer                211

1   A    Yes.

2   Q    How often?

3   A    About once in two weeks.

4   Q    What did he do when he went?

5   A    Greet employees, walk around, and then he would leave.

6   Q    Walk around for what purpose?

7              MR. SAMUEL:  Objection.

8              THE COURT:  Sustained.

9              Do you want to rephrase?

10  Q    When Mr. Katanov spoke to employees, did he give

11  instructions or tasks to do?

12             MR. SAMUEL:  Objection, leading.

13             THE COURT:  Overruled.

14  A    No.

15  Q    You observed Mr. Katanov picking up sushi ingredients

16  from Sushi Fussion Express?

17             MR. SAMUEL:  Objection, leading.

18             THE COURT:  Do you want to ask a general question

19  about what he observed him do.

20  Q    Besides walking around and greeting employees, what, if

21  anything, did you observe Mr. Katanov doing at Sushi Fussion

22  Express?

23  A    Taking materials.

24  Q    Such as?

25  A    Salomon, tuna, cucumber, avocado.

1    Q     How often would he do that?

2    A     Sometimes.

3    Q     On the order of once per month?  Once every two months?

4    Once every three months?

5    A     Not on a fixed basis.

6    Q     Approximately then?

7              MR. SAMUEL:  Objection, your Honor.  The witness

8    already answered the question.

9              THE COURT:  Sustained.

10   Q     Did you ever observe Mr. Katanov pay for those supplies?

11   A     No.

12   Q     Did you ever observe Mr. Katanov dropping off similar

13   supplies?

14   A     No.

15             MR. SCHWEITZER:  Is the screen share disabled?

16             THE DEPUTY CLERK:  Now it is.

17             MR. SCHWEITZER:  Thank you.

18             I have nothing further.

19             THE COURT:  Cross?

20   CROSS-EXAMINATION

21   BY MR. BERESIN:

22   Q     Good afternoon, Mr. Yang.

23   A     Hello.

24   Q     I am going to ask you a few questions now.  I also may

25   ask you about your deposition testimony.

Y. Gao - Cross - Beresin                213

1          Do you recall giving a deposition, sworn testimony,

2    in response to questions my colleague Michael Samuel asked

3    you back in 2018?

4    A    I am not very sure.  It has been a long time.

5    Q    I know it was a few years ago.

6          If I need to ask you a question about that, I am

7    going to show you a page from your deposition to see if that

8    helps you remember.

9          Thank you.

10   A    I think I should be able to.

11   Q    Thank you.

12         First, I would like to talk about the time periods

13   that you worked for my client, Mr. Katanov, and also other

14   periods you worked for Michael Yagudaev.

15         It is true, isn't it, that you worked for my

16   client, Mr. Katanov, first from September of 2011 until

17   October of 2013; is that correct?

18              THE INTERPRETER:  The very last number is 2013?

19              MR. BERESIN:  Yes.

20   A    Yes.

21   Q    That was at the Main Street -- the 7132 Sushi Fussion

22   Express Main Street store?

23              MR. SCHWEITZER:  Objection, mischaracterizes.

24              THE COURT:  Overruled.

25              MR. BERESIN:  I am going rephrase that.  It is my

Y. Gao - Cross - Beresin                214

1    error.

2    Q    That period from September to 2011 to 2013, you were

3    working for Mr. Katanov at the supermarket kiosk, correct,

4    most of that time?

5    A    Yes.

6         MR. SAMUEL:  Thank you for correcting me.

7    Q    So now I want to talk about what you did after that when

8    you worked for Michael Yagudaev.

9         After October 2013 you went to work for Michael

10   Yagudaev at the 7132 Main Street Sushi Fussion Express?

11        MR. SCHWEITZER:  Objection, this is stipulated to.

12        MR. BERESIN:  Okay.

13   Q    When you are worked for Michael Yagudaev, was he there

14   every day?

15   A    Correct.

16   Q    Thank you.

17        Was my client Mr. Katanov there every day?

18   A    No.

19   Q    Mr. Yagudaev is the one who paid you your weekly

20   compensation?  Whatever you got paid, it was by Mr. Yagudaev;

21   correct?

22   A    Correct.

23   Q    Thank you.

24        I want to ask you more about what you did for

25   Michael at that store.

Y. Gao - Cross - Beresin                    215

1           You managed that store for Michael; correct?

2   A    No.

3   Q    No.

4           MR. BERESIN:  I am going to mark for identification

5   Defense Exhibit D, page 18, from the witness's deposition of

6   May 9th of 2018.

7           MR. SCHWEITZER:  Let me see the copy.

8           No objection.

9   Q    I am going to read you a question from your deposition

10  and the answer that you gave.  This is on page 18 at line 10.

11  Mr. Samuel asks you, and this is in regard to your work at

12  Michael's store.  Mr. Samuel asks you:  Was there a head

13  sushi chef?  You answered, I was.

14          Is that correct?

15  A    Yeah.

16  Q    Thank you.

17          He asked you right after that, As the head sushi

18  chef were you in any way different from the other two sushi

19  chefs?

20          Your answer:  I managed the sushi bar.

21          Is that correct?

22  A    Yeah.

23  Q    Thank you.

24          Mr. Gao, did part of your job include your having

25  the ability, the authority to tell the other sushi chefs what

Y. Gao - Cross - Beresin                216

1   to do?

2   A    Yes.

3   Q    Thank you.

4        Such as you could tell them which type of sushi

5   rolls to make and when to make them?

6   A    Correct.

7   Q    You ordered supplies for the store by telling Mr.

8   Katanov what type of fish or supplies you need?

9        MR. SCHWEITZER:  For clarification, up to now we

10  have been talking about Sushi Fussion Express.  This question

11  is about Katanov.

12       MR. SAMUEL:  Sorry.  I apologize.  I am getting

13  ahead of myself.

14  Q    Staying with when you worked for Michael, you told

15  Michael what supplies he should order for the store; correct?

16  A    Correct.

17  Q    Did Michael order what you asked him to order when you

18  did that?

19       MR. SCHWEITZER:  Basis of knowledge.

20       THE COURT:  Sustained.

21  Q    It is true, isn't it, when you asked Michael to order

22  supplies, how long would it usually take to get the fish or

23  other supplies that you asked him to order?  How long would

24  it take?

25       THE INTERPRETER:  Can you repeat the question?

Y. Gao - Cross - Beresin                    217

1  Q    When you made requests to Michael that he order fish or

2  other supplies -- vegetables, rice -- how long would it take

3  from the time that you asked him to order those supplies for

4  the supplies to arrive to the store?

5  A    The next day.

6           (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. BERESIN:  (Continuing)

3   Q    Okay.  So is it true that you were ordering supplies as

4   frequently as every day for the next day?

5             MR. SCHWEITZER:  Objection.

6             THE COURT:  Overruled.

7   A    No, twice a week.

8   Q    Okay.  And when you made those requests that Michael

9   order supplies, was it typical that the next day the supplies

10  that you ordered arrived at the store or was the order very

11  different from what you asked him to get you?

12            MR. SCHWEITZER:  Asked and answered.

13            MR. BERESIN:  I don't think he's answered any

14  questions about what actually arrived.

15            THE COURT:  Can I see the question?

16            Overruled.

17            THE INTERPRETER:  Interpreter requests repetition.

18            MR. BERESIN:  Yes.

19  Q    Mr. Gao, when you made that request to Michael to order

20  supplies for you, the next day were those same supplies

21  delivered to the store just like you asked or was the delivery

22  different from what you requested?

23  A    It would be delivered the next day.

24  Q    As you requested, correct?

25  A    I just told him what was needed and then he would put in

Y. Gao - Cross - Beresin                219

1  the order, and the order would be delivered the next day.

2  Q     Okay.  Thank you.

3         So is it fair to say then, typically what he

4  requested was delivered, the order wasn't changed by Michael

5  or anyone, you received what you requested?

6  A     Right.

7  Q     Thank you.

8         Okay.  Now I would like to move back to the time

9  when you worked for Mr. Katanov, 2011 to 2013, at the

10 supermarket.  When you worked for Mr. Katanov from 2011 to

11 2013 at the supermarket, you were also the head chef, just

12 like you were for Michael later; is that correct?

13              MR. SCHWEITZER:  Lack of foundation.

14              THE COURT:  Overruled.

15 A     Correct.

16 Q     Thank you.

17        And you did things like posting ads for new sushi

18 chefs, just like you did later for Michael when you worked for

19 Mr. Katanov, correct?

20 A     Right, same.

21 Q     And you made requests for sushi supplies, fish, rice,

22 vegetables to Mr. Katanov, just like you did later when you

23 worked for Michael?

24 A     The same.

25 Q     Did Mr. Katanov ever argue with you or try to change your

Y. Gao - Cross - Beresin                    220

1  order or tell you that he didn't want to order what you were

2  requesting?

3  A    No.

4  Q    And when you spoke to prospective new sushi chefs, did

5  Mr. Katanov ask you what you thought of them or what your

6  opinion was, if they were qualified before he hired them?

7         MR. SCHWEITZER:  Objection; hearsay.

8         THE COURT:  What is the --

9         MR. SAMUEL:  It's not for the truth of the matter

10 asserted.  It's --

11        THE COURT:  Fair enough.  Overruled.

12 A    He would ask me whether they were good.

13 Q    Thank you.

14        Did Mr. Katanov ever not hire someone that you

15 recommended be hired?

16        MR. SCHWEITZER:  Lack of foundation for

17 recommendations.  He said he gave his opinion on their work,

18 not recommended that they be hired.

19        THE COURT:  You want to ask additional questions to

20 lay a foundation?

21 Q    Did you tell Mr. Katanov whether you thought any

22 prospective chefs were either qualified or not qualified?

23 A    No.

24 Q    So you didn't give him your opinion on what you thought

25 of the candidates?

Y. Gao - Cross - Beresin                    221

1    A      No.

2            MR. BERESIN:   I'm marking for identification

3    Defendants' Exhibit E, page 49, from Mr. Gao's deposition.

4            MR. SCHWEITZER:   Sidebar, Your Honor?

5            (Sidebar.)

6            (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                    222

 1   (Sidebar conference held on the record in the presence of the

 2   Court and counsel, out of the hearing of the jury.)

 3           MR. SCHWEITZER:  So there's two different questions

 4   being asked here:  One, whether he gave his opinion in a broad

 5   general sense and, two, whether he made a specific

 6   recommendation that a person be hired.  This speaks to the

 7   first issue, which he does not deny doing.  He testified that

 8   he gave his opinion.  He denied that he made a recommendation

 9   as to his qualifications.

10           MR. SAMUEL:  I think his last answer might have

11   been, he said he didn't give an opinion.

12           THE COURT:  That is how I recall it.

13           Can you read back the last answer?

14           (The record was read.)

15           MR. SCHWEITZER:  Before that, he had previously said

16   yes.  And then after that, he was asked about his

17   qualifications as foundation for hiring and firing

18   recommendations.

19           THE COURT:  It sounds like the answer that the court

20   reporter just read is not consistent with this.

21           MR. SCHWEITZER:  Because it's completely isolated.

22   He initially said yes, he gave his opinion.  Then he was

23   asked, did you give your opinion on qualifications, as

24   foundation for asking about whether he made recommendations

25   for hiring and firing; then he answered no.  Then he was
```

```
                            Sidebar                      223
```

1  re-asked the question, did you give your opinion.

2         MR. SAMUEL:  And he gave a different answer, so we

3  can impeach him on it.

4         MR. SCHWEITZER:  He was asking a set of confusing

5  questions.

6         THE COURT:  Let's move on.  You are welcome to

7  impeach.

8         MR. SAMUEL:  Okay.

9         (Sidebar ends.)

10         (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. BERESIN:

2  Q    Mr. Gao, this is from page 49 of your deposition.

3        Mr. Samuel asked you:  "Did Mr. Katanov ever ask you

4  what you thought of this guy or that guy in relation to the

5  candidates for sushi chef?"  And you answered:  "Yeah."

6  A    Yes, he would ask me.

7  Q    And then Mr. Samuel asked you:  "And would you give your

8  input on that?"  Your answer:  "Yeah."

9        Is that correct?

10  A    Yes, I would.

11  Q    Thank you.

12        All right.  Just a few more questions is all, a

13  couple.

14        THE INTERPRETER:  This is the interpreter.  The

15  witness was saying something.  Would you like me to interpret.

16        THE COURT:  I think there is no question pending, so

17  let's just let the attorney ask the next question.

18        MR. BERESIN:  Thank you.

19  Q    Mr. Gao, do you have any personal knowledge of whether

20  there is any formal business relationship between

21  Mr. Katanov's stores, where you worked for him, and

22  Mr. Yagudaev's stores, where you worked for Mr. Yagudaev?

23  A    Because I was transferred from the supermarket to the

24  Express, Leo told me that Michael was the boss.

25  Q    And when you left the supermarket and went to work for

1    Michael, it was because the supermarket closed, correct?

2    A    No, it was not because of the supermarket was closed.

3    They opened up the store and they moved everything there.

4            MR. BERESIN:  I'm marking for identification

5    Defendants' Exhibit F, as in Frank.  This is page 52 from

6    Mr. Gao's deposition.

7            MR. SCHWEITZER:  Objection.  Page 51 should be

8    included as well.

9            (Sidebar.)

10           (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                    226
```

1   (Sidebar conference held on the record in the presence of the

2   Court and counsel, out of the hearing of the jury.)

3              THE COURT:  Okay.  So for the inconsistencies that

4   you asked, it sounds like it closed, so he went to work for

5   the store and then he said yes or what?

6              MR. SCHWEITZER:  It says up here he didn't know.  In

7   response to the same question, he says he doesn't know.

8              THE COURT:  I am just trying to understand what you

9   are trying to offer first.

10             MR. SAMUEL:  The witness said he was transferred

11  from one location to the other, which would supposedly support

12  their position that it's a single enterprise.

13             THE COURT:  So tell me the inconsistencies.

14             MR. SAMUEL:  The inconsistency is, as he says, "I

15  wasn't transferred."  He goes "the supermarket closed," so he

16  went to work for the new place.  "It sounds like you weren't

17  really transferred."  He said he was transferred.  So this is

18  impeachment, yes.

19             THE COURT:  So he says he was transferred to the

20  store Katanov -- to the store owned by Yagudaev; is that

21  correct?  "What I meant by transfer is I moved to that

22  location."

23             MR. SAMUEL:  No, but here it sounds like, "You

24  weren't really transferred, it sounds like it closed, so you

25  went to work for the new store on Main Street?

```
                          Sidebar                      227

 1          MR. SCHWEITZER:  This is classic cherry-picking,

 2   Your Honor.  The classic whole statement saying by

 3   transferred, I was moved, that should be in for context.

 4          MR. SAMUEL:  Yes, but we kind of cleared up --

 5          THE COURT:  Can I just -- isn't this just using the

 6   word transferred in ways --

 7          MR. BERESIN:  It's semantics, I agree.  I'll fix it

 8   quickly.

 9              (Sidebar ends.)

10              (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Y. Gao - Cross - Beresin                    228

BY MR. BERESIN:

Q    I'm going to withdraw that exhibit and ask this question,
Mr. Gao.

          When you left to the supermarket and went to work
for Michael, did Michael ask you to come work there or did
Mr. Katanov instruct you that you needed to go work there?

A    Leo, the boss.

Q    What did he tell you?

A    He told me that this store will be transferred to over
there.

Q    Okay.  And if I asked this already, I apologize, but do
you have any personal knowledge that the business
relationship, that those stores were part of the same
business?  Do you have any personal knowledge of that?

          MR. SCHWEITZER:  Asked and answered.

          THE COURT:  It is asked and answered, you are right.

Q    And after you made that move to the Main Street Sushi
Fussion Express, did you ever go back and work in Great Neck
again for Mr. Katanov ever, even for a day?

A    No.

Q    Thank you.  All right.  Just one or two more.

          Do you have any knowledge that the different
restaurants, Mr. Katanov's restaurants and Michael's, shared
accounting books, records of the business, anything where they
combined their accounting records?

Y. Gao - Cross - Beresin                    229

1          MR. SCHWEITZER:  Basis of knowledge.

2          THE COURT:  Overruled.

3   Q    Do you have any knowledge of that?

4   A    I don't know.

5   Q    Thank you.

6          THE COURT:  Direct?

7          MR. BERESIN:  I'm sorry, I do just have a couple

8   more.

9          THE COURT:  Okay.

10  Q    And when you worked for Mr. Katanov, did you speak to the

11  other employees and people working, including Robert and

12  Mr. Katanov, did you have conversations either by text message

13  or verbally during the workday?

14  A    No.  He only send me messages when he wanted me to find

15  him workers.

16  Q    Okay.  I'm talking about when you were working at the

17  supermarket; you had testified earlier that Robert was there

18  sometimes, that you would send him text messages during the

19  day because he wasn't always standing nearby, right?  Is that

20  correct?

21          MR. SCHWEITZER:  Mischaracterizes.

22          THE COURT:  Okay.  Give me a minute, if you want me

23  to try to go back.

24          Do you want to just ask him the question without

25  putting it to what he said earlier?

1          MR. BERESIN:  Sure.

2    Q    You communicated with Robert and other employees at the

3    supermarket location during the workday when you worked there,

4    correct?

5          MR. SCHWEITZER:  Vague.  Communication could be as

6    much as talking to somebody.

7          THE COURT:  Overruled.

8    Q    Speaking or any other way, did you communicate with the

9    other employees that worked alongside you at the kiosk?

10   A    Yes.

11   Q    Such as the person that took the orders, the

12   counterperson, you spoke to them while you worked?

13   A    Yes.

14   Q    And the delivery person who was doing deliveries, you

15   would speak to them during the day as well?

16         MR. SCHWEITZER:  Lack of foundation.

17         THE COURT:  Do you want to ask a question to lay a

18   foundation?

19   Q    And in addition to the counterperson that you said you

20   had -- you spoke to, did you speak to others -- not including

21   the sushi chefs, but other employees at the kiosk during the

22   day?

23   A    Yes.

24   Q    And you spoke to Mr. Katanov; when he happened to be

25   there, you would speak to him as well during the day?

Y. Gao - Cross - Beresin                    231

1  A    I would greet him.

2  Q    And those conversations that you had with the order taker

3  at the counter, the delivery person --

4           MR. SCHWEITZER:  Objection.

5           THE COURT:  I take it that there is an objection to

6  the foundation as to the delivery person.  Is that what we are

7  talking about?

8           MR. SCHWEITZER:  Yes, Your Honor.

9           THE COURT:  Okay.  If you want to lay a foundation

10 for delivery person or rephrase it.

11          MR. BERESIN:  I'll rephrase it.

12 Q    So when you spoke to the order taker or Mr. Katanov or

13 Robert, were those conversations in English or Chinese?

14 A    Yes.

15 Q    English?

16 A    Correct.

17 Q    Thank you.  And this is the last question.

18          Mr. Gao, you were aware -- when you worked for

19 Mr. Katanov and Mr. Yagudaev, you were aware of how much other

20 sushi chefs were being paid at the job; the ones that were

21 working with you at the job there, you were aware of how much

22 they were making as well, correct?

23 A    Yes.

24 Q    Okay.  Thank you.

25          THE COURT:  Okay.  Are you done?

Y. Gao - Redirect - Schweitzer          232

1          MR. BERESIN:  Yes, last question.

2   Q    Mr. Gao, you were paid the most out of -- between you and

3   the other sushi chefs, you were paid more than they were when

4   you worked at the supermarket, correct?

5   A    Yes.

6          MR. BERESIN:  All right.  Thank you.  Thank you.

7          THE COURT:  Great.

8          MR. BERESIN:  Thank you very much.

9          THE COURT:  How long do you expect redirect to be?

10          MR. SCHWEITZER:  Maybe ten minutes.

11          THE COURT:  So I have told you all I am going to try

12   to wrap things up by 4:30.  It is now 4:26.  I guess our two

13   options are to try and get this witness done; we will be done

14   4:35.  But I want to keep my promise to you, so if any of you

15   want to leave now, let me know and we can call it a day early.

16          Okay.  So you have got ten minutes.

17   REDIRECT EXAMINATION

18   BY MR. SCHWEITZER:

19   Q    You said you started at $750 a week at Forest Hills,

20   right?

21   A    Correct.

22   Q    And that's also what Wei Chen, Kimy Lin, and Rico were

23   paid at the supermarket, right?

24   A    Correct.

25   Q    Why was your wage raised when you moved from Forest Hills

Y. Gao - Redirect - Schweitzer                  233

1   to the supermarket?

2   A    I asked Leo for the raise.

3   Q    And when you worked at the supermarket, was Robert there

4   every day?

5   A    Right.

6   Q    When you worked at the supermarket, who was in charge?

7   A    Robert.

8   Q    You said on cross that you would speak to the

9   counterperson, Albert, at the supermarket.  What did you talk

10  about, what kinds of things?

11  A    Making jokes.

12  Q    You didn't give Albert orders that he couldn't disobey,

13  did you?

14         THE INTERPRETER:  This is the interpreter.  Could

15  you repeat that?

16  Q    Did you give Albert any orders that he couldn't disobey?

17  A    No.

18  Q    You said on cross that you would give your opinions about

19  other sushi chefs to Mr. Katanov at the supermarket.  When you

20  gave your opinions to Mr. Katanov about other sushi chefs,

21  what did you say?  What kinds of things did you say?

22  A    Could I hear the question again?

23  Q    When you gave your opinions about other sushi chefs at

24  the supermarket to Mr. Katanov, what sorts of things would you

25  say?

1    A    He would only ask me whether they were good or not.

2    Q    And you would give a qualitative assessment of their

3    skill level?

4              MR. SAMUEL:  Objection to the form of that question.

5              THE COURT:  Do you want to rephrase that?

6    Q    And how would you respond to those questions?

7    A    I answered "okay."

8    Q    Did you ever tell Mr. Katanov, I think you should hire

9    Wei Chen?

10   A    No.

11   Q    Did you ever tell Mr. Katanov, I think you should hire

12   Kimy Lin?

13             MR. SAMUEL:  Objection.  That's a leading question.

14             THE COURT:  Do you want to rephrase it?

15             MR. SCHWEITZER:  Excuse me.

16   Q    What, if any, recommendation, affirmative recommendation

17   did you make to Mr. Katanov regarding Kimy Lin?

18   A    No.  I just told him to come in for interview.

19   Q    What affirmative recommendation, if any, did you give to

20   Mr. Katanov regarding Rico?

21   A    Just told him to come in for interview.

22   Q    Did you give Mr. Katanov any advice as to whether he

23   should hire Kimy Lin or Rico?

24   A    No.

25             (Continued on the next page.)

1  REDIRECT EXAMINATION

2  BY MR. SCHWEITZER: (Continuing)

3  Q    At Sushi Fussion Express, both Mr. Lee and Zhenkai Sun

4  were hired without you being involved at all; correct?

5  A    Correct.

6  Q    What did you mean at your deposition when you said you

7  managed the sushi bar at Sushi Fussion Express?

8             MR. SAMUEL:  Objection to that.

9             THE COURT:  What's the basis for the objection?

10            MR. SAMUEL:  I mean, I think his testimony is what

11 it is.  He said he managed the sushi bar and --

12            THE COURT:  Overruled.

13 BY MR. SCHWEITZER:

14 Q    What did you mean when you say you managed the sushi bar

15 at Sushi Fussion Express?

16 A    Because I need to check what we don't have in the

17 inventory, and I will tell the boss.

18 Q    So when you say "manage," that means check inventory?

19 A    Correct.

20 Q    And you said on cross that you could tell other sushi

21 chefs at Sushi Fussion Express what to do.  Could other chefs

22 at Sushi Fussion Express also tell you what to do?

23 A    Yes.

24 Q    Was this process hierarchical or collaborative?

25            MR. SAMUEL:  Just objection.

```
 1              THE COURT:  Do you want to rephrase that?
 2              MR. SCHWEITZER:  Excuse me.
 3    BY MR. SCHWEITZER:
 4    Q    What kinds of things would you tell other sushi chefs to
 5    do?  What kinds of things would other sushi chefs tell you to
 6    do?
 7    A    We would do whatever that was missing.
 8    Q    So you might tell another sushi chef to cover some task
 9    that wasn't being handled, and another sushi chef might tell
10    you the same thing?
11              THE COURT:  Sustained.
12    BY MR. SCHWEITZER:
13    Q    What did you mean when you said "cover what was missing"?
14    A    We would do whatever that was needed.
15    Q    How would you know what was missing?
16    A    Because we all knew.
17    Q    And would other sushi chefs know what was missing?
18    A    Because he also knew.
19    Q    Would any sushi chef get in trouble if they didn't do
20    what another sushi chef asked of them?
21              MR. SAMUEL:  Objection.
22              THE COURT:  You want to rephrase it in terms of the
23    witness's knowing of the sushi chef getting in trouble or not?
24              MR. SCHWEITZER:  Excuse me.
25    BY MR. SCHWEITZER:
```

1  Q    Was there ever any indication when you asked a sushi chef

2  to cover a noncovered task and that sushi chef did not do it

3  and that sushi chef got in trouble?

4  A    No.

5  Q    Were you able to get other sushi chefs in trouble if they

6  did not cover a task as you asked?

7  A    Only the boss could.

8          MR. SCHWEITZER:  Nothing further.

9          MR. BERESIN:  Just one recross.

10         THE COURT:  Okay.

11 RECROSS-EXAMINATION

12 BY MR. BERESIN:

13 Q    You just testified that you spoke to Albert, the counter

14 guy, and you told jokes or you discussed jokes with him, but

15 isn't it also true that sometimes you gave him instructions?

16 A    No.

17 Q    You never -- were there occasions when the orders got --

18 it got so busy that it was hard to handle the orders and you

19 had to make some decisions and give Albert some instructions

20 about whether he should stop taking phone orders?

21         MR. SCHWEITZER:  Lack of foundation.

22         THE COURT:  Overruled.

23 A    No.

24         THE COURT:  Anything else?

25 BY MR. BERESIN:

1   Q    So it's your testimony that you never instructed Albert

2   to stop taking phone orders because it was too busy?

3            MR. SCHWEITZER:  Asked and answered.

4            THE COURT:  That is asked and answered.

5            MR. BERESIN:  All right.  Thank you.

6            THE COURT:  Any redirect?

7            MR. SCHWEITZER:  No, Your Honor.

8            THE COURT:  Great.

9            Thank you.  You're excused.

10           (Witness steps down.)

11           THE COURT:  Is the plaintiff in a position to rest

12  today?

13           MR. SCHWEITZER:  Yes, Your Honor.

14           THE COURT:  Great.

15           So that ends the plaintiffs' case, and then tomorrow

16  we will be back for the defendants' case, if the defendants

17  want to put on a case, so I will ask you all to be back here

18  at 9:30 tomorrow.

19           Thank you for staying for the extra few minutes.

20           MR. SAMUEL:  Can we take up one matter after the

21  jury leaves?

22           THE COURT:  Sure.

23           Jurors, you're excused.  Don't talk about the case

24  with anybody.

25           Come back here tomorrow at 9:30.

*Proceedings*                                                      239

1              (Jury exits.)

2              THE COURT:  Anything the parties want to take

3    up?

4              MR. SAMUEL:  We just have a couple of motions to

5    make.

6              THE COURT:  Sure.

7              MR. SAMUEL:  A motion for directed verdict as to --

8    a Rule 15 motion for a directed verdict as to single

9    enterprise theory, and a motion for directed verdict as to

10   Levi Katanov's status of an employer as it pertains to Zhenkai

11   Sun, Charles Chipengule, and Wei Gao.

12             THE COURT:  Anything you want to say in support of

13   that?

14             MR. SAMUEL:  Do you want to take up argument today

15   or tomorrow morning?

16             THE COURT:  I would be happy to do it either time.

17             Do you want to take it up tomorrow morning?

18             MR. SAMUEL:  Sure.

19             THE COURT:  So you want to do it at 9:00?  I told

20   the jurors to come at 9:30, so we can meet at 9:00.

21             MR. SAMUEL:  Yes, okay.

22             THE COURT:  Great.

23             Anything else for us to take up this evening?

24             MR. SCHWEITZER:  No.

25             MR. SAMUEL:  Not for us.

*Proceedings*                                                240

1          THE COURT:  Great.

2          I will see everybody tomorrow at 9:00.

3          MR. BERESIN:  Thank you, Your Honor.

4

5     (Matter adjourned to November 17, 2021, at 9:00 a.m.)

6

7                    *       *       *       *       *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

241

1                             I N D E X

2

3       **WITNESS**                                    **PAGE**

4

5       **WEI GAO**

6            REDIRECT EXAMINATION

7            BY MR. SCHWEITZER                          67

8            RECROSS-EXAMINATION

9            BY MR. BERESIN                             89

10      **ZHENKAI SUN**

11           DIRECT EXAMINATION

12           BY MR. SCHWEITZER                          96

13           CROSS-EXAMINATION

14           BY MR. SAMUEL                              126

15           REDIRECT EXAMINATION

16           BY MR. SCHWEITZER                          130

17      **CHARLES CHIPENGULE**

18           DIRECT EXAMINATION

19           BY MR. SCHWEITZER                          143

20           CROSS-EXAMINATION

21           BY MR. SAMUEL                              152

22      **YANG YANG GAO**

23           DIRECT EXAMINATION

24           BY MR. SCHWEITZER                          155

25

242

I N D E X (Continued)

CROSS-EXAMINATION

BY MR. BERESIN                                    212

REDIRECT EXAMINATION

BY MR. SCHWEITZER                                 232

RECROSS-EXAMINATION

BY MR. BERESIN                                    237

243

1                          **E X H I B I T S**

2

3      Plaintiff Exhibit 16                             77

4

5      Plaintiffs' Exhibit 1                            202

6

7      Plaintiffs' Exhibit 2                            203

8

9      Plaintiffs' Exhibit 3                            204

10

11     Plaintiffs' Exhibit 4                            206

12

13     Plaintiffs' Exhibit 5                            208

14

15     Plaintiffs' Exhibit 11                           210

16

17

18

19

20

21

22

23

24

25