244

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - - X
                                     :
3       ZHENKAI SUN, et al.,         :   16-CV-04840(RPK)
                                     :
4              Plaintiffs,           :
                                     :
5                                    :   United States Courthouse
        -against-                    :   Brooklyn, New York
6                                    :
                                     :
7                                    :   November 17, 2021
        SUSHI FUSSION EXPRESS,       :   9:00 a.m.
8       INC., et al.,                :
                                     :
9              Defendants.           :
                                     :
10   - - - - - - - - - - - - - - - - X

11           TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
          BEFORE THE HONORABLE RACHEL P. KOVNER
12              UNITED STATES DISTRICT JUDGE

13
                     A P P E A R A N C E S:
14
     For the Plaintiff:       TROY LAW, PLLC
15                            41-25 Kissena Boulevard, Suite 103
                              Flushing, New York 11355
16
                              BY:  AARON SCHWEITZER, ESQ.
17

18   For the Defendant:       SAMUEL & STEIN
                              1441 Broadway, Suite 6085
19                            New York, New York 10018

20                            BY:  MICHAEL SAMUEL, ESQ.
                                   ANDREW BERESIN, ESQ.
21

22   Court Reporter:          DENISE PARISI, RPR, CRR
                              Official Court Reporter
23                            Telephone: (718) 613-2605
                              E-mail:  DeniseParisi72@gmail.com
24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.

1           (In open court; jury not present.)

2           THE COURTROOM DEPUTY:  All rise.

3           THE COURT:  Please be seated.

4           So I'm happy to hear anything you want to say on the

5    motion, and then if we have some extra time before the jury

6    arrives, maybe we can talk about the jury charge.

7           MR. SAMUEL:  Sure.

8           Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. SAMUEL:  So my motion for directed verdict is as

11   to several issues.  The first is whether Levi Katanov is

12   considered an employer for Zhenkai Sun, Wei Gao, and Charles

13   Chipengule.  I don't believe that they introduced any evidence

14   to show that he was their employer.  There's no testimony that

15   they know if we he had the ability to hire and fire; there's

16   no testimony that he set their schedule; he didn't supervise

17   them.  I think with Wei Gao, the only testimony regarding Levi

18   was that Levi, one time, asked him to make two rolls that were

19   special rolls, so I just don't think there's any evidence that

20   that should get to the jury.

21          THE COURT:  Okay.

22          Do you want to respond?

23          MR. SCHWEITZER:  Yes, Your Honor.

24          Defense counsel, a moment ago, eluded to the Carter

25   factors, showing authority to hire and fire, showing authority

*Proceedings*                                                                      246

1    to schedule, showing authority so set wage; however, the

2    Carter factors aren't sufficient to show employment, but are

3    not necessary.  The standard is economic reality considered in

4    light of all of the circumstances; and authority over

5    employees does not diminish even when it is infrequently

6    exercised -- *Irizarry v. Catsimatidis*.  Here, there is ample

7    circumstantial evidence that both -- well, we are going one

8    issue at a time.  So here there is ample circumstantial

9    evidence that Mr. Katanov exercised control over employees at

10   Sushi Fussion Express, including Wei Gao, Zhenkai Sun, and

11   Charles Chipengule.  Directed verdict depends on complete

12   absence of evidence in favor of the non-movement or such

13   overwhelming evidence in favor of the movement that a verdict

14   in favor of the non-movement could only be arrived at by

15   surmise or conjecture.

16              THE COURT:  What's the evidence you are relying on?

17              MR. SCHWEITZER:  Sure.  First thing's first.  Yang

18   Yang Gao testified -- and there's nothing to contradict

19   this --

20              MR. SAMUEL:  Your Honor, I was directing my directed

21   verdict to Wei Gao, Zhenkai Sun, and Charles Chipengule, and I

22   believe that the plaintiff would need to show that Levi was

23   the employer for each one of those three, not in broad

24   strokes, but he was the employer for Charles Chipengule.

25              THE COURT:  He might have been referring to Yang

1   Yang Gao's testimony as erring on that.

2           Go ahead.

3           MR. SCHWEITZER:  Excuse me.

4           So Yang Yang Gao testified that Mr. Katanov

5   transferred employees from both the Glatt Kosher Supermarket

6   location and from Manhattan to work at Sushi Fussion Express.

7   Wei Gao and Zhenkai Sun both said that Mr. Katanov told them

8   to -- gave them instructions to clean the sushi bar at Sushi

9   Fussion Express, not just to make rolls.  Wei Gao did further

10  say, in addition to that, that Mr. Katanov instructed him how

11  to prepare -- excuse me -- how to prepare those special rolls.

12  Mr. Chipengule testified that Mr. Katanov was able to visit

13  him in the kitchen, which is normally an employee only area,

14  and that he gave him instructions on how to prepare sushi

15  ingredients, including sweet potatoes.  And while -- excuse

16  me -- and while -- excuse me -- it doesn't go directly to Wei

17  Gao, Zhenkai Sun, or Charles Chipengule, Mr. Katanov did

18  instruct Yang Yang Gao to spread the word of vacancies, even

19  while Yang Yang Gao was working at Sushi Fussion Express

20  showing that he had control over employees at Sushi Fussion

21  Express.

22          MR. SAMUEL:  I can just address some of those

23  points.

24          THE COURT:  Sure.

25          MR. SAMUEL:  First of all, for Wei Gao, I think

1   plaintiffs' counsel mischaracterized the testimony.  The only

2   thing Wei Gao said was Levi Katanov one time asked him to make

3   two special rolls that were off the menu.  Wei Gao --

4   plaintiffs' counsel asked Wei Gao, "Did you ever observe Levi

5   speaking to any other people?" and the response to that was he

6   heard Levi ask them to clean the bar, but that has no affect

7   on whether Levi was way Gao's employee.

8          THE COURT:  Wouldn't the inference be -- you know, I

9   take it that employer status is determined on a person by

10  person basis, but it would the unusual restaurant where a

11  particular person had -- was the employer for some sushi chefs

12  but not other sushi chefs within the same restaurant; right?

13         MR. SAMUEL:  Right.  But even if you add up the few

14  things that they said, one time Levi asked him to make two

15  rolls.  I mean, I read Your Honor's jury instructions, and it

16  says it can be infrequent, but one time?  I mean, that's --

17  that's just ridiculous.

18         And as it relates to Charles Chipengule, he didn't

19  instruct him on how to make things; he made suggestions.  So I

20  can go into a restaurant and make suggestions, that's not

21  going to make me an employer, so for those reasons, they

22  haven't submitted anything that should even get to the jury as

23  to Levi's individual liability.

24         THE COURT:  Okay.  I want to give it a little bit of

25  thought, so I will follow the usual practice, and I will defer

1   at this point in time in the case.

2           MR. SAMUEL:  Okay.

3           One other matter.

4           THE COURT:  Yes.

5           MR. SAMUEL:  As it relates to the single enterprise

6   theory, there's been no testimony about Sushi Fussion of 47th

7   Street.  There's been no testimony whatsoever.  So we believe

8   we are -- we would be entitled to a directed verdict as to

9   Sushi Fussion of 47th Street.  And as it relates to Sushi

10  Fussion of Forest Hills, there has been no testimony that any

11  workers -- I don't believe there's been any testimony that any

12  workers went from Sushi Fussion of Forest Hills to any

13  Katanov -- to any Yagudaev restaurants; so, therefore, we feel

14  a directed verdict as to Sushi Fussion Forest Hills would be

15  appropriate.

16          THE COURT:  Do you want to respond?

17          MR. SCHWEITZER:  Single enterprise depends largely

18  on common ownership and management.  47th Street and Forest

19  Hills were both owned and managed by Mr. Katanov, who is

20  also --

21          THE COURT:  Is there evidence of that?

22          MR. SCHWEITZER:  It's stipulated.  Which -- it's

23  also stipulated that he was the owner and operated Sushi

24  Fussion, LLC, which was the entity operating the Glatt Kosher

25  Supermarket where Yang Yang Gao worked and from which Yang

 1    Yang Gao, Albert, and Rico were transferred by Mr. Katanov to

 2    Sushi Fussion Express.

 3              As for evidence of joint -- sorry -- of joint

 4    management between Sushi Fussion Express and the remainder of

 5    the Katanov defendants, including Sushi Fussion, LLC, there is

 6    that transfer.  Similar transfer was --

 7              THE COURT:  I would just focus on these two.

 8              Are these transfers transfers that involved Sushi

 9    Fussion Forest Hills and 47th Street?

10              MR. SCHWEITZER:  Excuse me.  Not directly.  Sushi

11    Fussion, LLC, operated the supermarket in the Great Neck

12    location; however, Mr. Gao was transferred from Forest Hills

13    to the supermarket in the first instance.

14              THE COURT:  Okay.  So as to 47th Street, is it

15    they're just common ownership?

16              MR. SCHWEITZER:  Common ownership and common

17    management, yes.

18              MR. SAMUEL:  But, Your Honor, I think when they talk

19    about single enterprise and common ownership, they are not

20    talking about common ownership among the restaurants that we

21    say we own versus the restaurants that the Yagudaev defendants

22    own.  Common ownership would mean that together all of those

23    restaurants are owned commonly, and there's been zero evidence

24    that any of the four plaintiffs know what the business

25    relationship is.  So, yeah, there's common ownership among all

*Proceedings*                                                    251

1    the Katanov restaurants, but that does not speak to the issue

2    as to whether those restaurants and the Yagudaev restaurants

3    form a single enterprise.

4            THE COURT:  What's the nature of the stipulation?

5    I'll just pull up the language.

6            MR. SAMUEL:  I think the stipulation just says which

7    restaurants are owned by Katanov, so it would be circular

8    logic to say since --

9            THE COURT:  I see.  So there's no stipulation that

10   Katanov has an interest in the Yagudaev, or that Yagudaev has

11   an interest in the Katanov restaurant?

12           MR. SCHWEITZER:  No, there isn't.  The common

13   ownership goes only so far as Katanov owns.  Beyond that, we

14   contend that he exercised management as well as the Yagudaev

15   restaurant.

16           THE COURT:  Okay.  So just focussing on Sushi

17   Fussion 47th Street for a second.

18           MR. SAMUEL:  Sure.

19           THE COURT:  So I'm looking at the factors -- four

20   factors:  Interrelation of operation, centralized control of

21   labor relations, counter management, and common ownership or

22   financial control.  You told me a minute ago, you are relying

23   on common ownership or financial control.  Can you spin that

24   out for me?  It sounds like what the stipulation is to common

25   ownership or financial control is is just that Mr. -- tell me,

*Proceedings*                                        252

1    what is the common ownership stipulation as to Sushi Fussion

2    47th Street that you think is probative.

3              MR. SCHWEITZER:  That would be Number 5, Levi

4    Katanov is an owner of Sushi Fussion, LLC; Sushi Fussion of

5    47th Street; Sushi Fussion of Forest Hills; and Sushi Fussion

6    of NYC.

7              THE COURT:  Where are you?

8              MR. SCHWEITZER:  So there were two sets of

9    stipulations, Your Honor.  Remember the original stipulations

10   in the pretrial order, and the additional stipulations.

11             THE COURT:  So we are in the original JPTO?

12             MR. SCHWEITZER:  Yes, yes, yes, yes, yes.

13             (Pause.)

14             THE COURT:  While I am working on getting that up,

15   the stipulation is essentially that Mr. Katanov owned both

16   Sushi Fussion 47th Street and a bunch of other restaurants,

17   but not the restaurants about which where these folks worked?

18             MR. SCHWEITZER:  He owned the Forest Hills location

19   where Yang Yang Gao worked and the supermarket location where

20   Yang Yang Gao worked.  The supermarket location was operated

21   by Sushi Fussion, LLC --

22             THE COURT:  Can I just ask, is your directed verdict

23   request as to Mr. Yang Yang Gao?  As to all the defendants?

24   What is your motion with respect to Sushi Fussion 47th Street?

25             MR. SAMUEL:  There's -- the records devoid any

*Proceedings*                                                253

1   mention of Sushi Fussion of 47th Street, so how could they be

2   a single employer with the Yagudaev restaurants?  There's --

3           MR. SCHWEITZER:  I don't think that's true.  There

4   was testimony that -- and one employee was transferred from

5   47th Street to Sushi Fussion Express at around the same time

6   as Yang Yang Gao, Albert, and Rico.  I believe that was --

7           MR. SAMUEL:  I don't think that was 47th Street.

8           MR. SCHWEITZER:  Yeah, it was said to be Manhattan.

9   That's 47th Street.

10          MR. SAMUEL:  No.  There was a different location in

11  Manhattan.  He's referring to Sushi Fussion of NYC.  And I'm

12  very sorry to confuse the Court, but he's talking about a

13  restaurant called Sushi Fussion of NYC.

14          THE COURT:  Yes.

15          MR. SAMUEL:  That's different than Sushi Fussion of

16  47th Street, so there's just zero evidence.

17          THE COURT:  Okay.  Anything else that anybody wants

18  to say on this issue?

19          MR. SCHWEITZER:  No, Your Honor.

20          THE COURT:  Okay.  I will look at it.

21          Can we talk about the jury charge while we're

22  waiting for the jurors?

23          MR. SAMUEL:  Of course.

24          THE COURT:  So I think I've tracked, to a large

25  extent, what you guys gave me, and some of the general

*Proceedings*                                                    254

1   instructions, I used a federal model rather than -- I think in

2   some cases, there was models that involved, kind of, a State

3   model jury charge.  But maybe we can just go through it page

4   by page and you can let me know if you've got -- well, I guess

5   I can think of a couple ways to do this.

6                Have you had a chance to read this?

7                MR. SAMUEL:  I did look at a couple of sections that

8   I have a comment on.

9                MR. SCHWEITZER:  I was preparing a motion until

10  midnight last night.  I did not have a chance to look at it.

11               THE COURT:  Sure.  I want to give you guys enough

12  time to look at it before we talk about it.  I'm happy to give

13  you all a chance to read it through if that's sensible.

14               MR. SAMUEL:  If I can indulge the Court for one

15  moment, it might just streamline things.

16               THE COURT:  Sure.

17               MR. SAMUEL:  I know on page 17, I think we are

18  talking about whether he was paid an hourly rate or a salary.

19               THE COURT:  Let me get to where you are, page 17.

20               MR. SAMUEL:  Aaron, do you have any position on

21  whether he was salaried or hourly?

22               MR. SCHWEITZER:  Excuse me.  According to the

23  evidence, he says he was paid salary.  According to your

24  client's records, he was paid hourly.

25               THE COURT:  So tell me your thought on this

1   instruction.

2         MR. SAMUEL:  You know what, Your Honor, we will

3   leave it as is, and I will look through the rest.

4         THE COURT:  Okay.

5         MR. SCHWEITZER:  On page 2, Your Honor, there's a

6   sentence about the Court asking the witness questions.  That

7   has not happened yet.  If it does not happen with respect to

8   the one witness remaining, should that be stricken?

9         THE COURT:  Sure.  I think I probably made it "may"

10  because I was just trying to leave open the possibility that

11  that would occur.  I'm happy to take out that sentence.  I

12  will highlight it and we'll take it out if it seems

13  inappropriate.

14        MR. SCHWEITZER:  When does the Court intend to read

15  the stipulations to the jury?

16        THE COURT:  My law clerk might have had the

17  opportunity to create a document that just has the

18  stipulations.

19        THE CLERK:  I'm doing it right now.

20        THE COURT:  Maybe now is actually a good time,

21  right, because plaintiff has just rested.

22        MR. SCHWEITZER:  Yeah, that makes sense.

23        THE COURT:  May as well.  I will read the

24  stipulation to the jury, and we will mark it and give it to

25  the jurors.  We are creating a separate document that has the

*Proceedings*                                                256

1    stipulations.

2              MR. SCHWEITZER:  As a Court exhibit?

3              THE COURT:  Yes.  We should probably add portions

4    from the JPTO.

5              THE CLERK:  I'm doing that.

6              Do you want the stipulations as to law in there?

7              THE COURT:  No.

8              MR. SAMUEL:  Your Honor, do you mind if I step out

9    for one minute?

10             THE COURT:  Sure, yes.  These jurors have been

11   pretty prompt, so I'm hopeful we will start close to 9:30.

12             MR. SAMUEL:  Okay.

13             (A recess in the proceedings was taken.)

14             THE COURTROOM DEPUTY:  Just two more jurors, Judge.

15             THE COURT:  Great.

16             MR. SCHWEITZER:  On page 12, when he's talking about

17   Yang Yang Gao, where he worked, it says the parties have not

18   stipulated --

19             THE COURT:  Let's wait until defense counsel is

20   back.

21             (Pause.)

22             MR. SAMUEL:  Your Honor, do you mind if we take five

23   minutes.  I will be as quick as I can.  Is the jury all here?

24             THE COURTROOM DEPUTY:  Not yet.

25             MR. SAMUEL:  I am in this room across the hall.

1         THE COURT:  Okay.  We will go look for you when

2   we've got all the jurors here.  You are going to be --

3         MR. SAMUEL:  Where the viewing room is.

4         THE COURTROOM DEPUTY:  Overflow courtroom, okay.

5         THE COURT:  Great.

6         THE COURTROOM DEPUTY:  Thank you.

7         (A recess in the proceedings was taken.)

8         THE COURTROOM DEPUTY:  Judge, the jury is here.

9         Do you want me to get them?

10        THE COURT:  Sure.

11        THE COURTROOM DEPUTY:  Okay.

12        (Pause.)

13        (Jury enters.)

14        THE COURT:  Okay.  Welcome back.  We are in the

15  homestretch, I think.

16        Are the parties comfortable with my -- my law clerk

17  is creating a printout -- with reference to the stipulations,

18  are the parties comfortable with my just reading from the JPTO

19  and from the document you gave me -- the subsequent

20  document -- without giving you that printout first?

21        MR. SCHWEITZER:  Yes, Your Honor.

22        MR. SAMUEL:  Yes.

23        THE COURT:  All right.  So I want to read to you a

24  stipulation.  That just means it's something that both parties

25  have agreed on.  They are facts that both parties have agreed

*Proceedings*                                                    258

1  are true, and I will give you are written copy of the

2  stipulations too for you to consider when you deliberate, but

3  I wanted to read those stipulations to you now.

4          One, Sushi Fussion, LLC, is a New York limited

5  liability company that operated the Sushi Fussion location

6  inside Main Glatt Supermarket, 6938 Main Street, Flushing,

7  New York 11367 from the start of a period relevant to this

8  lawsuit through on or about October 19th of 2013; and it has

9  operated the Sushi Fussion location at 613 Middle Neck Road,

10  Great Neck, New York 11023 throughout the period relevant to

11  this lawsuit.

12          Sushi Fussion of 47th Street, Inc., is a New York

13  company that has operated the Sushi Fussion location at 26

14  West 47th Street, New York, New York 10036 throughout the

15  period relevant to this lawsuit.

16          Sushi Fussion of Forest Hills, Inc., is a New York

17  corporation that has operated the Sushi Fussion location at

18  105-43 64th Road, Forest Hills, New York 11375 throughout the

19  period relevant to this lawsuit.

20          Sushi Fussion of NYC, Inc., is a New York

21  corporation that has operated the Sushi Fussion location at

22  224 West 35th Street, New York, New York 10001 throughout the

23  period relevant to this lawsuit, but which location is now

24  closed.

25          Leva Katanov is an owner of Sushi Fussion, LLC;

1   Sushi Fussion of 47th Street, Inc.; Sushi Fussion of Forest

2   Hills, Inc.; and Sushi Fussion of NYC, Inc.

3           All the corporate defendants at one point shared a

4   common website which lists all the Sushi Fussion restaurant

5   locations, but they no longer do so.  On the common website,

6   Sushi Fussion tells its customers, quote, "For live sushi bars

7   at your event, call Leo at" -- and then it provides a

8   telephone number.

9           Yang Yang Gao was hired by Leva Katanov.  Defendants

10  were engaged in interstate commerce and covered employees

11  under the Fair Labor Standards Act.

12          Yang Yang Gao.

13          Yang Yang Gao worked for Sushi Fussion, LLC, at 4938

14  Main Street, Flushing, New York 11367 from September 12th of

15  2011 through October 19th of 2013.  Yang Yang Gao worked for

16  Sushi Fussion Express, Inc., at 71-32 Main Street, Flushing

17  New York 11367 from October 20th, 2013, through October 2nd of

18  2016.  From October 20th, 2013, through October 2nd, 2016, at

19  71-32 Main Street, Flushing, New York 11367, Yang Yang Gao

20  worked 63 hours and ten minutes per week from 10:30 a.m.

21  through 9:50 p.m. on Sundays, Mondays, Tuesdays, Wednesdays,

22  and Thursdays, and from 10:30 a.m. through 5:00 p.m. on

23  Fridays.

24          Wei Gao.

25          Wei Gao worked for Sushi Fussion Express, Inc., at

1   71-32 Main Street, Flushing, New York 11367 from July 1st,

2   2015, through July 29th of 2015 as a sushi chef.  Throughout

3   his employment, Wei Gao worked for 56 hours and ten minutes

4   per week from 10:30 a.m. through 10:00 p.m. on Mondays; from

5   11:30 a.m. through 11:00 p.m. on Tuesdays and Thursday; from

6   10:00 a.m. through 5:00 p.m. on Fridays; from 9:30 p.m. to

7   12:30 a.m. on Saturdays; and from 11:30 a.m. through

8   11:00 p.m. on Sundays.

9            Throughout his employment, Wei Gao was paid $750 per

10  week.  Based on his hours stated above, Wei Gao has $25,264.29

11  in overtime wages -- in unpaid overtime wages, and $4,210.71

12  in unpaid spread of hours compensation.  The liquidated

13  damages for Wei Gao, based on his unpaid overtime wages and

14  spread of hours compensation are $29,475.

15           Throughout his employment, Wei Gao was not furnished

16  with a wage notice compliant with Section 195.1 of the

17  New York Labor Law.  Wei Gao's wage notice damages are $5,000

18  because he was not furnished with a wage notice compliant with

19  Section 195.1 of the New York Labor Law.  Throughout his

20  employment, Wei Gao was not furnished with wage statements

21  compliant with Section 195.3 of the New York Labor Law.  Wei

22  Gao's wage statement damages are $5,000 because he was not

23  furnished with wage statements compliant with Section 195.3 of

24  the New York Labor Law.

25           Zhenkai Sun.

1    Zhenkai Sun worked for Sushi Fussion Express, Inc.,

2  at 71-32 Main Street, Flushing, New York 11367 from April 1st

3  of 2014 through June 30th of 2015 as a sushi chef.  Throughout

4  his employment, Zhenkai Sun worked 56 hours and 30 minutes per

5  week from 10:30 a.m. through 10:00 p.m., Sundays, Tuesdays,

6  Wednesdays, and Thursdays; from 10:00 a.m. through 5:00 p.m.

7  on Fridays; and from 9:30 p.m. through 1:00 a.m. on Saturdays.

8  Throughout his employment, Zhenkai Sun was paid $775 per week.

9  Based on his hours stated above, Zhenkai Sun has $30,158.57 in

10 unpaid overtimes wages, and $5,026.43 in unpaid spread of

11 hours compensation.  The liquidated damages for Zhenkai Sun,

12 based on his unpaid overtime and spread of hours compensation

13 are $31,185.

14    Throughout his employment, Zhenkai Sun was not

15 furnished with a wage notice compliant with Section 195.1 of

16 the New York Labor Law.  Zhenkai Sun's wage notice damages are

17 $5,000 because he was not furnished with a wage notice

18 compliant with Section 195.1 of the New York Labor Law.

19    Throughout his employment, Zhenkai Sun was not

20 furnished with wage statements compliant with Section 195.3 of

21 the New York Labor Law.  Zhenkai Sun's wage statement damages

22 are $5,000 because he was not furnished with wage statements

23 compliant with Section 195.3 of the New York Labor Law.

24    Charles Chipengule.

25    Charles Chipengule worked for Sushi Fussion Express

1   Inc., at 71-32 Main Street, Flushing, New York 11367 from

2   November 1st of 2013 through December 31st of 2014 as a

3   kitchen helper.  From November 1st of 2013 through

4   December 31st of 2014, at 71-32 Main Street, Flushing,

5   New York 11367, Charles Chipengule worked 73 hours per week

6   from 10:00 a.m. through 10:30 p.m. on Sundays, Mondays,

7   Tuesdays, Wednesdays, and Thursdays; and from 10:00 a.m.

8   through 5:00 p.m. on Fridays; and from 9:30 p.m. through

9   1:00 a.m. on Saturdays.  From November 1st, 2013, through

10  December 31st, 2014, Charles Chipengule was paid $11 per hour,

11  including for overtime hours.  He was not paid time-and-a-half

12  for overtime hours or an extra hour's pay for days when his

13  spread of time exceeded ten hours.

14          Charles Chipengule worked for Hibachi Express, Inc.,

15  at 141-25 Jewel Avenue, Flushing, New York 11367 from

16  March 1st of 2015 through May 31st of 2015.  From March 1st of

17  2015 through May 1st of 2015, at that address, Charles

18  Chipengule worked 80 hours and 30 minutes per week from

19  10:00 a.m. through 12:00 a.m. on Sundays, Mondays, Tuesdays,

20  Wednesdays, and Thursdays; from 10:00 a.m. through 5:00 p.m.

21  on Fridays; and from 9:30 p.m. through 1:00 a.m. on Saturdays.

22  From March 1st of 2015 through May 31st of 2015, Charles

23  Chipengule was paid $11 per hour, including for overtime

24  hours, and was not paid time-and-a-half for overtime hours or

25  an extra hour's pay for days when his spread of time exceeded

*Proceedings*                                                    263

1   ten hours.

2          Charles Chipengule worked for Sushi Fussion Express,

3   Inc., at 71-32 Main Street in Flushing, New York 11367 from

4   June 1st of 2015 through November 30th, 2015.  From June 1st,

5   2015, through November 30th, 2015, at 71-32 Main Street,

6   Flushing, New York 11367, Charles Chipengule worked 80 hours

7   and 30 minutes per week, from 10:00 a.m. to 12:00 a.m. on

8   Sundays, Mondays, Tuesdays, Wednesdays, and Thursdays; from

9   10:00 a.m. through 5:00 p.m. on Fridays; and from 9:30 p.m.

10  through 1:00 a.m. on Saturdays.

11         From June 1st of 2013 through November 30th, 2015,

12  Charles Chipengule was paid $12.50 per hour, including for

13  overtime hours, and was not paid time-and-a-half for overtime

14  hours or an extra hour's pay for days when his spread of time

15  exceeded ten hours.

16         Based on his hours, as stated above, Charles

17  Chipengule has $20,865.59 in unpaid overtime wages, and

18  $5,768.93 in unpaid spread of hours compensation.  The

19  liquidated damages for Charles Chipengule, based on his unpaid

20  overtime wages and spread of hours compensation, are

21  $26,643.52.

22         Throughout his employment, Charles Chipengule was

23  not furnished with a wage notice compliant with Section 195.1

24  of the New York Labor Law.  Charles Chipengule's wage notice

25  damages are $5,000 because he was not furnished with a wage

1    notice compliant with Section 195.1 of the New York Labor Law.

2          Throughout his employment, Charles Chipengule was

3    not furnished with wage statements compliant with

4    Section 195.3 of the New York Labor Law.  Charles Chipengule's

5    wage statement damages are $5,000 because he was not furnished

6    with wage statements compliant with Section 195.3 of the

7    New York Labor Law.

8          Okay.  So that's the end of the stipulation.  Those

9    are some facts that the parties agree on in this case, and I

10   will give you a written copy of that stipulation, too, when

11   you are deliberating.

12         So it's defense case.

13         MR. SAMUEL:  Sure.  We would like to call Levi

14   Katanov to the stand.

15         THE COURT:  Great.

16         (Witness takes the stand.)

17         THE COURTROOM DEPUTY:  Mr. Katanov, please stand and

18   raise your right hand.

19         (Witness sworn.)

20         THE WITNESS:  Yes.

21         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

22         (Continued on next page.)

23

24

25

1   **LEVA KATANOV,**

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5   DIRECT EXAMINATION

6   BY MR. SAMUEL:

7   Q    Good morning.

8   A    Good morning.

9   Q    Please state your name for the record.

10  A    Leva Katanov, L-E-V-A K-A-T-A-N-O-V.

11  Q    Are you known by any other names?

12  A    Yeah.

13  Q    What names?

14  A    Levi, Leo.

15  Q    Okay.  And can you please tell the jury what your

16  relationship is with Sushi Fussion, LLC?

17  A    I am part owner.

18  Q    Okay.  What is Sushi Fussion, LLC?

19  A    It's a restaurant.  Sushi restaurant.

20  Q    Okay.  And you said you are part owner.  Who are the

21  other owners of that LLC?

22              MR. SCHWEITZER:  Relevance.

23              THE COURT:  Overruled.

24              THE WITNESS:  I need to answer?

25              THE COURT:  Yes, you can answer.

1            THE WITNESS:  I'm sorry?

2            THE COURT:  Yes, you can answer.

3   A    Robert Gurgov and Isaac Baayev.

4   Q    Those are your only partners in that entity?

5   A    Yes.

6   Q    Okay.  How long have you owned Sushi Fussion, LLC?

7   A    Since 2011.

8   Q    Okay.  And if you could please tell the jury what

9   location you first opened Sushi Fussion, LLC?

10  A    The Forest Hills location.

11  Q    Okay.  What was the address?

12  A    115-43 64th Road, Forest Hills, New York 11375.

13           MR. SCHWEITZER:  Objection.

14           Which locations were operated by which entities is

15  stipulated to.

16           THE COURT:  Overruled.

17           I let you do plenty of background.

18  BY MR. SAMUEL:

19  Q    Okay.  Can you tell the jury what -- how many people

20  worked at Sushi Fussion at the Forest Hills location when you

21  first opened?

22  A    Two.

23  Q    How many?

24  A    Two.

25  Q    Okay.  What were those people?  What type of workers?

1  A    Sushi chefs.

2  Q    Aside from the sushi chefs, did anyone else work there?

3  A    I worked there.

4  Q    And do you remember when in 2011 it was that you opened

5  up that location?

6  A    April -- April 7th, I believe.

7  Q    Okay.  And at some point in time, did you open up a

8  second location?

9  A    Yes.

10  Q    And where was that second location?

11  A    69-38 Main Street.  It was inside Main Glatt Supermarket.

12  Q    Is it fair to say that was a kiosk, or something else?

13  A    Kiosk.  Sushi stand inside of supermarket.

14  Q    When did you open up the kiosk inside of Main Glatt?

15  A    August, I believe, of 2011.

16  Q    Was that a sit-in restaurant, a takeout entity, or

17  something else?

18  A    It was a sushi stand, so all take out, deliveries.

19  Q    Okay.  How many people worked at that location when you

20  first opened?

21  A    It was myself, two sushi chefs, and a -- I had a counter

22  person, and a delivery guy.

23  Q    Okay.  Are you familiar with the plaintiff in this case,

24  Yang Yang Gao?

25  A    Yes.

1   Q    And how are you familiar with him?

2   A    I hired him.

3   Q    Okay.  What did you hire him to do?

4   A    To be a sushi chef.

5   Q    At what location?

6   A    I hired him to be a chef inside the supermarket, but I

7   originally had him trained in the Forest Hills location until

8   the supermarket opened up.

9   Q    Okay.  And do you recall when it was that he started

10  working inside of the Glatt supermarket?

11           MR. SCHWEITZER:  This is stipulated to.

12           THE COURT:  So I let both parties educe some facts

13  to provide context even though they were stipulated.  I will

14  let him educe some facts that provide context although they

15  are stipulated.

16           Go ahead.

17  A    Can you repeat the question, please?

18           MR. SAMUEL:  If the court reporter can read that

19  question back.

20           (Record read.)

21  A    Me or Yang Yang Gao?

22  Q    Yang Yang Gao.

23  A    As soon as we opened in August.

24  Q    What were his job duties when you first hired him to work

25  inside the Glatt Supermarket?

1  A    He ran the sushi bar.  He made sushi.  He did all the

2  ordering.  He would send me the orders on a daily basis.  He

3  would take inventory every day.  He would also interview new

4  chefs.  He would also have a say in the hiring and the firing.

5  He would make sure that the sushi bar ran smoothly on a daily

6  basis.  He was my guy that ran that sushi stand inside the

7  supermarket.

8  Q    So when you said he made orders, what does that mean?

9  A    Well, every time we get an order in the store, he would

10  make sure it's done either by himself or by a different sushi

11  chef.

12  Q    So you are taking about he made sushi rolls?

13  A    That's right.

14  Q    Okay.

15  A    Or anything else that's involved in the order:  soups,

16  salads, fried rolls.

17  Q    And if you could please tell the jury, how did it work

18  with the ordering system at the Glatt Supermarket?

19  A    Okay.  So we had a counter person.  We had a phone.  We

20  had a POS system.  A customer would either call in an order or

21  walk up an order in person.  Once the order is input into the

22  system, there's a ticket that's printed out.  That ticket is

23  then handed over or hung on a order stick where then the --

24  Eddie would take the order -- I said "Eddie," because he was

25  also known as Eddie, Yang Yang Gao -- he would take the order

1  and either himself or the other chef would have done it.

2  Q    How would it be decided who would make the roll?

3            MR. SCHWEITZER:  Hearsay.

4            THE COURT:  Do you want to rephrase the question?

5  BY MR. SAMUEL:

6  Q    Whose responsibility would it be to make the role when a

7  ticket came in?

8  A    It was his responsibility.

9  Q    "His," meaning Yang Yang Gao?

10 A    Yang Yang Gao.

11 Q    And would Yang Yang Gao decide if he would make the role

12 or the other sushi chef?

13           MR. SCHWEITZER:  Hearsay.

14           MR. SAMUEL:  He's the owner, so, I mean...

15           THE COURT:  Excuse me one second.

16           Do you want to rephrase the question?

17 A    Who would decide?

18 Q    Yes.  Who would decide?

19 A    It was up to Eddie.  If he was busy with something else,

20 he would tell the other chef to do it.  If he wasn't, he would

21 do it himself.  If it was a big order, they will do it

22 together, but it was his responsibility to make sure the order

23 goes out on time.

24 Q    When you say "Eddie" again, you are referring to Yang

25 Yang Gao?

1    A    I'm sorry?

2    Q    When you say "Eddie," you're referring to Yang Yang Gao?

3    A    Exactly.  That's his English name.

4    Q    Did you give Yang Yang Gao -- or Eddie, as you call

5    him -- authority to dictate who would make a roll?

6    A    That's right.

7    Q    Okay.  And did you, in fact, give authority to Yang Yang

8    Gao to make that decision?

9    A    Yes.

10   Q    Now, you said a few moments ago that one of Yang Yang

11   Gao's responsibilities would be to do inventory.

12   A    That's right.  On a daily basis, he would have to look

13   through the inventory to make sure that we have everything for

14   the next day, if we are low on anything, like the fish, the

15   vegetables, any containers, bags, he would send me an order on

16   a daily basis, and then I would place the order, and then he

17   would have it delivered to the store the next day.

18   Q    And did you ever question when he wanted to order

19   something?

20   A    No.  Whatever he said, I ordered.  I trusted him.

21   Q    You mentioned also one of his responsibilities was to

22   interview chefs.

23        Can you please explain to the jury what that means?

24   A    Sure.

25        So if we needed a new chef, for whatever reason, if

1   the other one was leaving, or we had to let him go because he

2   couldn't handle the workload, I would ask Eddie to find a

3   chef, he would advertise on his Chinese platforms in his own

4   language, then somebody would call him, and he would bring him

5   in for an interview.  There were times when I was there

6   present for the interview, and there were times that I was not

7   present.  But he would tell me, this guy is good, we could

8   take him; or he would say, you know what, let's give him a

9   week, and if he can handle, we take him.  If not, we can find

10  another guy.  I said all right.  He knows.  It's best for you

11  that you get a good guy, because he's working with you, and

12  that's the way it went.

13                 (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SAMUEL:   (Continuing.)

2    Q    And did Eddie make recommendations as to who to hire and

3    who not to hire?

4    A    He always said this guy is good let's keep him or, you

5    know what, I will bring another guy in, let's forget about

6    him.

7    Q    And how often would you listen to Yang Yang Gao's

8    recommendations when it came to who to hire?

9    A    Always.

10   Q    Would there be times when Yang Yang Gao would interview a

11   sushi chef when you weren't present?

12   A    Yeah, there would be times.

13   Q    Did Yang Yang Gao ever hire anybody without discussing it

14   with you first?

15   A    I always had the authority to hire and fire but I always

16   went according to his recommendation.

17   Q    And how much was Yang Yang Gao paid on a weekly basis?

18   A    He started at 750 when he worked in Forest Hills during

19   his training period, about a month.  And once we opened the

20   supermarket we gave him 850 because he was managing the store.

21   Q    And when you say 850, that's per week?

22   A    Per week.

23   Q    Was that paid in cash, check or something else?

24   A    He used to get one week cash the second week a $300 check

25   and the rest in cash.

1    Q    You mentioned that there was a counterperson inside of

2    the kiosk.  Did you give Yang Yang Gao authority to manage the

3    counter person as well?

4    A    Can you repeat that?

5    Q    You mentioned that there was a counterperson.

6    A    Okay.

7    Q    Did you give Yang Yang Gao authority to manage the

8    counterperson as well?

9              MR. SCHWEITZER:  Leading.

10             THE COURT:  Overruled.

11   A    Yes, I didn't directly tell him, listen, you have to make

12   sure to listen to Eddie, but the counterperson listened to

13   Eddie because he had to make sure that the orders went out

14   smoothly and Eddie would control the orders.  So, yes, the

15   counterperson did listen to Eddie whatever he said to do.

16             MR. SCHWEITZER:  Hearsay, ask to be stricken.

17             MR. SAMUEL:  That wasn't hearsay.

18             MR. SCHWEITZER:  He was asked whether he told --

19             THE COURT:  Wait a second.  Overruled.

20             MR. SCHWEITZER:  Sidebar, Your Honor.

21             (Sidebar held outside of the hearing of the jury.)

22             (Continued on next page.)

23

24

25

Sidebar                    275

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          MR. SCHWEITZER:  He was asked did you give the --

4     sorry, did you give Yang Yang Gao authority to direct the

5     counterperson and he answered no, I did not, but the

6     counterperson listened to Yang Yang Gao anyway.

7          THE COURT:  So, speaking for what the counterperson

8     would do, I ruled on this objection.  You can't have sidebars

9     on something I already ruled on.

10          MR. SCHWEITZER:  It's not responsive.  He's saying

11     something that the counterperson would do other -- he's saying

12     what the counterperson would do as a matter of the

13     counterperson's subjective judgment not as a matter of

14     authority he gave to Yang Yang Gao or as a direction that he

15     gave to the counterperson -- he didn't say to the

16     counterperson -- he didn't say to Eddie, you have authority

17     over the counterperson.

18          THE COURT:  Please stop.  There are two issues here.

19     The objection as stated, is overruled.  You can't have

20     sidebars every time you disagree.  State your objection in one

21     word.  If there is something you need to clarify, I will ask

22     you or I will ask your opponent to clarify.  We can't have all

23     of these sidebars.

24          MR. SCHWEITZER:  Note my objection to this.

25          (Sidebar ends.) (Continued on next page.)

SN        OCR        RPR

1    (Continuing.)

2         THE COURT:  Next question.  I think he answered the

3    question.  What is your next question?

4    BY MR. SAMUEL:

5    Q    You mentioned that Yang Yang Gao's responsibility was to

6    make sure that the sushi bar ran smoothly.  What does that

7    entail, to make a sushi bar run smoothly?

8    A    Every time you got an order it had to be made promptly.

9    He had to make sure that we have all the ingredients that we

10   need for every day.  He had to cut things up and make sure we

11   were ready whether it was by himself or with his helper, the

12   second sushi chef.  He had to make sure the deliveries went

13   out on time as well.  You know, if he didn't make it on time

14   then there wouldn't be sent on time and then we have sad

15   customers and it's bad for business.

16        So what is there to be coming in, he had to be

17   making them, they have to be done and sent out on time.

18   That's called running smoothly.  We always need the inventory

19   we need for that day he would know how much to order every

20   day.  Some days are busy some days aren't busier but he would

21   already know.

22   Q    You mentioned a delivery guy was part of running of sushi

23   bar, managing the delivery person as well?

24        MR. SCHWEITZER:  Leading.

25        THE COURT:  Overruled.

1    A    Yes.

2    Q    And in what way did he manage the delivery guy?

3    A    Well, if -- when they made the orders they would not pack

4    the orders.  The sushi chefs would make the rolls put them in

5    containers and put them on the counter, in the packing station

6    and the delivery guy would pack them, if he was around.  If he

7    was on a delivery, the counterperson would pack them and the

8    delivery guy would come in and the orders have to be sent out

9    and the chefs would be the ones who you can say send orders

10   out because they made the orders and the sous-chef can -- the

11   delivery guy can take out them.  But the orders were not

12   made -- the delivery guy cannot take the order out so he was

13   directly affected by the delivery as well, their performance.

14   Q    And would Yang Yang Gao have contact with the delivery

15   person?

16   A    Yes, yes, of course.

17   Q    And did you ever witness any interactions?  What would a

18   typical interaction be?

19         MR. SCHWEITZER:  Hearsay.

20         THE COURT:  Overruled.

21   A    There were a lot of times where sushi trays, the

22   containers, were piling up on the counter, the packing station

23   and the delivery guy would be outside smoking or on the phone

24   and say let's go, we have to clear out the station.  Everyone

25   is coming in.  I need space, pack them up and send them out.

1    We have to keep the place flowing.

2    Q    Would the delivery guys listen?

3    A    Most of the time, but again nobody is perfect.

4    Q    How long did Yang Yang Gao work for you in that location?

5    A    About two years.

6    Q    And do you know if Yang Yang Gao ever took breaks during

7    the day?

8    A    Yes, of course.

9    Q    And how long would the breaks typically be?

10   A    He had an hour lunch break and then any time it wasn't

11   busy, he went out for a cigarette, for a phone call, sit down

12   and rest if you need to be.  As long as it ran smoothly, I

13   didn't mind him taking breaks, as many as he needed.

14   Q    Okay.  And are you familiar with somebody named Michael

15   Yagudaev?

16   A    Yes.

17   Q    How do you know him?

18   A    He's a friend of mine.

19   Q    And when did you and he first interact?

20   A    We met around the same time I opened my first location.

21   He was good friends with my partner, Robert, for many years.

22   Q    Okay.  Did you and Michael ever own any restaurants

23   together?

24   A    No.

25   Q    Did Michael Yagudaev ever have any interest in Sushi

1   Fussion LLC?

2   A    No.

3   Q    Did Michael Yagudaev have any interest in Sushi Fussion

4   of Forest Hills, LLC?

5   A    No.

6   Q    How about Sushi Fussion on 47th Street?

7   A    No.

8   Q    Did you have any business relationship with Michael

9   Yagudaev?

10  A    Other than that he paid me a commission of 5 percent

11  after he opened his Sushi Fussion Express, no other business.

12  Q    Let's talk about that for a few minutes so the jury is

13  clear.

14  A    Sure.

15  Q    What do you mean he opened up a Sushi Fussion Express?

16  A    He approached my partner Robert one day -- my friend from

17  childhood.  He approached him saying he's tired of being a

18  barber and he was looking for a new industry to get into and

19  he saw that we're successful; we opened two locations within

20  one year.  He said, do you guys think that I can open up

21  something maybe with your name and we can do something.  We

22  thought about it.  We said, you know what, we found out that

23  Main Lot was closing at that same time, the supermarket was

24  closing.  We said we're pretty busy at the Forest Hills

25  location and we offered him the opportunity to open up his own

1    store under our name using our Sushi Fussion trademark and he

2    would pay us a 5 percent royalty fee from gross income and he

3    thought about it and agreed to it.

4    Q    And the name of that store you're referring to is what?

5    A    It's d/b/a Sushi Fussion and the legal name was Sushi

6    Fussion Express.

7    Q    And do you know if that was a legal entity?

8    A    Yes, of course.

9    Q    Okay.  And do you know who owned the shares of that

10   entity?

11   A    Michael Yagudaev.

12   Q    And you don't own any shares of that entity?

13   A    No.

14   Q    So, you testified a few minutes ago that you would get 5

15   percent of -- was that the gross sales?

16   A    Yes.

17   Q    And did he, in fact, pay you?

18   A    For the first, about, six months he paid.  Business was

19   doing well and he paid us and after six months it started

20   declining and he was barely making ends meet.  So we basically

21   felt bad for him and we said, you know what, we're not

22   charging you anymore.  Keep up your business, improve what you

23   can, but you don't have to pay us anymore.  Be sure you're

24   okay.

25   Q    So did any of the employees that worked for you at Sushi

1   Fussion LLC either in the Forest Hills location or the glatt

2   store, would those employees ever, like, switch back and forth

3   between your restaurant and the Yagudaev restaurant?

4   A    No.

5   Q    And were your employees kept on your books and his

6   employees kept on his books?

7   A    Correct.

8   Q    And just so the record is clear and the jury understands,

9   did you and Michael Yagudaev share a common set of financial

10  books?

11  A    No.

12  Q    Did you have any bank accounts together?

13  A    No.

14  Q    And when you paid your workers you paid them out of the

15  corresponding bank account from the entity that they worked

16  for for you?

17  A    Correct.

18  Q    And did you ever pay any workers that worked at Sushi

19  Fussion Express?

20  A    No.

21  Q    Now, in the glatt kiosk, who was the person that made the

22  most amount of money?

23  A    Eddie, Yang Yang Gao.

24  Q    And why was that?

25  A    Because he was the person who had the most

1    responsibilities at that location.

2    Q    Okay.  Is the glatt location still operating?

3    A    No.

4    Q    And what, if anything, happened with the workers that you

5    had at the glatt supermarket after it closed?

6    A    Before we were closing about a week or so, Michael was

7    opening his store and Michael approached me and said, listen,

8    what are you doing with your chefs, are they going to go to

9    any other locations.  I said I don't have anything in other

10   locations.  If you have a job you can offer them I said.  And

11   Michael approached Eddie and said would you like to work for

12   me.

13          They spoke on their own.  I had nothing to do with

14   that conversation and they came and told me and as soon as

15   Main Lot closed it was about a week, it was a week lag time

16   because he wasn't ready to open.  About a week after Main Lot

17   closed Sushi Fussion opened, Michael Yagudaev opened it, and

18   he hired Eddie and Eddie went to work over there.

19          MR. SCHWEITZER:  I ask that the portion of the

20   statement referring to Michael and Eddie speaking on their own

21   and coming to an agreement be stricken as speculative.

22          THE WITNESS:  I was not at that conversation.

23          THE COURT:  So I will direct the jurors to disregard

24   that portion is as to if there were conversations between

25   Michael and Eddie.

Katanov - direct - Samuel                    283

1    BY MR. SAMUEL:

2    Q    Do you know if Eddie or Yang Yang Gao ever in fact did

3    work for Michael Yagudaev after the glatt store closed?

4    A    Yes, I saw him working there.  I saw him working in

5    Michael's store.

6    Q    Were there any other workers that worked at the glatt

7    kiosk that also went to work for Sushi Fussion Express?

8    A    I believe Albert also, the counterperson, may have as

9    well.  Let me rephrase that.  He was hired by him.

10   Q    Now, did you ever go to visit the Sushi Fussion Express

11   restaurant?

12   A    Yes, of course.

13   Q    And how often would you go to visit that store?

14   A    Whenever I was in the area I would stop by and see my

15   friends, see Michael, see how things are going with him and he

16   would tell me, do me a favor, come inside, look at the

17   kitchen, look at the bar area, do you see anything I can

18   improve in.  You're in the business longer than I am.  I

19   mentored him.  I took a stroll and pointed things out.

20        And at times the sushi bar would be a little bit

21   messy.  You have to speak with your guys, this is not

22   acceptable, you should not let them run a bar like this.  It

23   has to be neat because customers can see what's happening

24   behind the bar when they're waiting for the orders.  I would

25   come in the kitchen and look around.  There was one point I

1  saw, I believe, Charles, he was cutting a sweet potato.  And I

2  told him Charles is doing a great job and Michael speaks very

3  highly of you and I told him that in one of my locations my

4  kitchen guy taught me that if you cut the sweet potato a

5  little thinner they fry faster and the order goes out faster

6  and the customer is happier.  He said, thank you, I didn't

7  know that and he took it and implemented it and it worked.

8  Q    And how many times did it happen with Mr. Chipengule?

9  A    With Chipengule, one time.

10 Q    And that was the sweet potato?

11 A    Yes.

12 Q    And when you told him to cut it thinner was that a

13 suggestion on your part?

14 A    It was strictly a suggestion.  It was up to him what he

15 wanted to do.

16 Q    Now, how about Wei Gou is?

17 A    Yeah.

18 Q    And who is Wei Gou in relation to this case?

19 A    He was a sushi chef that worked for Michael at Sushi

20 Fussion Express.

21 Q    Did you ever have any interaction with Wei Gou when he

22 worked at Sushi Fussion Express?

23 A    I think there was one instance where I walked in and he

24 was making a sushi roll and it didn't look exactly perfect,

25 you can say, and I did point out.  I said, you know, Wei if

1  you can make it a little bit better -- basically fish was

2  sticking out from the ends.  I told him if you push it in with

3  your hand, I have seen chefs in other locations how they make

4  the rolls.  It looks nicer to the customer.  I pointed it out

5  if you push the fish in from both ends it doesn't look as

6  messy and the roll looks bigger and the customer would be

7  happier and he said I will do that.  He remade that roll when

8  I was talking to him.

9  Q    And how many times did an interaction like that occur

10 between you and Wei Gou?

11 A    As far as I remember, it was that one time.

12 Q    And when you told him to push the fish in, was that a

13 suggestion on your part or an order on your part?

14 A    A suggestion.  They didn't have to listen to me.  I

15 wasn't his boss.

16 Q    Now, at the Sushi Fussion Express restaurant, did you

17 ever supervise anybody that worked there?

18 A    No.

19 Q    Did you ever manage anybody that worked there?

20 A    No.

21 Q    Was there ever any business relationship between you and

22 Michael related to that store?

23 A    The only relationship we had with him in regards to

24 business is when I came once a week to pick up the check and

25 that's it.

1   Q    Okay.  And of all the workers that worked for the Sushi

2   Fussion Express did you ever set anybody's schedule?

3   A    No.

4   Q    Did you ever pay anybody?

5   A    Nope.

6   Q    Did you have authority to pay anybody?

7   A    Nope.

8   Q    Did you have authority to set anybody's schedule?

9   A    No.

10  Q    Okay.

11  A    Actually there is one other thing if I can speak, there

12  were times where one of my stores was a little bit low on

13  inventory.  Like we run out of fish, salmon let's say, because

14  we had a very busy day and unexpectedly we run out, I would

15  call Mike I need salmon.  If you have some -- if you have a

16  little bit to spare one of my -- if I can borrow it and then I

17  will order extra for myself tomorrow and return it to you.

18  He'd say if you call the guys at the store the counterperson

19  or one of his chefs and ask him do you guys have any extra

20  fish yeah sure we'll get it ready and I would say somebody is

21  picking it up or myself.  Either myself or one of the drivers

22  would pick up the fish or whatever we were low on that day.

23           And there were times that he borrowed things from

24  me.  We would help each other out.  We're friends.  It's not

25  like you're on your own, that's it, you know.

1  Q    And how often -- how often would you say that it was that
2  you would borrow some food items or supplies from --
3  A    He borrowed more frequently than I did because he was
4  inexperienced with the ordering and of the busy times because
5  it was a new store.  So there were a lot of spikes, if you
6  know what I mean.  Some days were busier unexpectedly because
7  it was something new and they didn't know how to properly
8  order.  So he bought more frequently than he -- if I had to
9  guess I borrowed from him once every a few weeks, a month, if
10  any.
11  Q    Did you ever order any, like, pre-made sushi platters
12  from Sushi Fussion Express?
13  A    Yes, yes.  There were a few times when I went to get some
14  dinner for my family and my store was further away than his
15  store, closer to my house.  I lived on Main Street so I would
16  call him or his store and place an order and go pick up the
17  platter myself and most of the time he would deduct it from my
18  royalty check.
19  Q    Okay.
20  A    Also one other reason -- I could have really had my guys
21  to my house from my Forest Hills location, but he was new so I
22  wanted to support him so that's why I ordered from his store
23  as opposed to mine.
24  Q    Did you have an accountant for your financial records for
25  Sushi Fussion LLC?

Case 1:16-cv-04840-RPK-LB  Document 184  Filed 05/24/22  Page 45 of 196 PageID #: 1967

1    A    Yes, I still do.

2    Q    Who is your accountant?

3    A    Ben Malakh.

4    Q    And do you know if Michael Yagudaev also used that same

5    accountant?

6    A    He did not.

7    Q    Did you ever file any joint tax returns with Michael?

8    A    No.

9    Q    And did you ever have a website for Sushi Fussion?

10   A    Yes, we do.

11   Q    And was the Sushi Fussion Express location mentioned on

12   the website?

13   A    Yes, it was.

14   Q    And can you tell the jury why that would be?

15   A    So, we all went under the same name as Sushi Fussion.

16   That is our trademark and it still is and when he opened his

17   store, he asked me can he put his location there as well so

18   it's more convenient for the customer who puts in Sushi

19   Fussion, my location comes up as well.  I said I was going to

20   charge you, but I'm not because you're already paying a

21   royalty.  It's advertisement of your store and it's part of

22   that royalty fee.

23   Q    And do you know if on the website it mentioned anything

24   about who owned Sushi Fussion?

25   A    Yes.  So, on his page, Sushi Fussion Express, the page

1   that he had on my website it did mention that both Leva and

2   Michael, owners of Sushi Fussion.  This is something that a

3   magazine editor, Elon Cornblum (ph) wrote --

4              MR. SCHWEITZER:  Hearsay.

5   A    I'm sorry?  Okay, so.

6              THE COURT:  Just give me one second.

7              Do you want to lay a foundation?

8              MR. SAMUEL:  Well, I'm asking him?  Can we get that

9   exhibit up, the website?

10             THE COURT:  Sure.  Do you know what exhibit it is?

11             MR. SCHWEITZER:  It's Exhibit 5.  Let me get it up.

12  A    Do you want me to read it?

13             MR. SCHWEITZER:  I ask that it be published.

14             THE COURT:  I think it's up for the witness.  It's

15  up to the counsel if he wants to publish it to the jury.

16             MR. SCHWEITZER:  Excuse me.

17  BY MR. SAMUEL:

18  Q    Mr. Katanov, do you see what's on your screen?

19  A    Yes.

20  Q    What is it?

21  A    It's an About Us page for the Sushi Fussion Express for

22  him that was on our website.

23  Q    In the middle of the page can you please read the first

24  stage?

25  A    Sure:  Owners Levy and Michael have set out to create a

1   truly authentic and unique sushi experience making it a goal

2   to offer over 100 rolls.

3   Q    What was your understanding when it said owners Leva and

4   Michael?

5   A    That each one of us owns a Sushi Fussion restaurant.

6   Q    Okay.  And did you and Michael Yagudaev use the same

7   menus or the same type of menus?

8   A    So when he first opened up I told him you could take my

9   menu, you could create your own menu it's up to you.  He

10  looked at my menu.  Most of the stuff he took off of my menu

11  and he did make some new variations with new rolls that he

12  added.  He had a Main Street roll that I didn't have on my

13  menu that was at the beginning and at the end he added the

14  hibachi menu which I did not have in my locations.

15  Q    Okay.  So were you ever in contact with Yang Yang Gao

16  after he stopped working for you?

17  A    Yeah, we were like friends.  He used to help me find

18  chefs from other locations.  I used to text him and say,

19  Eddie, do me a favor, I need some chefs for Great Neck for

20  Manhattan.  He said, sure, no problem I will help you out.

21  There were times I offered him compensation for that but he

22  said don't worry about it.  He said you took care of me when I

23  was working for you.  He never took a penny from me which I

24  appreciated.

25  Q    Did you ever have a handbook for your store?

1   A    I did not.

2          I'm sorry, if I'm a little nervous.  I have never

3   done this before.

4   Q    That's okay.

5          MR. SCHWEITZER:  I ask that the remark be stricken.

6          THE COURT:  If you would, just answer the questions.

7   That would be great and don't make remarks.

8          THE WITNESS:  Sorry about that.

9          MR. SAMUEL:  I will be done in one moment, Your

10  Honor.  I want to look at my notes for a second.

11  BY MR. SAMUEL:

12  Q    One other question; when Yang Yang Gao was working for

13  you at the glatt supermarket what was his primary duty?

14         MR. SCHWEITZER:  Objection.  Calls for a legal

15  conclusion.

16         THE COURT:  One second.

17         Do you want to ask it a different way?

18         MR. SAMUEL:  Sure.

19  Q    What was Yang Yang Gao's most important function when he

20  worked for you at the supermarket?

21  A    Like I said, he ran the spot and he managed it.  His

22  responsibility was to make sure that the orders that came in

23  were executed properly and promptly, that we had everything we

24  needed for the store.  We as my guy.  He was the guy who ran

25  that spot for me.

1  Q     And are you able to estimate, like, what percent of his

2  time was spent managing and what percent of his time was spent

3  making sushi rolls?

4  A     I would say a good 60/40 split.  He was managing 40 and

5  making the sushi rolls himself.

6  Q     And did he have authority to, like, reprimand the other

7  sushi chef or the counter guy or delivery guy?

8            MR. SCHWEITZER:  Asked and answered.

9            MR. SAMUEL:  It's a different question.

10           THE COURT:  Give me a second.

11           I think the question whether he had authority over

12  the counter guy was asked and answered.

13           Do you want to rephrase your question?

14  BY MR. SAMUEL:

15  Q     Did you give Yang Yang Gao authority over the delivery

16  guy?

17  A     So officially I never told him that but he did have

18  authority over him.

19  Q     And how do you know that?

20  A     Because there were times, like I said, where the delivery

21  guy used to slack and Eddie would tell him you have to hurry

22  up, you have to do stuff.

23           MR. SCHWEITZER:  Hearsay.

24           THE COURT:  Overruled.  It's not for the truth.

25  A     Yeah, so.

1    Q    And could Eddie reprimand the counter guy?

2              MR. SCHWEITZER:  Asked and answered.

3              THE COURT:  Wait a second.

4              Overruled.

5              You can answer the question.

6    A    Yes.  He would, you know, tell him -- sometimes he

7    would -- we would get very busy, to stop taking orders we have

8    to catch up with what we have right now and I would give him

9    that power to do because I know that he knows if we need to

10   keep taking orders or stop taking orders.  We obviously didn't

11   want to overwhelm him with orders so his credibility wouldn't

12   go down, so I let him do it.

13   Q    Okay.  And did any employees ever work for you and for

14   Michael, like, at the same time but at different locations?

15   A    No.

16   Q    Okay.  Did you ever tell any of your employees to go work

17   for any of Michael Yagudaev's stores?

18   A    No.

19              MR. SAMUEL:  I have nothing further.

20              THE COURT:  Cross.

21   CROSS-EXAMINATION

22   BY MR. SCHWEITZER:

23   Q    You said just a moment ago that you were familiar with

24   Wei Gao; correct?

25   A    Correct.

1   Q    Do you recall being deposed in this matter?

2   A    I'm sorry?

3   Q    Do you recall being deposed in this matter?

4   A    Yes, I do.

5   Q    Do you recall at your deposition being asked the

6   following question and giving the following answer, page 91

7   lines 21 through 23:

8           "Question:  Are you familiar with a person named Wei

9   Gao?

10          "Answer:  No."

11  A    I remember that.  I the reason I said that because he was

12  not present and I did not recognize the name.  They all went

13  by English name and since I didn't write out the checks I

14  didn't know their Chinese names.

15          MR. SCHWEITZER:  I ask that the nonresponsive

16  portion of the answer be stricken.

17          MR. SAMUEL:  I think it was responsive.

18          THE COURT:  So I will strike the answer beyond "No."

19          Your attorney is listening to everything and will

20  have the opportunity to ask something if he wants to clarify.

21          THE WITNESS:  I wanted to explain myself.

22  BY MR. SCHWEITZER:

23  Q    You also testified that you were familiar with Charles

24  Chipengule; correct?

25  A    Correct.

Katanov - cross - Schweitzer                    295

1    Q    Do you recall being asked the following question and

2    giving the following answer in your deposition at page 91,

3    line 24:

4              "Question:  Are you familiar with a person names

5    Charles Chipengule?

6              "Answer:  No."

7    A    The same answer.  I did not recognize the name because

8    now that he is in the courtroom, I recognize him.

9              MR. SCHWEITZER:  I ask that the nonresponsive

10   portion be stricken.

11             THE COURT:  Overruled.

12   BY MR. SCHWEITZER:

13   Q    You said that the Main glatt kiosk opened in August of

14   2011; correct?

15   A    Around, yes.

16   Q    And you said that Yang Yang Gao was hired in August of

17   2011; correct?

18   A    I did not say that.

19   Q    When was Yang Yang Gao hired?

20   A    It was either end of September or middle of September or

21   it could be early August, but approximately that time.

22   Q    Would it be fair to say that the main glatt kiosk opened

23   slightly before Yang Yang Gao was hired?

24   A    No.

25   Q    Now if Yang Yang Gao was hired in September and the main

1   glatt kiosk opened in August, wouldn't it be fair to say that

2   the main glatt kiosk was opened before the Yang Yang Gao was

3   hired?

4   A    It was not opened.

5   Q    When you said it opened in August of 2011 that was not

6   true?

7   A    I said about August.  I do remember that it was September

8   that we opened and I hired him in August.  I'm sorry, it's too

9   many dates in my head and too many locations, thank God.

10  Q    You said that Yang Yang Gao spent the first month of his

11  employment training at Sushi Fussion in Forest Hills; correct?

12  A    Correct.

13  Q    And you said that his salary at that time was 750 per

14  week; correct?

15  A    Correct.

16  Q    Is that the standard starting salary for sushi chefs?

17  A    It was at that time.

18  Q    No starting sushi chef made more than 750; correct?

19  A    As far as I remember; correct.

20  Q    And Yang Yang Gao didn't manage the sushi bar at Forest

21  Hills, did he?

22  A    He did not.

23  Q    Are you familiar with a person named Ray?

24  A    Of course.

25  Q    Who is Ray?

1  A    Ray was a chef that took over for another chef that I had

2  there who started with me from the first day.  His name was

3  Danny.

4  Q    Was Ray a manager at Sushi Fussion Forest Hills?

5  A    He was the head chef at Sushi Fussion Forest Hills.

6  Q    Was he a manager?

7  A    He was not.

8  Q    And Ray's duties at Sushi Fussion Forest Hills were

9  making sushi and occasionally asking for -- asking around if

10 people would be interested in working; correct?

11 A    His responsibilities were making sushi, ordering all the

12 supplies that we needed the next day, making orders, taking

13 inventory and also is making sure that it would run smoothly

14 but I wasn't at the location and I wasn't the managing person.

15 Q    You described Ray's duties very similar to Yang Yang

16 Gao's duties, but you said that Ray was not a manager;

17 correct?

18 A    Correct.

19 Q    And you said that was true because you were constantly

20 present at the Forest Hills location?

21 A    Correct.

22 Q    Isn't it true that Robert was constantly present at the

23 glatt supermarket location?

24 A    That's not true.

25 Q    How do you know that?

1   A    Because he's my partner and I know where he was at all

2   times.  He ran that spot, meaning he was responsible for that

3   spot and he would not stay there all day.  He would pop in and

4   out.  We shared an office downstairs with the supermarket

5   owner.  We spent a lot of time there doing stuff.  He would go

6   out and try to look for more business.  He would try to get

7   accounts.  We had a Queens College account that we made sushi

8   for every day.  We would go to different supermarkets and see

9   if we could find an account and supply sushi and make more

10  money.

11  Q    So on a regular basis Robert would spend most of his time

12  in the glatt kiosk or in the office below the kiosk?

13  A    No he would not spend most of his days in the kiosk.  He

14  would be in and out or in the office or trying to find more

15  business.

16       MR. SCHWEITZER:  Your Honor, please direct the

17  witness to respond to my question as I asked it.

18  A    I did respond to the question as you asked.

19       THE COURT:  Let me respond to the objection.  I

20  think he responded.  Ask a question.

21  BY MR. SCHWEITZER:

22  Q    So, again my question was did Robert spend most of his

23  time, one, at the glatt kiosk and, two, at the office in the

24  basement under the glatt kiosk?

25  A    No.

1          MR. SAMUEL:  Objection, compound question.

2          THE COURT:  I don't understand the question.  Can

3  you rephrase it?

4  BY MR. SCHWEITZER:

5  Q    Did Robert spend most of his time in the basement under

6  the glatt kiosk from which he would sometimes go up to the

7  glatt kiosk?

8          MR. SAMUEL:  Asked and answered.

9          THE COURT:  Give me a second.

10          All right.  I will let him answer it.

11          You can answer.

12          Overruled.

13          THE WITNESS:  It's not a yes or no answer.  Can I

14  explain?

15          THE COURT:  Sure.

16  A    So, again, Robert did not only stay in the kiosk or the

17  office downstairs.  He would be in and out of the store.  He

18  would try to find new business and he would be downstairs and

19  once in a while he would go up and check on the operation at

20  the kiosk.

21  Q    So, in other words, you said you knew where he was at all

22  times.  My question is did he spend most of his time somewhere

23  in the supermarket?

24  A    Not most of the time, no.

25  Q    Where did he spend most of his time?

1    A    Outside of the supermarket.

2    Q    What was the proportion?

3    A    I would say he would spend about maybe 20 30 percent of

4    his time in the supermarket and the rest out.

5    Q    Okay.  And how much of your time did you spend in the

6    Forest Hills location in 2011 through 2013?

7    A    So when we opened in 2011 I was there for the first, I

8    would say, good six months until we opened the kiosk in the

9    supermarket and then after that we opened another location in

10   Great Neck, six months later in April of 2012 and I went over

11   there and managed that location.

12   Q    Again, how much of your time between 2011 and 2013 did

13   you spend at the Forest Hills location in particular?

14   A    Like I said, the first six months I was there every day

15   and after that I was not there every day.  I would just pop in

16   and out.

17   Q    So after the first six months in terms of a proportion

18   how much time did you spend there?

19   A    Percentagewise?

20   Q    Percentagewise.

21   A    I would pop in once in two days, sometimes twice a week.

22   Q    And how long would you stay?

23   A    How long would I stay at the location?

24   Q    Yes.

25   A    It depends on what I have to do that day, if I need to do

1    some paperwork or speak to the managers or speak to the chefs,

2    it could be ten or fifteen minutes or an hour at times.

3    Q    And after the first six months when you stopped being at

4    the glatt -- sorry at the Forest Hills location all of the

5    time, Ray still didn't become a manager, did he?

6    A    No, Ray would never be a manager in the Forest Hills

7    location because it was a standalone restaurant.

8    Q    Ray would never be a manager at the Forest Hills location

9    even if his duties were similar to Yang Yang Gao's at the

10   kiosk?

11   A    Right, because it was a bigger store and he had to -- he

12   needed help to watch over everything.

13   Q    When who decided that Yang Yang Gao would be working at

14   the kiosk?

15   A    Me and my partners.

16   Q    And who told Yang Yang Gao that he would be working at

17   the kiosk?

18   A    Me and my partner.

19   Q    All three of you?

20   A    Who spoke to him?

21   Q    Yes.

22   A    I did.

23   Q    Did he ask you for a raise at that time?

24   A    If I recall correctly we told him that once the

25   supermarket would open and he's going to run it, he's going to

Katanov - cross - Schweitzer                    302

1  get a raise to 850 meaning $100 more than he got when he was

2  training at the Forest Hills location.

3  Q    So did he ask for a raise?

4  A    No, he didn't.

5  Q    Between you and your partners whose idea was it to give

6  him a raise?

7  A    It was combined.

8  Q    Who had the idea first?

9  A    Who had the idea first?  We all made a unanimous

10 decision.

11 Q    Who proposed the decision?

12 A    It was just the way we did things; employees that have

13 more experience should be compensated more.

14 Q    Was Ray compensated more than other employees?

15 A    Of course.

16 Q    How much?

17 A    He got also $100 more a week than the others.

18 Q    You said he was not the manager?

19 A    He was not the manager.  He was the head chef.

20 Q    Over the course of two years isn't it true that there

21 were only three sushi chefs hired after Yang Yang Gao?

22 A    Can you repeat that, please?

23 Q    After Yang Yang Gao was hired, over the course of three

24 years at the glatt kiosk -- over the course of two years at

25 the glatt kiosk there were only three other sushi chefs hired;

1    correct?

2    A    I will be honest with you we hired and fired so many

3    chefs in the past eleven years, it's just -- I don't remember.

4    Q    So you don't remember how many sushi chefs were hired to

5    work at the glatt kiosk between 2011 and 2013?

6    A    So we always had two chefs at that location.  How many we

7    changed during those two years, I don't know.

8    Q    And you don't have any records reflecting those who

9    worked there; correct?

10   A    I do not.

11   Q    In fact -- withdrawn.  In fact, you kept records for

12   employees' time at the glatt supermarket but you destroyed

13   them, didn't you?

14   A    I didn't destroy them.  I just didn't think it was

15   necessary for me to keep them.  Yeah, you could say I threw

16   them out because the supermarket closed.  I thought that that

17   was the end of that chapter.

18   Q    Are you familiar with the provisions of the Fair Labor

19   Standards Act?

20   A    I am now.

21   Q    When did you become familiar with them?

22   A    You can say it was 2016, 2017.

23   Q    You said you had an accountant; right?

24   A    I still do.

25   Q    Did the accountant give you any information regarding the

1  minimum wage or payment of over time under the Fair Labor

2  Standards Act?

3  A    He did not.

4  Q    Did the accountant give you any information regarding the

5  payment of minimum wage or overtime under the New York Labor

6  Law?

7  A    He did not.

8  Q    Are you familiar with the Fair Labor Standards Act and

9  New York Labor Law's notice posting requirements?

10 A    I am now, yes.

11 Q    When did you become familiar with them?

12 A    Around the same time, 2016, 2017.

13 Q    Was that after you were sued?

14 A    Was that after we were sued -- what are you talking

15 about?  This lawsuit?

16 Q    Was that after the commencement of this lawsuit that you

17 became aware of those provisions?

18 A    It could be.

19 Q    To your knowledge, were any of your partners so aware of

20 those provisions?

21 A    I can't hear you.

22 Q    To your knowledge were any of your partners aware of

23 those provisions?

24 A    When were they aware, before or after?

25 Q    Before.

Katanov - cross - Schweitzer                     305

1    A     No, they were not.

2    Q     How do you know that?

3    A     Because I do the paperwork at my company, at our company.

4         MR. SCHWEITZER:  Can we screen share with the

5    witness?

6         (Exhibit published.)

7    Q     I am showing you Exhibit 1.  Do you recognize this

8    document?

9    A     Do I recognize it, no.  Actually this is Michael's

10   handbook that he implemented at his location.

11   Q     When did he implement it at his location?

12        MR. SAMUEL:  Objection -- I'm not sure how this

13   witness --

14        THE COURT:  If you know, you can answer the

15   question.

16   A     I don't remember.

17   Q     To your knowledge what prompted him to do that?

18        MR. SAMUEL:  Objection.  How would he know?

19        MR. SCHWEITZER:  If he doesn't know, he can say --

20   A     I can answer.  He had a consultant that approached him

21   one day and tried to educate him as to how to comply, I guess,

22   with the law and labor and all of that stuff, what prompted

23   that, I don't know.

24   Q     Who was the consultant?

25   A     I don't remember his name now.

SN        OCR        RPR

1  Q    Have you ever communicated with that consultant?

2  A    No.

3  Q    Did you ever have any part in drafting this handbook?

4  A    Nope.

5  Q    You said that the ordering at the kiosk worked at

6  follows:  A customer would place an order with the

7  counterperson the counterperson would print out the ticket,

8  the ticket would be given to the sushi chefs, the sushi chefs

9  would make their rolls and the rolls would be deposited at a

10  station to be packed; correct?

11  A    Correct.

12  Q    And you also said that managing the delivery guy would

13  consist of placing the rolls in the area to be packed;

14  correct?

15  A    I did not say that exactly.

16  Q    The record will reflect what it reflects.

17  A    It's along those lines.

18  Q    There's no question before you, sir.

19        THE COURT:  Let's not have comments.  Let's just

20  have questions.

21  Q    You also said on direct that the counterperson, Albert,

22  would listen to Yang Yang Gao, but you also said that you

23  didn't instruct Albert to listen to Yang Yang Gao; correct?

24  A    Correct.

25  Q    How often were you at the kiosk?

1   A    So, when it first opened in September I was there the

2   first six months and I did basically what Robert did when he

3   came in 6 months later.  I was in and out, you know, trying to

4   find new business.  I was in the office.  I was upstairs and

5   downstairs.  I was more often there than Robert there.  Robert

6   came six months later and it was more established, the kiosk.

7   Q    So in the first six months the kiosk needed more

8   oversight than it needed later on; correct?

9   A    Correct.

10  Q    And you provided that oversight?

11  A    Yes.

12  Q    As a proportion of your time over the first six months of

13  its operation how much -- how much of your time did you spend

14  at the kiosk?

15  A    I would say in the beginning, it -- I would say most of

16  the time I was at the kiosk.

17  Q    And not at Forest Hills?

18  A    No.  My partner Isaac took over that location.

19  Q    I see.  So were you there 100 percent of the time, 90,

20  80, 70 or something --

21  A    I was there more than Robert.  I was there I would say 30

22  to 40 percent of the time.

23  Q    Okay.  You were there more than Robert but nowhere near

24  100 percent of the time?

25  A    No, I didn't need to be.

1  Q    And you don't have personal knowledge of everything that

2  happened at the kiosk for the first six months, do you?

3  A    I'm sorry, repeat that.

4  Q    You don't have personal knowledge of everything that

5  happened at the kiosk for the first six months, do you?

6  A    Not 100 percent of the stuff, but I have a good idea.

7  Q    And you didn't observe all of Yang Yang Gao's arrival

8  times, leaving times, break times; correct?

9  A    No, the counterperson would tell me.  He would tell me

10 what time everybody came in and if there's anything I need to

11 know I was told by him.

12 Q    So the counterperson would keep track of the employees'

13 working times; correct?

14 A    Not really.  He would only tell me things out of the

15 blue, that somebody came in late or there was, like, a fight

16 or we had a fight once with the chef.

17 Q    But it would be the counterperson who told you these

18 things; right?

19 A    So it depends on who messed up.  You know, if it was the

20 chefs, the chef wouldn't tell me that he messed up.  The

21 counterperson would tell me that.  If it was the

22 counterperson, then Eddie would tell me that he's slacking

23 off.  If it's the delivery guy, they both could have told me

24 at times but it was mostly Eddie.

25 Q    So the counterperson would report on the sushi chefs to

1  you, the sushi chefs would report on the counterperson and

2  everybody would report on the delivery guy; right?

3  A    Pretty much.

4  Q    There was no person who was above or being reported on?

5  A    I didn't understand that.

6  Q    There was no person who was exempt from being reported

7  on, was there?

8  A    No.

9  Q    You described the decisionmaking process for who would

10 make rolls at the kiosk location, that if Yang Yang Gao was

11 not busy he would make the roll and if he was busy doing

12 something else the other sushi chef would make the roll; is

13 that correct?

14 A    It was his decision.

15 Q    That's a heuristic, right; it doesn't require any

16 independent judgment?

17 A    Excuse me?

18 Q    That's a heuristic; right?

19 A    What's a heuristic?

20 Q    Like a default model for making a decision.

21        MR. SAMUEL:  Objection to the form.  I think it's a

22 confusing question.

23        THE COURT:  Can you rephrase the question?  I don't

24 understand the question?

25 BY MR. SCHWEITZER:

1    Q    It would always be the case that if Yang Yang Gao was

2    busy, he wouldn't make the roll and if he wasn't busy he

3    would, right?

4    A    No, that's not the case.

5    Q    Well, that's how you described it; right?

6    A    I described it that way because that's the way it was

7    done at times but it was up to him totally as to who does the

8    rolls.

9    Q    And he would make that decision based on whether he was

10   busy or not, right?

11   A    It depends on that, on his mood, on the day, on the site

12   what he had to do, different factors.

13   Q    But he had to do side work?

14   A    Well, yeah.  How else are you going to make sushi?  You

15   have to make the rice, cut the cucumbers, slice the fish, of

16   course.  There was a lot of side work to be done and they had

17   a system.

18   Q    Isn't it true that Yang Yang Gao spent by far the vast

19   majority of his time either doing side work or making the

20   rolls directly?

21   A    No.

22   Q    You said that he spent about 40 percent of his time

23   making rolls.  That did not include side work, did it?

24   A    It did.

25   Q    But you differentiated between making rolls and doing

1   side work now?

2   A    They have a system as to who does the side work and who

3   does the rolls.  In the morning they would come in.  One of

4   the chefs would cut up the fish, do the side work and the

5   other would do the orders if they have.  If they didn't have

6   orders they would both do the side work.  So when I say 40

7   percent, I am including the side work with making the rolls.

8   Q    What, according to you, did Yang Yang Gao fill the

9   remaining 60 percent of his time with, if not making rolls or

10  making ingredients?

11  A    He would oversee the operations.

12  Q    By overseeing, stand by and do nothing?

13  A    No, no.  Taking inventory, making sure the showcase that

14  was filled up that was in front of the counter looked good.

15  Make sure that the fish is fresh.  He also to make sure that

16  the rice, the HP level was at a certain temperature.  There's

17  a lot of little factors that he had to make sure were complied

18  also with the Health Department.

19

20              (Continued on the following page.)

21

22

23

24

25

1    BY MR. SCHWEITZER:   (Continuing)

2    Q    And according to you, that added up to 60 percent of his

3    time?

4    A    Pretty much.

5    Q    There wasn't a time recording system in the kiosk, was

6    there?

7    A    No.

8    Q    And you said that Yang Yang Gao earned a salary of $850

9    per week, right?

10   A    Correct.

11   Q    Were sushi chefs subject to having a salary reduced if

12   they missed a day?

13   A    Yes.

14        MR. SCHWEITZER:   I'm going to show the witness

15   Exhibit Number 11 that's already been admitted and ask that it

16   be published to the jury.

17   Q    I'm showing you, sir, what's been admitted as Plaintiffs'

18   Exhibit 11.   This is marked Sushi Fussion, LLC payroll

19   summary.  Do you see that?

20   A    Yes.

21   Q    Did you create this document?

22   A    Yes, I did.

23   Q    And this document records Yang Yang Gao's salary payments

24   between October 2011 and October 2013, correct?

25   A    Correct.

1  Q    Yang Yang Gao was hired in August of 2011, correct?

2  A    Yang Yang Gao was hired August 11th, correct.

3  Q    And this document omits any record of any salary payments

4  to him between August and October, correct?

5  A    Correct.

6  Q    This document also records that he was only paid $300

7  every two weeks, correct?

8  A    Yes, because he was getting a check every other week.

9  Q    No.  This document only records the portion of his salary

10 that was paid by check, correct?

11 A    Correct.

12 Q    And there is a column "Taxes withheld."  Those are the

13 taxes withheld from the check amount, correct?

14 A    Correct.

15 Q    Not the taxes withheld from the total salary amount,

16 correct?

17 A    Correct.

18 Q    And the "hours" column here records that Mr. Gao worked

19 exactly 40 hours every two weeks throughout his employment,

20 correct?

21 A    That was the default setting in the payroll system.  I

22 just never changed it.  I mean to change it but, yes, that was

23 the hours in here.

24 Q    So you did not keep a record of Yang Yang Gao's hours and

25 days worked?

Katanov - cross - Schweitzer                   314

1    A    I did not do that.

2    Q    If you didn't know better than to keep a record of hours

3    worked, why is there an "hours" column in the document?

4    A    Like I said, it's a default setting and the payroll

5    system which was already checked off so I didn't even know to

6    change it or to uncheck it so I left it the way it was.

7    Q    What's the system you're referring to?

8    A    Intuit.

9    Q    Intuit QuickBooks?

10   A    Yes.

11   Q    How did you obtain Intuit QuickBooks?

12   A    My accountant gave it to me.

13   Q    And the accountant gave it to you for the purposes of

14   preparing payroll, correct?

15   A    Correct.

16   Q    And keeping an accurate record of payroll for taxes,

17   correct?

18   A    Correct.

19   Q    And you, in fact, inputted an inaccurate amount of pay

20   for Mr. Gao's salary, correct?

21        MR. SAMUEL:  Note my objection.

22   A    Incorrect.

23   Q    Well, this $300 is only part of his salary, correct?

24   A    Yes.  The part that was by check, that's the part I input

25   in the system.

1  Q    And you believe you didn't have to pay tax on the part

2  that was paid by cash?

3  A    Sorry.  I didn't understand that.

4  Q    You didn't believe you had to record the part that was

5  paid by cash?

6  A    No, I didn't.

7  Q    And you didn't believe you had to pay payroll tax on the

8  part of the payment that was paid by cash?

9  A    I didn't.

10  Q    You say again you had an accountant.  The accountant

11  never called you on this?

12  A    No.  I guess I didn't tell him.

13  Q    Well, you gave the accountant the payroll information

14  that you input into here, correct?

15  A    I didn't know to tell him about the cash payment that was

16  made to the employees.  I only thought I had to tell him

17  whatever I was giving a check on.

18  Q    Well, you gave the accountant this information though,

19  didn't you?

20  A    I'm sorry?

21  Q    You gave the accountant the information in the document,

22  didn't you?

23  A    Yes.  He asked me how much are you giving him.

24  Q    So he asked you how much are you giving him and you told

25  him with respect to Yang Yang Gao $300?

Katanov - cross - Schweitzer                    316

1    A    Yeah.

2    Q    So you lied to your accountant?

3    A    No.

4         MR. SAMUEL:  Objection.

5    A    I didn't.

6    Q    You omitted information when you were talking to your

7    accountant?

8    A    I did not know that I had to include cash payments into

9    the payroll system.

10   Q    When your accountant asked you directly how much are you

11   paying Yang Yang Gao --

12   A    He did not ask me how much I paid Yang Yang Gao.  He

13   asked how much I give him in a check and I told him $300 every

14   other week like it was requested by Yang Yang Gao.

15   Q    You did not infer from the existence of an "hours" field

16   that there should be time recording?

17   A    Can you repeat that, please?

18   Q    Did you not infer from the existence of an "hours" field

19   that there should be time recorded?

20        MR. SAMUEL:  Note my objection.  I don't know what

21   he means, "should be time recorded."

22        MR. SCHWEITZER:  That the employee's time should be

23   recorded.

24   A    No, I didn't.

25   Q    And you did not make a record of Yang Yang Gao's arrival

1    times, leaving times, break times or days worked, did you?

2    A    I didn't.

3    Q    You testified a moment ago that both Yang Yang Gao and

4    Albert went from the supermarket to work at Sushi Fussion

5    Express, didn't you?

6    A    No.  I said they were both hired by Michael to work at

7    Michael's location.

8    Q    Putting that aside, they worked for some time at Sushi

9    Fussion Express -- I'm sorry -- they worked at some time for

10   the kiosk and then sometime later, they worked for Sushi

11   Fussion Express, correct?

12   A    No.  They were -- I'm sorry.  I'm looking for the right

13   word to say.  They were basically done working at the Sushi

14   Fussion kiosk because it closed down and then Michael hired

15   them to work at his location, Sushi Fussion Express.

16   Q    So there was a period of time when both Yang Yang Gao and

17   Albert were working at Sushi Fussion kiosk in the supermarket

18   and there was another period of time when they were working at

19   Sushi Fussion Express?

20   A    Oh, yes, you're right.

21   Q    Do you recall that your -- excuse me.

22        Do you recall at your deposition being asked the

23   following question and giving the following answer?

24        Page 44, line 11:  Did any employees besides Eddie,

25   Yang Yang Gao, go to work from 6938 Main Street to Sushi

1   Fussion Express?

2           Answer:  No.

3   A    I recall saying that.  At that time, I did not remember

4   and throughout this trial, it was mentioned that Albert also

5   went and then I remembered, yes, Albert did go with him.

6   Q    That was mentioned by Yang Yang Gao.  Are you saying that

7   his testimony was truthful in that regard?

8   A    In that regard, yes.

9   Q    Did you ever have posters from the Department of Labor

10  talking about minimum wage and overtime posted at Forest

11  Hills?

12  A    When I learned about it, I did post them.  I'm sorry.

13  You said Forest Hills and --

14  Q    Forest Hills.

15  A    Yes.

16  Q    Okay.

17  A    This was after 2016, 2017 when I learned about it, not at

18  the beginning.

19  Q    Okay.  Now, you say that Sushi Fussion Express Inc. paid

20  5 percent royalty to use the name and trademark Sushi Fussion

21  and to appear on the Sushi Fussion website, correct?

22  A    Correct.

23  Q    To what person or entity was that payment made?

24  A    Sushi Fussion, LLC.

25  Q    And you don't have records of those payments being made,

1    do you?

2    A    Not anymore.

3    Q    And you don't have records of when they stopped, do you?

4    A    No.

5    Q    Was the agreement between Sushi Fussion Express Inc. And

6    Sushi Fussion, LLC for rights reduced to a writing?

7    A    No, it was orally.

8    Q    You testified -- excuse me.  You testified a moment ago

9    that no employees went from Sushi Fussion Express to work at

10   any of your locations, correct?

11   A    I said -- one more time, sir?  Repeat the question.  I'm

12   confused.

13   Q    No employees went from Sushi Fussion Express to work at

14   any of your locations, correct?

15   A    There actually was one employee that went from, that was

16   hired by my company, by Sushi Fussion, LLC, that used to work

17   for Michael's company.

18   Q    That would be Zhedong Li?

19   A    Correct.

20   Q    And he went to work from Sushi Fussion Express to

21   224 West 35th Street, correct?

22   A    So what happened was before Michael opened his store, we

23   had another supermarket that Li Zhedong worked at and after a

24   few months, it wasn't doing so well so we decided just to fill

25   up the showcase from our Forest Hills location and take away

1    the chef from there.  At that time, Michael needed a chef so I

2    told him, Listen, I have a chef, I don't need him anymore, if

3    you want to speak to him, offer him a job, he might come to

4    you.  Michael called Li Zhedong and they made an agreement and

5    they came to terms and he went to work for him.

6          Then later on after some time that he worked over

7    there, I was opening my 224 West 35th Street location and I

8    needed a chef and Michael had another chef that used to work,

9    meaning he had an extra chef and I told him, Listen, if you

10   can give me Li so I can put him in the location that's new

11   because he already knows our menu, it will help me.  He said,

12   Listen, you know what, I can find a cover for him, if he wants

13   to go back to you, I don't mind.

14         So I spoke to Li.  I said, Listen, you know, I'm

15   opening a location in Manhattan and it would be a little bit

16   of a commute for you, I'm willing to compensate you and I need

17   your help over there.  He agreed, I hired him back and he

18   worked at the 224 West 35th Street location.

19   Q    Are you familiar with an employee named Summer, a sushi

20   chef?

21   A    Yes, I am.

22   Q    Did Summer work for you?

23   A    Yes, he did.

24   Q    How did Summer come to work for you?

25   A    So he started working for Michael.  I don't remember how

1 long, maybe a few days a week.  And I was also looking for a

2 chef at that time for my Great Neck location, 613 Middle Neck

3 Road, and I told Michael, I said:  Listen, I'm looking for a

4 chef, do you know anybody.  He said:  I have a guy here that

5 I'm not too crazy about; if you want, if he's willing to

6 travel to you, you know, to your location, you can take him,

7 I'll find somebody else.  So I said:  All right, let me speak

8 to him.  I called him up, spoke to him, come to terms, and I

9 hired him and he came to work for me in Great Neck.

10 Q    Isn't it true that you asked Yang Yang Gao to find people

11 to work for you in Great Neck?

12 A    Yes, I did also.

13 Q    And is that about when you hired Summer?

14 A    It could be, yes.

15 Q    Have you ever described your Sushi Fussion locations with

16 one company?

17 A    I'm sorry.  Can you repeat that?

18 Q    Have you ever described your Sushi Fussion locations as

19 one company?

20 A    Describe to who?

21 Q    To anyone in the world.

22 A    I described Sushi Fussion as one company and I describe

23 it as a chain of restaurants most of the time, almost all the

24 time.

25 Q    Let me see if we can refresh your recollection.

Katanov - cross - Schweitzer                    322

1    A    Sure.

2    Q    Do you recall being asked the following question at

3    deposition and giving the following answer.

4            MR. SAMUEL:  What page?

5            MR. SCHWEITZER:  I'm just getting to that.

6    Q    This is not a single question and answer.  This is a set

7    of questions and answers.  I apologize.  It's beginning

8    page 51, line 9.

9            Were employees of the entities Sushi Fussion, LLC,

10   Sushi Fussion of 47th street, Sushi Fussion of Forest Hills

11   and Sushi Fussion of NYC, could they be transferred between

12   locations?

13           Answer:  Who, the employees?

14           Question:  Yes.

15           Answer:  Yes, they can, of course.

16           Question:  On what basis?

17           Answer:  What does that mean?

18           Question:  Why would they be transferred between

19   locations?

20           Answer:  If one of the chefs in one location did not

21   come out for one day, if he was sick, and then if I had, you

22   know, an extra chef in the other location, he would go to the

23   other location.  It's one company.

24           Question:  So based on need?

25           Answer:  Yeah.

```
                        Sidebar                        323
```

1           MR. SAMUEL:  So, Your Honor, if I can object to

2      that.

3           THE COURT:  Let's do it at sidebar.

4           (The following occurred at sidebar.)

5           MR. SAMUEL:  That's a misleading question.  He's

6      asking if, if Levi can transfer the workers among his own

7      locations.

8           THE COURT:  So he says that in connection with this

9      one company, right?  Is that what you're getting to, what

10     you're thinking is inconsistent or what?

11          MR. SCHWEITZER:  I was more going to refresh his

12     recollection because he wasn't sure that he had ever described

13     it as one company.

14          MR. SAMUEL:  No, no, no, but the question -- he

15     mentioned Levi's restaurants.  He didn't mention Michael's

16     restaurant.

17          MR. SCHWEITZER:  It's not offered for the purpose of

18     anything with Michael's restaurants.  I'm only going for joint

19     operation between the Katanov restaurants.

20          MR. SAMUEL:  Right, but that doesn't speak to the

21     question.

22          You want me to get the transcript.

23          THE COURT:  I want to look back.

24          (Pause.)

25          THE COURT:  Just to be clear, I think the question I

Sidebar                                    324

1  have Mr. Schweitzer was asking is have you ever described your

2  Sushi Fussion as one company.

3           MR. SAMUEL:  Right.  I think he's trying to explain

4  to the jury that they're all one company, but if you take a

5  look at this question:  Were the employees of the entities you

6  owned, Sushi Fussion, LLC, Sushi Fussion of 47th Street, these

7  are all Levi's entities --

8           MR. SCHWEITZER:  My question was not directed beyond

9  that.

10          THE COURT:  You've got to stop.

11          MR. SAMUEL:  He's not refreshing his recollection

12 because it's a different question that he asked.  He asked if

13 they're all --

14          MR. SCHWEITZER:  I did not ask if they were all.  I

15 asked if he had described his companies as one company.

16          MR. SAMUEL:  This is what he's trying to read from.

17 The question was:  Did you ever --

18          THE COURT:  And then here, right, he says one

19 company.

20          MR. SAMUEL:  Right, but these are one company.

21          THE COURT:  I'm sorry.  His question is have you

22 ever described your sushi locations.  So this is something

23 other than your sushi locations.

24          MR. SAMUEL:  But I think he's trying to imply

25 they're all one company.

Sidebar                                              325

1      THE COURT:  Meaning the Yagudaev --

2      MR. SAMUEL:  That's correct.

3      THE COURT:  That's not the question.

4      So go ahead.

5      (Sidebar conference ends.)

6      (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  You can answer the question if you

2   remember it or we can read back the question.

3          THE WITNESS:  I remember, yes.

4   A     Yes, I did say that in my deposition.  What I meant was

5   exactly what I said which is I can ask one of my chefs at any

6   one of my locations to come cover a different chef at any one

7   of my other locations at any given time aside from Michael's

8   location which was not mine, if that's what you're referring

9   to.

10  Q     And while Mr. Gao was working at the Glatt Kosher

11  Supermarket, you did ask him to work in Great Neck?

12  A     Which Gao?  Yang Yang Gao or Wei Gao?

13  Q     Yang Yang Gow, the only one who worked at the Glatt

14  Kosher Supermarket.

15  A     Okay.  When he was working at the Sushi Fussion at the

16  kiosk, I was opening in April, like I said, I was opening

17  Great Neck location and at the grand opening week, I needed

18  help.  I did ask Eddie to come help me over there while he was

19  working for me at the main supermarket and he did come help me

20  that week.

21  Q     And Eddie didn't act as the manager at the Great Neck

22  location?

23  A     No, I was there.

24  Q     Did you ever offer Wei Gao an opportunity to work at the

25  Great Neck location?

1   A    Never.

2   Q    Did Michael pay you to give advice to his employees about

3   cleanliness or about how to cut sweet potatoes?

4   A    That was all part of that 5 percent.

5   Q    That 5 percent was given to Sushi Fussion, LLC, right?

6   A    Like you asked me before, correct.

7   Q    And the revenue of that LLC would be split among the

8   partners, correct?

9   A    Correct.

10  Q    According to the LLC management agreement, correct?

11  A    Correct.

12  Q    And that LLC management agreement didn't make any

13  provision for how the 5 percent was to be split among the

14  partners; it was just split according to the general

15  management agreement, correct?

16  A    Correct, it was considered income.

17  Q    So you didn't get any special payment for yourself for

18  coming to Michael's restaurant and giving them advice?

19  A    No, it was my duty.

20  Q    That was your duty?  What duty did you have?

21  A    It was my duty to provide what Michael needed to run his

22  spot, that included that 5 percent which is pop in once in a

23  while, you know, to say hello, to look over the place when I

24  came to pick up the check, to put, you know, his location on

25  the website.  I ran the website as well.  That's it.  And I

1  deposited the checks, usually when Michael paid me, I

2  deposited it in the bank in the Sushi Fussion, LLC account.

3  Q    And you said Michael stopped paying you after about six

4  months, correct?

5  A    Correct.

6  Q    And despite that, did you still continue doing your duty

7  and going to his restaurant and giving advice?

8  A    No.  After that, I would just come in once in a blue, if

9  I, you know, if I wanted to get some sushi from him or just to

10  say hi, but I wouldn't really walk in, walk through like I did

11  diligently when I would come in when he did pay us.

12  Q    And you also received materials from Michaels after six

13  months, correct?

14  A    We used to borrow each other materials or return or pay

15  for them, but we never took them without returning.

16  Q    So what you said was you would buy extra from a vendor

17  and return what you had taken, right?

18  A    Yes.  Let's say I borrow salmon from him, right, tomorrow

19  I order whatever I borrowed from him and whatever else I need

20  for my store and then once I get it, I have somebody drop it

21  off to the store to return it.

22  Q    But you didn't pay Michael money directly for the items

23  that were taken, correct?

24  A    Usually we never paid for our things that we borrowed

25  because it was always available.  Once in a blue, there might

1  have been an item that was discontinued so we couldn't return

2  to each other.  Then we found the invoice and we paid for it.

3  It was taken off from the royalty check.

4  Q    But the usual practice was just to --

5  A    Yes.

6  Q    -- to not pay but return the items?

7  A    Exactly.

8  Q    And that was Michael's practice when he borrowed from you

9  as well?

10  A    Exactly.

11  Q    You said you managed the website, correct?

12  A    Well, yeah.  I had an IT person who did the website for

13  us but I was the one giving him the information.

14  Q    You decided what to put on the website, correct?

15  A    No.  We decided as a partnership what to put on the

16  website but I was the one that was in direct contact with the

17  IT person.

18  Q    You and Isaac and Robert all agreed -- hang on a second.

19  Withdrawn.

20          MR. SCHWEITZER:  I'm screen-sharing an exhibit and

21  I'd ask that it be published to the jury.

22          THE COURT:  I see we're around 11:30.  How long do

23  you think you have with this witness?

24          MR. SCHWEITZER:  Maybe five minutes.

25          THE COURT:  Okay.

1          MR. SCHWEITZER:  This is Exhibit 5.

2    Q    Showing you part of page 5 of Exhibit 5, this is

3    referring to Sushi Fussion Express, correct?

4    A    Correct.

5    Q    And you testified earlier that this portion of the

6    website said, "Owners Levi and Michael have set out to,"

7    et cetera, correct?

8    A    Yes.

9    Q    And was that text decided on -- withdrawn.

10         Was posting that particular text decided on by you,

11   among your partners, between you and Michael?

12   A    So as I was speaking to my lawyer on how this text came

13   about, I have told them and I will tell you the story.

14         We had a magazine editor, Elan Kornblum.  He had the

15   kosher, Great Kosher Restaurants Magazine.  So he added an

16   article about this location when it first opened, the Sushi

17   Fussion Express, and this was the text that he put in there

18   and I liked the way it sounded.  I told my partners, I said

19   this sounds good, nothing wrong with it, so I sent it to the

20   IT guy and he posted it up.

21   Q    I'm showing you the page 3 of the website.  This is

22   referring to Sushi Fussion Forest Hills, correct?

23   A    Right.

24   Q    There's nothing about any owners here, correct?

25   A    Yes, because I had wrote this myself.

1   Q    And I'm showing you page 1 of the exhibit.  This is

2   referring to Sushi Fussion in Brooklyn, correct?

3   A    Correct.

4   Q    There's nothing about owners here either, right?

5   A    Correct.

6   Q    You said on direct that Sushi Fussion Express used Sushi

7   Fussion's menu as the basis for its own, right?

8   A    Right.

9   Q    And Sushi Fussion Express, talking about Sushi Fussion

10  Express's physical menus, did Sushi Fussion Express list any

11  other Sushi Fussion locations on its menu?

12  A    All locations, all of my locations.

13  Q    And on the menus that were used in your locations, was

14  Sushi Fussion Express listed on those as well?

15  A    Yes, it was for marketing purposes.  I don't know why.

16       MR. SCHWEITZER:  All right.  Nothing further.

17       (Continued on next page.)

18

19

20

21

22

23

24

25

332

1           THE COURT:  Let's take a short break.  Let's come

2    back in ten minutes, 11:40.

3           THE WITNESS:  Am I excused?

4           THE COURT:  I don't know -- you're welcome to take a

5    ten minute break, but I don't know if you're excused because

6    your lawyer might have questions.

7           THE WITNESS:  Thank you.

8           (Jury exits.)

9           (Recess taken.)

10          (In open court; jury present.)

11          THE COURT:  Counsel, do you have any redirect?

12          MR. SAMUEL:  No redirect.

13          THE COURT:  Okay.  Then I guess you are excused.

14          THE WITNESS:  Thank you.

15          (Witness excused.)

16          THE COURT:  Does the defense rest?

17          MR. SAMUEL:  Yes.

18          THE COURT:  Okay.  All right.  Great.

19          I'm sorry that we took a break and now we're going

20   to take lunch but I have a legal issue I need to address with

21   the parties so why don't you take a little extra time and come

22   back at 1:00 p.m. if that's all right.  I anticipate closing

23   arguments at 1:00.

24          Great.  So I'll see you all at 1:00.

25          (Jury exits.)

1          THE COURT:  So have you had enough time to review

2    the charge?  We can go over the charge now.

3          MR. SCHWEITZER:   Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. SCHWEITZER:  Beginning with the sentence I

6    highlighted on page 2 at the end to the second to last full

7    paragraph.

8          THE COURT:  Right.  "There are times where I may ask

9    a witness questions"?

10          MR. SCHWEITZER:  Yes.

11          THE COURT:  I'll take that out.  I didn't ask any

12    questions.

13          Keep scrolling and either stop me if you've got

14    something.

15          On page 3?  Four?  Five?  Six?  Seven?  Eight?

16    Nine?  Ten?  Eleven?  Twelve?

17          MR. SCHWEITZER:  I have one on 12.

18          THE COURT:  Sure.

19          MR. SCHWEITZER:  When the charge talks about Yang

20    Yang Gao, when he mentioned that he worked at Sushi Fussion

21    LLC, I would ask that he, that wherever it says "Sushi

22    Fussion, LLC" it also say "Sushi Fussion Forest Hills Inc."

23          MR. KATANOV:  There was no Forest Hills Inc.  It was

24    all LLC.  The companies separated in 2016.

25          THE COURT:  So just so I have a concrete issue on

1   the table, so there's a paragraph that says:  The parties have

2   stipulated the hours Yang Yang Gao worked at Sushi Fussion,

3   Inc.  They did not stipulate how much he earned at that

4   restaurant.  The parties have not stipulated as to Yang Yang

5   Gao's hours.

6           Give me your proposed edits.

7           MR. SCHWEITZER:  So the second paragraph from the

8   bottom, second sentence:  The parties have not stipulated as

9   to Mr. Yang Yang Gao's hours or how much he earned at Sushi

10  Fussion, LLC.

11          I propose adding after "Sushi Fussion, LLC," "and

12  Sushi Fussion Forest Hills Inc."

13          THE COURT:  Sushi Fussion --

14          MR. SCHWEITZER:  But I would be amenable to saying

15  "at Sushi Fussion, LLC" --

16          MR. KATANOV:  Forest Hills location.

17          MR. SCHWEITZER:  -- "Sushi Fussion Forest Hills

18  location and Main Glatt Kosher Supermarket location."

19          MR. SAMUEL:  Yes.

20          THE COURT:  Give it to me again.

21          MR. SCHWEITZER:  "The parties have not stipulated as

22  to Yang Yang Gao's hours or how much he earned at Sushi

23  Fussion, LLC's Forest Hills location" --

24          THE COURT:  Okay.

25          MR. SCHWEITZER:  "And Main Glatt Supermarket

1   location."

2          THE COURT:  That's M-A-I-N, first word G-L-A-T-T,

3   Supermarket?

4          MR. SCHWEITZER:  Yes, Your Honor.

5          THE COURT:  Okay.  So let me just read back the

6   sentence to both of you.

7          "The parties have not stipulated as to Mr. Yang Yang

8   Gao's hours or how much he earned at Sushi Fussion, LLC's

9   Forest Hills location or the Main Glatt Supermarket Location."

10         MR. SAMUEL:  That sounds good.

11         MR. SCHWEITZER:  Yes.

12         THE COURT:  Okay.

13         MR. SCHWEITZER:  I would suggest a similar change be

14  made to the first sentence in the last paragraph on page 12

15  where it says:  "You will also need to decide how many hours

16  Yang Yang Gao worked at Sushi Fussion, LLC."

17         It should continue to read:  "Sushi Fussion, LLC's

18  Forest Hills location and Main Glatt Supermarket Location."

19         THE COURT:  Okay.  So let me read back the sentence

20  with that edit.

21         "Accordingly, you will need to decide how many hours

22  Yang Yang Gao worked at Sushi Fussion, LLC's Forest Hills

23  location and Main Glatt Supermarket location."  And it

24  continues, how much he was paid.

25         MR. SCHWEITZER:  And a similar change to be made to

1  the last sentence beginning:  "You will also need to determine

2  whether Yang Yang Gao was a management employee exempt from

3  overtime compensation when he worked at Sushi Fussion LLC's

4  Forest Hills location and Main Glatt Supermarket location."

5          THE COURT:  Yes.

6          MR. SAMUEL:  He didn't say he was the manager at the

7  Forest Hills location.

8          MR. KATANOV:  Only at the supermarket.

9          MR. SCHWEITZER:  So could we add another stipulation

10 to that effect?

11         MR. SAMUEL:  We're not claiming he was a manager at

12 Forest Hills.

13         THE COURT:  Okay.  So shall we add the fact that he

14 was not a manager at Forest Hills to the stipulated facts

15 we're going to provide the jury?

16         MR. SCHWEITZER:  I would be amenable to that.

17         THE COURT:  Do we want the jury to decide it or we

18 don't want the jury to decide it?  If we don't want the jury

19 to decide it, we should add the stipulation, right?

20         MR. SAMUEL:  Well, can we let the jury decide?

21         THE COURT:  Okay.  So I'm going to take the proposed

22 edit.  "You also need to determine whether Yang Yang Gao was a

23 management employee exempt from overtime compensation when he

24 worked at Sushi Fussion, LLC's Forest Hills location and Main

25 Glatt Supermarket location."

Charge Conference                    337

1          MR. SAMUEL:  We'll let the jury decide that.

2          THE COURT:  Okay.

3          All right.  So that takes on to page 13.  Does

4    anybody have anything on 13?

5          MR. SCHWEITZER:  Yes.  In the first paragraph, I

6    would ask that the text from "if you find that some through

7    Sushi Fussion Express Inc." be stricken.  "You will also need

8    to decide how much Yang Yang Gao was paid and whether he

9    received proper wage notices and wage statements there."

10   We'll need the jury to decide that.

11         THE COURT:  I'm lost.  So you're in the first full

12   paragraph on --

13         MR. SCHWEITZER:  Thirteen.

14         THE COURT:  First sentence:  "In addition," is that

15   sentence okay?

16         MR. SCHWEITZER:  That sentence is fine.

17         I'm looking specifically at the second sentence.

18   This is saying:  "The jury only needs to decide Yang Yang

19   Gao's wages and hours at the Sushi Fussion Express only if

20   they find the defendants were his employers."

21         I don't think that's correct.  We can rely on the

22   jury for a verdict as to his wages and hours for purposes of

23   determining Mr. Yagudaev's and Sushi Fussion Express Inc.'s

24   liability.

25         THE COURT:  The actual defendants?

Case 1:16-cv-04840-RPK-LB  Document 184  Filed 05/24/22  Page 95 of 196 PageID #: 2017

1          MR. SCHWEITZER:  Yes, or the amount of their damages

2     at any rate.

3          MR. SAMUEL:  Is that only for Yagudaev's purposes?

4     Is that what you're --

5          THE COURT:  I think he's right.  I take it we're all

6     agreed that if the jurors find that the defendants at trial

7     were not Mr. Gao's employers, that ends the inquiry as to

8     those defendants.

9          I think the only question is whether they should

10    make findings about how much Yang Yang Gao was paid and

11    whether he received proper wage notices and statements for the

12    purposes of a default judgment against Mr. Yagudaev and his

13    related entities.  Is that right?

14         MR. BERESIN:  Is there evidence at this trial about

15    what he was paid by Yagudaev?

16         MR. KATANOV:  I don't think so.

17         MR. SCHWEITZER:  Yes, there is.

18         THE COURT:  They're making that finding based on

19    what, based on the, what?

20         MR. SAMUEL:  Well, Mr. Schweitzer said he was going

21    to be making a motion for default judgment after this trial.

22         THE COURT:  Right.

23         MR. SAMUEL:  So it's probably wrapped up in that.

24         MR. SCHWEITZER:  Excuse me.  If we can get findings

25    of facts from the jury, then we can pare down the default

Case 1:16-cv-04840-RPK-LB  Document 184  Filed 05/24/22  Page 96 of 196 PageID #: 2018

1  judgment motion.

2       THE COURT:  So what would they be making that

3  finding based on?  What's the evidence you're relying on?

4       MR. SCHWEITZER:  Yang Yang Gao put in evidence of

5  his salary at, what do you call it, at Sushi Fussion Express.

6  I said he was paid, that he was paid for his first week $850,

7  then it was raised to $900, and then on Passover in 2015, it

8  was raised to 925.  His hours were stipulated to.

9       THE COURT:  I think the question is whether this

10  stipulation by this party binds the absent party.  I don't

11  know the answer to it but I don't object to having the jury

12  make findings on this evidence if that's how you want to

13  proceed.

14       Any reason, any legal objection that you have on

15  letting the jury make findings as to the hours that

16  Mr. Schweitzer can then use in his default judgment motion?

17       MR. SAMUEL:  I guess that's okay.

18       THE COURT:  Okay.

19       All right.  So I'm going to say:  Separately, you

20  should also decide how much Yang Yang Gao was paid and whether

21  he received proper wage notices and statements when he worked

22  at Sushi Fussion Express Inc.

23       Does that capture it?

24       MR. SCHWEITZER:  Yes.

25       THE COURT:  Okay.  Anything else on page 13?

```
                        Charge Conference                    340

 1           MR. SCHWEITZER:  No, Your Honor.

 2           THE COURT:  Okay.  Page 14?  Page 15?  Page 16?

 3           MR. SCHWEITZER:  First paragraph, the second

 4   sentence is a bit garbled.

 5           THE COURT:  It's possible that it changed.  First, I

 6   got what the parties stipulated to.

 7           MR. SCHWEITZER:  I'm on page 16, the first paragraph

 8   beginning:  "But you will need to make findings to determine

 9   whether Yang Yang Gao was owed overtime and if so, how much."

10           THE COURT:  Yes.

11           MR. SCHWEITZER:  The second sentence appears --

12           THE COURT:  Yes.

13           MR. SCHWEITZER:  Like it was cut off in the middle

14   or something.

15           THE COURT:  Let me see if I can figure out what

16   happened there.  Maybe it's the superfluous "and."

17           MR. SCHWEITZER:  You know, I'm not sure we do

18   dispute how much Yang Yang Gao was paid by Sushi Fussion, LLC

19   in particular.

20           Yang Yang Gao testified that he was paid, that he

21   started at 750 at the Forest Hills location and was raised to

22   850 at the Main Glatt Supermarket location.  Mr. Katanov

23   testified to the same.

24           THE COURT:  Is there anything you want the jury to

25   make findings on?
```

1            MR. SAMUEL:  No.

2            MR. SCHWEITZER:  Can we stipulate to that?

3            MR. SAMUEL:  That he was paid 50 --

4            MR. SCHWEITZER:  That he was paid 750 at Forest

5    Hills and 850 at Main Glatt.

6            MR. SAMUEL:  Yes.

7            THE COURT:  So my law clerk may be able to draw up a

8    sentence and substitute it in.

9            MR. SCHWEITZER:  Maybe strike the "and" and strike

10   "Sushi Fussion, LLC" and the following "and."

11           Then add:  "The parties do not dispute how much Yang

12   Yang Gao was paid by Sushi Fussion, LLC" as another sentence.

13           THE COURT:  I've got two proposals.  My law clerk is

14   simultaneously drafting something.

15           He drafted:  "The parties agree that Mr. Gao was

16   paid 750 a week from Sushi Fussion, LLC's Forest Hills

17   location and 850 per week at the Main Street" --

18           MR. SCHWEITZER:  "Sushi Fussion, LLC's Main Glatt

19   Supermarket location."

20           THE COURT:  Is that fair?

21           MR. SAMUEL:  Yes.

22           THE COURT:  Okay.

23           MR. SCHWEITZER:  And does it continue to say:  "The

24   parties continue to dispute what Yang Yang Gao was paid at

25   Sushi Fussion Express."

1          MR. SAMUEL:  Sushi Fussion Express?  We don't

2    dispute that.

3          MR. SCHWEITZER:  Okay.  Can we stipulate to that as

4    well?

5          THE COURT:  Give me a sentence?  "The parties agree"

6    or "the parties do not dispute that" --

7          MR. SCHWEITZER:  "The parties do not dispute that --

8          MR. SAMUEL:  Well, maybe let's let the jury decide

9    just like they're going to decide --

10          MR. SCHWEITZER:  All right.  That makes sense.

11          THE COURT:  Okay.  You will need to decide how much

12    Yang Yang Gao was paid at, which Sushi Fussion?

13          MR. SCHWEITZER:  Sushi Fussion Express.

14          THE COURT:  Okay.  At Sushi Fussion Express, Inc.?

15          MR. SCHWEITZER:  Yes.

16          THE COURT:  And then we can delete the line after

17    that.

18          So the next line we're going to add:  "To do this,

19    you will need to start with a determination of how many hours

20    Yang Yang Gao worked."  Right?

21          Okay.  So continuing on page 16, anything else on

22    16?

23          MR. SCHWEITZER:  No.

24          THE COURT:  Anything on 17?  Anything on 18?

25    Anything on 19?

1        MR. SCHWEITZER:  19-C where it says, "Sushi Fussion,

2   LLC."  That should say "Sushi Fussion, LLC's Forest Hills

3   location and Sushi Fussion, LLC's Main Glatt Supermarket

4   location."

5        THE COURT:  Okay.  "Defendants claim they were not

6   required to pay Yang Yang Gao's overtime for his work at Sushi

7   Fussion, LLC's Forest Hills location and Sushi Fussion, LLC's

8   Main Glatt Supermarket location."

9        MR. SCHWEITZER:  Yes.

10        THE COURT:  Anything else on 19 then?

11        MR. SCHWEITZER:  No.  I have a substantial request

12   for addition on 20.

13        THE COURT:  Okay.

14        MR. SCHWEITZER:  The salary basis test requires that

15   a person's salary not be subject to deduction based on

16   absences.  For that, see Havey versus Homebound Mortgage,

17   Inc., 547 F.3d 158, Second Circuit, 2008.

18        THE COURT:  Okay.  Do you have language you want to

19   propose?

20        MR. SCHWEITZER:  "Generally, an employer that

21   maintains the discretion to reduce an employee's compensation

22   as a result of the employee's hours or the quality of the

23   employee's work may not consider the employee to be paid on a

24   salary basis."

25        THE COURT:  All right.  Any objection to adding that

Charge Conference                                         344

1   sentence?

2          MR. SAMUEL:  Yes, I would like just to research that

3   issue.

4          THE COURT:  Okay.  So we've got the first sentence.

5   We'll look at that too and then we can reconvene at the end of

6   lunch and talk about that.

7          Question:  Are you claiming that there were

8   deductions that were actually made?

9          MR. SCHWEITZER:  There don't need to be deductions

10  that were actually made.  There merely needs to be a policy

11  that deductions could be made.  Mr. Katanov testified that

12  sushi chefs were subject to the policy of being deducted for

13  hours paid.

14         THE COURT:  So do you want to address it now or look

15  at the case?

16         MR. SAMUEL:  We'll look at the case.

17         THE COURT:  Okay.

18         So I think that this -- I guess the caveat we need

19  to work out is whether this, the initial sentence about

20  deductions.

21         Let me pull up the prior version so I can figure out

22  where we are.

23         (Pause.)

24         MR. SCHWEITZER:  This tracks both NYLL and FLSA,

25  Reisch versus Waldbaum, Inc., 62 F.3d 3540.

1          THE COURT:  Sorry.  Hang on a second.

2          (Pause.)

3          THE COURT:  So just so I understand because at the

4   parallel level, there's a FLSA and Labor Law claims.  The

5   defense theory is he's exempt under both FLSA and New York

6   Labor Law.

7          MR. SAMUEL:  Yes.

8          THE COURT:  Do the parties see this test as the test

9   under both because I guess -- I'd very much love to give one

10  test.  I think the jury is going to have to find a bunch of

11  stuff and it gets confusing.  My one worry is sometimes

12  there's a fifth element under New York Labor Law.

13         Do the parties think that this -- I guess the other

14  way of referring to it, are you pursuing kind of separate FLSA

15  and New York Labor Law theories?  Do you think it's sufficient

16  to charge on --

17         MR. SCHWEITZER:  I think it's sufficient to charge

18  on, I think it's sufficient to charge on New York because if

19  found, it could displace the FLSA damages.

20         THE COURT:  Okay.  So I guess then defendants, my

21  question for you is as I take it, the New York law test --

22  well, let me ask the parties.

23         Are you comfortable with this charging language?  Do

24  you think it's adequate language for the New York test?

25         MR. SAMUEL:  Which page and paragraph?

Charge Conference                    346

1           THE COURT:  It's under "Exempt Employees."  There's

2   a four part test.

3           MR. SCHWEITZER:  The four part test, I'm fine with.

4   I wanted the addition of the no deductions for absences as

5   part of the explanation of the salary basis test in

6   particular.

7           THE COURT:  All right.  So I guess that's the issue

8   we can take up at the end of the lunch break.

9           MR. SAMUEL:  Yes.

10          THE COURT:  Okay.  So continuing on, anything else

11  in this section?

12          MR. BERESIN:  Your Honor, thank you.

13          At the very top of page 20, the first line

14  literally, at the end of that first line, I think that word

15  "whose" is a little bit grammatically kind of confusing or

16  doesn't flow.

17          I think it should say:  The plaintiff had the

18  authority to hire and fire other employees or the plaintiff's

19  suggestions and recommendations as to the hiring and firing.

20  I think that word "whose" --

21          THE COURT:  So I think it should be the plaintiffs.

22          MR. BERESIN:  Yes.

23          THE COURT:  That seems like a correct grammatical

24  change.  Authority to hire or fire employees or the

25  plaintiff's recommendations on hiring and firing, et cetera.

1           MR. SCHWEITZER:  No objection.

2           THE COURT:  Okay.  Continuing, anything else in this

3   section?

4           All right.  The next section, I've got "Spread of

5   Hours."  Anything in the "Spread of Hours" section?  Anything

6   in "Wage Notices"?  Anything in "Wage Statements"?  Anything

7   in "Good Faith"?  Okay.  And then anything in "Closing

8   Instructions"?

9           Okay.  So I think we've got one issue for you folks

10  to look at during the break.  I'm also finishing up a verdict

11  sheet.

12          So can you come back -- we told the jury to come

13  back at 1:00.  Can you guys come back at 12:45 and we can

14  resolve that outstanding issue and I'll have that verdict

15  sheet?

16          MR. SCHWEITZER:  Okay.

17          THE COURT:  Great.

18          (Luncheon recess.)

19

20

21

22

23

24

25

*Proceedings*                                                                348

1                        **AFTERNOON SESSION**

2              (In open court; jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Do you want to talk about the additional

5     language?  I looked at the case.  Do you have any thoughts on

6     that?

7              MR. SAMUEL:  Do you recall what the question was

8     during cross-examination relating to that point?

9              THE COURT:  We might be able to get it.

10             MR. SCHWEITZER:  I recall what it was.  Excuse me.

11    Could -- it was, essentially:  Could sushi chefs be deducted

12    in their salary if they missed a day of work?

13             THE COURT:  I think that's right.  That's my

14    recollection of what it was.

15             MR. SAMUEL:  I think that's too general since we

16    didn't really -- I think there's more to it than just that.  I

17    have -- let's see.  Give me a second.

18             THE COURT:  There is more of the testimony -- let me

19    give you some possible language, and you can tell me if you

20    think I should give this language, or what your objection is.

21    Here's what I took from the case.

22             I have the existing language, first element is that

23    the defendant must prove that the defendant was paid at least

24    the minimum salary shown in this table.  Then I would go to

25    the table, obviously, and then I would go:  An employer that

1   maintains the discretion to reduce an employee's compensation

2   as a result of the employee's hours or the quality of the

3   employee's work may not consider the employee to be paid on a

4   salary basis.  However, an employer only maintains such

5   discretion for purposes of this question if, one, the employer

6   has an actual practice of making deductions based on the

7   employee's hours or the quality of the employee's work, or,

8   two, the employer has a clear and particularized policy that

9   effectively communicates that the deductions will be made in

10  specified circumstances.

11          MR. SAMUEL:  But, Your Honor, there's been no

12  testimony that any of that happened, so I don't see how they

13  can argue that point.

14          MR. SCHWEITZER:  Excuse me.  There has been

15  testimony that it was a policy that sushi chefs could have

16  their wages deducted if they missed days of work.  That would

17  meet the second prong of the test.  Regardless of whether we,

18  here, judge that it subjectively meets the test, the jury

19  should still be instructed on the test and how to apply it.

20          THE COURT:  Okay.  I think there's enough.  I mean,

21  I take it that the parties could make different arguments

22  about whether what Mr. Katanov said was -- indicated there was

23  a policy that effectively communicates that deductions will be

24  made in specified circumstances or not.  I think I will

25  include that language and I will leave it to the jury to

 1   argue, unless there's anything specific to the language that

 2   either party wants to raise.

 3                    MR. SAMUEL:  No.

 4                    MR. SCHWEITZER:  No.  That's acceptable.

 5                    THE COURT:  My clerk is going to be here momentarily

 6   with the verdict sheet.  Anything else for us to take up aside

 7   from the verdict sheet?

 8                    MR. SCHWEITZER:  No, Your Honor.

 9                    MR. BERESIN:  We have one question, Your Honor,

10   which is what ability we have to describe the legal -- the

11   profile of the case, as far as the fact that both Yagudaev and

12   our client, Mr. Katanov, were named as defendants in this case

13   in terms of how it happened that way, that the initial

14   complaint was filed against Mr. Yagudaev, it was amended to

15   include our client subsequently.

16                    THE COURT:  Well, I'll tell you what Mr. Schweitzer

17   said earlier -- I think he said when we are selecting a jury,

18   or he said earlier in the language -- is the Yagudaev

19   defendants are also defendants, but they've defaulted and

20   they're not here or in the case.  Is there anything beyond

21   that that you -- first of all, anybody object to that

22   characterization -- characterization along the lines of, they

23   are -- or they were defendants, but they defaulted and they're

24   not here?

25                    MR. SCHWEITZER:  Certainly not.  I would object to

*Proceedings*                                                  351

1   any argument that the procedural history of this case is not

2   part of the trial record.  It hasn't been brought to the

3   jury's attention.

4              THE COURT:  Yes, I'm not sure it would be relevant

5   for the jury to consider who was sued first or second.

6              MR. BERESIN:  Okay.  Thank you.

7              THE COURT:  Sure.

8              (Pause.)

9              THE COURT:  So, sorry, one issue.  On the exempt

10  employee instruction, do you all have a view on whether under

11  New York Labor Law there's a fifth element that the plaintiff

12  has to customarily and regularly exercise discretionary

13  powers?

14             MR. SCHWEITZER:  There is.  It's under the

15  hospitality industry wage order, Section 146-3.2(c).

16             THE COURT:  But you haven't requested an instruction

17  about that, so tell me what your thinking is.

18             MR. SCHWEITZER:  I believe we did.  It's -- it was

19  in addition to -- first of all, we definitely did in our

20  submission, and then --

21             THE COURT:  Okay.

22             MR. SCHWEITZER:  No, no, no.  There is an element.

23  I don't know what your -- the Court's pagination is now, but

24  on my page 20 in the paragraph beginning --

25             THE COURT:  Got it.

*Proceedings*                                               352

1          MR. SCHWEITZER:  -- to establish the plaintiff with

2    an executive employee --

3          THE COURT:  Got it.  Okay.  Are we in agreement

4    about this instruction that -- and I guess then they -- the

5    jurors do need to make separate findings.  Are you exempt

6    under New York Labor Law, or are you exempt under FLSA, right?

7    Slightly different.

8          MR. SCHWEITZER:  I suppose so.

9          MR. SAMUEL:  Yeah.

10         THE COURT:  Okay.

11         (Pause.)

12         THE COURT:  So I think my clerk is going to hand you

13   guys proposed verdict sheets.  The jury might come back, but

14   if so, we can do this after closings.  We can take a break

15   then and go over the verdict sheet.

16         THE COURTROOM DEPUTY:  Judge, I've got the jury.

17         Do you want me to bring them in?

18         THE COURT:  Yes, I think we're ready.

19         THE COURTROOM DEPUTY:  Okay.  I'm bringing them in.

20         Thank you, Judge.

21         (Pause.)

22         THE COURTROOM DEPUTY:  Jury is coming in.

23         (Jury enters.)

24         THE COURT:  Okey dokey.  Welcome back.

25         So I think we are ready for the parties' closing

1    statements.  The closing statements of the parties, as you

2    know, are not themselves evidence, but they're the parties'

3    explanation of what they think the evidence has showed at

4    trial.

5              MR. SCHWEITZER:  Hello, ladies and gentlemen.  Thank

6    you again for your attentiveness and for your conscientious

7    evaluation of the evidence that I'm sure you will engage in.

8              At the outset of this case, I told you it was going

9    to be about who was in charge, and the evidence you have heard

10   clearly those that Leva Katanov was in charge of all of the

11   Sushi Fussion locations, including Sushi Fussion Express, and

12   that Yang Yang Gao was in charge nowhere.

13             First, Yang Yang Gao.

14             You will hear more about the particular tests that

15   will apply to him from the Court, but briefly, to be an exempt

16   executive employee, an employee's primary duty needs to be

17   management of at least two other employees, not including

18   himself.  It strains credulity jewel tee to believe that Yang

19   Yang Gao could have been hired to manage the Sushi Fussion

20   Forest Hills where other employees were hired before him,

21   where Ray, a more senior employee, would have the one extra

22   responsibility that he, Yang Yang Gao, would later have, the

23   Glatt Kosher Supermarket and at Sushi Fussion Express and

24   where he only stayed for about a month.  In fact, there's been

25   no contention at all that Yang Yang Gao was ever a manager or

1   an exempt employee at Sushi Fussion in Forest Hills.

2   Importantly, neither was Ray considered a manager, despite

3   having the same responsibilities at Forest Hills that Yang

4   Yang Gao would have at the Glatt Kosher Supermarket.  At the

5   Glatt Supermarket, Yang Yang Gao worked with only one other

6   sushi chef at the time and with a cashier, all under the

7   direct supervision of either Mr. Katanov or Robert,

8   Mr. Katanov's partner.  There is simply no scope for him to

9   have supervised other employees in that arrangement, and even

10  if he had been, quote, "managing the sushi bar," unquote,

11  there was only one other sushi chef.  And you heard that

12  Mr. Katanov and Mr. Gao say that the sushi chefs and the

13  counter person -- Albert -- were equal rank.  You heard

14  Mr. Katanov say he never even told Albert to take directions

15  from the sushi chefs, and he wouldn't collaborate with them on

16  his own accord.

17          Now, Mr. Katanov was not regularly present at the

18  supermarket location and did not observe Yang Yang Gao

19  throughout the performance of his duties.  He has no basis to

20  speculate as to the proportion of what duties he performed,

21  what proportion of his duties were -- what proportion of his

22  time was spent making sushi and what proportion of his time

23  was spent doing anything else.  Mr. Gao, on the other hand,

24  was present every moment that he worked at Glatt Kosher

25  Supermarket, and he testified, based on that knowledge, that

1  he would spend maybe 15 minutes in a week doing anything other

2  than making sushi.

3        An exempt executive employee's salary is also

4  relevant to your decision -- excuse me -- in two ways.

5        First, it must be over a certain threshold that

6  could not change from week to week, and Judge Kovner will

7  instruct you on that.  You've heard testimony that Yang Yang

8  Gao made $750 per week at Sushi Fussion Forest Hills and $850

9  per week at Sushi Fussion in the supermarket; however,

10  Mr. Katanov failed to keep records of -- of that salary.  He

11  reported to his accountant a lower amount, only what was paid

12  by check, and only that amount used -- that was paid by check

13  was used to calculate the payroll tax on Mr. Gao's -- excuse

14  me -- salary.

15        Not only is there an -- an obligation of an employer

16  to keep and maintain time accurate, and complete time and pay

17  records, which was not done here, there is a credibility

18  component to this, too.  Mr. Katanov's accountant asked him to

19  provide him, what I would presume to be, an accurate

20  accounting of what he paid his employees.  Mr. Katanov failed

21  to do that.  He provided the same inaccurate accounting to the

22  United States and New York State governments -- these

23  documents we use to prepare taxes.

24        Ask yourselves if this is someone you can believe

25  when he says -- when he testifies to you about what he

1    observed.

2         Mr. Katanov, importantly, was not able to identify

3    any employees Yang Yang Gao supposedly hired, nor does what

4    either he or Yang Yang Gao described Yang Yang Gao doing

5    amount to hiring employees.  Here's what happened:  At

6    Mr. Katanov's request, Yang Yang Gao would ask his friends if

7    anyone was interested in working at one of -- one of

8    Mr. Katanov's restaurants.  Assuming someone was, he would

9    introduce them.  Mr. Katanov or -- excuse me -- or whoever

10   else was in charge would interview them.  If they needed an

11   interpreter, Yang Yang Gao would interpret because he knew

12   some English, and Yang Yang Gao did not offer any affirmative

13   recommendations that they be hired or fired.  You heard

14   Mr. Katanov say, himself, he had the final say.  And you heard

15   Yang Yang Gao say not only did he offer no recommendations,

16   but these -- but that these decisions were made without his

17   input.

18        By way of illustration or comparison, your testimony

19   that Zhenkai Sun also acted as a passive interpreter between

20   Michael Yagudaev and his cousin, Summer, but he also had no

21   input on whether Summer was hired.  This is the same thing

22   Yang Yang Gao did.  Illustratively, there is no contention

23   that Zhenkai Sun was a manager.

24        Also, tellingly, Zhenkai Sun was hired to work at

25   Sushi Fussion Express without Yang Yang Gao's input at all.

1   Yang Yang Gao was not there the day he was interviewed or

2   hired, did not participate at all in his interview.

3        Returning to primary duty, at Sushi Fussion Express,

4   none of the people Yang Yang Gao was supposedly managing there

5   said he had any authority over him whatsoever.  That's Wei Gao

6   and Zhenkai Sun.  They both said that no one was in charge;

7   that everyone just did their tasks, and that when Yang Yang

8   Gao was absent, the sushi bar ran as smoothly as when he was

9   there.  Both they and Yang Yang Gao described a collaborative

10  work environment at the sushi bar where co-workers could, and

11  did, remind each other tasks that needed doing.  All three, as

12  well as Charles Chipengule, testified that they knew what

13  orders to make by being told by the cashier, not from any head

14  chef or sushi chef.  Yang Yang Gao described the same

15  situation at the supermarket.

16        Excuse me.  Now, Mr. Katanov admits that he owned

17  certain -- certain locations; that he could transfer employees

18  between them based on need, but he denies being able to do

19  that with respect to Michael Yagudaev's restaurants, in

20  particular, Sushi Fussion Express, where each of these

21  plaintiffs worked.  You should not find that credible because

22  of the weight of the circumstantial evidence coming against

23  it.

24        Mr. Katanov accepted a percentage of the gross

25  profits from Mr. Yagudaev's restaurant.  Mr. Katanov

1   frequently went to that restaurant and provided Mr. --

2   sorry -- Mr. Katanov frequently went to that restaurant to

3   provided Mr. Yagudaev with advice:  how to run it, how to keep

4   it clean.  He gave that advice directly to employees, and he

5   didn't remember doing that at his deposition back in 2018, but

6   four years later, today, he remembers it, supposedly based on

7   what he saw and heard today in the courtroom.  That should

8   give you some idea as to the credibility of the plaintiffs

9   themselves.  Mr. Yagudaev -- sorry -- if Mr. Katanov is

10  willing to trust their testimony, maybe you should too.

11          Excuse me.  Now, both Wei Gao and Zhenkai Sun and

12  Mr. Katanov all described Mr. Katanov giving instructions as

13  to how to keep the sushi bar clean.  Both Mr. Chipengule and

14  Mr. Katanov described Mr. Katanov going into the kitchen, an

15  employee only area, where he gave Mr. Chipengule advice as to

16  improve his cutting sweet potato.  Excuse me.  This is not

17  something a member of the general public or your consultant

18  can do.  This is something that, as Michael would describe

19  him, the big boss, would do.

20          Mr. Katanov frequently borrowed materials from Sushi

21  Fussion Express.  He did not pay for those materials.  He

22  would return them in kind at some other point.  No accounting

23  was made of the exchange of materials between locations or

24  between corporations, and no record -- no record was even made

25  of the financial transaction between Sushi Fussion Express,

1    Inc. and Sushi Fussion, LLC.  There was no contract.  There

2    was -- there was no written contract, rather.  There was no

3    record of payment.  We have Mr. Katanov's word only that

4    payments stopped after six months.

5           Now, let's assume they did.  In that situation,

6    there was no penalty for Sushi Fussion Express for doing that.

7    They continued to use Sushi Fussion's trademarked trade dress.

8    They continued to use Sushi Fussion's doing business as name.

9    They continued to appear on Sushi Fussion's website where

10   Mr. Katanov admits that he -- excuse me -- that he directed a

11   post of information holding himself and Michael -- that was

12   the owners of Sushi Fussion in Flushing -- Sushi Fussion

13   Express.

14          Excuse me.  Mr. Yagudaev used Sushi Fussion's menu

15   as the basis for his own restaurant menu.  He only added

16   Hibachi when his separate Hibachi restaurant, that

17   Mr. Chipengule testified about, closed and that -- and its

18   employees and materials were moved into Sushi Fussion Express.

19   And all the locations continued to appear on all location's

20   menus.  That is, when customers would go in, they would see,

21   not only is this location where I'm eating at a Sushi Fussion

22   location, this other one is too.  This one in Flushing is.

23   This one in Great Neck is.  Two in Manhattan.  One in Forest

24   Hills.  One in Brooklyn.

25          You heard Mr. Katanov testify that he -- that once

1   he had multiple locations, he would frequently go in between

2   them to -- excuse me -- to see how business was to supervise

3   as needed.  He did the same thing for Sushi Fussion Express.

4   He went there from time to time.  He gave advise, he gave

5   instructions.  He conferred with Mr. Yagudaev about how

6   business was.  Presumably, this was because he had codified to

7   present the profits.  All this should tell you that in

8   reality -- excuse me -- Mr. Katanov is the one in charge at

9   all locations and he's responsible for ensuring the integrity

10  of his brand, that he's responsible for making sure customers

11  aren't turned off by uncleanly or -- an uncleanly sushi bar or

12  a sloppy sushi presentation.  These are all things he did.

13  These are all things he admits doing.  He merely doesn't want

14  to take responsibility for it.

15          I ask that you require him to do so and find in

16  favor of the plaintiffs.

17          THE COURT:  Okay.

18          Defense counsel?

19          MR. BERESIN:  Good afternoon.  Andrew Beresin,

20  attorney for Leva Katanov, and I appreciate the opportunity to

21  speak to you before you get this case to decide the important

22  facts that you have to decide.  There are really just a

23  handful of very important issues that you will be deciding.

24  Granted, there are a lot of facts you are going to have to

25  find to make those decisions, but the evidence is clear on the

1   first main issue in this case, and that is that my client,

2   Mr. Katanov and Michael Yagudaev, who is not here, each owned

3   sushi restaurants, but they were separate.  They were not

4   managed together.  Decisions weren't made jointly,

5   respectively.  Mr. Katanov owned and operated his restaurant,

6   and he helped Mr. Yagudaev start his own restaurant by

7   providing him expertise and advice that he didn't have because

8   he was totally new to the business.  He did that as a favor.

9   He already had known him, they were friends, but there was

10  going to be some effort required, so, in return, Mr. Yagudaev

11  agreed to pay a royalty -- 5 percent royalty to Mr. Katanov

12  for the time, the effort he was going to put in to support a

13  business that he didn't own.  Makes a lot of sense to me.

14          The evidence that you heard supports that the

15  restaurants were separate.  They were owned separate.  There's

16  been no evidence that they were owned together; that all the

17  decisions to hire employees were made by Mr. Yagudaev when it

18  came to Sushi Fussion Express; and with respect to

19  Mr. Katanov's restaurants, they were made by him.

20  Mr. Yagudaev had nothing to do with those decisions.  When it

21  came time to pay employees, Mr. Yagudaev paid each of these

22  employees.  Every time they got paid, it was by him.

23  Mr. Katanov paid his own employees at his restaurants.

24  Mr. Yagudaev had nothing to do with that.

25          (Continued on the following page.)

1          MR. BERESIN:  (Continuing)  Now, the Judge is going

2    to give you instructions on how you need to apply the law to

3    all of the relevant facts in the case.

4          When she gives that to you, it's going to be clear,

5    when you overlay that with the facts that you've seen from

6    this evidence, that the four plaintiffs here, when they worked

7    at Sushi Fussion Express, they were working for Mr. Yagudaev.

8    They testified that he was their boss, they testified that he

9    paid them, he set their schedule.  That was consistent.  That

10   was consistent.  That's the consistent evidence from all four

11   witnesses for the plaintiff.

12         My client, Mr. Katanov, did not hire any of the four

13   plaintiffs to work at Mr. Yagudaev's restaurants.  He did not

14   supervise them on any kind of regular basis other than to

15   provide them with some tips and suggestions when he would stop

16   by in order to support his friend, Mr. Yagudaev, and help his

17   restaurant succeed as possible but he was not their employer.

18   He didn't decide how much they got paid.  He didn't maintain

19   any employment records with regard to these plaintiffs when

20   they worked for Mr. Yagudaev at the Sushi Fussion Express.

21         The evidence is clear that Mr. Katanov was not their

22   employer when they worked at Mr. Yagudaev's restaurant.

23         Now, another key issue here is going to be Mr. Yang

24   Yang Gao's responsibilities, what work he did when he was

25   working for Mr. Katanov for the two year period when he worked

1  for him and then later, when he worked for Mr. Yagudaev.

2          Again, the evidence has been consistent and clear

3  that he had greater responsibilities than the other sushi

4  chefs and he got paid more for it.  There was no dispute in

5  that.  Why would you get paid more for doing the same job as

6  everybody else?  Wherever I've worked, it doesn't work that

7  way.  You do more, you have more responsibilities, you're

8  typically paid more.

9          Also, it's strange for the jury to believe that even

10  at a small operation like a sushi bar with a handful of

11  employees, that no one was in charge on a daily basis in terms

12  of operating.  There's always someone in charge.  There's

13  always someone who has the ability to instruct, direct, manage

14  the operation to make it run as best as it can.

15          That person was Mr. Yang Yang Gao.  He himself

16  testified to that.  He said he was in charge, he said he was a

17  manager, that he was the main chef.  He exercised discretion

18  on a number of levels.  He ordered supplies.  Each and every

19  time he requested such supplies, Mr. Katanov simply placed the

20  order for him.  He trusted him.  He trusted Mr. Yang Yang

21  Gao's judgment on ordering supplies and he took his input on

22  hiring employees.  He always sought his input before deciding,

23  before making that final decision with Mr. Yang Yang Gao's

24  input that he sought to help him make that decision.

25          Those are the kinds of things that someone who's not

1   just a line employee does and those are the kind of things

2   that you get paid more to do and Mr. Yang Yang Gao did get

3   paid more to do those things.

4           Finally, I just want to speak to you a little bit

5   about my client and the fact that he's been an entrepreneur at

6   least ten years, creating jobs to the best he could, as many

7   as he could, for as long as he could and still does.  He did

8   that for these four plaintiffs here.

9           Now, Mr. Yagudaev is not here but my client is not

10  the only one who was named as a defendant in this case.

11  Mr. Yagudaev was named as a defendant in this case.  Why?

12  Because he employed the four plaintiffs.  Why is he not here?

13  Because he didn't even respond to the lawsuit.  He defaulted.

14  There's no dispute.  He was their employer.  So why would he

15  even waste time trying to fight that?  He's not here.  My

16  client is their plan B.  They're hoping to recover from him

17  what they may not be able to recover from Mr. Yagudaev who's

18  not here and is in default in this action.

19          Again, the facts of this case are what matter the

20  most and the evidence you've seen consistently from everyone

21  is that my client did not employ these plaintiffs at Sushi

22  Fussion Express.  He was not their employer there and he also,

23  his restaurants have no business connection, no formal

24  relationship to Mr. Yagudaev's restaurants in any way.  They

25  have no formal connection financially and they are not a

1    single company operating together and never were.

2              So the evidence is clear and you should find, must

3    find, that my client's restaurants and Mr. Yagudaev's

4    restaurants were not a joint single enterprise operating as

5    one company.

6              Thank you.

7              THE COURT:  Any rebuttal?

8              MR. SCHWEITZER:  No, Your Honor.

9              THE COURT:  Okay.  Thanks, jurors.  So I think the

10   next step is for me to give you some instructions on the law.

11   Before we do that, let's take a ten minute break.  Come back

12   at 2:35.

13             (Jurors exit.)

14             THE COURT:  I think we made a couple of proofreading

15   changes so we're working on getting you a new copy of the

16   sheet.

17             MR. SCHWEITZER:  We're doing a unified verdict

18   sheet?

19             THE COURT:  What it will be is the alternative.  You

20   want to do it person by person or defendant by defendant?

21             MR. SCHWEITZER:  No.  It was initially plaintiff by

22   plaintiff so I was curious was to why the change.

23             THE COURT:  I think we tried to streamline this a

24   little bit.  I think we asked all the relevant questions,

25   person by person.

366

1         MR. SCHWEITZER:  Okay.  That's fine.

2         (Recess taken.)

3         MR. SCHWEITZER:  Do we have a record of the charge

4    conference.

5         THE COURT:  Yes, we do, but in the hopes of trying

6    not to read back the charge conference, what's the issue?

7         MR. SCHWEITZER:  There may have been a stipulation

8    reached with regard to --

9         THE COURT:  The salary?

10        MR. SCHWEITZER:  I think so.

11        THE COURT:  So we have that in the jury instruction

12   but we added the language:  The parties agree that he was paid

13   750 while at, whichever one it was, Forest Hills, and 850.

14        MR. SCHWEITZER:  That's in the updated instructions?

15        THE COURT:  Yes.  It's on 16 of the instructions.

16        Do you have any objection to my adding it to the

17   joint stipulations?

18        MR. SAMUEL:  The 850 per week at Glatt?

19        THE COURT:  Yes.

20        MR. SAMUEL:  No, no objection.

21        THE COURT:  All right.

22        MR. SCHWEITZER:  Thank you.

23        Judge, I don't think we have a copy of the new

24   charge.

25        THE COURT:  We're working on getting you a final

367

1    copy of the charge and we're working on getting a verdict

2    sheet that has some, I think, small changes.

3              Do you all have anything on the verdict sheet?

4              MR. SCHWEITZER:  No.  Broadly speaking, it looks

5    fine.

6              THE COURT:  Okay.

7              I think we've got a member of the public in the

8    courtroom.

9              I think we're going to have the jury sit in rows

10   where you are when the jury comes back in a few minutes.

11   We've got an overflow video room.

12             THE CLERK:  Courtroom 4-G.

13             (Recess taken.)

14             (In open court; outside the presence of the jury.)

15             MR. BERESIN:  On Item 7 of the verdict sheet, we

16   stipulated that Yang Yang Gao was employed by Sushi Fussion,

17   LLC from September of 2011 through October 19th of 2013.

18             We already stipulated to that so this question, I

19   think, should really be asking the jury was he their employer

20   after that?

21             THE COURT:  The question I'm looking at is:  Was

22   Yang Yang Gao paid at least 1.5 times of his regular rate of

23   pay for overtime work.

24             Do I have that in the right plays?

25             MR. BERESIN:  I'm on number 7, top of page 3 of the

368

1   copy that Jason just handed us.

2          THE COURT:  I may be in the wrong copy.  I'm sorry.

3   It's renumbered.  It starts in a different section.

4          So you're on:  Were the following defendants Yang

5   Yang's employer?  Is that the question?

6          MR. BERESIN:  Yes.

7          THE COURT:  Tell me again.

8          MR. BERESIN:  So we've stipulated that Sushi

9   Fussion, LLC employed Yang Yang Gao from September 12th of

10  2011 through October 19th of 2013.  And that after that, the

11  second stipulation with regard to Mr. Yang Yang Gao is that he

12  then worked for Sushi Fussion Express Inc. at 7132 Main from

13  October 20, 2013, the next day, until October 2 of 2016.

14         THE COURT:  Fair enough.  Can I take out then this

15  first line about Sushi Fussion, LLP since the parties

16  stipulated that he did work there and there was no dispute

17  about the when?

18         MR. SCHWEITZER:  Yes, you can take out the first

19  line Sushi Fussion, LLC.  Please add a clarification that the

20  parties have stipulated that Sushi Fussion, LLC employed Yang

21  Yang Gao at least through October 2013.

22         Remove the instruction between question 1.8 and

23  issue 2 since there will be an affirmative yes answer.

24         MR. BERESIN:  I'm trying to address a different

25  issue which is that the question is were these entities that

369

1  Mr. Katanov owns Mr. Yang Yang Gao's employer after he left,

2  after October of 2013.  That's really what they -- because

3  we've already -- with regard --

4          THE COURT:  So tell me what specific change you're

5  asking for.

6          MR. BERESIN:  Yes, to the end of the question.  It

7  should say, "after October 12th" or "October 19th of 2013."

8          THE COURT:  "After October 19th of 2013"?  All

9  right.

10         How do you feel about that?

11         MR. SCHWEITZER:  I think that's fine.  I would add

12 the additional clarification at the top question:  "The

13 parties have stipulated that Sushi Fussion, LLC employed Yang

14 Yang Gao through October 19, 2013" and then the question

15 continues --

16         THE COURT:  Can you slow down?

17         "The parties have stipulated that Sushi Fussion" --

18         MR. SCHWEITZER:  -- "LLC employed Yang Yang Gao

19 through October 19, 2013," and the question continues.

20         THE COURT:  Sorry.  Sorry.  Employed Yang Yang Gao

21 through October what?

22         MR. SCHWEITZER:  19.

23         THE COURT:  October 19th of 2016?

24         MR. SCHWEITZER:  '13.

25         THE COURT:  And then just continue.

370

1          MR. SCHWEITZER:  Then continue.  And then between

2    "enterprise" and the question mark, add "after October 19,

3    2013."

4          THE COURT:  And then I'm going to take out "Sushi

5    Fussion, LLC" because we just addressed that in the

6    stipulation.

7          MR. SCHWEITZER:  No, we didn't.  The question is now

8    about only that period October 20, 2013 and into the future.

9          THE COURT:  Well, but is there -- did you offer any

10   evidence that he worked for Sushi Fussion after October 19th

11   of 2013?

12         MR. SCHWEITZER:  That he worked at a location?

13         THE COURT:  No, that he worked for Sushi Fussion,

14   LLC.

15         MR. BERESIN:  That's part of their theory.

16         THE COURT:  I see.  So I'm going to put this back.

17   So Sushi Fussion is back.

18         MR. BERESIN:  Yes, just the date range needs to be

19   included after the 19th of October.

20         THE COURT:  Let me read to you what I've got to make

21   sure we're all on the same page.

22         "Question 7:  The parties have stipulated that Sushi

23   Fussion, LLC employed Yang Yang Gao through October 19th of

24   2013.  Were the following defendants Yang Yang Gao's employer

25   either directly or as part of a single enterprise after

371

1    October 19th of 2013," and then list the four.

2              MR. SCHWEITZER:  Yes.

3              We should also make a similar change to Question 8.

4              THE COURT:  Tell me.  The numbering restarts.

5              MR. SCHWEITZER:  Issue one, Question 8.

6              THE COURT:  So it should say after that date, after

7    October?

8              MR. BERESIN:  Yes.

9              MR. SCHWEITZER:  Again, the parties stipulate that

10   Leva Katanov employed Yang Yang Gao after October 13, 2019.

11   Was he his employer after October 19, 2013.

12             THE COURT:  Okay.

13             MR. BERESIN:  Thank you.

14             MR. SCHWEITZER:  And I think we still want to remove

15   the instruction between question 1.8 and issue 2.  The reason

16   why is we're hoping that the jury is going to answer questions

17   about Yang Yang Gao and Sushi Fussion Express regardless of

18   whether they find --

19             THE COURT:  Yes.  All right.  I'm fine with striking

20   that bolded text there and having the jury answer the

21   following questions.

22             Anything else on the verdict sheet?

23             MR. BERESIN:  Thank you, Judge.  We're just looking

24   through this.

25             (Pause.)

1          THE COURT:  So here's the language we've added to

2   the joint stipulation:  "Yang Yang Gao was paid $750 per week

3   at Sushi Fussion, LLC's Forest Hills location and $850 per

4   week at Sushi Fussion, LLC's Main Glatt Supermarket location."

5          Is that acceptable?

6          MR. SCHWEITZER:  Yes.

7          MR. SAMUEL:  Yes.

8          MR. SCHWEITZER:  Question about issue 9?

9          THE COURT:  Okay.

10          MR. SCHWEITZER:  The good faith issue goes to

11   liquidated damages and the parties have stipulated to

12   liquidated damages for each of Wei Gao, Zhenkai Sun and

13   Charles Chipengule but I think issue 9, questions 3 through 8,

14   don't need to be addressed.

15          THE COURT:  Any reason why I should leave Issue 9?

16          MR. SAMUEL:  No, I don't see any reason.

17          THE COURT:  I think that's right.

18          MR. SCHWEITZER:  Also they can probably be

19   renumbered.  We're missing questions 1 and 2 on that issue.

20          THE COURT:  All right.  So it's just going to start

21   with what is now question 9.  That's going to be renumbered.

22          Anything else?

23          MR. SCHWEITZER:  No, Your Honor.

24          MR. SAMUEL:  No.

25          THE COURT:  Okay.  So from my perspective, we're

Charge of the Court                    373

1    ready for the jury and ready to charge the jury.

2          Anything anybody wants to bring up before we do

3    that?

4          MR. SCHWEITZER:  No.

5          MR. SAMUEL:  No.

6          THE COURT:  Okay.  Great.  So we can get the jurors.

7          (Jury enters.)

8          THE COURT:  Okay.  So thank you all for paying such

9    close attention during the trial.  I really appreciate it and

10   the parties appreciate it.  We are really at the home stretch.

11         Now that the evidence in this case has been

12   presented and the attorneys for the plaintiffs and the

13   defendants have finished their closing arguments, it is my

14   responsibility to instruct you as to the law that governs this

15   case.  We're grateful to you for the close attention you have

16   given to the case thus far and I ask that you continue to do

17   so as I give you these instructions.

18         I will provide with you a written copy of the

19   instructions afterwards too so you'll have that.  Don't feel

20   like if you miss something, you won't be able to go back and

21   look at it.

22         So my instructions will be in three parts.

23         First, I will instruct you regarding the general

24   rules that define and govern the duties of a jury in a civil

25   case.  Second, I will instruct you about the legal elements of

1  the plaintiffs' claims.  And third, I'll instruct as to some

2  general rules regarding your deliberations following the

3  instruction.

4        You should not single out any one instruction as

5  alone stating the law, but you should consider my instructions

6  as a whole when you retire to the jury room.

7        You should not, any of you, be concerned about the

8  wisdom of any rule that I state.  Regardless of any opinion

9  that you may have as to what the lay may be or ought to be, it

10  would violate your sworn duty to base a verdict upon any other

11  view of the law than that which I give you.

12        Part one:  A jury's duty.

13        To begin with, it is your duty to find the facts

14  from all the evidence in this case.  You are the sole judges

15  of the facts and it is, therefore, for you and you alone to

16  pass upon the weight of the evidence, to resolve such

17  conflicts as may have appeared in the evidence, and to draw

18  such inferences as you deem to be reasonable and warranted

19  from the evidence.

20        It is your job, not mine, to find the facts.  I have

21  neither compressed nor attempted to suggest that I have an

22  opinion about how you should decide the facts in this case.

23  You should not consider anything I have said or done in the

24  course of the trial, including these instructions, as an

25  expression of an opinion about the facts or the merits of this

1   case.  You should attach no special significance to these

2   questions just because I asked them.

3            With respect to any question concerning the facts,

4   it is your recollection of the evidence that controls.

5            My job is to instruct you on the law.  You must

6   apply the law to the facts as you find them in accordance with

7   my instructions.  While the lawyers may have commented on some

8   of these rules, you must be guided only by what I instruct you

9   about them.  You must follow all the rules as I explain them

10  to you.  You may not follow some and ignore others.  Even if

11  you disagree with some of the rules or don't understand the

12  reasons for some of them, you are bound to follow them.

13           I'll instruct you now about what counts as evidence,

14  and how you should consider it.  The evidence you should

15  consider in deciding what the facts are comes in several

16  forms:  First, sworn testimony of witnesses, both on direct

17  and cross-examination, and regardless of who called them;

18  second, exhibits that have been received into evidence by the

19  Court; and, third, facts as to which both parties have agreed

20  to in a stipulation.  A stipulation is an agreement among the

21  parties that a certain fact is true and you should regard such

22  agreed facts as true.

23           Certain things are not evidence and must, therefore,

24  be disregarded by you in deciding what the facts are.  The

25  following are not evidence:  First, arguments or statements by

1  lawyers; second, questions put to the witnesses; third,

2  objections to such questions or to offered exhibits.

3          In this regard, attorneys have a duty to their

4  clients to object when they believe that evidence should not

5  be received.  You should not be influenced by such objections

6  or by the Court's ruling on them.  If the objection was

7  sustained, ignore the question.  If the question was answered

8  before the objection was sustained, you should ignore the

9  question and the answer.  If the objection was overruled,

10  treat the answer like any other answer.

11          Fourth of things that are not evidence, testimony

12  that has been excluded, stricken, or that you have been

13  instructed to disregard is not evidence and you must disregard

14  it.  Fifth:  Obviously anything you might have seen or heard

15  outside the courtroom is not evidence.  Sixth:  Nothing I have

16  said or done should be used by you to infer that defendants

17  are or are not liable.

18          During the course of the trial, I may have

19  questioned witnesses.  I also may have had limited colloquy or

20  debate or arguments with the attorneys.  The jury should not

21  draw any inference from observing these interactions.  They

22  were conducted for the sole purpose of insuring the orderly

23  and clear presentation of the evidence to you, the jury.

24          In deciding whether or not the plaintiffs have met

25  their burden of proof, you may consider both direct evidence

1   and circumstantial evidence.

2           Direct evidence is evidence that proves a disputed

3   fact directly.  For example, when a witness testifies to what

4   he or she saw, heard or observed, that's called direct

5   evidence.

6           Circumstantial evidence is evidence that tends to

7   prove a disputed fact by proof of other facts.  To give a

8   simple example, suppose that when you came into the courthouse

9   today, the sun was shining and it was a nice day, but the

10  courtroom has no windows and so you couldn't look outside.

11  Then, later, as you were sitting here, suppose someone walked

12  in with a dripping wet umbrella and soon afterward, somebody

13  else walked in with a dripping wet raincoat.  Now, on our

14  assumed facts, you can't look outside of the courtroom and you

15  can't see whether or not it is range so you have no direct

16  evidence of that fact, but on the combination of the facts

17  about the umbrella and the raincoat, it would be reasonable

18  for you to infer that it had begun to rain.

19          In this case, the plaintiffs have asked you to draw

20  one set of inferences while the defendants have asked you to

21  draw another set of inferences based on the same evidence.

22  Whether a given inference is or is not to be drawn is entirely

23  a matter for you, the jury, to decide.

24          That is all there is to circumstantial evidence.

25  Using your reason and experience, you infer from established

1  facts the existence or the nonexistence of some other fact.

2  Please note, however, that it is not a matter of speculation

3  or guess.  It's a matter of logical inference.

4       The law makes no distinction between direct and

5  circumstantial evidence.  Circumstantial evidence is of no

6  less value than direct evidence, and you may consider either

7  or both, and may give them such weight as you conclude is

8  warranted.

9       Although the plaintiffs bear the burden of proof,

10  the law does not require the plaintiffs to call as witnesses

11  all persons who may appear to have some knowledge of the

12  matters at issue in this trial, nor does the law require that

13  all things mentioned during the trial be produced as exhibits.

14       During the trial, you may have heard the attorneys

15  use the term "inference."  In the attorneys' arguments, they

16  may have asked you to infer, on the basis of your reason,

17  experience, and common sense, from one or more established

18  facts, the existence of some other facts.

19       An inference is not a suspicion or a guess.  It is a

20  reasoned, logical decision to conclude that a disputed fact

21  exists on the basis of another fact which you find exists.

22       There are times when different inferences may be

23  drawn from facts, whether proved by direct or circumstantial

24  evidence.  The plaintiff asks you to draw one set of

25  inferences while the defendant asks you to draw another.  It

Charge of the Court                    379

1  is for you, and you alone to decide what inferences you will

2  draw.

3          The process of drawing inferences from facts is not

4  a matter of guesswork or speculation.  An inference is a

5  deduction or a conclusion which you, the jury, are permitted

6  to draw, but are not required to draw from the facts which

7  have been established by either direct or circumstantial

8  evidence.  In drawing inferences, you should exercise your

9  common sense.

10          So while you are considering all the evidence

11 presented to you, you are permitted to draw from the facts

12 which you find to be proven such reasonable inferences as

13 would be justified in light of your experience.

14          Your verdict must be based solely upon the evidence

15 developed at trial or the lack of such evidence.  In your

16 deliberations as to whether the plaintiffs have sustained

17 their burden of proof, it is improper for you to allow any

18 personal feelings you may have about a defendant's race or

19 religion or national origin or ethnic background or sex or age

20 influence your decision.

21          It would be equally improper for you to allow any

22 feelings you might have about the nature of the claims in this

23 case to influence your decision making.

24          To repeat, your verdict must be based exclusively

25 upon the evidence, or lack of evidence, as it had has been

1    presented in this case.

2              In determining the issues of fact and rendering a

3    verdict in this case, you should perform your duty with

4    complete impartiality and without bias, sympathy or prejudice

5    to any party.  All parties are equal before the law and are

6    entitled to the same fair consideration.  I know that you will

7    carefully and impartially consider all the evidence, follow

8    the law as it is now being given to you, and reach a just

9    verdict regardless of the consequences.

10             In this case, some of the defendants are

11   corporations.  The fact that those defendants are corporations

12   and the plaintiffs are individuals does not mean that the

13   corporation defendants are entitled to any lesser

14   consideration by you.  All litigants are equal before the law

15   and corporations, big or small, are entitled to the same fair

16   consideration you would give to any other party, to any other

17   individual party.

18             Mandarin Chinese has been spoken during the trial.

19   You are only to consider evidence provided through the

20   official court translator.  Although some of you may know

21   Mandarin, it's important that all jurors consider the same

22   evidence.  Therefore, you must base your decision on the

23   evidence presented in the English translation.  You must

24   ignore any different meaning of the Mandarin words.

25             In deciding what the facts are in this case, you

Charge of the Court                    381

1   must consider all the evidence that has been offered.  In

2   doing so, you must decide which testimony to believe and which

3   testimony not to believe.  You are the sole judges of the

4   credibility of the witnesses and of the weight to be assigned

5   to their testimony.  You may choose to disbelieve all or part

6   of any witness' testimony.  Any assumption that a witness will

7   speak the truth may be counteracted by the appearance and

8   conduct of the witness, by the manner in which the witness

9   testifies, by the character of the testimony given, or by

10  other evidence or testimony contrary to that witness'

11  testimony.

12          You should carefully scrutinize all the testimony

13  given, the circumstances under which each witness testified,

14  and other matters in evidence that tend to indicate whether a

15  witness' testimony is worthy of belief.  Consider each

16  witness' intelligence, motive, state of mind, interest in the

17  prosecution or defense of the case, and his or her demeanor

18  while on the stand.

19          Inconsistencies or discrepancies in the testimony of

20  a witness, or between the testimony of different witnesses,

21  might or might not cause you to discredit their testimony.

22  Two or more people witnessing an incident or transaction may

23  see or hear it differently, and innocent misrecollection, like

24  failure of recollection, is not an uncommon experience.  In

25  weighing the effect of a discrepancy, consider whether it

1  pertains to a matter of importance or to an unimportant

2  detail, and whether it results from innocent error on the one

3  hand, or intentional falsehood on the other.  You may also

4  consider whether the witness has an explanation for the

5  inconsistency and whether that explanation appeals to your

6  common sense.

7        If a witness is shown knowingly to have testified

8  falsely concerning any important matter, you have a right to

9  discredit that witness' testimony in other particulars, and

10  you may reject all the testimony of that witness or you may

11  assign it such weight as you think it deserves.

12        In determining the weight to be accorded a witness'

13  testimony, you may consider any demonstrated bias, prejudice

14  or hostility of that witness.

15        The testimony of a single witness is sufficient to

16  prove any fact, even if a greater number of witnesses

17  testified to the contrary, if after considering all of the

18  other evidence, you believe this witness.

19        Now the plaintiffs have the burden of proving each

20  essential element of their claims by a preponderance of the

21  evidence.  The defendants have the burden of proving the

22  defense that they are asserting by a preponderance of the

23  evidence.

24        Another way to say this is that the party with the

25  burden of proof on an issue must establish the claim by a fair

Charge of the Court                                383

1    preponderance of the credible evidence.  To establish a claim

2    by a preponderance of the evidence means to prove that

3    something is more likely so than not so.

4            In other words, a preponderance of the evidence

5    means that when you consider and compare it with the evidence

6    opposed to it -- let me read that again.

7            In other words, a preponderance of the evidence

8    means that, when you consider it and compare it with the

9    evidence opposed to it, convinces you that what is sought to

10   be proved is, more likely than not, true.

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Charge of the Court                                      384

1  (Continuing.)

2        THE COURT:  A preponderance of the evidence means

3  the greater weight of the evidence.  That does not mean the

4  greater number of witnesses or a greater length of time taken

5  by either side.  This determination is based on the quality

6  and persuasiveness of the evidence, the weight and effect it

7  has on your mind.

8        In determining whether a claim has been proved by a

9  preponderance of the evidence, you may consider the relevant

10 testimony of all witnesses regardless of which side called

11 them and all the relevant exhibits received in evidence

12 regardless of who may have produced them.  If you find that

13 the evidence produced by the party who does not have the

14 burden outweighs the evidence produced by the party who does

15 have the burden of proof, you must find in favor of the party

16 without the burden of proof and against the party with the

17 burden of proof.

18        If you find that the credible evidence on a given

19 issue is in balance or evenly divided between the parties,

20 that it is as probable that one side is right as it is that

21 the other side is right, then you must decide the issue

22 against the party having the burden of proof.  That is because

23 the party that has the burden of proof must prove more than

24 simple equality of the evidence.  He must prove the elements

25 at issue by a preponderance of the evidence.

1          On the other hand, the party with the burden of

2   proof does not have to prove more than a preponderance.  As

3   long as you find that the scales tip, however slightly, in

4   favor of the party with the burden of proof, that what he

5   claims is more likely true than not true, then that element

6   would have been proved by a preponderance of the evidence.

7          Some of you might have heard of proof beyond a

8   reasonable doubt, which is the standard in a criminal trial,

9   that requirement does not apply to a civil case like this one

10  and you should put it out of your mind.

11         You may have heard evidence during the trial that at

12  some earlier time a witness has said or done something which

13  counsel has argued is inconsistent with the witness's

14  testimony at trial.  If you find that a witness actually made

15  a prior inconsistent statement, you are not to consider that

16  prior statement as affirmative evidence in determining a

17  liability.  Evidence of a prior inconsistent statement was

18  offered for the limited purpose of helping you decide whether

19  to believe the trial testimony of the witness who contradicted

20  himself.  First, you should decide whether there was a prior

21  inconsistent statement.

22         Then, if you find that the witness made an earlier

23  statement that conflicts with his trial testimony you may

24  consider that fact in deciding how much of his trial

25  testimony, if any, to believe.  In making this determination,

1   you may consider whether the witness purposefully made a false

2   statement or whether it was an innocent mistake; whether the

3   inconsistency concerns an important fact or whether it had to

4   do with a small detail; whether the witness had an explanation

5   for the inconsistency and whether that explanation appealed to

6   your common sense.  It is exclusively your duty, based upon

7   all the evidence and your own good judgment, to determine

8   whether the prior statement was inconsistent, and if so how

9   much, if any, weight to give to the inconsistent statement in

10  determining whether to believe all or part of the witness's

11  testimony.

12          In evaluating the credibility of witnesses, you

13  should take into account any evidence that a witness may

14  benefit in some way from the outcome of the case.  For

15  example, both plaintiff and defendant have an interest in

16  prevailing at trial.  An interest in the outcome may create a

17  motive to testify falsely and may sway a witness to testify in

18  a way that advances his or her own interests.  Therefore, if

19  you find that any witness whose testimony you are considering

20  may have an interest in the outcome of the trial, then you

21  should bear that factor in mind when evaluating the

22  credibility of his testimony and accept it with great care.

23  Keep in mind, though, that it does not automatically follow

24  that testimony given by an interested witness is to be

25  disbelieved.  There are many people who, no matter what their

1    interest and the outcome of a case may be, will testify

2    truthfully.  It is for you decide, based on your perception

3    and common sense to what extent, if at all, the witness's

4    interest has affected his testimony.

5             Some of the testimony before you is in the form of

6    depositions which have been received into evidence.  A

7    deposition is simply a procedure where, prior to a trial, the

8    attorneys for one side may question a witness or an adversary

9    party under oath before a court stenographer.  This is part of

10   a pretrial discovery and each side is entitled to take

11   depositions.  You may consider the testimony of a witness

12   given in a deposition according to the same standards you

13   would use to evaluate the testimony of a witness given at

14   trial.

15            In reaching a verdict, you must bear in mind that

16   each defendant is to be considered separately, solely on the

17   evidence or lack of evidence presented against that defendant,

18   without regard for the liability of the other defendants.

19   Similarly, in reaching a verdict, you must bear in mind that

20   each plaintiff's claims are to be considered solely on the

21   evidence or lack of evidence presented in support of those

22   claims.

23            Okay, so this is part two about substantive law.  So

24   I will now instruct you as to the law governing the

25   plaintiff's claims.  The plaintiffs made claims under the New

1  York Labor Law and the Fair Labor Standards Act.  Because the

2  New York Labor Law and Fair Labor Standards Act are very

3  similar in application, I usually do not distinguish between

4  them in my instructions to you.  I will only point out

5  differences between the two laws when it's necessary to do so.

6          Now, plaintiffs have brought four categories of

7  claims each of which I will now briefly summarize and then I

8  will explain the law governing each claim in greater depth.

9  First, plaintiffs claim that defendants violated the Fair

10 Labor Standards Act and the New York Labor Law by failing to

11 pay them overtime at one and a half times the regular hourly

12 pay for all hours worked in excess of 40 hours in a single

13 week.

14         Second, plaintiffs claim that defendants violated

15 the New York Labor Law by failing to pay them spread of hours

16 compensation.  An employee is entitled to spread of hours

17 compensation on days that the employee's workday is longer

18 than ten hours.  Spread of hours compensation is equal to an

19 extra hour of pay at the minimum wage rate.

20         Third, plaintiffs claim that Defendants did not

21 provide them with accurate wage notices as required by the New

22 York Labor Law.

23         And finally, plaintiffs claim that Defendants did

24 not provide them with accurate wage statements as required by

25 the New York Labor Law.

Charge of the Court                           389

1          Now, the parties have stipulated or agreed as to the

2    overtime wages and spread of hours compensation owed to Wei

3    Gao, Zhenkai Sun and Charles Chipengule.  The parties have

4    also stipulated or agreed that Wei Gao, Zhenkai Sun and

5    Charles Chipengule did not receive proper wage notices or wage

6    statements.  Therefore, with respect to those plaintiffs, you

7    will need to determine only whether the defendant's Levy

8    Katanov, Sushi Fussion LLC, Sushi Fussion of 47th Street,

9    Inc., Sushi Fussion of Forest Hills, Inc. and Sushi Fussion

10   NYC were their employers.  The parties have stipulated to the

11   hours Yang Yang Gao worked at Sushi Fussion Express, Inc., but

12   they have not stipulated how much he earned at that

13   restaurant.  The parties have not stipulated as to Yang Yang

14   Gao's hours or how much he earned -- is this line correct?

15          MR. SCHWEITZER:  I don't think so, Your Honor.

16          THE COURT:  Okay, give me one minute.  We may have

17   failed to update one line in this.

18          (Pause in proceedings.)

19          THE COURT:  We needed to edit this instruction to

20   take into account additional factors the parties have agreed

21   on, as the version I was reading didn't reflect that.

22          Can the court reporter read the last part of the

23   record?

24          (Record read.)

25          THE COURT:  So, in that sentence, part of what I

1    read to you is inaccurate.  The sentence should read:  The

2    parties have not stipulated as to Yang Yang Gao's hours at

3    Sushi Fussion LLC's Forest Hills location or Main Glatt

4    Supermarket location and the parties have not stipulated as to

5    whether Yang Yang Gao received proper wage notices and wage

6    statements.  Accordingly, you will also need to decide how

7    many hours Yang Yang Gao worked at Sushi Fussion LLC's Forest

8    Hills location and Main Glatt Supermarket location, and

9    whether he received proper wage notices and wage statements

10   while working there.

11         You will also need to determine whether Yang Yang

12   Gao was a management employee, exempt from overtime

13   compensation, when he worked at Sushi Fussion LLC's Forest

14   Hills location and Main Glatt Supermarket location.  In

15   addition, you will need to decide whether Mr. Katanov, Sushi

16   Fussion LLC, Sushi Fussion of 47th Street, Inc., Sushi Fussion

17   of Forest Hills, Inc. and Sushi Fussion of NYC, Inc. were Yang

18   Yang Gao's employers when he worked at Sushi Fussion Express,

19   Inc.

20         Separately, you should also decide how much Yang

21   Yang Gao was paid and whether he received proper wage notices

22   and wage statements when he worked at Sushi Fussion Express,

23   Inc.

24         The defendants at this trial are several

25   corporations and an individual.  In order for you to find that

1   a defendant was liable to a plaintiff, you must find that that

2   defendant was that plaintiff's employer.  The parties disagree

3   about whether Leva Katanov was an employer of the plaintiffs.

4   The parties also disagree about whether four of the corporate

5   defendants, Sushi Fussion LLC, Sushi Fussion of 47th Street,

6   Inc., Sushi Fussion of Forest Hills, Inc., and Sushi Fussion

7   of NYC, Inc. are employers of plaintiffs.  A person or company

8   can be an employer because that defendant possessed control

9   over that plaintiff as an employee.  An employee may have a

10  single employer or may have multiple employers.  A person or a

11  company may be an employer even if his or it's control over

12  the employee is restricted, indirect or only occasional.  You

13  should consider the totality of the circumstances that

14  constitute the economic reality of the employer/employee

15  relationship.  The focus is on the economic reality of the

16  situation rather than technical concepts or job titles.  You

17  may consider several factors in determining whether a

18  defendant was a plaintiff's employer based on the defendant's

19  control of the employee.  No single factor is controlling and

20  you must make your decision based on the totality of the

21  circumstances.  Relevant factors include whether a defendant,

22  1, had the power to hire or fire the particular plaintiff; 2,

23  supervised or controlled the plaintiff's work schedule or

24  conditions of employment; 3, determined the plaintiff's rate

25  and method of pay -- of payment; and, 4, maintained the

1    plaintiff's employment records.

2          The factors I have just listed are not exhaustive.

3    You may also consider any other factors that you think are

4    relevant to determining whether a defendant had the power to

5    control the means and manner of a plaintiff's employment.

6          Evidence that an individual is an owner or officer

7    of a company, or otherwise makes corporate decisions that have

8    nothing to do with an employee's function, is insufficient to

9    demonstrate employer status.  Instead, to be an employer, an

10   individual defendant must possess control over a company's

11   operations in a manner that relates to a plaintiff's

12   employment.  Evidence showing an individual's authority over

13   management, supervision and oversight of a company's affairs

14   in general is relevant to the totality of the circumstances in

15   determining the individual's operational control of the

16   company employing the plaintiff employees.

17         An employee may also impose liability for violations

18   of the Fair Labor Standards Act and New York Labor Law, or on

19   other entities that are part of a single integrated

20   enterprise.  For example, a parent company and it's

21   wholly-owned subsidiary entities may be treated as a single

22   employer, or separate entities under common ownership and

23   management may be treated as a single employer.  Whether a

24   group of entities qualifies as a single integrated enterprise

25   turns on four factors.  First, inter-relation of operations;

1   second, centralized control of labor relations; third, common

2   management; and fourth, common ownership or financial control.

3   No factor is dispositive.

4           Each plaintiff has the burden to prove by a

5   preponderance of the evidence that each defendant was his

6   employer.

7           Okay, the next section goes to overtime pay claims.

8   Under the Fair Labor Standards Act and New York Labor Law, an

9   employer is required to pay certain employees at least one and

10  a half times the employee's regular rate for time that is

11  worked over 40 hours in a work week.  A work week is a fixed

12  and regularly repeating period of 168 hours; that is, seven

13  consecutive 24-hour days.  Put another way, if an employee

14  works more than 40 hours in one work week, the employer must

15  pay the employee the overtime rate of 1.5 times the regular

16  rate for all the time that's worked after the first 40 hours

17  and this is commonly known as time-and-a-half pay for overtime

18  work.

19          In order for the defendant's to be liable for

20  failing to pay overtime as required by law, the plaintiff must

21  prove by a preponderance of the evidence the following

22  elements:  First, the plaintiff must prove that he was

23  employed by the defendant; second, the plaintiff must prove

24  that he was employed in an enterprise that engaged in commerce

25  that had annual gross sales of at least $500,000; and third,

1    the plaintiff must prove the defendant failed to pay him time

2    and a half overtime wages for hours works in excess of 40 in

3    one or more work weeks.

4           Now, in regarding the first element, if you found

5    that a plaintiff was not an employee of a defendant, then the

6    defendant in question is not liable for any violations of the

7    minimum wage or overtime requirements.  The parties have

8    stipulated, or agreed, that defendants were all covered by the

9    Fair Labor Standards Act such that the second element is

10   satisfied for each defendant.

11          With respect to the third element, the plaintiff

12   must establish by a preponderance of the evidence that during

13   part or all of the time period he was employed by the

14   defendants, the defendants did not pay him the overtime amount

15   that is required by law.  The parties have stipulated as to

16   the hours worked and overtime wages owed to plaintiffs Charles

17   Chipengule, Wei Gao, and Zhenkai Sun, but you will need to

18   make findings to determine whether Yang Yang Gao was owed

19   overtime and, if so, how much.  The parties agree that Yang

20   Yang Gao was paid $750 per week at Sushi Fussion LLC's Forest

21   Hills location and $850 per week at Sushi Fussion LLC's Main

22   Street Glatt Supermarket location.  However, you will need to

23   decide how much Yang Yang Gao was paid at Sushi Fussion

24   Express, Inc.

25          To do this, you will need to start with the

1    determination of the hours Yang Yang Gao worked.  The parties

2    have stipulated or agreed on the number of hours that Yang

3    Yang Gao worked for Sushi Fussion Express, Inc., but the

4    parties dispute how many hours Yang Yang Gao worked for Sushi

5    Fussion LLC, so you will need to make findings about that one.

6              The number of hours an employee works in a day is

7    determined under what is called the continuous workday rule.

8    Under that rule, the workday begins when an employee begins to

9    engage in his principal activity or activities and it

10   continues until the completion of those activities.  It

11   includes all time within that period whether or not the

12   employee is engaged in work throughout the entire period.  An

13   employee's principal activities are the activities performed

14   as part of the regular work of an employee and in the regular

15   course of his or her employment.  A plaintiff may rely on the

16   defendant's payroll records to establish the time that he

17   worked and the compensation he was paid.  If the defendants

18   failed to keep accurate records, the plaintiff has satisfied

19   his burden if he proofs that he has in fact performed work for

20   which he was improperly compensated and he produces sufficient

21   evidence to show the amount and extent of that work as a

22   matter of just and reasonable inference.  The plaintiff's

23   burden is not high.  It's possible for the plaintiff to meet

24   his burden through estimates based on his own recollection.

25             Once the plaintiff satisfies his burden, the

1  defendant's may rebut that evidence, and may rebut with

2  evidence of the precise amount of work performed or with

3  evidence to negate the reasonableness of the inference to be

4  drawn from the plaintiff's evidence.

5          After determining how many hours Yang Yang Gao

6  worked, the next issue you must determine is how much Yang

7  Yang Gao was paid per hour by Sushi Fussion LLC, and Sushi

8  Fussion Express, Inc., and I will refer to that as the regular

9  rate of pay.

10         You may consider all of the evidence received at

11 trial when you determine regular rate of pay.  However, if you

12 find that the defendants did not keep and maintain the

13 required employment records, then Yang Yang Gao can meet his

14 burden by presenting sufficient evidence to show the amounts

15 he was paid as a matter of just and reasonable inference.

16 That means he may rely on his own testimony regarding his

17 recollection of what he was paid.  You should find he met his

18 burden of proof if you find that his testimony is credible and

19 provides a basis for a reasonable approximation of the wages

20 he was paid.  If you find that a plaintiff has satisfied that

21 burden, then the defendants have the burden to show the

22 inferences drawn from the testimony are unreasonable.

23         Now, before you decide Yang Yang Gao's regular rate

24 of pay, you must first decide whether he was paid on an hourly

25 basis, or if he was paid a salary or a flat rate for an agreed

1    upon period of time.  If you find that Yang Yang Gao was paid

2    at an hourly rate, then you don't have to do any math to

3    determine his regular rate of pay.  The rate he was paid per

4    hour is his regular rate of pay.  However, if you determine

5    that Yang Yang Gao was paid a flat amount to cover an

6    agreed-upon period of time; for example, flat monthly pay,

7    then you must convert his rate to into a weekly rate and then

8    divide his weekly rate by the lesser of 40 hours or the actual

9    number of hours he worked that week to determine his regular

10   rate of pay, rounding to the nearest cent.

11          Let me give you an example of such a calculation

12   now.  If you find that the plaintiff was paid a flat monthly

13   rate, you would follow the following steps to find the rate he

14   was paid.  First, you would convert plaintiff's monthly salary

15   to a yearly salary by multiplying it by 12 months per year,

16   then you would divide his yearly salary by 52 weeks per year

17   to get his weekly salary.

18          For example, if the plaintiff earned $866.67 per

19   month, you would multiply that number 866.67 by 12 months per

20   year to arrive at a yearly rate of $10,400, and then you would

21   divide $10,400 by 52 weeks per year and you would arrive at a

22   weekly salary rate of $200 per week.  Once you have the

23   plaintiff's weekly rate of pay, you would divide his weekly

24   salary by the lesser of 40 hours or the actual number of hours

25   he worked that week.  The resulting number, rounded to the

1    nearest cent, is his regular rate of pay.

2           Continuing our example, the plaintiff earns $200 for

3    a week in which he worked 25 hours per week, then you would

4    divide 200 per week by 25 hours and you would find a rate of

5    $8 per hour.  If, on the other hand, plaintiff earned $200 for

6    working a 50-hour week, you would divide $200 by 40 hours per

7    week because 40 is less than 50 and you would arrive at an

8    hourly rate of $5 per hour.

9           An employee must be paid at a rate of at least one

10   and one-half times either the employees regular rate of pay or

11   the statutory minimum wage, whichever is greater, for all

12   overtime hours.  Because the applicable minimum wage in the

13   New York Labor Law was the same or higher than the federal

14   minimum wage during the relevant period, and because

15   plaintiffs cannot recover twice for the same overtime wage

16   violations under both federal and state law, you will be

17   applying the minimum wage rate under the New York Labor Law.

18          Under New York Labor Law, the applicable minimum

19   wages were as follows -- and there's a chart that I will give

20   you, obviously, but for the period as of January 1st of 2011

21   through December 30 of 2013, the minimum wage was 7.25 per

22   hour.  From December 31st, 2013 to December 30th, 2014, the

23   minimum wage was $8 per hour.  From December 31, 2014 through

24   defense 30, 2015, the minimum wage was $875 -- sorry, $8.75.

25   And from December 31, 2015 through December 30, 2016, the

Charge of the Court                              399

1    minimum wage was $9 per hour.

2            If you find that Yang Yang Gao's regular wage rate

3    was less than or equal to the minimum wage, then overtime

4    should be calculated based on the legal minimum wage that he

5    was entitled to receive for the time period in question and

6    not on what Yang Yang Gao was actually paid.  In that case the

7    overtime wage is -- the overtime rate is 1.5 times the

8    statutory minimum wage.  If you find that Yang Yang Gao's

9    regular rate of pay exceeds the applicable minimum wage then

10   you would determine his overtime rate by multiplying his

11   regular rate of pay by 1.5 which increases it by 50 percent.

12           Okay.  The next instruction is about exempt

13   employees.

14

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

1    (Continuing.)

2         THE COURT:  The defendants' claim that they were not

3    required to pay Yang Yang Gao overtime for his work at Sushi

4    Fussion, LLC's Forest Hills location and Sushi Fussion, LLC's

5    Main Glatt Supermarket location because he was not in the

6    category of employees who were covered by the overtime law.

7    In other words, defendants say that Mr. Gao was an exempt

8    executive employee, and I will define for you what it means to

9    be a exempt executive employee.

10         An executive employee is exempt from the overtime

11   payment requirements under the FLSA and New York Labor Law.

12   In other words, employers do not have to pay overtime to

13   executive employees.  In order for the defendants to establish

14   that plaintiff was an executive employee exempt from the

15   FLSA's overtime requirements, the defendants must prove by a

16   preponderance of the evidence the following elements:

17         First, that the plaintiff was paid a certain minimum

18   salary; second, that the plaintiffs primary duties were

19   management of the enterprise in which he was employed or

20   management of a customarily recognized department or

21   subdivision of that enterprise; third, the plaintiff

22   customarily and regularly directed the work of two or more

23   other employees; and, fourth, that the plaintiff had the

24   authority to hire and fire other employees or the plaintiff's

25   suggestions and recommendations as to the hiring, firing,

1  advancement, promotion or any other change of status of other

2  employees are given particular weight.

3          To establish that the plaintiff was an executive

4  employees exempt from the New York Labor Law's overtime

5  requirements, the defendants must prove by preponderance of

6  the evidence those four elements and also fifth element that

7  the plaintiff customarily and regularly exercises the

8  discretionary powers.

9          Let me explain those first four elements in a little

10 more detail.

11         So the first element, as I said, is that the

12 defendant must prove that the plaintiff was paid at least a

13 certain minimum salary, and there's a table for that salary

14 that you will have that it's set.  It's from January 1st,

15 2011, through December 30, 2013, a salary of $543.75 per week;

16 from December 31st, 2013, through December 30, 2014, the

17 minimum salary was $600 per week; from December 31st, 2014,

18 through December 30, 2015, it was minimum salary of $656.26

19 per week; and from December 31st, 2015, through December 30,

20 2016, it's a minimum salary of $675 per week.

21         An employer that maintains the discretion to reduce

22 an employee's compensation as a result of the employee's hours

23 or the quality of the employee's work may not consider the

24 employee to be paid on a salary basis.  However, an employer

25 only maintains such discretion for purposes of this question

1   if the employer has an actual practice of making deductions

2   based on an employee's hours or the quality of the employee's

3   work, or if the employer has a clear and particularized policy

4   that effectively communicates that deductions will be made in

5   specified circumstances.

6           The second element of this management exemption is

7   that the plaintiffs' primary duties or management of the

8   enterprise in which he was employed, or management of a

9   customarily recognized department or subdivision of the

10  enterprise.

11          Primary duty means the principal, main, major or

12  most important duty that the employee performs.  In order to

13  determine an employee's primary duty, you must consider all

14  the facts in the case with a major emphasis on the character

15  of the employee's job as a whole.  Factors to consider when

16  determining the primary duty of an employee include, but are

17  not limited to, the relative importance of the exempt duties

18  as compared with other types of duties; the amount of time

19  spent performing exempt work; the employee's relative freedom

20  from direct supervision; and the relationship between the

21  employee's salary and the wages paid to other employees for

22  the kind of nonexempt work performed by the employee.

23          The amount of time performing spent performing

24  exempt work can be a useful guide in determining whether

25  exempt work is the primary duty of an employee.  Thus,

1    employees who spend more than 50 percent of their time

2    performing exempt work will generally satisfy the primary duty

3    requirement.  Time alone, however, is not the sole test.  It's

4    not necessary for exempt employees to spend more than

5    50 percent of their time performing exempt work.  Employees

6    who do not spend more than 50 percent of their time performing

7    exempt duties may nonetheless meet the primary duty

8    requirement if the other factors support such a conclusion.

9              The following are some examples of management

10   activities.  Now, these examples are not exclusive.  Some

11   examples are interviewing, selecting, and training of

12   employees; setting and adjusting their rates of pay and hours

13   of work; directing the work of employees; maintaining

14   production or sales records for use in supervision or control;

15   appraising employees' productivity and efficiency for the

16   purpose of recommending promotions or other changes in status;

17   handling employee complaints and grievances; disciplining

18   employees; planning the work; determining the techniques to be

19   used; apportioning the work among employees; determining the

20   type of materials, supplies, machinery, equipment, or tools to

21   be used or merchandise to be bought, stocked, and sold;

22   controlling the flow and distribution of materials or

23   merchandise and supplies; providing for the safety and

24   security of the employees or the property; planning and

25   controlling the budget; and monitoring or implementing legal

1    compliance measures.

2            The third element of this exempt employee issue is

3    that the plaintiff customarily and regularly directed the work

4    of two or more other employees.  "Customarily and regularly"

5    means a frequency that must be greater than occasional, but

6    which of course may be less than constant.  Tasks or work

7    performed customarily and regularly includes work normally and

8    recurrently performed every workweek.  It does not include

9    isolated or one-time tasks.  The phrase "a customarily

10   recognized department or subdivision" is intended to

11   distinguish between a mere collection of employees assigned

12   from time to time to a specific job or series of jobs, and a

13   unit with permanent status and function.  A customarily

14   recognized department of subdivision must have a permanent

15   status and a continuing function.

16           The phrase "two or more other employees" means two

17   full-time employees or their equivalent.  One full-time and

18   two half-time employees, for example, are equivalent to two

19   full-time employees.  Four half-time employees are also

20   equivalent to two full-time employees.  The supervision can be

21   distributed among two, three, or more employees, but each such

22   management employee must customarily and regularly direct the

23   work of two or more other full-time employees or the

24   equivalent.  Thus, for example, a department with five

25   full-time nonexempt workers may have up to two exempt

1   supervisors if each such supervisor customarily and regularly

2   directs the work of two of those workers.  An employee who

3   merely assists the manager of a particular department and

4   supervises two or more employees only in the actual manager's

5   absence does not meet this requirement.

6            The fourth element is that the plaintiff had the

7   authority to hire and fire other employees, or that the

8   plaintiffs' suggestions and recommendations as to the hiring,

9   firing, advancement, promotion, or other change of status of

10  other employees are given particular weight.  To determine

11  whether an employee's suggestions and recommendations are

12  given particular weight, factors to be considered include, but

13  are not limited to, whether it is part of the employee's job

14  duties to make such suggestions and recommendations; the

15  frequency with which such suggestions and recommendations are

16  made or requested; and the frequency with which the employee's

17  suggestions and recommendations are relied on.  Generally, an

18  executive's suggestions and recommendations must pertain to

19  employees whom the executive customarily and regularly

20  directs.  It does not include an occasional suggestion with

21  regard to the change and status of the co-worker.  An

22  employee's suggestions and recommendations may still be deemed

23  to have particular weight even if a higher level manager's

24  recommendation has more importance, and even if the employee

25  does not have the authority to make the ultimate decision as

1   to the employee's change of status.

2          The issue before you is not whether it was necessary

3   to have more than one manager or whether it was a wise

4   business decision to staff a location in a way that defendants

5   did.  There's no limit to how many executive employees can be

6   in a company.  In other words, a company can have more than

7   one executive employee at the same time.

8          If the defendant proves all of the elements of the

9   executive exemption defense by a preponderance of the

10  evidence, then you must find that the employee is exempt from

11  the overtime pay requirement.

12         The next instruction is about spread-of-hours

13  compensation.

14         The New York Labor Law requires that an employer pay

15  an employee one additional hour of pay at the basic minimum

16  hourly rate on each day during which the spread of hours

17  exceeds ten.  The spread of hours is the length of the

18  interval between the beginning and the end of an employee's

19  workday, including any working time or breaks.  For example,

20  if an employee began work at 9:00 a.m., took a one-hour lunch

21  break from 12:00 noon to 1:00 p.m. and then finished work at

22  8:00 p.m., then the employee's spread of hours would be 11

23  hours.  The employee would be entitled to an additional hour

24  of pay at the basic New York Labor Law minimum hourly rate.

25         The parties have stipulated -- or agreed -- about

1  the spread-of-hours compensation owed to Wei Gao, Zhenkai Sun,

2  and Charles Chipengule, so you need to decide only if Yang

3  Yang Gao is entitled to unpaid spread-of-hours compensation.

4  If you find by a preponderance of the evidence that Yang Yang

5  Gao worked a spread of hours that exceeded ten hours, you will

6  need to determine also the number of days on which this

7  occurred.

8       The next instruction is about wage notices.

9       Plaintiffs claim that defendants violated a

10  provision of the New York Labor Law that requires employers to

11  provide employees a written notice of their wages.

12       The parties have stipulated that Wei Gao, Zhenkai

13  Sun, and Charles Chipengule were not provided with proper wage

14  notices.  You need decide only if Yang Yang Gao was provided

15  with a proper wage notice.

16       The New York Labor Law requires employers to provide

17  employees within ten business days of the start of employment

18  a written notice containing the following information:  the

19  rate or rates of pay and basis thereof, whether paid by the

20  hour, shift, day, week, salary, piece, commission, or other;

21  allowances, if any, claimed as part of the minimum wage,

22  including tip, meal, or lodging allowances; the regular pay

23  day designated by the employer; the name of the employer; any

24  "doing business as" names used by the employer; the physical

25  address of the employer's main office or principal place of

1    business, and a mailing address if different; and the

2    telephone number of the employer.  The notice must be provided

3    in English and in the language identified by the employee as

4    his primarily language.

5         If you find by a preponderance of the evidence that

6    defendants did not provide the proper notice to Yang Yang Gao,

7    you should state the number of days that the defendant failed

8    to provide this notice to each plaintiff or to the plaintiff.

9         The next instruction is about wage statements.  The

10   plaintiffs also claim that the defendants failed to give them

11   wage statements that they were required to provide under New

12   York law.

13        The parties have stipulated that Wei Gao, Zhenkai

14   Sun, and Charles Chipengule were not provided proper wage

15   statements, but you will need to decide if Yang Yang Gao was

16   provided proper wage statements.

17        New York law requires employers to provide employees

18   a written wage statement with every payment of wages that

19   contain certain information.  For all employees, the wage

20   statement has to include the dates of work covered by the

21   payment of wages; the name of the employee; the name of the

22   employer; the address and phone number of the employer; the

23   rate or rates of pay and basis of those wages, whether paid by

24   the hour, shift, day, week, salary, piece, commission, or

25   other; gross wages; deductions; allowances, if any, claimed as

1   part of a minimum wage; and net wages.  Wage statements for

2   employees who are not exempt from overtime compensation must

3   also state the regular hourly rate or rates of pay; the

4   overtime rate or rates of pay; the number of regular hours

5   worked; and the number of overtime hours worked.

6           In order to prevail on a wage statement claim, a

7   plaintiff must prove by a preponderance of the evidence the

8   defendants did not give him the required wage statement with

9   at least one wage payment.

10          If you find that plaintiff Yang Yang Gao was not

11  provided with proper wage statements, you must also determine

12  how many weeks Yang Yang Gao did not receive the proper wage

13  statements.

14          Okay.  The next instruction is about good faith.  If

15  you find that any defendants were employers of Wei Gao,

16  Zhenkai Sun, or Charles Chipengule, that defendants were

17  employers of Yang Yang Gao and Sushi Fussion Express and

18  failed to pay him overtime or spread-of-hours compensation, or

19  that defendants failed to pay Yang Yang Gao overtime or

20  spread-of-hours compensation at Sushi Fussion, LLC, and that

21  Yang Yang Gao was not exempt, then you will need to determine

22  whether the defendants acted in good faith.

23          I will now instruct you on how to determine if the

24  defendants acted in good faith.

25          To act in good faith is to act with an objectively

1   reasonable grounds for believing that certain acts or

2   omissions did not violate the law.  It is the defendants'

3   burden to establish good faith.  It is not enough for

4   defendants to claim that they did not know that their acts or

5   omissions violated the law.  To establish good faith, the

6   defendants must prove that they took active steps to ascertain

7   the dictates of the law, and that they then took action to

8   comply with the law as they understood it.

9            Okay.  The last section is closing instructions.

10           I've now outlined for you the rules of law

11   applicable to this case, the process by which you weigh the

12   evidence and determine the facts and the legal elements, which

13   must be proved by a preponderance of the evidence.  In a few

14   minutes, you will retire to the jury room for your

15   deliberations.  I'm going to give you some general rules about

16   your deliberations.

17           Keep in mind that nothing I have said in these

18   instructions is intended to suggest to you in any way what I

19   think your verdict should be.  That is entirely for you to

20   decide.  By way of reminder, I charge you once again that it

21   is your responsibility to judge the facts in this case from

22   the evidence presented during the trial and to apply the law

23   as I have given it to you.  Remember also that your verdict

24   must be based solely on the evidence in this case and the law

25   as I have given it to you and not on anything else.

1          Foreperson.

2          In order for your deliberations to proceed in an

3    orderly fashion, you must have a foreperson.  The custom in

4    this Court is for Juror Number 1 to be the foreperson, but if

5    when you begin deliberations you decide that you want to elect

6    another foreperson, you are welcome to do so.  The foreperson

7    will be responsible for signing all communications to the

8    Court and for handing them to the deputy marshal during your

9    deliberations, but, of course, the foreperson's vote is

10   entitled to no greater weight than that of any other juror.

11         Communications with the Court.

12         It is very important that you not communicate with

13   anyone outside the jury room about your deliberations or about

14   anything touching on this case.  There's only one exception to

15   that rule.  If it becomes necessary during your deliberations

16   to communicate with me, you can send me a note through the

17   deputy marshal signed by your foreperson.  No member of the

18   jury should attempt to communicate with me except by assigned

19   writing, and I will never communicate with any member of the

20   jury on any subject touching on the merits of the case other

21   than in writing or orally here in open court.

22         Juror's recollection governs and requests for trial

23   testimony.

24         Your recollection governs.  Nobody else's.  If, in

25   the course of your deliberations, your recollection of any

1   part of the testimony should fail or you should find yourself

2   in doubt concerning my instructions on the law, you can

3   request that a witness or witnesses' testimony, or portions

4   thereof, be sent back to you in the jury room.  Again, you

5   would make such a request by a note to the deputy marshal, but

6   I suggest that you be specific to avoid receiving testimony

7   that you don't want or don't need.  Describe as best and

8   precisely as you can what you want to hear and be patient

9   because sometimes it takes a little while for us to find that

10  testimony in the record.

11            Deliberations.

12            Your duty is to reach a fair conclusion from the law

13  and the evidence.  It is an important one.  When you are in

14  the jury room, listen to each other and discuss the evidence

15  and issues in the case amongst yourselves.  It's the duty of

16  each of you as jurors to consult with one another and to

17  deliberate with a view toward reaching an agreement on a

18  verdict, if you can do so without violating your individual

19  judgment and conscience.  While you should not surrender

20  conscientious convictions of what the truth is and of the

21  weight and effect of the evidence, and while each of you must

22  decide the case for yourself and not merely acquiesce in the

23  conclusion of fellow jurors, you should examine the issues and

24  the evidence before you with candor and frankness and with

25  proper deference to and regard for the opinions of your fellow

1   jurors.

2          You should not hesitate to reconsider your opinions

3   from time to time and to change them if you are convinced they

4   are wrong.  However, do not surrender an honest conviction as

5   to the weight and effect of the evidence simply to arrive at a

6   verdict.

7          The decision you reach must be unanimous; so you all

8   have to agree.

9          When you have reached a verdict, simply send me a

10  note signed by your foreperson indicating that you have

11  reached a verdict, but please do not indicate what the verdict

12  is.  In no communication to the Court should you give a

13  numerical count of where the jury stands in its deliberation.

14         Remember in your deliberations that the dispute

15  between the parties is for them no passing matter.  They and

16  the Court rely upon you to give full an conscientious

17  deliberation and consideration to the issues and evidence

18  before you.  By doing so, you carry out to the fullest your

19  oaths as jurors to well and truly try the issues of this case

20  and to render a true verdict.

21         Once you have reached your verdict, you will record

22  your decisions on the verdict sheets that I prepared for you.

23  You should proceed through the questions on the verdict sheet

24  in the order in which they are listed, and the foreperson

25  should complete the verdict sheet, date it, and sign it.  The

1    foreperson should then give a note to the marshal outside your

2    door stating that you have received a verdict.  Don't specify

3    what your verdict is in the note.  The foreperson should keep

4    the verdict sheet until I ask you for it.  You must be all in

5    agreement with the verdict if it's announced in court.

6              I will ask you to wait for a few moments while I

7    discuss with counsel if there's anything else that you need to

8    be charged with.

9              Do you guys want to approach?

10             (Sidebar.)

11             (Continued on next page.)

*Sidebar*                                                                    415

1          (Sidebar conference held on the record out of the

2      hearing of the jury.)

3               MR. SAMUEL:  We have nothing to add.

4               MR. SCHWEITZER:  We have nothing to add.

5               THE COURT:  I'm planning to send back the exhibits,

6      a copy of the charge and the verdict sheet and the

7      stipulations.

8               MR. SAMUEL:  Okay.

9               THE COURT:  Make sense to everybody?

10              MR. SCHWEITZER:  Yes.

11              (Sidebar conference ends.)

12              (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                           416

1           (In open court.)

2           THE COURT:  Great.  So thank you.  We're going to

3    send you back to the jury room to deliberate.  We're going to

4    also send you copies of the exhibits, a copy of the verdict

5    sheet, a copy of my instructions on the law, and a copy of the

6    stipulation which reflects the facts of which all the parties

7    have agreed.

8           As I indicated in the instructions, if you want

9    testimony read back to you at any point, you can send me a

10   note about that.

11          It's now around 3:00, so my thought is if you can

12   deliberate until 4:30, I recognize that you may need more time

13   than that, so I assume that you will all call it a day at 4:30

14   and come back tomorrow if you haven't reached a verdict then.

15   But if 4:30 comes around and you tell me, we want to stay and

16   work on this today, we think we're close enough, send me a

17   note to that effect and we can accommodate that too.

18          Thanks, everybody.

19          THE COURTROOM DEPUTY:  Marshal, please raise your

20   right hand.

21          (Marshal sworn.)

22          THE MARSHAL:  I will.

23          THE COURTROOM DEPUTY:  Thank you, marshal.

24          (The jury retired to commence deliberations at 2:57

25   p.m.)

*Proceedings*                                            417

1           (In open court; jury not present.)

2           (Court's Exhibit 2 received in evidence.)

3           THE COURT:  Okay.  So we have a note from the

4    jurors.  The note says:  "Can we get the written instructions

5    and the verdict sheet.  We only have the exhibits and

6    stipulations."  So with the parties' permission, I have gone

7    ahead and sent the instructions and the verdict sheet back.

8           That's it.  I'm sorry you had to come all the way up

9    for that.

10          (Court in recess awaiting the verdict of the jury.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings* 418

1       (In open court; jury not present.)

2       (Court's Exhibit 3 and 4 received in evidence.)

3       THE COURTROOM DEPUTY:  All rise.

4       THE COURT:  Please be seated.

5       THE COURTROOM DEPUTY:  Judge, two notes.

6       THE COURT:  Okay.  So we have two notes.  Note

7    number one:  "Can you please clarify what Michael Yagudaev's

8    defaulting means and what results from that?"

9       Note two:  "Is there an error in the verdict sheet?"

10   -- which I'd ask Jason to check -- "after one seven and one

11   eight it suggests we skip to the end.  This seems to ignore

12   calculations for the years prior to 10/20/2013.  Are the years

13   Yang Yang Gao worked for SF, LLC, not part of this case?"

14      THE CLERK:  Will you read that note again, Judge?

15      THE COURT:  Here it is.

16      THE CLERK:  Sure.  Thank you.

17      THE COURT:  So what do you parties think about what

18   the response should be on these?

19      MR. SCHWEITZER:  For note 3, there is an error in

20   the verdict sheet that the instruction was supposed to have

21   been stricken.

22      THE CLERK:  Which instruction was supposed to have

23   been stricken?

24      MR. SCHWEITZER:  The one between Section 1 and

25   Section 2.

*Proceedings*                                                           419

 1              THE CLERK:  Okay.

 2              THE COURT:  Yes.  So we are just going to delete

 3     that whole --

 4              THE CLERK:  Do you want me to reprint and give them

 5     a corrected version?

 6              THE COURT:  Yes.  All right.  So what I've done is

 7     delete that bolded text at the end of sheet one before sheet

 8     two.

 9              Are we all in agreement about that?

10              MR. SAMUEL:  Yes.

11              MR. SCHWEITZER:  Yes.

12              THE COURT:  So we are going to reprint that.

13              So I'm writing a physical note that says, "Response

14     to note.  Yes, there is an error in the verdict sheet.  Please

15     use" -- can you write on there, Jason -- sorry -- somewhere on

16     that document or write on the physical document "revised"?

17              THE CLERK:  Can I write it in pen?

18              THE COURT:  Yes.

19              Please use the attached revised verdict sheet.

20              I'm giving you this note and then you can put that

21     note on the verdict sheet and we can go ahead and give that

22     back to the jurors.

23              THE COURTROOM DEPUTY:  Sure, Judge.

24              THE COURT:  Okay.  So what do you parties think with

25     respect to the question about Mr. Yagudaev?

1          MR. SCHWEITZER:  A defaulting defendant admits the

2     allegations against him, admits to liability -- excuse me --

3     and permits the Court to find damages.  It is your task to

4     decide what the factual allegations made against Mr. Yagudaev

5     and his companies with respect to Yang Yang Gao are.  The

6     parties have stipulated to what those allegations are with

7     respect to the other plaintiffs.

8          THE COURT:  Are you in agreement with that?  Or is

9     there something else that you want?

10         MR. BERESIN:  Your Honor, defense -- we feel that it

11    means that Mr. Yagudaev is subject to a default judgment being

12    entered against him in which he would be liable to the

13    plaintiffs for the claims against him.  It doesn't have

14    anything to do with our client.

15         THE COURT:  All right.  So give me your proposed

16    language again, and I will ask if there's an objection to the

17    proposed language.  I've got -- I write slower than you speak,

18    but I've got:  A defaulting defendant admits the allegations

19    against him.

20         MR. SCHWEITZER:  And permits the Court to -- excuse

21    me -- and permits the Court to find liability and damages

22    against him.  The parties have stipulated to the amount of

23    damages with respect to Wei Gao, Zhenkai Sun, and Charles

24    Chipengule.  It is your task to determine what, if any --

25    excuse me -- the facts underlying --

*Proceedings*                                                421

1      THE COURT:  The parties have stipulated to the

2  amount of --

3      MR. SCHWEITZER:  -- damages for Wei Gao, Charles

4  Chipengule, and Zhenkai Sun.  It is your task to find what the

5  factual allegations are supporting damages against --

6      THE COURT:  I want to try to streamline this.  So

7  "Can you please clarify what Michael Yagudaev's defaulting

8  means and what results from that?"  So I think as to that, it

9  is sufficient to say a defaulting defendant -- as to what it

10  means, can I say:  A defaulting defendant does not participate

11  in -- a defaulting defendant chooses not to participate --

12      MR. SCHWEITZER:  Yes.

13      THE COURT:  -- in the litigation of the case?

14      MR. SCHWEITZER:  Yes.

15      THE COURT:  So how about:  A defaulting defendant

16  chooses not to participate in the litigation of a case.  A

17  defaulting defendant admits the allegations against him and

18  permits the Court to find liability and damages against him.

19      MR. SCHWEITZER:  That's fine.

20      THE COURT:  Okay.

21      Is that okay with you?

22      MR. SAMUEL:  Yeah.

23      THE COURT:  Will you type it up?

24      Just so you know what it says, "A defaulting

25  defendant chooses not to participate in the litigation of a

*Proceedings*                                                        422

1    case.  A defaulting defendant admits the allegations against

2    him and permits the Court to find liability and damages

3    against him."

4              MR. SCHWEITZER:  No objection.

5              THE COURT:  Okay.

6              (Court in recess awaiting the verdict of the jury.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                           423

1              (In open court; jury not present.)

2              (Court's Exhibit 5 received in evidence.)

3              THE COURT:  So we've got a note, and it says we've

4     reached a verdict, so I'm going to call the jurors back and

5     ask for their verdict form.

6              THE COURTROOM DEPUTY:  Okay, Judge.

7              (Jury enters.)

8              MR. SAMUEL:  Can we just wait one minute for my

9     client to come?

10             THE COURT:  Sure.

11             MR. SAMUEL:  He's coming upright now.

12             THE COURT:  Okay.

13             (Pause.)

14             MR. SAMUEL:  Can I step out for a minute?

15             THE COURT:  Sure.

16             (Pause.)

17             MR. SAMUEL:  He'll be here in 30 seconds.

18             THE COURT:  Okay.  Great.

19             (Pause.)

20             THE COURT:  Okey dokey.  So I understand the jury

21    has reached a verdict; is that right?

22             THE JURY FOREPERSON:  Yes.

23             THE COURT:  Great.  I'll have Mr. Chan take the

24    verdict sheet.

25             THE COURTROOM DEPUTY:  Mr. O'Donnell?

*Proceedings*                                                     424

1          Thank you.  Thank you so much.

2          (Pause.)

3          THE COURT:  Will you read the verdict form from

4    jury?

5          THE COURTROOM DEPUTY:  Sure, Judge.

6          Zhenkai Sun, Wei Gao, Yang Yang Gao, also known as

7    Eddie Gao, and Charles Chipengule, on behalf of themselves and

8    others similarly situated against Sushi Fussion Express,

9    Incorporated, et al., 16-CV-4840.

10          Issue I:  Employer Status.

11          Question 1:  Were the following defendants Wei Gao's

12    employer, either directly or as part of a single integrated

13    enterprise?

14          As to Sushi Fussion, LLC:  No.

15          As to Sushi Fussion of 47th Street, Inc.:  No.

16          As to Sushi Fussion of Forest Hills, Inc.:  No.

17          As to Sushi Fussion of New York City, Inc.:  No.

18          Question 2:  Was Leva Katanov a/k/a Levi Katanov

19    a/k/a Leo Katanov Wei Gao's employer?  Answer:  No.

20          Question 3:  Were the following defendants Zhenkai

21    Sun's employer either directly or as part of a single

22    integrated enterprise?

23          As to Sushi Fussion, LLC:  No.

24          As to Sushi Fussion of 47th Street, Inc.:  No.

25          As to Sushi Fussion of Forest Hills, Inc.:  No.

1          As to Sushi Fussion of New York City, Inc.:  No.

2          Question 4:  Was Leva Katanov a/k/a Levi Katanov

3     a/k/a Leo Katanov Zhenkai Sun's employer?  Answer:  No.

4          Question 5:  Were the following defendants Charles

5     Chipengule's employer either directly or as part of a single

6     integrated enterprise?

7          As to Sushi Fussion, LLC:  No.

8          As to Sushi Fussion of 47th Street, Inc.:  No.

9          As to Sushi Fussion of Forest Hills, Inc.:  No.

10         As to Sushi Fussion of New York City, Inc.:  No.

11         Question 6:  Was Leva Katanov a/k/a Levi Katanov

12    a/k/a Leo Katanov Charles Chipengule's employer?  Answer:  No.

13         Question 7:  The parties have stipulated that Sushi

14    Fussion, LLC, employed Yang Yang Gao through October 19, 2013.

15    Were the following defendants Yang Yang Gao's employer either

16    directly or as part of a single integrated enterprise after

17    October 19th, 2013?

18         As to Sushi Fussion, LLC:  No.

19         As to Sushi Fussion of 47th Street, Inc.:  No.

20         As to Sushi Fussion of Forest Hills, Inc.:  No.

21         As to Sushi Fussion of New York City, Inc.:  No.

22         Question 8:  The parties have stipulated that Leva

23    Katanov a/k/a Levi Katanov a/k/a Leo Katanov employ Yang Yang

24    Gao through October 19th, 2013.  Was Leva Katanov a/k/a Levi

25    Katanov a/k/a Leo Katanov Yang Yang Gao's employer after

*Proceedings*                                        426

 1   October 19th, 2013?  Answer:  No.

 2          Issue II:  Overtime.

 3          Question 1:  How many hours did Yang Yang Gao work

 4   per week at Sushi Fussion LLC's Forest Hills location?  If the

 5   number of hours per week changed, please note when it changed

 6   and what it changed to.  The answer is 63.

 7          How many hours did Yang Yang Gao work per week at

 8   Sushi LLC's Main Glatt Supermarket Location?  If the number of

 9   hours per week changed, please know when it changed and what

10   it changed to.  Answer:  63.

11          Question 2A:  Was Yang Yang Gao paid on an hourly

12   basis at Sushi Fussion Express, Inc., or was he paid salary or

13   flat rate for agreed-upon period of time?  He was paid salary

14   or flat rate.

15          Question 2B, skip.

16          2C:  If you found that Yang Yang Gao was paid a

17   salary or flat rate at Sushi Fussion Express, Inc., what was

18   the dollar amount and unit time (days, weeks, months, or

19   years) that Yang Yang Gao was paid at Sushi Fussion, LLC?

20   $750 per week and $800 per week at the Forest Hills

21   supermarket.

22          Question 3:  During Yang Yang Gao's employment, did

23   he work overtime hours at Sushi Fussion, LLC, Forest Hills

24   location that is more than 40 hours per week?  Answer:  Yes.

25          Question 4:  During Yang Yang Gao employment, did he

*Proceedings*                                                    427

1   work overtime hours at Sushi Fussion LLC's Main Glatt

2   Supermarket Location that is more than 40 hours per week?

3   Answer:  Yes.

4          Question 5:  How many overtime hours, if any, did

5   Yang Yang Gao work per week at Sushi Fussion LLC's Forest

6   Hills location?  Subtract 40 hours from the number of hours

7   found in response to question 11.1.  If the number of hours

8   per week changed, please note when they change and what it's

9   changed to.  23 hours.

10         How many overtime did Yang Yang Gao work per week,

11  if any, at Sushi Fussion LLC's Main Glatt Supermarket

12  location?  Subtract 40 hours from the number of hours found in

13  response to question 11.1.  If the number of hours per week

14  changed, please note when they changed and when it changed to.

15  The answer is 23 hours.

16         Question 6:  Was Yang Yang Gao paid at least 1.5

17  times the greater of the minimum wage or his regular rate of

18  pay for each overtime hour at Sushi Fussion LLC's Forest Hills

19  location?  Answer:  No.

20         Question 7:  Was Yang Yang Gao paid at least 1.5

21  times the greater of the minimum wage of his regular rate of

22  pay for such overtime at Sushi LLC's Main Glatt Location?

23  Answer:  No.

24         Question 8:  The parties have stipulated that Yang

25  Yang Gao worked more than 40 hours per week at Sushi Fussion

*Proceedings*                                                                428

1   Express, Inc.  Was Yang Yang Gao paid at least 1.5 times the

2   greater of the minimum wage of his regular rate of pay for

3   each overtime hour at Sushi Fussion Express, Inc.?  Answer:

4   No.

5            Question 9:  Was Yang Yang Gao an executive employee

6   at Sushi Fussion LLC's Forest Hills location who was exempt

7   from receiving overtime under the Fair Labor Standard Act?

8   Answer:  No.

9            Was Yang Yang Gao an executive employee at Sushi

10  Fussion LLC's Forest Hills location who was exempt from

11  receiving overtime under the New York Labor Law?  Answer:  No.

12           Question 10:  Was Yang Yang Gao an executive

13  employee at Sushi Fussion LLC's Main Glatt Supermarket

14  Location who was exempt from receiving overtime under the Fair

15  Labor Standards Act?  Answer:  No.

16           Was Yang Yang Gao an executive employee at Sushi

17  Fussion LLC's Main Glatt Supermarket location who was exempt

18  from receiving overtime under the New York Labor Law?  Answer:

19  No.

20           Issue III:  Spread of Hours at Sushi Fussion LLC.

21           Question 1:  Did Yang Yang Gao's spread of hours at

22  Sushi Fussion LLC's Forest Hills location exceed ten hours on

23  any given day at any time during his employment?  Answer:

24  Yes.

25           Question 2:  Indicate the number of days per week,

*Proceedings*                                                    429

1    if any, you find that Yang Yang Gao spread of hours exceeded

2    ten hours at Sushi Fussion LLC's Forest Hills location.  If

3    the number of days per week changed, please note when they

4    change and what it changed to.  Answer:  Four days.

5            Question 3:  Was Yang Yang Gao paid at least one

6    additional hour of pay at the applicable New York minimum wage

7    for each day his spread of hours exceeded ten hours at Sushi

8    Fussion LLC's Forest Hills location?  Answer:  No.

9            Question 4:  How many days, if any, was Yang Yang

10   Gao not paid spread-of-hours compensation that he was owed at

11   Sushi Fussion LLC's Forest Hills location?  Sixteen days.

12           Question 5:  Did Yang Yang Gao's spread of hours at

13   Sushi Fussion LLC's Main Glatt Supermarket location exceed ten

14   hours on any given days at any time during his employment?

15   Answer:  Yes.

16           Question 6:  Indicate the number of days per week,

17   if any, you find that Yang Yang Gao's spread of hours exceeded

18   ten hours at Sushi Fussion LLC's Main Glatt Supermarket

19   Location.  If the number of days per week change, please note

20   when it changed and what it changed to.  Five days from

21   September 2011 to April 2012, and then September 2012 to

22   April 2013.  And six days, May 2012 to August 2012.  And then

23   May 2013 to August 2013.  And then five days, September 2013

24   to October 2013.

25           Question 7:  Was Yang Yang Gao paid at least one

*Proceedings*                                                    430

1   additional hour pay at the applicable New York minimum wage

2   for each day his spread of hours exceeded ten hours at Sushi

3   Fussion LLC's Main Glatt Supermarket location?  Answer:  No.

4           Question 8:  How many days, if any, was Yang Yang

5   Gao not paid spread-of-hours compensation that he was owed at

6   Sushi Fussion LLC's Main Glatt Supermarket Location?  572

7   days.

8           Issue IV:  Spread of Hours at Sushi Fussion Express,

9   Inc.

10          Question 1:  Did Yang Yang Gao spread of hours at

11  Sushi Fussion Express, Inc., exceed ten hours on any given

12  days at any time during his employment?  Answer:  Yes.

13          Question 2:  Indicate the number of days per week,

14  if any, you find that Yang Yang Gao spread of hours at Sushi

15  Fussion Express, Inc., exceeded ten hours.  If the number of

16  days per week changed, please note when it changed and what it

17  change to.  Five days.

18          Question 3:  Was Yang Yang Gao paid at least one

19  additional hour's pay at the applicable New York minimum wage

20  for each days his spread of hours exceeded ten hours at Sushi

21  Fussion Express, Inc.?  Answer:  No.

22          Question 4:  How many days, if any, was Yang Yang

23  Gao not paid spread-of-hours compensation that he was owed at

24  Sushi Fussion, LLC Main Glatt Supermarket location?  Answer:

25  765 days.

*Proceedings* 431

1          Issue V:  Wage Notification at Sushi Fussion LLC.

2          Question 1:  Was Yang Yang Gao provided with an

3    adequate wage notice of Sushi Fussion LLC within ten days of

4    his date he was hired?  Answer:  No.

5          Question 2:  Was Yang Yang Gao provided with an

6    adequate wage notice at any point during his employment at

7    Sushi Fussion LLC?  Answer:  No.

8          Issue VI:  Wage Notification at Sushi Fussion

9    Express, Inc.

10          Question 1:  Was Yang Yang Gao provided with an

11    adequate wage notice at Sushi Fussion Express, Inc. within ten

12    days of his date he was hired?  Answer:  No.

13          Question 2:  Was Yang Yang Gao provided with an

14    adequate wage notice of any point during his employment at

15    Sushi Fussion Express, Inc.?  Answer:  No.

16          Issue VII:  Wages Statement at Sushi Fussion, LLC.

17          Question 1:  Was Yang Yang Gao provided with a full

18    and accurate wage statement on each payday during his

19    employment at Sushi Fussion, LLC?  Answer:  No.

20          Question 2:  For how many weeks was Yang Yang Gao

21    not furnished a full and accurate wage statement at Sushi

22    Fussion, LLC?  108 weeks.

23          Issue VIII:  Wage Statements at Sushi Fussion

24    Express, Inc.

25          Question 1:  Was Yang Yang Gao provided with a full

*Proceedings*                                                      432

1   and accurate wage statement on each payday during his

2   employment at Sushi Fussion Express, Inc.?  Answer:  No.

3              Question 2:  For how many weeks was Yang Yang Gao

4   not furnished a full and accurate wage statement at Sushi

5   Fussion Express, Inc.?  153 weeks.

6              Let me see.

7              (Pause.)

8              THE COURTROOM DEPUTY:  Issue IX:  Good Faith.

9              Question 1:  To an extent defendant failed to pay

10  Yang Yang Gao adequate overtime wages, did they nevertheless

11  act in good faith?  Answer:  No.

12             Question 2:  To the extent defendant failed to pay

13  Yang Yang Gao's adequate spread of hours wages, did they

14  nevertheless act in good faith?  Answer:  No.

15             Signed by foreperson Mr. O'Donnell, Juror Number 1.

16             THE COURT:  Thank you, Mr. Chan.

17             Would you mind polling the jurors?

18             THE COURTROOM DEPUTY:  Sure, Judge.

19             Juror Number 1, Mr. O'Donnell, is that your verdict?

20             JUROR NUMBER 1:  Yes.

21             THE COURTROOM DEPUTY:  Juror Number 2, Ms. Rios, is

22  that your verdict?

23             JUROR NUMBER 2:  Yes.

24             THE COURTROOM DEPUTY:  Juror Number 3, Ms. Holland,

25  is that your verdict?

*Proceedings*                                                    433

1          JUROR NUMBER 3:  Yes.

2          THE COURTROOM DEPUTY:  Juror Number 4, Mr. McGinn,

3     is that your verdict?

4          JUROR NUMBER 4:  Yes.

5          THE COURTROOM DEPUTY:  Juror Number 5,

6     Ms. Dumas-Hydleburg, is that your verdict?

7          JUROR NUMBER 5:  Yes.

8          THE COURTROOM DEPUTY:  Juror Number 6, Mr. Curtis,

9     is that your verdict?

10         JUROR NUMBER 6:  Yes.

11         THE COURTROOM DEPUTY:  Juror Number 7, Ms. Francis,

12    is that your verdict?

13         JUROR NUMBER 7:  Yes.

14         THE COURTROOM DEPUTY:  Juror Number 8,

15    Mr. Lamattina, is that your verdict?

16         JUROR NUMBER 8:  Yes.

17         THE COURTROOM DEPUTY:  Jury polled, Judge.

18         THE COURT:  Are there any issues the parties want to

19    take up with me before I thank and excuse the jurors?

20         MR. SCHWEITZER:  Yes, Your Honor.

21         (Sidebar.)

22         (Continued on next page.)

23

24

25

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. SCHWEITZER:  I believe Question 22 was worded

4     confusingly.  The jury found the weekly wage rates for the

5     Forest Hills location and the Glatt location, but they were

6     also asked about Sushi Fussion Express, Inc.  I'm willing to

7     not make an objection out of that because we can still move

8     for default judgment against that.

9          THE COURT:  Sushi Fussion Express is one -- I have a

10    hard time keeping all of my sushi -- are they a defaulting

11    defendant?

12         MR. SCHWEITZER:  That's a defaulting defendant.

13         THE COURT:  So I think that's probably the way to

14    go.

15         MR. SAMUEL:  Yes.  We can clean it up.

16         MR. SCHWEITZER:  Additionally, there was a note I

17    have issue with, Question 4.4.  This was -- this is following

18    a question about Sushi Fussion Express, but I believe this is

19    erroneously included a question about Sushi Fussion LLC --

20    4.4, and 3.8 both ask about Main Glatt Supermarket.

21         THE COURT:  I think that's correct.  I think I made

22    an error on this verdict form, and the sentence should have

23    said, Sushi Fussion Express, Inc., in this phrase, and I

24    assume that's what the jurors understood, but I would be

25    inclined to ask them.

*Sidebar*                                                                       435

1           MR. SAMUEL:  So this applies to Sushi Fussion

2      Express, which --

3           MR. SCHWEITZER:  That would apply to Sushi Fussion

4      Express.  This is what applies to the -- yeah.

5           MR. SAMUEL:  Oh.

6           THE COURT:  I guess I have the same question if it's

7      the defaulting defendant or do we really need to --

8           MR. SCHWEITZER:  No, we don't.

9           THE COURT:  Anything you've got?

10          MR. SAMUEL:  No.

11          THE COURT:  Okay.  Great.

12          (Sidebar ends.)

13          (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    436

1              (In open court.)

2              THE COURT:  I want to thank you all very, very much

3    on my behalf and behalf of the parties.  I don't comment at

4    all on the substance of any verdict ever, because that's your

5    job, it's not my job, but you all paid really close attention

6    during trial.  You were all here on time and took your

7    responsibilities as jurors really seriously.  And this case is

8    really important to the plaintiffs and to the defendants, so I

9    am really grateful, and I know that the parties are also

10   really grateful for you taking time out of your lives,

11   particularly during COVID, but at any time to do that.

12             So I want to thank you all, and you are all excused,

13   and don't feel the need to come back here tomorrow.

14             Thank you.

15             (Jury exits.)

16             THE COURT:  Do you all have anything you want to

17   take up at this point?

18             MR. SCHWEITZER:  Scheduling for default judgment

19   motion.

20             THE COURT:  Sure.  So I'm not sure that you have

21   filed a request that the clerk of court note the default yet

22   at this point, have you?

23             MR. SCHWEITZER:  I don't believe so, no.

24             THE COURT:  Okay.  So how long do you want to file

25   it, the motion for default judgment?

*Proceedings*                                                              437

1          MR. SCHWEITZER:  I don't know.  Four weeks?

2          THE COURT:  All right.  That's fine with me, so

3     we'll do a docket entry that reflects that.

4          MR. SCHWEITZER:  And the parties should confer about

5     a statement of damages taking into account the facts found by

6     the jury.

7          THE COURT:  That would be helpful.

8          MR. SCHWEITZER:  And we can get that in by 14 days.

9          THE COURT:  That work for you?

10         MR. SAMUEL:  Let's make it 21, if we can.

11         MR. SCHWEITZER:  Works for me.

12         THE COURT:  Sounds great.  So we will do a docket

13    entry that reflects those two dates.

14         Anything else for us to take care of today?

15         MR. SCHWEITZER:  No, Your Honor.

16         MR. SAMUEL:  Nothing from defendants.

17         THE COURT:  Okay.  Thanks everybody, and I

18    appreciate all your work in trying this case.

19         (Matter concluded.)

20

21              *       *       *       *       *

22

23

24

25

438

**I N D E X**

**WITNESS**                                                    **PAGE**


**LEVA KATANOV**

    DIRECT EXAMINATION

    BY MR. SAMUEL                                       265

    CROSS-EXAMINATION

    BY MR. SCHWEITZER                                   293

439

1                          **E X H I B I T S**

2

3

4      Court's Exhibit 2                                417

5

6      Court's Exhibit 3 and 4                          418

7

8      Court's Exhibit 5                                423

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25