1

<pre>
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - X
                                   :
 3      ZHENKAI SUN, et al.,       :   16-CV-04840(RPK)
                                   :
 4            Plaintiffs,          :
                                   :
 5                                 :   United States Courthouse
        -against-                  :   Brooklyn, New York
 6                                 :
                                   :
 7                                 :   November 15, 2021
        SUSHI FUSION EXPRESS,      :   9:30 a.m.
 8      INC., et al.,              :
                                   :
 9            Defendants.          :
                                   :
10   - - - - - - - - - - - - - - - X
</pre>

11               TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
              BEFORE THE HONORABLE RACHEL P. KOVNER
12                 UNITED STATES DISTRICT JUDGE

13

                         A P P E A R A N C E S:
14

For the Plaintiff:        TROY LAW, PLLC
15                        41-25 Kissena Boulevard, Suite 103
                          Flushing, New York 11355
16
                          BY:  AARON SCHWEITZER, ESQ.
17


18   For the Defendants:   SAMUEL & STEIN
                          1441 Broadway, Suite 6085
19                        New York, New York 10018

20                        BY:  MICHAEL SAMUEL, ESQ.
                               ANDREW BERESIN, ESQ.
21

22   Court Reporter:       DENISE PARISI, RPR, CRR
                          Official Court Reporter
23                        Telephone: (718) 613-2605
                          E-mail:  DeniseParisi72@gmail.com
24

     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.

1              **A F T E R N O O N   S E S S I O N**

2          THE COURTROOM DEPUTY:  All rise.

3          (Jury enters the courtroom.)

4          THE COURT:  We thank you all for making your way up

5    here and coming back.  My goal is to move the trial along in

6    as speedy a way as possible so you can complete your service

7    and get back to your regular lives.

8              Let me give you a few quick instructions before we

9    begin.  These are just preliminary instructions about what you

10   can expect to happen at trial.  At the trial you and I have

11   different roles.  You are the judges of the facts and I am the

12   judge of the law.  That means that you, and you alone, decide

13   what happened based on the evidence presented at trial.  You

14   shouldn't speculate about what I think about the facts.

15   Nothing that I say or do during the trial is intended to

16   indicate what your verdict should be.

17             That being said, I'm the judge of the law.  You have

18   to apply the facts to the law as I will give it to you.  You

19   have to follow the law as I explain it, whether you agree with

20   the law or not.  You can't say, well, I think the law is

21   different; or I think the law should be different.  I won't

22   step on your toes as judges of facts and I'll ask you to

23   follow any instructions as the judge of the law.

24             The evidence from where you find of the facts

25   consists of testimony of witness who testify here under oath.

1    It will also include documents and any other evidence accepted

2    into the record and exhibits, those exhibits will have

3    numbers.  The lawyers may also agree or stipulate to certain

4    facts or certain testimony.  If they do, you should accept

5    those facts as true and accept the testimony as to what a

6    witness would have said; although you must still then decide

7    what weight to give to those stipulated facts or stipulated

8    testimony.

9           Some things are not evidence and I just want to tell

10   you what those things are.  First of all, statements or

11   arguments or questions by the lawyers, are not evidence.

12   Objections that they make to questions are also not evidence.

13   Lawyers have an obligation to their clients to make an

14   objection when they think that some item of evidence is being

15   offered for a reason that is not allowed under the rules of

16   evidence.  There is nothing wrong with that; they should

17   object when they think they have a basis to object.  The fact

18   that a lawyer objected or my ruling on the objection shouldn't

19   give any more weight to what the question is.

20          So you probably know this from TV or elsewhere, if I

21   sustain an objection, that means that the witness should not

22   answer the question.  You should not speculate about what the

23   witness would have said if the answer would have been allowed.

24   Just put that out of your mind.

25          If the objection is overruled, then the witness will

1   be directed to answer the question.  And the answer is

2   entitled to as much weight as you think it is entitled to.

3           The fact there was an objection or the fact that I

4   overruled the objection doesn't elevate the value of that

5   testimony.  There is no special magic to the fact that I ruled

6   on an objection, so don't worry about that.  It's for me to

7   decide what evidence is allowed under the rules of evidence.

8   And if I overrule an objection and the question is allowed,

9   then consider the answer just like any other answer from a

10  witness.

11          It could happen that I instruct you that some item

12  of evidence is being allowed for a limited purpose only.  You

13  must follow that instruction.

14          If I strike an answer or if I instruct you to

15  disregard an answer, you should also disregard that testimony.

16  It's not appropriate evidence and it shouldn't be considered

17  by you as evidence.

18          Anything you may see or hear outside of the

19  courtroom is not evidence.  It has to be disregarded by you

20  because your verdict must be based solely on the evidence that

21  is introduced and is presented here in the courtroom.

22          There are two basic types of evidence, direct and

23  circumstantial evidence.  Direct evidence is direct proof of

24  an act, such as testimony from an eye witness.  Circumstantial

25  evidence is proof of facts from which you may infer or

1    conclude that other facts exist.  I'll give you a further

2    instruction on those, as well as other matters, at the end of

3    the case.  But keep in mind that you can consider both kinds

4    of evidence.

5            One of the most important tasks that you'll have as

6    jurors is to evaluate the credibility of the witnesses who

7    testify here at the trial.  It will be up to you to decide

8    which witnesses to believe, which witnesses to disbelieve, and

9    how much of the testimony, if any, to accept or to reject.

10   I'll give you more guidance and instructions on this at the

11   end of the case.  But in the meantime, just pay careful

12   attention, listen to the witnesses as they testify, watch what

13   they do.  Everything a witness does on the stand is relevant

14   to your assessment of credibility.  So pay careful attention

15   and you'll be in a better position to assess the credibility

16   of witnesses.

17           That's where own experiences come into play.  Your

18   own judgment and your own common sense, that's the genius of

19   the jury.  All of these eyes, all these people from different

20   backgrounds and experiences.  And you are able to assess

21   credibility in a way that will be much deeper and richer than

22   what a single judge can do.  That's one of the reasons why we

23   have jurors.

24           There might be times when counsel or the Court might

25   ask that you be excused or that we confer privately when

1    arguments or objections are made.  Those arguments might

2    include matters of evidence the Court might exclude or legal

3    issues that are not the provenance of the jury.  The reason I

4    might ask the parties to do that out of your hearing or out

5    the room is to assure that you won't hear evidence or legal

6    arguments that are not properly admissible.

7            This is a civil case.  The plaintiffs will have the

8    proofing the claims by a preponderance of the evidence.  I'll

9    give you further instructions on that point later on.  Bear in

10   mind that that way a civil case is different than a criminal

11   case.

12           Just a few words about your conduct as a juror.

13   First, during the trial, please, don't discuss this case with

14   anybody and don't let anybody discuss it with you.  If

15   somebody asks, you can simply say:  I've been selected to

16   serve as a juror in a civil case.  I've been instructed by the

17   judge not to discuss the case while it is going on.

18           Until you retire to the jury room at the end of the

19   case to deliberate, you shouldn't talk about the case.  And

20   that means even at breaks.  Don't say what did you think about

21   that witness, or, I got a weird feeling about this.  It's too

22   early to make those decisions.  You shouldn't be taking about

23   that in the jury room.

24           Obviously, you're going to get to know each other

25   and often friendships form from jury service, and that's a

1   good, thing but talk about anything else except the case.  Do

2   not discuss the case until the end of the case when you've

3   heard all the evidence and arguments from the lawyers and my

4   instructions about the law.  Only at that point that you're in

5   a position to make firm decisions about the proof in this case

6   and what the evidence shows.

7           I mentioned this earlier, if you see the lawyers or

8   witnesses in the hallway or the subways or elevator, don't

9   talk to them.  You're not being rude, just following my

10  instructions.  And I instruct the lawyers in the same way.

11          If you hear anything about this case outside of the

12  courtroom, please turn away from that source and let my

13  deputy, Mr. Chan, know and don't discuss what you heard with

14  your fellow jurors.  I don't want you to be influenced by

15  anything that you're seeing or hearing outside of the

16  courtroom.  If anybody tries to talk to but the case, let me

17  know and let Mr. Chan know.  Don't go online.  Don't do any

18  research.  Don't blog about the case.  Don't tweet your

19  experience as a juror or anything about that while you're on

20  the jury.  Every once in a while you've seen a newspaper how a

21  whole trial had to be redone because the juror didn't follow

22  the instruction and tainted the outcome of the case.  Please

23  take that seriously.  When the case is over, you can write a

24  book if you want, you can blog or tweet.  Until you finish

25  your deliberations, don't do research about the case and don't

*Proceedings*                                                          8

1    write about it.

2          Don't go on the Internet and do searches about the

3    lawyers or the parties or me or anything like that, anything

4    that would taint your impression of the case or introduce

5    things that are not evidence put forth here in court, will

6    make it impossible for you to be a fair and impartial.

7          If at any point you recognize anybody in the

8    courtroom let me know.  There is nothing wrong with that, it's

9    a public courtroom and different people may come in, as court

10   reporters or witnesses.  But if it's somebody who is close to

11   you, I would want to know that and I would want to either

12   instruct them don't discuss this with your friend or take

13   other appropriate steps.  Let me know if you see somebody in

14   the courtroom who you know.

15         All of you, I think, have legal pads.  So those

16   notepads are for you to use and takes notes when you want.

17   Feel free to put your name on the pad.  It's an aid to you and

18   your recollection when you're deliberating.  I'll ask you to

19   leave them here, in the jury room, at the end of the day.

20   Don't take them home with you.  When you leave at night, we'll

21   secure that room.  We'll lock it.  And those will be available

22   to you tomorrow.

23         The notes are for your use only.  It's your memory

24   that controls.  The notes are an aid to memory.  If you take

25   notes, don't get caught up in the process of taking notes and

1    then missing part of the testimony.  At some point in school

2    we probably all figured out there is a balance between the

3    right amount of note taking and right amount of listening.

4    Strike a balance that works for you.

5            In your deliberations if it turns out that there is

6    some difference or disagreement between one juror's notes and

7    another juror's notes, or one juror's notes and another

8    juror's memory, the fact that one juror had a note about

9    something doesn't entitle it to greater weight.  It's your

10   memory that controls.  But if there is a dispute, you can ask

11   for the transcript.  We have a court reporter here who is

12   taking down everything that is said in court.  There will be a

13   transcript of all the testimony.  You can have access to that

14   testimony to clarify what was said in court.

15           As I mentioned, also, there will be exhibits

16   received into evidence into during trial.  And there will be

17   exhibit numbers.  If you think an exhibit is interesting and

18   you want to see it later during deliberations, feel free to

19   jot down that number.  I'll also give you a list of all the

20   exhibits that are received into evidence with a brief

21   description so you can figure out what is what and you'll have

22   the opportunity to get those exhibits back and look at them if

23   you want to.  Take the notes you think are appropriate, but

24   you'll also have the opportunity to have testimony in this

25   case read back to you or see the exhibits.  And you'll also

1   get a copy of my instructions at the end of the case, you'll

2   have those with you as well.

3          If you chose not to take notes, remember it's your

4   own responsibility to listen carefully to the evidence.  You

5   can't give that responsibility to somebody who is taking

6   notes.  We depend on the judgment of all members of the jury

7   to pay attention to the evidence and render a judgment in the

8   case.

9          Finally, don't form any opinion on what the right

10  result is until all of the evidence is in.  Keep an open mind

11  until you start your deliberations at the end of the case.

12  Those instructions apply whenever the Court is in recess, when

13  we take a break, keep an open mind.

14         Now we're about to begin the trial.  We'll start

15  every day at 9:30 a.m.  When we're conducting the trial,

16  please be on time like you were this afternoon.  I want to

17  make sure we're not going an extra day because we haven't been

18  able to start on time.  I want to get this trial done as

19  efficiently as possibly can.  Start at 9:30, take a one-hour

20  lunch break in the middle of the day, and end each day at 4:30

21  so folks with child care will have enough time to handle

22  those.

23         This is how we'll proceed:  Opening statements from

24  the lawyers.  The plaintiffs will make an opening statement,

25  and after that the defendants will make an opening statement.

1          The opening statement is, as I instructed, not

2     evidence.  They are also not argument.  The opening statement

3     is a preview of the evidence that the lawyers think will be

4     introduced into this case, what they believe the evidence will

5     show.  It's designed to give you a road map, to give you a

6     sense of what the evidence will be and some context for what

7     you'll hear from the witnesses so you understand what is

8     happening as it takes place during the trial.  The opening

9     statements themself is not evidence.

10          After the opening statements the plaintiffs will

11     present their case.  They will call their witnesses.  And

12     after each witness testifies on direct examination, then there

13     will be, if the defendants want, there will be

14     cross-examination.

15          We've seen that on the TV, the plaintiff's lawyer

16     will do a direct examination, then the defense lawyer will

17     have cross-examination, after that there might be redirect

18     examination when the plaintiff's will follow up on a couple of

19     points that might have been covered on cross.  Perhaps there

20     might be recross-examination following up on by the

21     defendants.  Each time it will get shorter and hopefully not

22     too much recross.

23          Once the plaintiffs have rested, they put on all of

24     their evidence, then the plaintiffs will stop and the

25     defendants will have the opportunity to put on their own case.

1   They will have a chance to have defense witnesses testimony

2   and so on in the same pattern that I described.

3          After the evidence is completed and after both sides

4   have rested, then the attorneys can give their closing

5   arguments.  That's their opportunity to summarize what the

6   evidence shows and their arguments about what conclusions you

7   should draw.

8          Obviously that's important, you should pay careful

9   attention to that.  But keep in mind that those closing

10  arguments are not evidence.  So if your recollection of the

11  evidence differs from what the lawyers have told you, it's

12  your recollection of the evidence that controls.

13         Finally, after closing arguments I'll give you

14  instructions about the law.  I'll be more detailed than now

15  about what the law is and how you evaluate the evidence that

16  you've heard.  After that you'll retire to deliberate as

17  jurors.

18         You're doing a tremendously important function by

19  serving as jurors in this case.  We're grateful for you doing

20  it, a public service of the highest order, enshrined in the

21  Constitution, that you'll do your function well and

22  faithfully.  So thank you so much.

23         Is the plaintiff ready for its opening?

24         MR. SCHWEITZER:  Thank you, your Honor.  May it

25  please the Court, ladies and gentlemen, thank you for being

1    here today and thank you in advance for your attention.

2          At this trial I'll be asking you to decide one basic

3    fundamental question:  Who is in charge.  When it comes to a

4    chain of restaurants doing business under the same name, is

5    the person in charge the overall owner of the chain, the part

6    owner, on-site manager of a particular restaurant, or a line

7    employee at that particular restaurant?

8          My clients, the plaintiffs, Yangyang Gao, Wei Gao,

9    Zhenkai Sun, and Charles Chipengule all worked at a restaurant

10   known as Sushi Fussion Express, also known as Sushi Fussion

11   Kew Gardens Hills, located 7132 Main Street in Flushing.  Yang

12   Yang Gao, Wei Gao and Zhenkai Sun were sushi chefs.  Carl

13   Chipengule was a cook.

14         Before he worked at Sushi Fussion Express, Yang Yang

15   Gao worked at Sushi Fussion located at 105-43 64 Road in

16   Forest Hills and in a Sushi Fussion kiosk in Glatt Kosher

17   Supermarket, 6938 Main Street in Flushing.  While he was

18   working at that supermarket, Yang Yang Gao also occasionally

19   worked at Sushi Fussion located at 613 Middle Neck Road in

20   Great Neck.

21         Charles Chipengule also worked at Habachi Express at

22   14125 Jewel Avenue in Flushing.

23         It is undisputed between the plaintiffs and the

24   defendants that the corporations and limited liability

25   companies operated the Forest Hills Sushi Fussion, Great Neck

Case 1:16-cv-04840-RPK-LB   Document 185   Filed 05/24/22   Page 14 of 65 PageID #: 2132

1   Sushi Fussion, the Glatt Kosher Supermarket Sushi Fussion

2   kiosk were owned in part by the defendant, Levi Katanov, also

3   known as Levi or Leo.

4         Mr. Katanov denies that he was in charge at Sushi

5   Fussion Express or Habachi Express.  And that he was not an

6   employer of any employee who worked there.  He wants to pass

7   the buck on that to his co-defendant, Michael Yagudaev.  He

8   also denies that his restaurants worked together or with Sushi

9   Fussion Express or Habachi Express.

10        The evidence will show that the Sushi Fussion

11  locations did operate together, sharing employees, transferred

12  between locations, and materials with each other and with

13  Sushi Fussion Express and Habachi Express at the direction of

14  Mr. Katanov.

15        The evidence will show that Mr. Katanov hired Yang

16  Yang Gao initially to work at Sushi Fussion Forest Hills in a

17  subordinate position.  It will show that Mr. Katanov

18  transferred Yang Yang Gao to work at the Glatt Kosher

19  Supermarket Sushi Fussion kiosk.  It will show that

20  Mr. Katanov occasionally had Yang Yang Gao work at the Sushi

21  Fussion Great Neck location while he was working at the

22  supermarket.  And Mr. Katanov ultimately, when the supermarket

23  location closed, transferred Yang Yang Gao and the other kiosk

24  employees to work at Sushi Fussion Express.

25        The evidence will show that Mr. Katanov frequently

1   visited Sushi Fussion Express.  That he did and that when he

2   did, he would give Mr. Chipengule instructions as to how to

3   prepare dishes.  Or would, for the sushi chefs, pick up filets

4   of fish, cucumbers, avocados, take-out containers and other

5   materials to use as the other Sushi Fussion restaurants if

6   they were running short.

7           The evidence will show that when one of the Sushi

8   Fussion locations needed to hire new workers, Mr. Katanov

9   would ask Yang Yang Gao to spread the word of the opening

10  among his friends, even though he was working at Sushi Fussion

11  Express.  That these new workers would be interviewed at Sushi

12  Fussion Express, even if they went on to work at other Sushi

13  Fussion locations.

14          The evidence will show that Sushi Fussion Express

15  and Sushi Fussion Kew Gardens Hills shared a website with

16  Forest Hills and Kings Highway and other locations Mr. Katanov

17  admits to operating.  That website held Mr. Katanov and

18  Mr. Yagudaev out as joint owners of Sushi Fussion Express Kew

19  Garden Hills.  The evidence will show that the Sushi Fussion

20  restaurants had near identical menus ultimately determined by

21  Mr. Katanov from a template from the first restaurant in

22  Forest Hills.

23          So when it comes to Mr. Yagudaev and Mr. Katanov,

24  who is in charge, who is an employer, your answer, as I'll

25  argue at end of trial, should be both.  But because

1   Mr. Yagudaev is not here, opted not to appear for trial, is

2   admitted to being an employer.  We'll only ask you to decide

3   whether Katanov was also an employer also in charge.

4          Mr. Katanov will ask you shortly to believe that

5   Yang Yang Gao was also in charge as a manager, at least enough

6   to be exempt from receiving overtime pay.  The evidence will

7   show that Yang Yang Gao could not have been in charge at Sushi

8   Fussion Forest Hills, where he was a new hire, where other

9   sushi chefs were more experienced, and where he directed the

10  work of no other person.  The evidence will show that he could

11  not have been in charge at the Glatt Kosher Supermarket, where

12  there were too few other sushi chefs for any of them to be a

13  manager.  Under the law, you need to supervise a certain

14  number of people in order to be a managerial employee.  There

15  simply weren't enough.

16         And the evidence will show that he could not have

17  been in charge at Sushi Fussion Express.  Sushi Fussion

18  Express had neither a head chef in the kitchen nor a head

19  sushi chef at the sushi bar.  The evidence will show that each

20  of the employees simply did their jobs without the need for

21  regular supervision or direction.

22         Yang Yang Gao at Mr. Katanov's direction did put the

23  word out among his friends when any of the Sushi Fussion

24  locations needed new workers.  He did not interview them,

25  evaluate their skills, hire them, or recommend that they be

1    hired.  While Yang Yang Gao did interpret between Mr. Yagudaev

2    and the Chinese speaking employees at Sushi Fussion Express,

3    he did no more than that.

4             The evidence will show that at all times the

5    defendants recorded Yang Yang Gao salary they recorded a

6    salary too low to claim an overtime exemption for Yang Yang

7    Gao; you need to make a certain amount per week and they

8    recorded he was paid less.  Yang Yang Gao contends that this

9    record under-recorded his salary in the event.  But it cannot

10   be that the defendants recorded one thing, kept that record,

11   and now go back on it and claim something else.

12            Yang Yang Gao will ask you to find that he was not

13   in charge at any location to any meaningful degree.  And that

14   he should be entitled to overtime pay.

15            Yang Yang Gao will also ask you to find the spans of

16   his employment, that is when he started and stopped working

17   for each particular location, the hours he worked and the

18   salary he was paid from week to week at Sushi Fussion Forest

19   Hills, Sushi Fussion in the supermarket, and Sushi Fussion

20   Express.  The evidence will show that defendants failed to

21   furnish Yang Yang Gao a written wage notice setting forth his

22   salary or wage rate required by law, failed to keep records of

23   arrival and departure times from work, kept incredible records

24   of his total hours worked per two-week period, grossly

25   under-recording his hours, failed to record his entire salary

1    and failed to furnish him with accurate pay stubs.

2           Wei Gao, Zhenkai Sun, Yang Yang Gao, and Charles

3    Chipengule spanned hours and salaries, the fact that they were

4    not furnished wage notices, a requirement with pay stubs with

5    their payments, and the damages they were owed, have all been

6    stipulated by the defendants.  Those spans, hours, and

7    salaries are the ones that we will ask you to find with

8    respect to them.

9           The issue before you with respect to everyone other

10   than Yang Yang Gao is:  Was Mr. Katanov and were his companies

11   their employer.  The evidence will show that at all times

12   Mr. Katanov was aware of his obligations under the federal and

13   state labor laws to pay overtime.  And under the state labor

14   laws to furnish wage notices and pay stubs.  Despite

15   Mr. Katanov's knowledge, plaintiffs received none of these

16   things.

17          The evidence will show that Mr. Katanov was aware of

18   his obligation to keep accurate time and pay records, but did

19   not do so, even with respect to Yang Yang Gao and Sushi

20   Fussion Forest Hills and Sushi Fussion Glatt Kosher

21   Supermarket.

22          Who is in charge?  You go into the jury room and

23   deliberate, it will be you.  We ask, as plaintiffs, that you

24   as the sole finders of fact, find that Mr. Katanov was

25   plaintiffs' employer, that his companies were also plaintiffs'

1  employer by virtue of employing directly and operating

2  together with companies that directly employ them.  That they

3  were the other plaintiffs' employers by virtue of operating

4  together with the companies that employed them.  That Yang

5  Yang Gao, in particular, was not a manager, that he worked at

6  hours and was paid the salary he says he was.  And that

7  Mr. Katanov knew better.  Thank you.

8           THE COURT:  Counsel for defense.

9           Before you go, plaintiff you're sharing your screen

10  with me and my deputy.

11           MR. SCHWEITZER:  My understanding is that screen

12  sharing is controlled by your deputy.  I simply had it

13  connected so it could be shared.

14           THE COURT:  Tsz, can we cease to share?  Thank you.

15           Go ahead.

16           MR. SAMUEL:  Thank you.  May it please the Court,

17  Mr. Schweitzer, and you members of the jury.

18           My name is Michael Samuel.  I represent Levi

19  Katanov, Sushi Fussion LLC, Sushi Fussion 47 Street, Sushi

20  Fussion NYC, Sushi Fussion of Forest Hills.

21           At this point in the trial I'm afforded the

22  opportunity to talk to you just to give you a brief overview

23  of what we expect the evidence will show.  And in order to

24  start, I'd like to tell you about my client, Levi Katanov.

25           You're going to hear testimony that Levi decided to

1    go into the restaurant business around 2011.  He decided he

2    wanted to open his own business and open a sushi restaurant.

3    And sometime in the middle of 2011 he opened a restaurant in

4    Forest Hills, Sushi Fussion LLC.  About four or five months

5    later, he decided he wants to open up a second location and

6    that was inside of the Glatt Kosher Supermarket, the kiosk

7    that Mr. Schweitzer was referring to.

8              You'll hear testimony that one of the things that

9    Levi did when he opened the Glatt Kosher Supermarket kiosk was

10   to hire a manager.  That manager is the plaintiff, Yang Yang

11   Gao.

12             He hired Yang Yang Gao to manage the sushi bar at

13   that location.  Yang Yang Gao is probably going to get on the

14   stand and tell that you making sushi rolls was what he did on

15   a daily basis, but we're not going to deny that he made sushi

16   rolls.  But you'll hear evidence that Yang Yang Gao was

17   actually the manager in that location.

18             You'll hear evidence that Yang Yang Gao's primary

19   duty while working was to make sure that the sushi bar ran

20   smoothy.  You'll hear evidence and testimony that one of his

21   responsibilities was to hire more sushi chefs and more workers

22   for the restaurant.

23             In addition to that, you'll hear testimony that

24   Mr. Yang Yang Gao would post advertisements on Craigslist,

25   hear from people that were interested in the job.  He would

 1   help interview those other workers.  And you're going to hear

 2   testimony that Yang Yang Gao's input into whether who should

 3   be hired or fired was strongly considered by Mr. Katanov.

 4          You're further going to hear testimony that Mr. Yang

 5   Yang Gao's job responsibilities was to make sure the sushi bar

 6   was stocked, that they had appropriate food and supplies

 7   including fish, rice, vegetables.

 8          And you'll hear that one of his primary

 9   responsibilities was to oversee the take out and delivery

10   process, making sure that the telephone orders were prepared

11   and delivered in a timely way.

12          You're going to hear testimony that Yang Yang Gao's

13   job duties on a daily basis was to supervise the other sushi

14   chefs, counter guys and delivery guys working under him.

15          You'll hear that he was well compensated for his

16   efforts.  You'll hear he was paid the most amount of money of

17   any other the other employees in that location.

18          Why does all of this matter?  As you know from the

19   plaintiffs' opening statement, this lawsuit is mainly about

20   overtime.  At the end of the case the judge is going to

21   instruct you on the law of overtime pay.  The judge will

22   instruct you that not all employees are entitled to overtime,

23   not all employees get overtime.  At the end of the case the

24   judge will explain to you what an exempt employee is.

25          What I want you to do is pay particular attention

1    and see if the facts fit the law; meaning, was Yang Yang Gao

2    exempt from getting overtime benefits.  As you're aware, it's

3    our position that he's an exempt employee.

4            So far I've only been talking about Yang Yang Gao.

5    There are three other employee plaintiffs at the table:

6    Zhenkai sun, Wei Gao and Charles Chipengule.  You'll hear them

7    testify about their job duties, about the number of hours they

8    worked, and how they were paid.  My client is not going to

9    challenge any of that.  We're not going to challenge how much

10   they were paid, how many hours they worked.  And we're not

11   even going to claim that those are exempt employees.

12           Why aren't with going to do this?  Because my

13   client, Levi Katanov, has no knowledge of these workers.  And

14   why not?  Very simply, these three people never worked for

15   Levi Katanov, Sushi Fussion LLC, or any of the restaurants

16   owned by my client.

17           You're going to hear testimony that my client had a

18   restaurant in Forest Hills, he had a kiosk inside of the Glatt

19   Kosher Supermarket, and that's undisputed.  But these three

20   workers that I just mentioned, they worked at a different

21   restaurant with the same name, Sushi Fussion; however, they

22   were separate illegal entities.

23           You're going to hear testimony that none of those

24   other restaurants, we'll call them the Yagudaev restaurants,

25   you will hear testimony that my client had no ownership in

1    those restaurants.  He didn't manage them.  He didn't

2    supervise them.  And they were owned by a different person,

3    Michael Yagudaev, who is not even here today.

4            How is it that we have the Yagudaev Sushi Fussion

5    and the Katanov Sushi Fussion restaurant?  You'll hear

6    testimony about Levi Katanov and his friend Michael Yagudaev.

7    And sometime in 2013 Levi wanted to help a friend out, he

8    wanted to help out his friend, Michael.  His friend Michael

9    wanted to open up a Sushi Fussion restaurant, so Levi gave him

10   some advice.  And those Sushi Fussion restaurants were

11   separate legal entities, not owned by my client.

12           You'll hear a little bit about the business

13   relationship between them.  What did Levi get out of

14   instructing Michael how to open up the restaurants?  You'll

15   hear that he got a little royalty, like 5 percent of the gross

16   on a monthly basis.  That was the extent of what Levi got out

17   of Michael opening the restaurants.

18           You're going to hear -- this is very important --

19   because like I said, Levi was going to get 5 percent of the

20   profits, and you'll hear that he did a little bit of joint

21   marketing.  As Mr. Schweitzer said, they had a common website

22   and some the menus had all of the locations.  Think about

23   McDonald's or a big franchise.

24           You will not hear from anybody that they were

25   business partners.  You're not going to hear that Levi

1    invested in those restaurants.  They did not have any common

2    ownership.  They didn't sign for each other's leases.  Michael

3    Yagudaev did not own any interests in Mr. Katanov's

4    restaurants.

5            During the trial, the plaintiffs are going to try to

6    offer some isolated facts about the Levi Katanov.  We're not

7    going to deny that Mr. Katanov used to go in to check on his

8    friend's restaurant once or twice a month.  We're not going to

9    deny that fact.  But when Mr. Katanov went in, he would speak

10   to Michael, how are things going.  You might hear testimony

11   that Levi would sometimes order a sushi platter to help his

12   friend out, to help him increase sales a little bit.  But any

13   time that Levi would order the sushi platter, he would always

14   pay for it -- he would get a little discount, but he always

15   paid for.

16           One other thing that the plaintiffs might try to

17   argue is that Levi would come in and take supplies.  But any

18   time that Levi would take supplies, he would either repay the

19   supplies or pay for those supplies.  There was no common

20   sharing of supplies between restaurants.

21           These are all legal separate entities.  I think

22   that's the crux of this case.  Why does all of this matter?

23   Well, it's a very common sense principle, which the judge will

24   explain at the end of the case.  Only somebody that is

25   classified as an employer can legally be responsible for how

1   employees are paid.  The judge at the end of the case is going

2   to instruct exactly what an employer is.  What you need to do

3   is look at the facts, see how they fit in with the law.

4           This case may not be an exciting one.  I can promise

5   there are much more exciting cases going on in New York,

6   across the country, but it's important to my client, a small

7   businessman who thought that he did everything right.  This is

8   important to the plaintiffs also.

9           So we ask as the trial proceeds, listen carefully to

10  the details about Mr. Yang Yang Gao's work for Mr. Katanov.

11  And listen carefully to the details of the relationship

12  between Mr. Katanov and Mr. Yagudaev.  Thank you.

13          THE COURT:  We'll have the plaintiff's first

14  witness.  Do we need to swear the interpreter first?

15          THE COURTROOM DEPUTY:  Will the interpreter stand

16  and raise your hand?

17          (Interpreter sworn.)

18          THE INTERPRETER:  Yes.

19          THE COURT:  Who is your first witness?

20          MR. SCHWEITZER:  Wei Gao.

21          (Witness takes the witness stand.)

22          THE COURTROOM DEPUTY:  Please raise your right hand.

23          (Witness sworn.)

24          THE WITNESS:  I do.

25          (Continued on next page.)

Case 1:16-cv-04840-RPK-LB   Document 185   Filed 05/24/22   Page 26 of 65 PageID #: 2144

1   **WEI GAO**,

2               called as a witness, having been first duly

3               sworn/affirmed, was examined and testified as

4               follows:

5   DIRECT EXAMINATION

6   BY MR. SCHWEITZER:

7   Q    Good afternoon, Mr. Gao.  Please state your full name for

8   the record.

9   A    My name is Gao Wei.

10  Q    Are you familiar with a restaurant known as Sushi Fussion

11  Express?

12  A    Yes.

13  Q    How are you familiar with that restaurant, Mr. Gao?

14  A    I used to work there.

15  Q    What was your position at that restaurant?

16  A    As a sushi chef.

17  Q    While you were working as a sushi chef, who else worked

18  as a sushi chef as Sushi Fussion Express?

19  A    You want their names?

20  Q    Please.

21  A    Gi Fu Wang (ph), Gao Yang Yang Gao.

22  Q    Any others?

23  A    For the sushi bar, those are the three, us three.

24  Q    Was Gi Fu Wang more senior than you, or less senior than

25  you; that is to say, was he hired before or after you?

1  A     I came in later, he was before me.

2  Q     How about Yang Yang Gao, was he hired before you or after

3  you?

4  A     He was before me.

5  Q     How did you learn about the job availability at Sushi

6  Fussion Express?

7  A     Gi Fu Wang refer me there.

8  Q     Is that the same person as Gi Fu Wang, the sushi chef?

9  A     Yes.

10  Q     Can we get the spelling from the witness, or if that's

11  not possible a phonetic spelling from the interpreter?

12  A     Jeff Wang actually, J-E-F-F, W-A-N-G.

13  Q     What did Mr. Wang say to you when he told you about the

14  job availability?

15  A     He asked if I was working and told me of an opportunity

16  as Sushi Fussion Express, a vacancy for a sushi chef.

17  Q     Did you know Mr. Wang from before your time at Sushi

18  Fussion Express?

19  A     Yes.

20  Q     Did you know Yang Yang Gao before you started to work at

21  Sushi Fussion Express?

22  A     No, I didn't.

23  Q     Did Mr. Wang when he was telling you about the job,

24  inform you what salary you would be making or what hours you

25  would work?

1          MR. SAMUEL:  Note my objection, your Honor.  It

2    calls for hearsay.

3          THE COURT:  The question, did he tell you, is fine.

4    A    He did tell me what the salary would be and the time.

5    Q    What did he tell you?

6          THE COURT:  What is your hearsay exception?

7          MR. SCHWEITZER:  It's not offered for the truth of

8    the matter asserted.  It's not offered for to show what hours

9    he worked or wage he was paid; that's stipulated to.  It's

10   merely showing he was told these things.

11         MR. SAMUEL:  Sounds like it's being offered for the

12   truth.

13         THE COURT:  Is it offered for the fact he was told?

14   He already answered that.

15         MR. SCHWEITZER:  That he was told not, what he was

16   told.

17         THE COURT:  What is the evidentiary value of the

18   information that he received that is not hearsay?

19         MR. SCHWEITZER:  Sidebar, your Honor?

20         (Continued on the next page.)

21

22

23

24

25

1            (Sidebar conference.)

2            MR. SCHWEITZER:  Part of what is being offered for

3    the proposition that Mr. Yang Yang Gao was an exempt executive

4    employee was that he was going out among his friends telling

5    them about job availability, telling about terms of

6    employment.  No such representation has been made with regard

7    to Jeff Wang.  It would make very little sense to have

8    co-equal managers in a three-person sub-branch of the

9    restaurant.

10           THE COURT:  The point is, Jeff Wang told him how

11   much money he would make in a job.  And you're not going to

12   elicit that Yang Yang Gao was providing similar information?

13           MR. SCHWEITZER:  I anticipate that will be a

14   defendant's move to elicit that information or try to elicit

15   that information.

16           THE COURT:  What are you getting by getting that

17   out?  I'm not sure this matters much, it's stipulated what he

18   was paid.  What is value of what he was paid?

19           MR. SCHWEITZER:  The point is, if there is no

20   representation being made that Jeff Wang is an exempt

21   executive employee on the basis of making these introductions,

22   why would Mr. Yang Yang Gao be --

23           THE COURT:  Is Jeff Wang a party on this case?

24           MR. SCHWEITZER:  No.

25           THE COURT:  No representations at all about his

1   supervisory.  They don't have to make an argument that he was

2   or wasn't.

3           MR. SCHWEITZER:  They don't have to, but if Jeff

4   Wang is compared to Yang Yang Gao -- and it seems like they

5   are similarly situated -- then either you got a situation

6   where there are two managers and one line employee, or a

7   situation where nobody is a manager.

8           THE COURT:  I take the point your making.  I think

9   that Jeff Wang told him his rate of pay and you got that out.

10  I'm not sure there is a hearsay harm from the additional

11  evidence, but I can see a not hearsay purpose.

12          So we're not going to do:  What exactly did Jeff

13  Wang tell him he would be paid.

14          (End of sidebar conference.)

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2    BY MR. SCHWEITZER:

3    Q    After you had this conversation where Jeff Wang told you

4    about the job opportunity at Sushi Fussion Express, what did

5    you do?

6    A    I went into Sushi Fussion Express for an interview.

7    Q    What happened at that interview?

8    A    Well, Jeff, Michael, or the boss, and Gao Yang Yang Gao

9    were present.

10   Q    Who among them, if anyone, interviewed you?

11   A    Michael and Gao Yang Yang Gao.

12   Q    What did Gao Yang Yang Gao do?

13   A    He interpret for me.

14   Q    Like Mr. Kwok is doing for me?

15   A    Yes, yes, due to lack of English.

16   Q    What was said at the interview?

17   A    So Gao Yang Yang Gao told me that the boss wants me to

18   make a roll, a special hand roll, and a few pieces of sushi to

19   demonstrate.

20   Q    How did you react to that?

21   A    I'm capable of doing it.

22   Q    Did you do what was asked of you?

23   A    Yes.

24   Q    Who was it that you observed you making the sample rolls?

25   A    The boss, Michael, Gao Yang Yang Gao, they were watching.

1   Q    How about Jeff?

2   A    He was working on something, doing something.

3   Q    I see.  How long did the interview and demonstration

4   take?

5   A    I don't remember how long.

6   Q    Can you give me an estimate, less than an hour, less than

7   30 minutes, less than 15?

8   A    About approximately hof an hour.

9   Q    What did you do when the interview was over?

10  A    After that, Michael informed me that I'm hired.  And told

11  me what my pay or salary would be, and what date to come back.

12  And that was it, I left.

13  Q    Did you observe Michael and Yang Yang Gao conferring

14  among themselves at all before Michael told you you were

15  hired?

16  A    That I don't know.  I was told to wait outside.

17  Q    How long did you spend waiting?

18  A    Not for long, maybe a minute, two minutes, three minutes.

19  Q    What did you do after you were told you were hired?

20  A    Michael shook my hand.  After that, I mean, I went home.

21  Q    When did you next come into work?

22  A    I came to work the next day.

23  Q    How did you know when to come into work?

24  A    Jeff Wang actually told me.  He actually told me before

25  when he was giving me the lead to this job, he already told me

1    at that time.

2    Q    Did you get any information about your work schedule what

3    days you would work, what hours you would work, from Yang Yang

4    Gao?

5    A    No.

6    Q    When it came time to give you your pay, who was it that

7    gave you your pay?

8    A    Michael, boss Michael.

9    Q    How did he pay you, by check, by cash, by direct deposit,

10   some other way?

11   A    Cash.

12   Q    Did you receive any other piece of paper with your cash?

13   A    No.

14   Q    Did Michael or Jeff or Yang Yang Gao give you any piece

15   of paper during your interview or after you were hired?

16   A    No.

17   Q    Around the time you were hired, did you sign any

18   on-boarding paperwork?

19   A    No.

20   Q    Among the three sushi chefs, you, Jeff Wang, and Yang

21   Yang Gao who, if anyone, was in charge?

22   A    Supervising, no one.

23   Q    How did the work get split up between the three of you?

24   A    Boss Michael would tell me what needs to be done, and

25   that would be what I would be doing. (Continued on next page.)

1   DIRECT EXAMINATION

2   BY MR. SCHWEITZER:   (Continuing)

3   Q    Were there days when Yang Yang Gao had off but you were

4   working at Sushi Fussion Express?

5   A    No.

6   Q    Were there days when Jeff Wang had off but you were

7   working?

8   A    What do you mean by that?  Are you asking whether anybody

9   told me about this?  What do you mean?

10  Q    I'm asking for your observation.  Were there days when

11  you and Yang Yang Gao were manning the sushi bar and Jeff was

12  absent from work?

13  A    Sorry, can I have that question again?

14        MR. SCHWEITZER:  Please read it back.

15        (The record was read.)

16  A    I still don't understand what the question means.

17  Q    All right.  Let's put it this way.  You said there were

18  three sushi chefs employed at Sushi Fussion Express.  Were

19  there any days when only two of the sushi chefs would be

20  working?

21  A    Yes.  Yes, definitely.

22  Q    Okay.  During a typical week, how many days out of the

23  week would there be only two sushi chefs on duty?

24  A    Monday, Tuesdays and Wednesdays.

25  Q    And the restaurant was closed Friday evenings and

1   Saturdays, correct?

2   A    Yes.

3   Q    So there would be three sushi chefs on duty Thursdays,

4   Fridays and Sundays?

5   A    Possibly also worked Saturday night.

6   Q    And on Saturday nights, would there be three or two or

7   one sushi chef on duty?

8   A    Three.  Three.

9   Q    All right.  And since there appeared to have been some

10  confusion around my initial question, I'm going to repeat it.

11        Were there days when you and Jeff worked alone and

12  Yang Yang Gao was not on duty?

13  A    Well, in terms of work, Thursday to Sunday.

14  Q    What distinguishes Thursdays through Sundays?

15  A    Thursday through Sundays are relatively busy days.

16  Q    And that's why all three sushi chefs would be working on

17  those days?

18  A    Yes.

19  Q    Among the Mondays, Tuesdays and Wednesdays, were there

20  days when Yang Yang Gao did not work?

21  A    He's always off on Mondays.

22  Q    Now, on Mondays, did the performance of the sushi bar

23  with just you and Jeff Wang there decrease or worsen as

24  compared to the performance of the sushi bar on Tuesdays or

25  Wednesdays when it would be you and Yang Yang Gao there?

1  A    No, not much difference.  Business from Monday through

2  Wednesday are generally more or less the same.

3  Q    Were there any more complaints from customers on Mondays

4  and on Tuesdays or Wednesdays?

5  A    That I don't know.

6  Q    Did Michael need to intervene more on Mondays as compared

7  to Tuesdays or Wednesdays?

8  A    Meaning, are you talking about the boss?

9  Q    Yes, Michael.  Mr. Yagudaev.

10 A    Possibly about the same.

11 Q    Did you notice any difference between Mondays, on the one

12 hand, and Tuesdays and Wednesdays on the other?

13 A    No difference that I know of.  But are you talking about

14 difference in business or something else?

15 Q    Difference in your job performance or Jeff's job

16 performance.

17 A    Okay, no.  No difference.

18 Q    Is Yang Yang Gao in the courtroom today?

19 A    Yes, yes.

20 Q    Can you point him out and give a brief physical

21 description for the record?

22 A    Do I need to stand?

23 Q    If it helps.

24 A    That would be him over there, wearing the black jacket.

25 Q    Are you familiar with Leva Katanov, also possibly known

W. Gao - Direct - Schweitzer                    37

1   as Levi Katanov or Leo Katanov?

2   A    I do.  I recognize.

3   Q    Is he present in the courtroom today?

4   A    Yes.

5   Q    Can you point him out and give a brief physical

6   description?

7   A    Well, he is the person to the side, sitting over there,

8   with a white shirt, black-colored mask and a black cap.

9   Q    How do you recognize him?

10  A    I have seen him before.

11  Q    In what context?

12  A    When I was at the restaurant.

13  Q    Did Mr. Katanov come to the restaurant?

14  A    Yes.

15  Q    And what, if anything, did he do when he came to the

16  restaurant?

17  A    Sometimes he would come in and leave after he circle --

18  after he made a circle, walk around a little bit and sometimes

19  he come and drop off supplies, fish, vegetable, supplies.

20          THE INTERPRETER:  I'm asking him to repeat what he

21  said.

22  A    And sometimes he would take a party tray away that he

23  ordered.

24  Q    And you mentioned that Mr. Katanov would drop off

25  supplies.  To your knowledge, where did those come from?

1   A    I meant to say that he took those supplies from us.

2   Q    I see.

3        Did he ever drop off supplies, to your knowledge?

4   A    No.  At least I haven't seen that.

5   Q    All right.  To your knowledge, for what purpose would he

6   be taking supplies from Sushi Fussion Express?

7        MR. SAMUEL:  Objection, Your Honor.  Calls for

8   speculation.

9        THE COURT:  If you know.

10       THE INTERPRETER:  Sorry, can I have that question

11  again?

12       MR. SCHWEITZER:  Please read it back.

13       (The record was read.)

14  A    I don't know.  I don't know.

15  Q    Are you familiar with a Sushi Fussion restaurant in Great

16  Neck?

17  A    Are you talking about Sushi Fussion Express?

18  Q    Sushi Fussion Express is in Flushing.  I'm asking you

19  about a restaurant in Great Neck also known as Sushi Fussion.

20  A    Oh, yes.

21  Q    How are you familiar with that Sushi Fussion restaurant?

22  A    Well, previously, Leo, or the boss, Leo, asked me whether

23  I would be willing to go there once a week.

24  Q    When did he ask you that?

25  A    When?  I don't remember exactly when.

1  Q    Towards the beginning, the middle or the end of your

2  employment?

3  A    I would say somewhere in the middle, at least after I

4  started for a little while already.

5  Q    And how many times was this request to work at Sushi

6  Fussion in Great Neck extended to you?

7  A    He asked me twice, once over the phone.  Another time, he

8  came personally to ask.

9  Q    To your knowledge, how did Mr. Katanov have your phone

10  number?

11         MR. SAMUEL:  Objection.

12  Q    If you know.

13         THE COURT:  You can answer if you know.

14  A    I don't know.

15  Q    And did you ever give Mr. Katanov your phone number?

16  A    No.

17  Q    All right.  And how did you respond to the request to

18  work at Great Neck?

19  A    I said I cannot, it's too far from me.

20  Q    Did you own a car at the time?

21  A    No.

22  Q    Where were you living around that time?

23  A    I was living near Queens College at that time.

24  Q    And had you accepted the offer to work at Great Neck, how

25  would you have gotten there?

W. Gao - Direct - Schweitzer                    40

1           THE COURT:  Counsel, is the relevance to this going

2    to become apparent?

3           MR. SCHWEITZER:  Excuse me.  I'm at the end of this

4    line of questioning.

5           THE COURT:  Okay.  Go ahead.

6    A    I mean, I don't know.  I mean, I didn't agree because I

7    had no way of getting there.  I don't know.

8    Q    To your knowledge, did any of the other workers at Sushi

9    Fussion Express work part time at the Great Neck or any other

10   Sushi Fussion location?

11          MR. SAMUEL:  Note my objection.

12          THE COURT:  Is there going to be any possible basis

13   for knowledge that is not a hearsay basis?

14          MR. SCHWEITZER:  Yes.  It could come from a

15   party-opponent statement, from Leo himself, that he heard, or

16   from Michael.

17          MR. SAMUEL:  Can we sidebar, Your Honor?

18          THE COURT:  Yes.

19          (Sidebar.)

20          (Continued on the next page.)

21

22

23

24

25

Sidebar                                              41

1              (Sidebar conference held on the record in the

2      presence of the Court and counsel, out of the hearing of the

3      jury.)

4              MR. SAMUEL:  We served discovery demands in case of

5      statements by party-opponents.  I let the first one slide

6      where he brought in Leo and asked him to work at Great Neck,

7      but that was never disclosed prior and we served interrogatory

8      requests and document demands.

9              THE COURT:  Is he actually going to say that Leo

10     told him other people worked at this Great Neck restaurant, or

11     we do not know what he is going to say?

12             MR. SCHWEITZER:  I don't precisely know what he's

13     going to say.

14             MR. SAMUEL:  This is ridiculous.  We stipulated to a

15     whole bunch of facts to eliminate all of this.  This whole

16     line of questioning is just ridiculous.  The only issue is

17     whether the Katanov defendants are jointly -- is a single

18     entity.

19             MR. SCHWEITZER:  And the sharing employees between

20     locations is evidence of a single enterprise.

21             MR. SAMUEL:  Not if they're paid separately.  And he

22     doesn't even --

23             THE COURT:  Okay.  So I think the first objection

24     that your opponent raises is they asked for statements of the

25     party opponent, you did not give him any statements, and now

Sidebar                    42

1    the only basis you are offering, the only non-hearsay basis

2    would be Mr. Katanov told him, right?  So what about that?

3            MR. SCHWEITZER:  Or Mr. Yagudaev.

4            I don't have any sort of request for party-opponent

5    statements in my file.  I don't know what he's talking about.

6            MR. SAMUEL:  We served demands to have a copy of it.

7    Did you not get our demands?  You responded to them.

8            MR. SCHWEITZER:  We got interrogatories and we got

9    document demands.

10           MR. SAMUEL:  Right.  And in the interrogatories we

11   asked if there are any statements by a party opponent and the

12   answer is no.

13           MR. SCHWEITZER:  Okay.

14           THE COURT:  All right.  Sounds like you did not give

15   any statements in opponent -- in response to the request.  We

16   are not even sure if there is any basis for if he is actually

17   going to offer some non-hearsay statement.  Seems odds to not

18   know what he is going to say in response to questions you are

19   asking at trial.

20           MR. SCHWEITZER:  Fine.

21           THE COURT:  Sustained.

22           (Sidebar ends.)

23           (Continued on the next page.)

24

25

W. Gao - Direct - Schweitzer                    43

1   BY MR. SCHWEITZER:

2   Q    Did Michael give you any job related instructions or

3   tasks related to Leo's coming around to the restaurant?

4         MR. SAMUEL:  Objection.  I think that calls for

5   hearsay as well.

6         THE COURT:  Overruled.

7   A    Yes.

8   Q    What instructions did he give you?

9   A    He said, "You see Leo coming around, make sure you do a

10  good job.  Keep the sushi bar clean.  The roll or sushi that

11  you make, make them nice-looking."

12  Q    And what was the purpose of that?

13  A    Well, he said he's the big boss, so I have to do --

14  perform even better, do better.

15  Q    After you started working, did Jeff Wang's schedule

16  change?

17         MR. SAMUEL:  Objection as to relevance.

18         THE COURT:  What is the relevance?

19         MR. SCHWEITZER:  Sidebar?

20         (Sidebar.)

21         (Continued on the next page.)

22

23

24

25

```
                        Sidebar                    44

 1          (Sidebar conference held on the record in the
 2  presence of the Court and counsel, out of the hearing of the
 3  jury.)
 4          MR. SCHWEITZER:  I expect the witness to answer that
 5  he observed Jeff Wang working less at Sushi Fussion Express
 6  over time and using that time to work at Sushi Fussion in
 7  Great Neck.
 8          MR. SAMUEL:  It's all speculative.
 9          THE COURT:  Is he going to say the first part, that
10  he worked less?  He is obviously not going to know where he
11  was working, right, if he was not at the place where he was.
12          MR. SCHWEITZER:  He does know where he was working.
13          THE COURT:  And the relevance of all of this is that
14  Sushi Fussion in Great Neck is Mr. Katanov's restaurant?  Is
15  that the idea?
16          MR. SCHWEITZER:  Yes.
17          MR. SAMUEL:  But that doesn't prove anything
18  because, I mean, you can have one worker work a few days here
19  and a few days -- he can work five days at Macy's and two days
20  at Bloomingdale's and it could each be paid separately.  No
21  relevance.
22          MR. SCHWEITZER:  That's certainly an argument that
23  defense counsel can make, but I am entitled to make the
24  argument they're sharing employees more intimately than that.
25          THE COURT:  I will let you elicit worked more or
```

```
                        Sidebar                    45
```

1   less frequently.

2          MR. BERESIN:  How does he know where he was working

3   when he wasn't with him?

4          MR. SCHWEITZER:  Observation.

5          THE COURT:  Elicit the question that is asked is,

6   did he observe Jeff Wang working less frequently at this

7   restaurant.

8          MR. SAMUEL:  I mean, also, the last line of

9   questioning when he said Michael said Leo's the big boss and

10  you have to make everything nicely.

11         THE COURT:  If you would have objected to "the big

12  boss," I would have sustained it.

13         MR. SAMUEL:  Yes.

14         THE COURT:  So when you ask the next question which

15  is, did you know where he was working what is his basis for

16  knowledge going to be?

17         MR. SCHWEITZER:  That Jeff told him where he was

18  working.

19         THE COURT:  Isn't that hearsay?

20         MR. SAMUEL:  Classic hearsay.

21         THE COURT:  So if you want to elicit that he worked

22  less frequently at some point at this restaurant, I will let

23  you do it.

24         MR. SAMUEL:  It's also irrelevant, but...

25         (Sidebar ends.) (Continued on next page.)

1   BY MR. SCHWEITZER:

2   Q    At some point after you were hired at Sushi Fussion

3   Express, did Jeff Wang's schedule change?

4   A    I don't know.

5   Q    At some point, did Jeff leave Sushi Fussion Express

6   entirely?

7   A    What do you mean?

8   Q    Did he stop working at Sushi Fussion Express?

9   A    Yes, he quit eventually and left.

10  Q    Was he replaced?

11  A    Yes.

12  Q    How much time passed between his departure and his

13  replacement, approximately?

14  A    A day or two.

15  Q    Did Jeff give advance notice that he was leaving?

16  A    Announcement to me or to Mike, to Michael the boss?

17  Q    Answer to the extent of your knowledge.

18  A    He told the boss he's quitting and left the same night

19  and did not return.

20  Q    And who was Jeff's replacement?

21  A    Leo.

22  Q    And just to be clear, this Leo is a different Leo from

23  Mr. Katanov?

24  A    Correct.  Yes, correct.

25  Q    Did you observe Leo's interview?

1   A    No.

2   Q    How did you meet Leo?

3   A    Sushi Chef Leo?

4   Q    Yes.

5   A    I saw him after I returned from a break.

6   Q    And to your knowledge, what was Leo's previous job before

7   Sushi Fussion Express?

8            MR. SAMUEL:  Objection.

9            THE COURT:  Counsel, the relevance of a lot of this,

10  I am wondering about.  Do you want to proffer the relevance?

11           MR. SCHWEITZER:  I'll withdraw, Your Honor.  Excuse

12  me.

13  Q    Did Leo work full time at Sushi Fussion Express?

14           MR. SAMUEL:  Same objection.

15           THE COURT:  Counsel, can we sidebar?

16           (Sidebar.)

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

```
                            Sidebar                       48
```

1   (Sidebar conference held on the record in the presence of the

2   Court and counsel, out of the hearing of the jury.)

3              THE COURT:  The relevance of a lot of this is pretty

4   thin-seeming.  What is the relevance of this?

5              MR. SCHWEITZER:  He has knowledge that Leo also

6   worked at Great Neck.

7              THE COURT:  Is it going to be from Leo?

8              MR. SCHWEITZER:  Yes.

9              THE COURT:  So let's move on.

10             MR. SCHWEITZER:  Okay.

11             (Sidebar ends.)

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SCHWEITZER:

2   Q    Did Mr. Katanov ever give you instructions or tasks to

3   do?

4            MR. SAMUEL:  Objection.

5            THE COURT:  Overruled.

6   A    He came in once and asked me to make two rolls and then

7   he left with it.

8   Q    Was there anything distinguishing about these rolls?

9   A    Special rolls.

10  Q    How were they special?

11  A    That I don't remember.

12  Q    Were they on the usual menu?

13  A    It was not.

14  Q    Do you know for what purpose Mr. Katanov wanted these

15  rolls?

16           MR. SAMUEL:  Objection.

17           THE COURT:  Sustained.

18           MR. SCHWEITZER:  Nothing further.

19           THE COURT:  Cross.

20  CROSS-EXAMINATION BY

21  MR. BERESIN:

22  Q    Good afternoon, Mr. Gao.

23  A    Hello.

24  Q    I want to ask you a couple of questions about your

25  interview that you described when you were hired.

1    A    Okay.

2    Q    I believe you testified just a few minutes ago that

3    during your interview, Mr. Yang Yang Gao interpreted for

4    Michael Yagudaev, the owner, correct?

5    A    Yes.

6    Q    Is that because Mr. Yagudaev does not speak Chinese?

7    A    Yes.

8    Q    And then when the interview concluded, they asked you to

9    wait outside for one or two minutes, you said; is that

10   correct?

11   A    I don't remember exactly for how long or how many

12   minutes.  It wasn't long.  One, two, three minutes, yes.

13   Q    Thank you.

14        And then when they called you back in or when they

15   came out and told you -- offered you the job, it was Michael

16   who told you your schedule and how much you were going to be

17   paid and not Yang Yang Gao?

18   A    That's right, it was not.  Because Jeff previously

19   already told me how many days, what time I need to work and

20   salary.  And Boss Michael, told me how much I would be paid

21   and I'm hired.

22   Q    Did Boss Michael tell you that in English or in Chinese?

23   A    He spoke to me in English.

24   Q    Without an interpreter?

25   A    No, no, I mean, the -- he spoke to me directly, yes.

1  Q    And you understood him in English?

2  A    Yes, this.  This.  For this, yes.

3  Q    Okay.  Now, Mr. Gao, do you recall giving a deposition

4  testimony a few years ago in July of 2018 where my colleague,

5  Mr. Samuel, asked you some questions and you answered those

6  questions under oath?

7  A    Possibly, yes.

8  Q    Okay.  I'd like to read to you some of your testimony

9  from that deposition.

10            MR. SCHWEITZER:  Objection.  Please ask the

11  witness -- the witness should be asked if he recalls being

12  asked the question and giving the answer.

13            THE COURT:  That is right.

14            THE INTERPRETER:  And if you can provide maybe a

15  display so I can read it.

16            MR. BERESIN:  Thank you.

17  Q    I'm going to ask you if you can please tell the jury if

18  you recall being asked the following question.  And this is

19  from page 12.

20            THE COURT:  You can just read it.

21  Q    Do you remember being asked this question at your

22  deposition, Mr. Gao:  "Did Michael Yagudaev interview you for

23  the position?"

24            And do you remember giving this answer:  "No, it was

25  Yang Yang Gao who interviewed me."

1   A    I don't remember.

2   Q    You don't remember giving that answer?

3   A    I don't remember.  It's been so long.

4   Q    And you don't remember being asked that question either?

5   A    I forgot how I exactly answer him.  It's so long.  It's

6   so long ago.

7           MR. BERESIN:  I'd like to mark this page from the

8   transcript as Defense Exhibit 1.

9           Are we doing numbers?

10          MR. SCHWEITZER:  Defendants would be letters.

11          MR. BERESIN:  Letters?  Okay, A.  Defense Exhibit A.

12          THE CLERK:  I'll mark it.

13          MR. BERESIN:  Okay.

14          THE COURT:  Are you offering Exhibit A?

15          MR. BERESIN:  Yes.

16          THE COURT:  Any objection?

17          MR. SCHWEITZER:  No, Your Honor.

18          THE COURT:  Admitted.

19          MR. BERESIN:  Thank you.

20          (Defense Exhibit A was received in evidence.)

21  Q    I'm going to ask you to look at this page from your

22  deposition, please, page 12, to see if it helps you remember

23  those questions.

24  A    Well, I cannot read it.  Can it be translated?

25          MR. BERESIN:  Can you translate it, Mr. Kwok,

1    please?

2            THE INTERPRETER:  Yes.

3            What line to what line, please?

4            MR. BERESIN:  Page 12, line numbers 3 to 6, I think

5    it is.

6            MR. SCHWEITZER:  Just for the record, the ending

7    line is line 7, not line 6.

8            THE INTERPRETER:  So I finished reading and

9    interpreting those lines.

10   Q    Does that help you remember now answering the question

11   that way?

12   A    I still don't recall.

13   Q    Okay.

14   A    Okay.

15   Q    Okay.  And, Mr. Gao, at Sushi Fussion Express, Michael

16   Yagudaev was your boss, correct?

17   A    Correct.

18   Q    And Mr. Yang Yang Gao, he was in charge of the sushi bar

19   there, correct?

20   A    No, no one is in charge of the sushi bar.

21           MR. BERESIN:  Okay.  I would like to offer in

22   Defense Exhibit B, page 16 from the deposition of Mr. Wei Gao.

23           THE COURT:  Any objection?

24           MR. SCHWEITZER:  Excuse me.  If it's to what I think

25   it is, lines 16 through 19, I would object that the answer is

1  ambiguous.  The witness was given two options to pick from to

2  which he answered yes.

3          THE COURT:  Are there particular lines that you

4  are --

5          MR. BERESIN:  22.

6          THE COURT:  Overruled.

7          MR. BERESIN:  Thank you.

8  Q    Okay.  Mr. Gao, do you recall being asked at your

9  deposition the following question:  "Was one of the three

10 chefs in a higher position than the other two or were they all

11 the same level of responsibility?"  And your answer was yes.

12          And then Mr. Samuel asked you:  "And what was the

13 name of the person that was more in charge?"

14          "Answer:  Yang Yang Gao."

15          Do you remember the question?

16 A    I don't remember.  I don't.

17 Q    And do you remember being asked:  "And how were his

18 responsibilities different than your responsibilities?"

19          "Answer:  He is more responsible for the sushi bar.

20 For example, he orders the supplies."

21 A    Yes, that I possibly do remember.

22 Q    Thank you.

23          And, Mr. Gao, Michael Yagudaev is the one who paid

24 you, correct?

25 A    You mean my salary?

1    Q    Yes.

2    A    Yes.

3    Q    My client, Mr. Katanov, he never paid you your salary,

4    did he?

5    A    No.

6    Q    And you talked about Mr. Katanov coming to the restaurant

7    and taking some supplies and you weren't sure why.  Do you

8    know whether Mr. Katanov paid for those supplies?  Do you know

9    whether he paid for them or not?

10   A    I don't know.

11   Q    And you don't know if he ever returned those supplies or

12   the same kind of supplies at a later date?  Do you know if he

13   ever did that?

14   A    I mean, there's no way for me to answer that if I have

15   not seen that.

16   Q    It's okay if you don't know.  That's perfectly fine.

17   Thank you.

18        Now, Mr. Gao, do you have any reason to know -- do

19   you know if Mr. Katanov's restaurants and Mr. Yagudaev's

20   restaurants were operating together as one business?  Do you

21   have any knowledge of that?

22   A    I don't.

23   Q    So you don't know whether the restaurants that you worked

24   at and Mr. Katanov's restaurants, the glatt supermarket were

25   under any common control, do you?

1          MR. SCHWEITZER:  Objection.  Calls for legal

2     conclusion.

3          THE COURT:  Overruled.

4     A    No.

5     Q    And do you know if all those restaurants kept separate

6     accounting records or kept accounting records together as one

7     business?  Do you have any knowledge of that?

8     A    How could I possibly know?  I'm just a worker over there.

9     Q    Thank you.

10         And do you have any personal knowledge that

11    Mr. Katanov, my client, was the, quote/unquote, big boss of

12    this group of sushi restaurants?  Do you have any personal

13    knowledge of that?

14    A    Yes.  Michael, the boss, told me he's the big boss and

15    told me, as I told you before, that if I see him coming, keep

16    the sushi counter clean, perform even better than normal, make

17    the rolls.

18         MR. BERESIN:  I'm going to object to the answer as

19    nonresponsive.

20         THE COURT:  Sustained.

21         Do you want to rephrase your question?

22         MR. BERESIN:  Yes.

23    Q    Mr. Gao, I'm asking you, do you know personally, not what

24    someone might have told you.  Do you have any reason to know

25    yourself, from your own personal knowledge, that Mr. Katanov

1    was the big boss of the restaurant you worked at or the owner

2    or anything like that?

3    A    What do you mean by that?  What do you mean by personal?

4    Q    Other than what someone else told you, whether it was

5    Michael Yagudaev or somebody else telling you, do you have any

6    knowledge yourself of that?

7    A    Well, what about the fact that he came in and told me to

8    make those rolls?  Does that count?  And took it and just

9    walked away, so...

10   Q    Okay.  Do you know if Mr. Katanov paid for those rolls or

11   do you have any knowledge of whether he paid for them or not?

12   A    I did not see it.  I did not see that.  What I saw was he

13   took it and he walked out.

14   Q    Okay.

15              Thank you, Mr. Gao.  I only have one or two more

16   questions.

17              Did you ever see Mr. Katanov hire anybody or fire

18   anybody from the restaurant where you worked?

19   A    Well, what about when he asked or told Jeff Wang to go to

20   work at Great Neck?

21              MR. BERESIN:  Objection.

22              Not responsive.

23              THE COURT:  Sustained.

24              MR. BERESIN:  Move to strike that answer, please.

25              THE COURT:  Sustained.

1          MR. SCHWEITZER:  Objection.

2          THE COURT:  Sidebar.

3          (Sidebar.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      59
```

1           (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4           THE COURT:  Isn't this all hearsay?

5           MR. SCHWEITZER:  That's not established, Your Honor.

6           THE COURT:  Okay.  He has a basis other than

7    Jeff Wang telling him?

8           MR. SCHWEITZER:  Again, that hasn't been

9    established.  That can be established on further questioning,

10   how do you know that he hired Jeff Wang to work over at Great

11   Neck?

12          THE COURT:  Are you going to have more than

13   five minutes of redirect?

14          MR. SCHWEITZER:  Yes, I think so.

15          MR. BERESIN:  I have one question.

16          THE COURT:  Okay.

17          (Sidebar ends.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

1

2    BY MR. BERESIN:

3    Q     I just have one last question, Mr. Gao.  Thank you.

4          You testified earlier that Mr. Katanov asked you to

5    go work in Great Neck; is that right?

6    A     Yes.

7    Q     I should say, he asked if you would be willing to go work

8    in Great Neck?

9    A     Yes.

10   Q     Now, if Mr. Katanov was your boss, if he was your boss,

11   would he need to ask you if you were willing to go or could he

12   instruct you to go work there?

13            MR. SCHWEITZER:  Calls for speculation.

14            THE COURT:  Sustained.

15            Anything further?

16            MR. BERESIN:  No, thank you.  Thank you, Your Honor.

17            THE COURT:  Okay.  And so I think because I promised

18   I would get you out of here by 4:30 and it is 4:29, we will

19   have any redirect as to this witness tomorrow morning.  So go

20   home.  Do not talk to anybody about the case and please be

21   back here in this courtroom.

22            Relieve the jurors next door, Mr. Chan?

23            THE CLERK:  Yes.

24            THE COURT:  Jury room where you will reassemble at

25   9:30 tomorrow.

Proceedings                61

1          And feel free to leave your notes in that jury room.

2          THE CLERK:  Jurors, follow me to the other

3    courtroom.

4               (Jury exits.)

5               (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                          62

1    (Continuing.)

2            THE COURT:  Do the parties have anything they want

3    to take up before we close out for the day?

4            MR. SAMUEL:  Nothing for the defendant.

5            MR. SCHWEITZER:  Not for plaintiffs, Your Honor.

6            THE COURT:  Okay.  Great.  And I asked you all that

7    question about whose burden is it with respect to

8    recording-keeping, so just -- that is something we can talk

9    about before we start tomorrow or on break tomorrow to give

10   you a chance to figure out what your thoughts are on that.

11           MR. SCHWEITZER:  I think we can clear that up.

12           It is plaintiffs' burden to prove that they were not

13   provided with the documents, but defendant --

14           THE COURT:  I can't hear you; we have a lot of

15   people talking at once.  Go ahead.

16           MR. SCHWEITZER:  So it is the plaintiffs' burden to

17   prove -- to prove that they were not provided with a wage

18   notice, wage statements, but it is -- excuse me -- that can be

19   proven by recollection or testimony.

20           THE COURT:  Sure.

21           MR. SCHWEITZER:  And it can be rebutted easily

22   enough by providing the documents that are in the defense

23   exhibit list.

24           THE COURT:  Okay.  So the instruction is -- bottom

25   line, the instruction is plaintiffs' burden -- taking the

*Proceedings*                                                      63

1    point that that burden can be met through testimony.

2            MR. SCHWEITZER:  Yes.

3            THE COURT:  Okay.  Great.  See everybody tomorrow

4    morning.

5            MR. SCHWEITZER:  Thank you.

6            THE COURTROOM DEPUTY:  All rise.

7        (Matter adjourned to November 16, 2021, at 9:30 a.m.)

8

9                    *      *      *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

1                          **I N D E X**

2

3       **WITNESS**                                    **PAGE**

4

5       **WEI GAO**

6            DIRECT EXAMINATION BY

7            MR. SCHWEITZER                            26

8            CROSS-EXAMINATION BY

9            MR. BERESIN                               49

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

**E X H I B I T S**

Defense Exhibit A                                                52